**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NIGHT BOX
FILED

MAY 23 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

IN THE MATTER OF THE ARBITRATION
BETWEEN:

FOUR SEASONS HOTELS AND
RESORTS B.V.; FOUR SEASONS
HOTELS LIMITED; and FOUR
SEASONS CARACAS, C.A.,

04 - 20673

CIV-MOORE

          Petitioners,        Case No.

v.

CONSORCIO BARR, S.A.,

          Respondent.

MAGISTRATE JUDGE
O'SULLIVAN

_____/

## MOTION TO CONFIRM AND ENFORCE ARBITRAL AWARD

Petitioners, Four Seasons Hotels and Resorts, B.V., Four Seasons Hotels Limited and Four Seasons Caracas, C.A, ("Four Seasons"), through their undersigned attorneys, sue Respondent Consorcio Barr, S.A., and allege as follows:

### THE PARTIES

1.      Petitioner, Four Seasons Hotels and Resorts, B.V. ("FSHBV") is a corporation incorporated under the laws of The Netherlands, having its principal place of business at Herengracht 466, 2nd Floor, 1017 CA Amsterdam, The Netherlands.

2.      Petitioner, Four Seasons Hotels Limited ("FSHL") is a corporation incorporated under the laws of Canada, having its principal place of business at 1165 Leslie Street, Toronto, Ontario, Canada.

3.      Petitioner, Four Seasons Caracas, C.A. ("FSC") is a corporation domiciled in the city of Caracas, Republic of Venezuela, having its principal place of business at Avenida



Francisco de Miranda, Caracas, Venezuela.   FSHBV, FSHL and FSC may collectively be referred to herein as "Four Seasons".

4.      Respondent, Consorcio Barr, S.A. ("Consorcio" or "Respondent") is a corporation domiciled in the city of Caracas, Republic of Venezuela, duly inscribed in the Second Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on December 18, 1990, under No. 27, Volume 113-A Second, having its principal offices in Caracas, Venezuela.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under Chapter 2 of the Federal Arbitration Act, 9 U.S.C.§ 201, *et seq.*(which incorporates the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards into U.S. federal law), and pursuant to Section 1331 of the Judicial Code, 28 U.S.C. §§ 1331. Venue lies pursuant to 28 U.S.C. § 1391. Jurisdiction is proper under the federal and Florida long-arm statutes and under the Federal Arbitration Act, 9 U.S.C. §9, since the arbitral proceedings occurred in Miami, within the Southern District of Florida. Additionally, Respondent consented to jurisdiction and venue in this Judicial District by contractual agreement.

## GENERAL ALLEGATIONS

6.      On April 9, 1997, the parties entered into a series of agreements ("Hotel Agreements") regarding the management and operation of the Four Seasons Hotel Caracas ("Hotel").  On November 30, 2001, Four Seasons brought an Arbitration seeking redress for claims under four of these agreements:   (1) Hotel Management Agreement ("Management Agreement") (A true and correct copy of which is attached as Ex. "A" to Statement of Claim, attached to this Complaint as Composite Exhibit "1"); (2) Hotel Advisory Agreement ("Advisory Agreement") (Ex. "B" to Comp. Ex. "1"); (3) Hotel Services Agreement ("Services Agreement") (Ex. "C" to Comp. Ex. "1"); and (4) Hotel Pre-Opening Services Agreement ("Pre-Opening Agreement") (Ex. "D" to Comp. Ex. "1").

7.      The Hotel Agreements expressly provide that the parties shall resolve any alleged

"disputes", as that term is defined, through arbitration in Miami, Florida or Caracas, Venezuela, at Four Seasons' option, pursuant to the Commercial Arbitration Rules of the American Arbitration Association. *See,* Section 19.03, Management Agreement, Ex. "A" to Comp. Ex. "1"; §17.03, Advisory Agreement, Ex. "B" to Comp. Ex. "1"; §10.03, Services Agreement, Ex. "C" to Comp. Ex. "1"; and §17.03, Pre-Opening Agreement, Ex. "D" to Comp. Ex. "1".

8.     Based upon the arbitration provisions in the Hotel Agreements, on November 30, 2001, Four Seasons initiated arbitration proceedings against Respondent, Consorcio, in Miami, Florida pursuant to a Statement of Claim and Demand for Arbitration (the "Arbitration"). A true and correct copy of the Statement of Claim and Demand for Arbitration is attached as Composite Exhibit "1".

9.     On June 17, 2002, Four Seasons named its party appointed arbitrator.  Thereafter, on July 22, 2002, Consorcio named its party appointed arbitrator.  On July 29, 2002, the two party-appointed arbitrators agreed upon the appointment of a neutral Chairman, and the panel was formally constituted.

11.     Four Seasons and Consorcio actively litigated the arbitration claim, filing memorials and presenting evidence in support of their respective positions.

12.     On September 2, 2003, despite fully participating on the merits up to that point, including the filing of briefs and memorials as to the merits, submission of documentary evidence, and the filing of multiple witness statements, Consorcio unilaterally announced its decision not to participate in the Evidentiary Hearing set to commence on September 22, 2003.

13.     The Arbitral Tribunal invited Respondent to reconsider its position.  However, when the Respondent refused to reconsider, the Arbitral Tribunal after considering the facts, and the applicable rules (of the American Arbitration Association), determined that the hearing would proceed.

14.     Consequently, an evidentiary hearing before the Arbitral Tribunal was held on September 22-25, 2003, in Miami Florida, during which the Arbitral Tribunal received oral evidence and heard argument from Four Seasons.   Consorcio, at the commencement of the

hearing, sent a member of its U.S. legal team, who stated he was present without authority from Consorcio to answer questions or address the Arbitral Tribunal.

15. On October 30, 2003, the Arbitral Tribunal entered its order granting the parties until December 1, 2003 to present Post-Hearing briefs.

16. Four Seasons timely filed a Post-Hearing brief, and Consorcio Barr elected not to file a brief.

17. On March 8, 2004, the Arbitral Tribunal inquired of the parties as to whether they had any further proofs to offer or witnesses to be heard. Being satisfied that the record before it was complete, the Arbitral Tribunal declared the hearing closed on March 17, 2004.

18. On March 22, 2004, the International Centre for Dispute Resolution of the AAA transmitted to the parties the Award issued by the Arbitral Tribunal. A true and correct copy of the Award is attached as Exhibit "2".

19. The award grants the relief requested by Four Seasons, including *inter alia*: (i) a determination that Consorcio Barr breached each and every contract it had with Four Seasons; (ii) ordering that Consorcio Barr specifically perform all of its obligations under the various contracts; (iii) for so long as the Hotel Management Agreement shall remain in force, permanently enjoining Consorcio Barr from directly or indirectly interfering in the management of the Hotel; (iv) directing Consorcio Barr to cause its officers, directors and agents not to interfere in the management of the Hotel; (iv) awarding the various Four Seasons Claimants an aggregate of $8,166,100.00 in compensatory damages for the breaches of the contracts; (v) awarding Four Seasons pre-award and post-award simple interest on the $8,166,100.00 awarded; and (vi) taxation of arbitrators' fees and administrative fees against Consorcio Barr in the sum of $253,635.43. *See* Exhibit "2", Pp. 65-67.

20. The Hotel Agreements provide that awards of the Arbitral Tribunal "when reduced to writing and signed by them shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction." *See,* Section 19.03(b), Management Agreement, Ex. "A" to Comp. Ex. "1"; §17.03(b), Advisory Agreement, Ex. "B" to

Comp. Ex. "1"; §10.03(b), Services Agreement, Ex. "C" to Comp. Ex. "1"; and §17.03(b), Pre-Opening Agreement, Ex. "D" to Comp. Ex. "1".

21.     The Award granted by the Arbitral Tribunal, annexed hereto as Exhibit "2", requires affirmative action of the Court and is thus not an intermediate step in arbitral proceedings. The Partial Award should be confirmed by this Court.

22.     All conditions precedent to the relief requested have occurred or have otherwise been waived or excused.

### COUNT I

23.     Petitioner reincorporates and realleges the allegations contained in paragraphs 1 through 22 above, as if set fully herein.

24.     Pursuant to the New York Convention,[1] codified in the Federal Arbitration Act, 9 U.S.C. §201, *et seq.* (2003), Four Seasons seeks to have this Court confirm the arbitral award entered on March 18, 2004, in Miami, Florida

25.     The Arbitration was held in Miami, Florida (i.e. within the Southern District of Florida) pursuant to a valid and enforceable Arbitration agreement and the Arbitral Tribunal had jurisdiction over the parties and the issues.

26.     After hearing evidence from the parties, the Arbitral Tribunal rendered an Award and granted the relief requested by Four Seasons, which award was signed by all three arbitrators, and was notified to both Four Seasons and Consorcio.

27.     The Agreements provide for the ability of a party to seek confirmation and enforcement of an award from any Court having jurisdiction.

28.     As such, the award should be confirmed and enforced by this Court under the the New York Convention as codified in the Federal Arbitration Act.

---

[1] Four Seasons has previously noted an apparent overlap between the provisions of the New York Convention, and the provisions of Chapter 1 of the FAA.   Although, a previous Partial Award was confirmed by this Court under the provisions of the New York Convention, and not Chapter 1 of the FAA, *see Four Seasons Hotels and Resorts, B.V. et al. v. Consorcio Barr, S.A.*, 267 F.Supp.2d 1335 (S.D.Fla. 2003)(Moore, J.), as that decision is still on appeal, Four Seasons would alternatively seek  confirmation pursuant to 9 U.S.C. § 9 (2003).

WHERFORE, Petitioners, FOUR SEASONS HOTELS AND RESORTS, B.V., FOUR SEASONS HOTELS LIMITED and FOUR SEASONS CARACAS, C.A, request that this Court enter a judgment confirming the Award, reducing the Award to a judgment of this Court, and granting such other and further relief it deems just and proper.

Dated:   March *22*, 2004

Respectfully submitted,

RODRIGUEZ & MACHADO, P.A.

Juan J. Rodriguez
Florida Bar No. 613843
jrodriguez@rodriguezmachado.com
Albert J. Xiques
Florida Bar No. 948217
axiques@rodriguezmachado.com
101 Madeira Avenue
Coral Gables, Florida 33134
(305) 377-1000 (telephone)
(305) 377-1055 (facsimile)

**COUNSEL FOR PETITIONERS**

American Arbitration Association

# COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

05:20 RCVD

MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. If you wish for the AAA to contact the other parties to ascertain whether they wish to mediate this matter, please check this box (there is no additional administrative fee for this service)

| TO: Name Consorcio Barr, S.A. | Name of Representative (if known) Joseph Klock | Name of Firm (if applicable) Steel Hector & Davis, L |
|---|---|---|
| Address Av. Francisco de Marando Con, Av. Luis Roche Office Hotel, Ninel II | Representative's Address 200 South Biscayne Blvd. | |

| City Caracas | State Venezuela | Zip Code Urb. Altamira | City Miami | State FL | Zip Code 33131 |
|---|---|---|---|---|---|
| Phone No. | Fax No. 011 58-212-286-1073 | | Phone No. 305-577-7000 | Fax No. 305-577-4452 | |

The named claimant, a party to an arbitration agreement contained in a written contract, dated **therefore are dated April 4, 199** and providing for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder. **and one of which is dated February 2, 1996**

THE NATURE OF THE DISPUTE

See attached Statement of Claim

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any)

See attached Statment of Claim

DOES THIS DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP?  ☐ Yes  ☒ No

TYPES OF BUSINESS

Claimant  Luxury Hotel Management          Respondent  Building Construction

HEARING LOCALE REQUESTED  City of Miami, State of Florida, United States

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association at its  Miami  office, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative) | Title Managing Partner, Rodriguez & Machado, |
|---|---|
| Name of Claimant Four Seasons Caracas, C.A., Four Seasons Hotels Limited | Name of Representative s Juan Rodriguez & Robert Rodriguez & Machado, Amsterdam Amsterdam & Peroff, P.A Name of Firm (if applicable) |
| Address (to Be Used In Connection with this Case) 1000 Brickell Avenue, Suite 660 | Representative's Address 1000 Brickell Avenue, Suite 660 |

| City Miami | State FL | Zip Code 33131 | City Miami | State FL | Zip Code 33131 |
|---|---|---|---|---|---|
| Phone No. 305-377-1000 | Fax No. 305-377-1055 | | Phone No. 305-377-1000 | Fax No. 305-377-1055 | |

TO INSTITUTE PROCEEDINGS, PLEASE SEND TWO COPIES OF THIS DEMAND AND THE ARBITRATION AGREEMENT, WITH THE FILING FEE AS PROVIDED FOR IN THE RULES, TO THE AAA. SEND THE ORIGINAL DEMAND TO THE RESPONDENT.

Composite
EXHIBIT
" 1 "

Form C2 11/99

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| FOUR SEASONS CARACAS, C.A., a Venezuelan corporation,  FOUR SEASONS HOTELS AND RESORTS B.V., a Netherlands company, and FOUR SEASONS HOTELS LIMITED, a Canadian corporation,<br><br>Claimants,<br><br>vs.<br><br>CONSORCIO BARR, S. A., a Venezuelan corporation,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### STATEMENT OF CLAIM

1.      The Claimants are affiliates of the Four Seasons corporate group ("Four Seasons Group") that carry on the business of operating luxury hotels throughout the world:

    (a)      Claimant Four Seasons Caracas, C.A. ("Four Seasons Caracas"), is a company domiciled in the City of Caracas, Republic of Venezuela.  Its principal place of business is the site of the luxury hotel trading under the "Four Seasons" name in Caracas, Venezuela ("Hotel");

    (b)      Claimant, Four Seasons Hotels and Resorts B.V. ("Four Seasons Netherlands"),  is a company incorporated pursuant to the laws of the Netherlands. Its principal place of business is the City of Amsterdam, the Netherlands.

    (c)      Claimant Four Seasons Hotels Limited ("Four Seasons Canada"),  is a company incorporated pursuant to the laws of the laws of the Province of Ontario, Canada.  Its principal place of business is the City of Toronto, Canada.

2.      Respondent, Consorcio Barr, S.A., ("Consorcio Barr") is a company domiciled in the City of Caracas, Republic of Venezuela.  The company's principal place of business is the City of Caracas, Venezuela.

1

3.      This dispute arises out of various agreements ("Hotel Agreements") between the Claimants and the Respondent regarding the construction, management and operation of the Hotel. Specifically, the Claimants bring this claim pursuant to the following arbitration provisions contained in the following Hotel Agreements:

(a)     Section 19.03 of the Hotel Management Agreement dated April 9, 1997 ("Management Agreement") between the Respondent and Four Seasons Caracas. A true and correct copy of the Agreement is attached as Exhibit "A".

(b)     Section 17.03 of the Hotel Advisory Agreement dated April 9, 1997 ("Advisory Agreement") between the Respondent and Four Seasons Netherlands. A true and correct copy of the Agreement is attached as Exhibit "B".

(c)     Section 10.03 of the Hotel Services Agreement dated April 9, 1997, ("Services Agreement") between the Respondent and Four Seasons Canada. A true and correct copy of the Agreement is attached as Exhibit "C".

(d)     Section 17.03 of the Hotel Pre-Opening Services Agreement ("Pre-opening Agreement") between the Respondent and Four Seasons Canada. A true and correct copy of the Agreement is attached as Exhibit "D".

4.      Claimants allege that Respondent has breached the Management Agreement, the Advisory Agreement, the Services Agreement and the Pre-opening Agreement in several respects including but not limited to the following:

(a)     failing to complete the construction, furnishing and equipping of the Hotel in accordance with the high standards of a world-class, luxury, Four Seasons hotel;

(b)     failing to fund the working capital requirements of the Hotel and establish a line of credit that is sufficient to meet these working capital requirements;

(c)     failing to pay approximately $1,700,000 US that is owing to the Four Seasons Group pursuant to the Hotel Agreements;

(d)     seizing approximately $800,000 US from the Hotel bank accounts, funds which should have been used to fund the Hotel's working capital requirements;

(e)     failing to hand over physical, operational and managerial control of the Hotel, including physical control of the infrastructural systems, facilities and equipment necessary for the operation and management of the Hotel ("Hotel Infrastructure");

2

(f)    interfering with the Claimants' management and operation of the Hotel to such an extent that the Hotel does not meet the high standards of a world-class, luxury, Four Seasons hotel;

(g)    failing to adequately insure the Hotel; and

(h)    failing to provide the Claimants with powers of attorney required to operate the Hotel.

5.    The Respondent is obligated to construct, furnish and equip the Hotel to the general, and the particular, standards laid down by Four Seasons Canada (See sections 3.01 and 3.03 of the Pre-opening Agreement, sections 5.01, 5.04 and 5.05 of the Advisory Agreement, sections 4.01 (h), 5.04 and 5.05 of the Management Agreement and section 3.01 of the Services Agreement). The general standard to be met is that of a "world class luxury hotel" comparable to hotels and resorts operated and managed by Four Seasons or any affiliate thereof under the name "Four Seasons" in North America.    The particular standards to be met are those contained in the Pre-opening Agreement, those set out in the Hotel Design Brief appended to that agreement, the designs approved by Four Seasons Canada for the Hotel and the specifications approved by Four Seasons Canada for the Hotel.

6.    Four Seasons Canada has repeatedly notified the Respondent that there are substantial deficiencies with respect to the Hotel's construction, furnishing and equipping as required by the Hotel Agreements. Four Seasons Canada has exhaustively documented the deficiencies, and communicated them to the Respondent, over an extensive period of time commencing well before the opening of the Hotel and continuing up to the present time. These deficiencies include the failure to complete large portions of the physical facilities, including guest rooms, meeting and banquet rooms and the health club and spa, the failure to complete the furnishing of the Hotel and the failure to provide adequate operating equipment and supplies required by the Hotel staff to provide services

3

to the guests at the high standards of a world-class luxury Four Seasons hotel as required by the Hotel Agreements.

7.      Respondent is also obligated to fund the working capital requirements of the Hotel. The amount of the working capital to be provided must be sufficient to ensure "uninterrupted and efficient operation of the Hotel." To facilitate the funding of the working capital requirements, the Respondent is obligated to establish, maintain and replenish an "irrevocable line of credit" ("Line of Credit") with a bank approved by Four Seasons Caracas. Consistent with the irrevocable nature of the Line of Credit, Four Seasons Caracas has an unrestricted right to "draw cash from the Line of Credit in any amount required to operate the Hotel in accordance with the Hotel Agreements" and the Respondent has a corresponding obligation to refrain from "terminating, diminishing or otherwise materially and adversely affecting Operator's [Four Seasons Caracas'] right to draw funds". (See section 8.01(b) of the Management Agreement.) The amount of the Line of Credit must be equal to the "Working Capital Reserve". Under the Management Agreement, this is the amount of "working capital required for the uninterrupted and efficient operation of the Hotel" over the next two succeeding fiscal quarters. (See section 8.01(a) and Schedule "A" of the Management Agreement.

8.      The Respondent has totally failed to honor any of its obligations to fund the Hotel's working capital. The Respondent has never established the Line of Credit, nor has it otherwise provided sufficient working capital to operate the Hotel. In the absence of any Line of Credit from which to draw cash, Four Seasons Caracas has no ability to pay creditors. Contrary to the Management Agreement, the Respondent controls payments to the creditors and makes such payments on an untimely and erratic basis without prior consultation with Four Seasons Caracas. The Respondent also fails to give Four Seasons Caracas adequate and timely disclosure of the payments.

4

9.     As a result of Respondent's breaches, the Hotel has suffered, and continues to suffer from, severe cash flow problems. These cash flow problems have inevitably caused serious interruptions and inefficiencies in the operation of the Hotel. The Claimants have not only demanded, on an ongoing basis, that the necessary credit facilities be established, they have also repeatedly underscored the fact that the complete absence of the credit facilities has led to frequent interruptions and continuous inefficiencies in the Hotel's operations. As Four Seasons Canada has emphasized, the lack of working capital has created a vicious and ongoing cycle of operational inefficiencies.

10.     Specifically, without sufficient working capital on-hand, the Hotel has been unable to meet obligations as they become due. This has undermined trade relations with the Hotel suppliers. The Hotel's suppliers are extremely dissatisfied. Several suppliers have severed relations, and refuse to do business, with the Hotel. Other suppliers continue to do business but on stringent conditions such as "cash on delivery". Given that the suppliers demand cash and the cash on hand is always insufficient, the Hotel never has an adequate inventory of food and beverages. Inadequate inventory levels have led, in turn, to customer dissatisfaction.

11.     The inability to meet obligations as they become due, coupled with the lack of full and timely disclosure about payments has resulted in further inefficiencies in the areas of cash management, bookkeeping, accounting, financial reporting and inventory purchasing. In short, Respondent's failure to provide sufficient working capital has greatly impaired the ability of the Claimants to manage the Hotel to Four Seasons standards.

12.     Additionally, the Respondent is obligated to pay the Four Seasons Group, on demand, fees for services rendered under the Hotel Agreements, reimbursable expenses incurred on behalf of the Hotel and accruing interest. (For example, see sections 10.03 and 10.04 of the Management

5

Agreement). The balance due to the Four Seasons Group on account of fees and reimbursable expenses has been extremely high since opening of Hotel. Despite repeated demands for payment from the Four Seasons Group, the Respondent has failed to satisfy the indebtedness. As noted above, the Respondent has prevented Four Seasons Caracas from exercising its right to pay any creditor, including itself and the other members of the Four Seasons Group. In addition, the Respondent has not used its control over the bank accounts to pay the amount due to the Four Seasons Group.

13.    Pursuant to the Management Agreement, the Respondent has delegated to Four Seasons Caracas the "exclusive responsibility" for the management of the Hotel and its staff. Pursuant to the Advisory Agreement, the Respondent has delegated to Four Seasons Netherlands the "exclusive responsibility" for advising the Respondent "in connection with the supervision and direction of the Hotel". These Hotel Agreements give the Claimants "full control and discretion in the operation and management of the Hotel". Consistent with the absolute and exclusive nature of the Plaintiffs' managerial power, the Respondent has several corresponding obligations to facilitate Four Seasons management and accept Four Seasons supervisory advice. The Respondent is obliged "to allow the Operator [Four Seasons Caracas] to operate and manage the Hotel and its staff as a world class luxury hotel as Operator [Four Seasons Caracas] determines in its sole discretion." (See Section 5.01, Management Agreement) Similarly, the Respondent is obliged to accept and promptly take all necessary action to implement all advice [regarding supervision and direction of the Hotel] provided from time to time [by Four Season Netherlands] to Owner [the Respondent]. (See section 5.01, Advisory Agreement).

14.    The Respondent's commitment to place full managerial control in the hands of the Claimants, and to implement all advice from the Claimants regarding Hotel supervision, is reinforced by the Respondent's guarantee that it will not interfere with the Plaintiffs' exclusive right to access

6

and manage the Hotel. Under the Management Agreement, the Respondent has given an unqualified representation and warranty that Four Seasons Caracas "may peaceably and quietly possess, manage and operate the Hotel during the Term [of the Management Agreement], free from interruption or disturbance". Likewise, the Respondent has given an unqualified covenant, under the Advisory Agreement, to the effect that Four Seasons Netherlands "may have complete access to the Hotel, during the Term [of the Advisory Agreement], free from interruption or disturbance". (See section 4.02(i) of the Management Agreement and section 3.01 of the Advisory Agreement).

15.     The Respondent has systematically breached its obligation to give full control of the Hotel to the Claimants and to refrain from interfering with such control. The most basic violation in this regard is the Respondent's refusal to relinquish physical control of the central Hotel components, including the Hotel's Infrastructure. The Respondent's employees occupy and physically control the Communications Room and the various engineering areas of the Hotel. The controls for the Hotel's Infrastructure reside in these areas including, for example, the controls of the computer, safety, heating, lighting, plumbing, sanitation, air conditioning and ventilation systems.

16.     The Respondent has also attempted to exercise arbitrary control and direction over Four Seasons' employees in a manner that undermines Four Seasons' control. Respondent, for example, employs its own security personnel for the premises contrary to the provisions of the Hotel Agreements and has even utilized its own security force to prevent Claimants access to sections of the Hotel.

17.     As noted above, Four Seasons Caracas does not have any control over the Hotel's cash receipts or disbursements due to the Respondent's failure to establish the Line of Credit. As a result, the Respondent has effectively and improperly reserved onto itself a fundamental area of Hotel management- cash flow management.

7

18.     Under the Management Agreement, the Respondent is obligated to deposit all funds derived form the operation of the Hotel into the Hotel bank accounts. The Respondent has violated this obligation and, in fact, has diverted Hotel funds by removing approximately $800,000 US from the accounts and using the same for its own improper purposes other than as required under the Management Agreement for the Hotel.

19.     Accordingly, Claimants respectfully request that the Arbitrators enter a decision as follows:

(a)     an adjudication of all amounts owed to Claimants with an award for same plus interest, costs and reasonable attorneys' fees;

(b)     an order directing the Respondent and its agents to cease and desist from interfering with the management of the Hotel;

(c)     an order requiring Respondent to specifically perform all its obligations under the Hotel Agreements;

(d)     an order finding the Respondent has breached the Hotel Agreements and has failed to fulfill certain conditions precedent to performance on the part of Claimants.

(e)     and such further and necessary relief the Arbitrators deem just and proper.

8

Dated November 30, 2001.

Respectfully submitted,

**AMSTERDAM & PEROFF**
Attorneys for Claimants
150 York Street, Suite 1902
Toronto, Ontario, Canada M5H3S5
Telephone        (416) 367-4100
Telefax          (416) 367-0076

By: _____
        Robert R. Amsterdam

By: _____
        Dean A. Peroff

**RODRIGUEZ & MACHADO, P.A.**
Attorneys for Claimants
The 1000 Brickell Building, Suite 660
1000 Brickell Avenue
Miami, Florida 33131-3014
Telephone(305)377-1000
Telefax(305)377-1055

By: _____
        Juan J. Rodriguez, Esq.
        Florida Bar No.613843

9

# EXHIBIT "A"

# HOTEL MANAGEMENT AGREEMENT

### Between

## FOUR SEASONS CARACAS, C.A.

### And

## CONSORCIO BARR, S.A.

## FOUR SEASONS HOTEL, CARACAS

# TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.01   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.02   Recitals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.03   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.04   Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE II - TERMINATION PRIOR TO THE OPENING DATE . . . . . . . . . . . . . . . . . 6
    2.01   Termination Prior to Opening Date . . . . . . . . . . . . . . . . . . 6

ARTICLE III - PARTIAL OPERATIONS PRIOR TO OPENING DATE . . . . . . . . . . . . . 7
    3.01   Partial Operations Prior to Opening Date . . . . . . . . . . . . . . . 7

ARTICLE IV - REPRESENTATIONS, WARRANTIES AND GENERAL COVENANTS OF
             THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.01   Representations, Warranties and Covenants of Owner . . . . . . . . . . 8
    4.02   Representations, Warranties and Covenants of Operator . . . . . . . . . . . 10

ARTICLE V - OPERATOR'S AND OWNER'S RESPONSIBILITIES . . . . . . . . . . . . . . . . 10
    5.01   Operator's Appointment . . . . . . . . . . . . . . . . . . . . . . . 10
    5.02   Operator's Responsibilities . . . . . . . . . . . . . . . . . . . . . . 11
    5.03   Operator's Responsibility Relating to Residential Apartments . . . . . . . . 14
    5.04   Owner's Responsibility . . . . . . . . . . . . . . . . . . . . . . . 14
    5.05   Maintenance and Capital Refurbishing Programs . . . . . . . . . . . . . 15
  · 5.06   Dealings with Third Persons . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE VI - ANNUAL PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    6.01   Compliance with Annual Plan . . . . . . . . . . . . . . . . . . . . . 16
    6.02   Emergency Expenditures . . . . . . . . . . . . . . . . . . . . . . . 17
    6.03   Capital for Furniture, Fixtures and Equipment Replacements . . . . . . . . 18

ARTICLE VII - RELATIONSHIP OF OPERATOR AND OWNER . . . . . . . . . . . . . . . 18
    7.01   Operator to Act as Agent for Owner . . . . . . . . . . . . . . . . . . 18
    7.02   Delegation of Authority by Operator . . . . . . . . . . . . . . . . . . 18
    7.03   Delegation of Authority by Owner . . . . . . . . . . . . . . . . . . . 19
    7.04   Additional Benefits to Personnel . . . . . . . . . . . . . . . . . . . 19

ARTICLE VIII - FUNDING, BANKING, ETC. . . . . . . . . . . . . . . . . . . . . . . . . 21
    8.01   Request for Working Capital . . . . . . . . . . . . . . . . . . . . . 21
    8.02   Advances by Operator . . . . . . . . . . . . . . . . . . . . . . . . 22
    8.03   Investor's Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    8.04   Operator's Cash Flow Guarantee . . . . . . . . . . . . . . . . . . . 25
    8.05   Bank Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.06   Owner's Right to Funds . . . . . . . . . . . . . . . . . . . . . . . 29
    8.07   Pledging of Bank Accounts . . . . . . . . . . . . . . . . . . . . . . 29
    8.08   Extending Credit . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE IX - TERM AND RENEWALS . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    9.01   Initial Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    9.02   Extension Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    9.03   Exercise of Extension Options . . . . . . . . . . . . . . . . . . . . . 31
    9.04   Covenants to Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE X - REMUNERATION AND REIMBURSEMENT OF OPERATOR . . . . . . . . . 31
    10.01  Basic Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    10.02  Reimbursement of Costs . . . . . . . . . . . . . . . . . . . . . . . . 32
    10.03  Manner of Payment of Fees, Charges, Costs and Expenses . . . . . . . . . . 33
    10.04  Payment of Available Cash . . . . . . . . . . . . . . . . . . . . . . . 34
    10.05  Use of Proceeds from Sales of Residential Apartments . . . . . . . . . . . . 35
    10.06  Financial Statements of Hotel . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE XI - BOOKS AND RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . 37
    11.01  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    11.02  Location, Examination and Inspection . . . . . . . . . . . . . . . . . . . 38

ARTICLE   XII   -   REPAIRS,   REPLACEMENTS,   MAINTENANCE   AND
            IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    12.01  Repairs, Replacements and Maintenance . . . . . . . . . . . . . . . . . . 38
    12.02  Structural Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    12.03  Alterations, Additions and Improvements . . . . . . . . . . . . . . . . . . 40

ARTICLE XIII - DAMAGE TO AND DESTRUCTION OF THE HOTEL . . . . . . . . . . . . 40
    13.01  Owner's Obligation to Repair . . . . . . . . . . . . . . . . . . . . . . . 40
    13.02  Operator's Reinstatement . . . . . . . . . . . . . . . . . . . . . . . . . 42

ARTICLE XIV - EXPROPRIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    14.01  Complete Expropriation . . . . . . . . . . . . . . . . . . . . . . . . . 43
    14.02  Partial Expropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    14.03  Temporary Expropriation . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE XV - TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    15.01  Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    15.02  Contest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ARTICLE XVI - INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    16.01  Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    16.02  Named Insureds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    16.03  Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    16.04  Insurance Companies . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    16.05  Certificates of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . 49
    16.06  Blanket Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    16.07  Insurance Appraisals . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

ARTICLE XVII - ASSIGNMENTS AND MORTGAGES . . . . . . . . . . . . . . . . . . . . . . . 51
    17.01  Owner's Right to Assign . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    17.02  Owner's Right to Mortgage  . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    17.03  Limitation on Owner's Right to Assign and Mortgage  . . . . . . . . . . . . 52
    17.04  Operator's Right to Assign . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    17.06  Limitation on Operator's Right to Assign . . . . . . . . . . . . . . . . . . . 53

ARTICLE XVIII - EVENTS OF DEFAULT AND TERMINATION . . . . . . . . . . . . . . . . 54
    18.01  General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    18.02  Rights of Non-Defaulting Party . . . . . . . . . . . . . . . . . . . . . . . . 55
    18.03  Remedying Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    18.04  Bona Fide Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    18.05  Owner's Right to Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    18.06  Operator's Right to Terminate . . . . . . . . . . . . . . . . . . . . . . . . 59
    18.07  Cross-Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    18.08  Accounting on Termination . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    18.09  Owner to Receive All Books and Records Upon Termination . . . . . . . . . 60
    18.10  Claims on Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ARTICLE XIX - APPROVALS, DISPUTE RESOLUTION AND ARBITRATION . . . . . . . 61
    19.01  Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    19.02  Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    19.03  Arbitration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

ARTICLE XX - OPERATOR'S LIABILITY  . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    20.01  Standard of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    20.02  Indemnities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

ARTICLE XXI - ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    21.01  Owner's Acknowledgments  . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    21.02  Operator's Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . 68

ARTICLE XXII - GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 68
    22.01  Entire Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
    22.02  Modification and Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    22.03  Partial Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    22.04  Counterparts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    22.05  Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    22.06  Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
    22.07  Enurement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
    22.08  Recording . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
    22.09  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    22.10  Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    22.11  Designation of Agent for Service of Process . . . . . . . . . . . . . . . . . 72
    22.12  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
    22.13  Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

22.14  Time of Essence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
22.15  Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
22.16  Calculation Methodology  . . . . . . . . . . . . . . . . . . . . . . . . . 76
22.17  Other Opportunities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
22.18  Access to Hotel Facilities  . . . . . . . . . . . . . . . . . . . . . . . . . 77

SCHEDULE "A"   -   DEFINITIONS

SCHEDULE "B"   -   INSURANCE COVERAGE

SCHEDULE "C"   -   CALCULATION METHODOLOGY

SCHEDULE "D"   -   FORM OF ASSUMPTION AGREEMENT

SCHEDULE "E"   -   FORM OF SUBORDINATION AND NON-DISTURBANCE
                   AGREEMENT

SCHEDULE "F"   -   SAMPLE CALCULATION OF PRORATED DEFICIT
                   PAYMENT

# HOTEL MANAGEMENT AGREEMENT

THIS AGREEMENT is made this 9ᵀᴴ day of April, 1997.

B E T W E E N:

> FOUR SEASONS CARACAS, C.A., a corporation domiciled in the City of Caracas, Republic of Venezuela, duly inscribed in the Fifth Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on April 7, 1997, under No.10, Volume 105-A Fifth, having its principal offices at the Hotel,
>
> ("Operator"),
>
> - and -
>
> CONSORCIO BARR, S.A., a corporation domiciled in the City of Caracas, Republic of Venezuela, duly inscribed in the Second Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on December 18, 1990, under No. 27, Volume 113-A Second, having its principal offices at Calle Veracruz, Edif. Torreon, Piso 2, Urb. Las Mercedes, Caracas, Venezuela,
>
> ("Owner").

## RECITALS

A.  Owner is the legal and beneficial owner of the Land (as defined below) situated in the City of Caracas, Venezuela.

B.  Owner is in the process of developing upon the Land the Project (as defined below) consisting of: (i) a World Class Luxury Hotel (as defined below), containing approximately 212 guest rooms, together with restaurants, bars, banquet, meeting and other public rooms, a fitness club and other facilities to be developed, constructed, furnished and equipped in accordance with the Hotel Design Brief (as defined below), (ii) a residential component consisting of approximately 116 residential luxury apartment

units and other related facilities, (iii) a commercial component consisting of up to 3,000 square metres of general office space, (iv) an exclusive retail component consisting of approximately six retail units for lease by retail tenants, and (v) two independent commercial components consisting of up to 1,300 square metres of general commercial space.

C.  Operator, together with its Affiliates (as defined below), has expertise in the various phases of the development, construction, furnishing, equipping, operation, management, supervision and direction of World Class Luxury Hotels and other related facilities.

D.  Owner intends that the Hotel become one of the leading hotels in the City of Caracas and, at the same time, be operated and managed in an efficient manner and, in that regard, Operator and its Affiliates have offered to provide to Owner certain services in connection with the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of the Hotel as a World Class Luxury Hotel and with a view to maximizing benefits for both Owner and Operator and its Affiliates.  Owner, after a lengthy selection process, has decided to engage Operator and its Affiliates to provide such services.

E.  Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Pre-Opening Services Agreement") with Four Seasons Hotels Limited ("Four Seasons"), pursuant to which Four Seasons (for certain fees) has agreed to provide to Owner certain services with respect to the development and construction of the Hotel (as defined below) and certain other services with respect to the pre-opening of the Hotel.

F.  Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Services Agreement") with Four Seasons pursuant to which Four Seasons (for certain fees) has agreed to provide to Owner certain services with respect to the ongoing purchasing services, the refurbishing and the marketing of the Hotel.

G.      Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel License Agreement") with Four Seasons Hotels and Resorts B.V. ("Licensor") pursuant to which Licensor (for certain fees and other consideration) has agreed to provide the right and licence to use the Trademarks (as defined below) and to utilize the Proprietary Materials (as defined below) to Owner in connection with the marketing, operation and management of the Hotel and the marketing of the Residential Apartments (as defined below) for sale by Owner.

H.      Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Advisory Agreement") with Four Seasons Hotels and Resorts B.V. ("Advisor") pursuant to which Advisor (for certain fees) has agreed to provide to Owner certain advice and services in connection with the supervision and direction of the Hotel.

I.      Owner also wishes to obtain the benefit of Operator's expertise in providing services with respect to the day-to-day operation and management of World Class Luxury Hotels and other related facilities and Operator (for certain fees) has agreed to provide such services to Owner in connection with the Hotel, upon and subject to the terms and conditions set forth in this Agreement.


**AGREEMENT**


**NOW THEREFORE** in consideration of the covenants and agreements set forth in this Agreement, the parties agree that:

# ARTICLE I
# DEFINITIONS

**1.01**       <u>Definitions</u>

All capitalized terms herein shall, unless otherwise indicated, have the meaning set forth in the Hotel Advisory Agreement.  In this Agreement, the terms in Schedule "A" attached hereto shall have the respective meanings indicated therein.

**1.02**       <u>Recitals</u>

Operator and Owner each represent and warrant to the other that the Recitals in this Agreement, insofar as they relate to it, are true and correct.

**1.03**       <u>Interpretation</u>

In this Agreement, save and except as otherwise expressly provided:

(a)       all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun;

(b)       the division of this Agreement into Articles and sections and the use of headings is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions;

(c)       when calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date which is the reference day in calculating such period shall be excluded.  If the last day of such period is not a business day, the period in question shall end on the next business day;

(d)     all monetary amounts are expressed in United States Dollars. All payments of sums, charges, fees, costs, expenses and other amounts contemplated by this Agreement shall be paid in United States Dollars. If, pursuant to the judgment or order of any court or otherwise, any amount due or payable hereunder in United States Dollars (the "Original Currency") is paid in any other currency (the "Second Currency"), such payment in the Second Currency shall discharge or satisfy the obligation of the party making such payment to pay such amount in the Original Currency only to the extent that the amount of such payment is, when converted on the date of such payment to the Original Currency based on the United States Dollar Exchange Rate, equivalent to the amount of such payment if such payment had been made in the Original Currency. The party making such payment shall, as a separate and independent obligation, which shall not be merged in any such judgment or order or extinguished by any such payment in the Second Currency, pay or cause to be paid such obligation in respect of the Original Currency not so discharged and satisfied in accordance with the foregoing and indemnify the party receiving such payment and hold the party receiving such payment harmless from and against any losses, costs, damages or expenses which the party receiving such payment may sustain or incur as a result of any such amount being paid in the Second Currency;

(e)     all references to Article and section numbers refer to Articles and sections of this Agreement, and all references to Schedules refer to the Schedules attached hereto; and

(f)     the words "herein", "hereof", "hereunder", "hereafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or section hereof.

**1.04**      <u>Schedules</u>

The following schedules are attached hereto and are incorporated and deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| Schedule "A" | - | Definitions |
| Schedule "B" | - | Insurance Coverage |
| Schedule "C" | - | Calculation Methodology |
| Schedule "D" | - | Form of Assumption Agreement |
| Schedule "E" | - | Form of Subordination and Non-Disturbance Agreement |
| Schedule "F" | - | Sample Calculation of Prorated Deficit Payment |

## ARTICLE II
### TERMINATION PRIOR TO THE OPENING DATE

**2.01**      <u>Termination Prior to Opening Date</u>

If any or all of the other Hotel Agreements are terminated in accordance with their terms before the Opening Date, then this Agreement shall terminate on the date of such termination and Owner and Operator shall have no future obligations arising out of this Agreement, save and except as otherwise expressly provided for in this Agreement. Notwithstanding the foregoing, if this Agreement is terminated in accordance with its terms (other than as a result of the failure by Operator to perform its obligations under this Agreement or by any Affiliates of Operator to perform their respective obligations under any of the other Hotel Agreements) and within five years from the date of the termination Owner or a Related Person commences or intends to commence the development or construction or takes or intends to take any action in furtherance of the development or construction of a luxury hotel on the Land, then Owner shall promptly notify Operator in writing of such intention or action (which notice shall set forth in reasonable detail the character of the contemplated hotel development

or construction). In addition, upon receipt by Owner of a written offer from any Person for the provision of any of the services contemplated by this Agreement in respect of such proposed hotel (which offer Owner is willing to accept), Owner shall promptly submit a copy of such offer to Operator. Operator shall have a period of three months after receipt of a copy of such offer to notify Owner whether it is willing to provide the services contemplated in such offer on the terms and conditions set forth therein. If Operator notifies Owner of its unwillingness to provide such services on the terms and conditions set forth in the offer or fails to notify Owner of its intention within such three month period, Owner shall be entitled to accept such offer on the terms and conditions set forth therein.

## ARTICLE III
### PARTIAL OPERATIONS PRIOR TO OPENING DATE

3.01      <u>Partial Operations Prior to Opening Date</u>

Operator may conduct partial operations of the Hotel prior to the Opening Date in accordance with the Pre-Opening Plan and Budget for the purpose of staff training and operational and promotional development.

## ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND
### GENERAL COVENANTS OF THE PARTIES

4.01      <u>Representations, Warranties and Covenants of Owner</u>

Owner represents, warrants and covenants to Operator that:

(a)      Owner has the requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

- 8 -

(b)     subject to the provisions of Article XVII, Owner has, and throughout the Term will maintain, good and marketable title to its Interest, free and clear of any liens, charges and encumbrances of any nature or kind;

(c)     the Hotel is, and Owner will ensure that, prior to the Opening Date, all activities and conditions at the Hotel will be, in compliance with Applicable Law, including (without limitation) Environmental Law;

(d)     no notice advising of any defects in the construction, state of repair or state of completion of the Hotel, or ordering or directing that any alteration, repair, improvement or other work be done, or relating to non-compliance with any building permit or Applicable Law, or relating to any threatened or impending condemnation or expropriation has been received by Owner from any Governmental Authority or mortgagee of the Hotel which has not been complied with to the satisfaction of the Governmental Authority or mortgagee, as the case may be.  Owner shall promptly provide Operator with a copy of any such notice in writing, or full particulars of any such notice not in writing, forthwith upon receipt;

(e)     there are no actions, suits or proceedings pending or, to the knowledge of Owner after due enquiry and investigation, threatened at law or in equity or before any Governmental Authority which could or may have a material adverse effect on the Hotel or the Hotel Agreements.  Owner shall promptly provide Operator with written notice of any such action, suit or proceeding of which Owner may become aware;

(f)     Owner is not in default or in breach of, and there exist no facts or circumstances that, with the passage of time or giving of notice or both, would result in a breach or default under, any contract, agreement or other instrument which relates to the Hotel or the Hotel Agreements and Owner shall take, or refrain

- 9 -

from taking, all such actions as may be necessary to ensure that Owner does not become in default or breach of any such contract, agreement or other instrument;

(g) Owner is not aware of any other fact or facts which would, or would reasonably be expected to, adversely affect the value of the Hotel or any of the Hotel Agreements or the development, construction, furnishing, equipping, marketing, operation, management, supervision or direction of the Hotel as contemplated by the Hotel Agreements or any rights granted to Operator under this Agreement, Advisor under the Hotel Advisory Agreement, Licensor under the Hotel License Agreement or Four Seasons under any of the Hotel Services Agreement or the Hotel Pre-Opening Services Agreement;

(h) Owner shall, or shall cause, the Hotel to be developed, constructed, furnished and equipped and shall deliver the same to Operator in a turnkey state on the Opening Date for operation in accordance with the provisions of this Agreement, and shall arrange to obtain all financing necessary in connection with such development, construction, furnishing and equipping; and

(i) Operator may peaceably and quietly possess, manage and operate the Hotel during the Term, free from interruption or disturbance.

4.02     **Representations, Warranties and Covenants of Operator**

Operator represents, warrants and covenants to Owner that:

(a) Operator has the requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

(b) subject to the performance, satisfaction and compliance by Owner of and with all of its obligations under this Agreement and the other Hotel Agreements as and when required, Operator will ensure that, after the Opening Date, all activities

and conditions at the Hotel will be in compliance with all Applicable Laws, including (without limitation) Environmental Law; provided that to the extent that there are insufficient funds in the Hotel Bank Accounts to ensure compliance by Operator with its obligations under this section 4.02(b), Owner shall deposit in the Hotel Bank Accounts the amounts from time to time necessary to ensure such compliance in accordance with section 8.01; and

(c)     Operator is not in default or in breach of, and there exist no facts or circumstances that, with the passage of time or giving of notice or both, would result in a breach or default under, any contract, agreement or other instrument which relate to the Hotel or the Hotel Agreements and Operator shall take, or refrain from taking, all such action as may be necessary to ensure that Operator does not become in default or breach of any such contract, agreement or other instrument.

## ARTICLE V
## OPERATOR'S AND OWNER'S RESPONSIBILITIES

5.01     **Operator's Appointment**

Subject to acting in furtherance of the advice given by Advisor pursuant to the Hotel Advisory Agreement, Owner engages Operator as the exclusive operator and manager of the Hotel during the Term with exclusive responsibility and full control and discretion in connection with the operation and management of the Hotel and its staff as a World Class Luxury Hotel in accordance with the terms and conditions of this Agreement. Owner expressly agrees and undertakes, subject to the terms and conditions of this Agreement, to allow Operator to operate and manage the Hotel and its staff as a World Class Luxury Hotel as Operator determines in its sole discretion.

5.02         Operator's Responsibilities

Operator shall, throughout the Term, in a professional, efficient and expeditious manner, do all things and take all necessary action for the operation and management of the Hotel as a World Class Luxury Hotel, all for the account of and on behalf of Owner. Without limiting the generality of the foregoing and the other provisions of this Agreement, Operator is authorized and directed, as agent of Owner, subject to and in accordance with the terms and conditions of this Agreement and the Annual Plan, to:

(a)     use all reasonable efforts consistent with a World Class Luxury Hotel to maximize patronage and profitability of Hotel facilities, including (without limitation) the establishment of room rates for the Hotel on a basis consistent with a World Class Luxury Hotel;

(b)     use all reasonable efforts to collect all charges, rents and other amounts due from guests, patrons and Hotel tenants, subtenants, Persons providing exclusive services and concessionaires, cause notices to be served upon such guests, patrons, tenants, subtenants, Persons providing exclusive services and concessionaires to quit and surrender space occupied or used by them where desirable or necessary, ask for, demand, collect and give receipts for all charges, rents and other amounts which may at any time be due from such guests, patrons, tenants, subtenants, or Persons providing exclusive services or concessionaires and sue for and institute summary proceedings where desirable or necessary in the name of Operator or Owner, where required, in connection therewith;

(c)     hire, pay, supervise, relocate and discharge all personnel of the Hotel, including (without limitation) the General Manager of the Hotel, establish and from time to time modify any appropriate employee benefit plans, pension plans and profit sharing plans, and determine all matters with regard to such personnel, including (without limitation) compensation, bonuses, fringe benefits and replacement, it being agreed by Owner that all such personnel (other than the Senior Hotel

Personnel) shall be employed by Owner and that all expenses relating to the employment of such personnel (other than the Senior Hotel Personnel) shall be borne by Owner (as an Operating Expense), and such personnel (other than the Senior Hotel Personnel) shall be employees of Owner. The Senior Hotel Personnel shall be employed by Operator, it being agreed by Owner that all expenses relating to the employment of such Senior Hotel Personnel, whether arising during the employment of such Senior Hotel Personnel or after the termination of the employment of such Senior Hotel Personnel, including (without limitation) any entitlement to profit sharing (and any additional amount required to be paid to such Senior Hotel Personnel as profit sharing as a result of the reimbursement contemplated by this Section 5.02(c)) or damages for dismissal, in each case to the extent relating to the employment of such Senior Hotel Personnel shall be reimbursed by Owner to Operator (as an Operating Expense). Owner shall have the right to approve the appointment of the Controller of the Hotel selected and proposed by Operator and to select and propose, subject to the approval by Operator of their appointment (whether on a temporary basis or otherwise), the Assistant Controller and Purchasing Manager of the Hotel; provided that all other decisions relating to the employment of the Controller, Assistant Controller and Purchasing Manager of the Hotel, including (without limitation) the compensation, benefits, dismissal, relocation and replacement of such personnel shall be made by Operator. Operator shall, to the extent practicable, discuss with Owner in advance of any dismissal, relocation or replacement of the Controller, Assistant Controller or Purchasing Manager of the Hotel;

(d)     in consultation with Owner, negotiate with any labour union or other bargaining unit lawfully entitled to represent Hotel personnel or any of them engaged in the operation of the Hotel;

(e)     provide for the maintenance and repair of the Hotel in accordance with World Class Luxury Hotel standards; provided that Operator shall not be responsible for maintaining or repairing any mechanical or electrical equipment or systems of the Hotel which also serve any other component of the Project;

(f)     arrange for utility, telephone, detective agency protection, elevator, escalator, window-washing, vermin extermination, trash removal and other services necessary for the operation of the Hotel and purchase on the credit of Owner all Operating Equipment and Supplies and Furniture, Fixtures and Equipment and such other services and merchandise as are necessary for proper operation of the Hotel as a World Class Luxury Hotel;

(g)   purchase on the credit of Owner all Furniture, Fixtures and Equipment pursuant to any hotel refurbishing plan or capital improvement, including (without limitation) any approved Capital Refurbishing Programs;

(h)   with the approval of Owner, commence any legal action or proceeding concerning the Hotel as is necessary or required in the opinion of Operator and retain counsel in connection with such action or proceeding;

(i)   subject to section 5.04(d), enter into contracts in connection with the operation and management of the Hotel, including (without limitation) leases for retail facilities incidental to and customary in World Class Luxury Hotels and grant concessions for services customarily subject to concession in World Class Luxury Hotels, and operate and manage the sundry shop;

(j)   operate and manage the parking and garage services of the Hotel or, with the approval of Owner, retain a parking operator to operate the parking and garage services of the Hotel under a management agreement or a lease on terms and conditions satisfactory to Operator and Owner;

(k)   with the approval of Owner, hire, engage or appoint the auditors, attorneys, consultants and other advisors of the Hotel, it being agreed by Owner and Operator that all such advisors shall be hired, engaged and appointed at Owner's sole cost and expense and shall be advisors of Owner and that any decisions relating to the hiring, engaging and appointing of any such advisors shall be made with the prior approval of Owner;

(l)   subject to section 8.05, establish the cash management and banking arrangements for the Hotel;

(m)   establish the Hotel policy regarding its association with any credit card system; and

(n)     cause all such other things to be done in and about the Hotel as shall be necessary to comply with Applicable Law respecting the use or manner of use of the Hotel or the operation and management of the Hotel, the non-compliance with which would materially and adversely affect the Hotel; provided, however, that Operator shall, in consultation with Owner, have the right to contest by legal proceedings the validity of any Applicable Law to the extent and in the manner provided or permitted by Applicable Law until final determination of any such proceedings.

5.03        **Operator's Responsibility Relating to Residential Apartments**

Operator shall, throughout the Term, in a professional, efficient and expeditious manner, arrange for the Hotel to provide services to the owners and occupants of the Residential Apartments, including (without limitation) room service, maid service and valet and laundry service. The scope of, and fees and charges for, such services shall be agreed to in advance by Owner and Operator and shall be incorporated into the agreement of purchase and sale for each of the Residential Apartments. Operator shall perform or cause to be performed such services at a level of quality consistent with that of a World Class Luxury Hotel, all for the account of and on behalf of Owner. Operator is authorized and directed, as agent of Owner, to perform or cause to be performed such services, subject to and in accordance with the terms and conditions of this Agreement.

5.04        **Owner's Responsibility**

Owner shall:

(a)     cause the Hotel to be operated and managed as a World Class Luxury Hotel and otherwise in accordance with this Agreement;

(b)     cause the Hotel to (i) be furnished, equipped, supervised, directed, serviced and marketed, and (ii) continue to be developed and constructed, in each case in accordance with the other Hotel Agreements;

(c)    cause the mechanical and electrical equipment and systems of the Hotel which also service any other component of the Project to be maintained and repaired at a level of standard and quality consistent with that of a World Class Luxury Hotel; and

(d)    subject to the approval of Operator of the type and quality, negotiate leases, licenses and concession agreements for stores and shops constituting part of the Hotel which shall include, without limitation, a hair salon (other than the sundry shop which shall be operated and managed by Operator) and office space and lobby space at the Hotel all on a basis consistent with a World Class Luxury Hotel,

and shall fulfil all of its obligations under this Agreement and under the other Hotel Agreements.

5.05    **Maintenance and Capital Refurbishing Programs**

(a)    Owner covenants to maintain the Hotel as a World Class Luxury Hotel.

(b)    Operator shall allow any Capital Refurbishing Programs approved by Owner in accordance with the Hotel Advisory Agreement to be implemented.

5.06    **Dealings with Third Persons**

Owner hereby acknowledges and agrees that, in fulfilment of its obligations hereunder, Operator may, subject to the terms and conditions of this Agreement, communicate directly with any Person engaged to provide services to the Hotel, including (without limitation) Advisor, and Operator may act in furtherance of the advice given by any such Person throughout the Term.

## ARTICLE VI

## ANNUAL PLAN

6.01        Compliance with Annual Plan

(a)     Operator shall comply with the Annual Plan relating to each Fiscal Year and shall not (except to the extent permitted pursuant to section 6.02) exceed the capital expenditures or materially exceed the aggregate of the other expenditures set out in the Annual Plan, without the prior approval of Owner.  For the purposes of the references in this Agreement to expenditures contemplated in, or to be made in compliance with, the Annual Plan, expenditures which are the same as the capital expenditures or do not vary materially from the other expenditures set out in the Annual Plan shall be deemed to be contemplated in, or to be made in compliance with, the Annual Plan.

(b)     Owner acknowledges that the Annual Plan is a planning tool used to attempt to achieve the objective of operating and maintaining a World Class Luxury Hotel in accordance with this Agreement.  As such, Owner agrees that Operator shall not be liable for any variance between actual results and the estimate of the projected results for the Fiscal Year set out in the Annual Plan, it being agreed that the Annual Plan cannot be relied upon as an assurance of actual results for such Fiscal Year.

(c)     Owner acknowledges that, notwithstanding Operator's experience and expertise in relation to the operation and management of World Class Luxury Hotels, the projections contained in each Annual Plan are subject to and may be affected by changes in financial, economic and other conditions and circumstances beyond Operator's control.  Owner further acknowledges that certain of the figures set forth in the Annual Plan for a Fiscal Year will be variable in correlation to the occupancy of the Hotel and, therefore, to the extent that the occupancy of the

- 37 -

Hotel exceeds the occupancy projected in such approved Annual Plan, increases in such variable expenses shall be deemed part of such approved Annual Plan.

**6.02**      **Emergency Expenditures**

Notwithstanding the provisions of section 6.01 or any other provisions in this Agreement requiring adherence to the Annual Plan, whenever, by reason of circumstances beyond the control of Operator, emergency, unforeseen or special circumstances warrant expenditures which are in the opinion of Operator required to be made for the lawful, safe, efficient or effective operation and management of the Hotel, Operator shall be entitled to make such expenditures which are in the opinion of Operator reasonable notwithstanding that such expenditures are not provided for in the Annual Plan.  Operator shall use its reasonable efforts to give Owner advance notice of any expenditures required to be made by Operator pursuant to this section 6.02 and to obtain the approval of Owner prior to making any such expenditures. Whenever the giving of such advance notice or the obtaining of such approval is, however, impracticable, in Operator's opinion, by virtue of the nature of the emergency, unforeseen or special circumstances giving rise to any expenditures required to be made by Operator pursuant to this section 6.02, Operator shall be entitled to make such expenditures without having to give such advance notice or having to obtain such approval; provided, however, that Operator shall give Owner notice as soon as practicable after such expenditures are made of the nature of the emergency, unforeseen or special circumstances giving rise to such expenditures, the action taken by Operator to deal with the emergency, unforeseen or special circumstances giving rise to such expenditures and the amount of such expenditures.

**6.03**      **Capital for Furniture, Fixtures and Equipment Replacements**

Owner agrees that Operator shall be entitled to expend any amounts in the Capital Reserve, including (without limitation) interest accrued thereon and any unused amounts in the Capital Reserve from any preceding Fiscal Year, for the purpose of the replacement and renewal of Furniture, Fixtures and Equipment.

# ARTICLE VII

## RELATIONSHIP OF OPERATOR AND OWNER

7.01      <u>Operator to Act as Agent for Owner</u>

In the performance of its duties as the operator and manager of the Hotel, Operator shall act solely as the agent of Owner. Nothing in this Agreement shall constitute or be construed to be or create a partnership, joint venture or joint employer relationship between Owner and Operator, and the relationship of Operator to Owner shall be that of an independent contractor acting on Owner's behalf. Operator shall not be required to expend any of its own funds or otherwise incur any debts or liabilities to any Person in the performance of its duties as the operator and manager of the Hotel. All debts and liabilities to third Persons required or permitted to be incurred by Operator under this Agreement in the course of its operation and management of the Hotel shall be the debts and liabilities of Owner only and Operator shall not be liable for any such obligations by reason of its operation and management of the Hotel for Owner. Operator may so inform third Persons with whom it deals on behalf of Owner and may take any other reasonable steps to carry out the intent of this section 7.01.

7.02      <u>Delegation of Authority by Operator</u>

(a)      Operator may engage one or more Persons to perform services in connection with the operation and management of the Hotel and each Person engaged by Operator to perform such services, including (without limitation) any of its Affiliates, any agent or employee of Operator or any of its Affiliates or any agent or employee of Owner hired by Operator or any of its Affiliates, shall be acting solely as agent of Owner and not of Operator for such purposes. Notwithstanding that Operator may engage one or more Persons to perform the services contemplated by this section 7.02(a), Operator shall not be released from its responsibilities under this Agreement or any liabilities which may result therefrom nor shall such responsibilities or liabilities be diminished.

(b)     Operator may delegate to Senior Hotel Personnel of the Hotel the responsibility of hiring, paying, supervising and discharging Owner's employees at the Hotel and each Person to whom any such duty is delegated by Operator shall be acting solely as agent of Owner and not of Operator for such purposes.

(c)     Owner shall, at the request of Operator, provide the Persons contemplated in sections 7.02(a) and (b) with an appropriate form of power of attorney so as to enable such Persons to perform the services contemplated in such sections.

7.03        **Delegation of Authority by Owner**

Owner may, subject to the terms and conditions of this Agreement, engage one or more of its Affiliates to fulfil its obligations hereunder. Notwithstanding that Owner may engage one or more of its Affiliates to perform its obligations hereunder, Owner shall not be released from its responsibilities under this Agreement or any liabilities that may result therefrom nor shall such responsibilities or liabilities be diminished.

7.04        **Additional Benefits to Personnel**

(a)     Operator, in its discretion but always in accordance with normal practice in other hotels and resorts under management of Operator or any of its Affiliates, may provide food and lodging for Senior Hotel Personnel and allow them to use the Hotel facilities without charge and may provide other Hotel personnel fully or partially discounted rooms, food and beverage and access to other Hotel facilities. Furthermore, Operator may, in accordance with normal hotel practice in other hotels and resorts under management of Operator or any of its Affiliates, allow Senior Hotel Personnel to occupy suitable living quarters inside the Hotel or may provide such Senior Hotel Personnel with suitable living quarters outside the Hotel and, in either event, any costs incurred in providing such suitable living quarters, whether inside or outside of the Hotel, shall be an Operating Expense. In this regard, Owner acknowledges the current practice in other hotels and

- 20 -

resorts under the management of Operator or any of its Affiliates of providing interest-free mortgage loans to senior management of such hotels and resorts, and approves of Operator providing interest-free mortgage loans from the Hotel Bank Accounts to, or otherwise arranging interest-free mortgage loans for, selected Senior Hotel Personnel to enable them to purchase suitable homes. All such loans shall be used solely for the purchase of homes for occupancy by such Senior Hotel Personnel, shall be secured by a valid mortgage or lien against the home, and shall be immediately due and payable in regard to any particular home at any time the borrower ceases to hold the position of a Senior Hotel Personnel with the Hotel. All costs and expenses of the Hotel of providing such food and lodging or suitable living quarters for Senior Hotel Personnel and the use by them of the Hotel facilities and of providing fully or partially discounted rooms, food and beverage and access to other Hotel facilities to other Hotel personnel shall be estimated by Advisor in the Annual Plan.

(b)    Operator may also, in its discretion but always in accordance with normal practice in other hotels and resorts under management of Operator or any of its Affiliates, permit senior management personnel of Operator or any of its Affiliates the use of all Hotel facilities, including (without limitation) those for the provision of food and beverages, when appropriate in the context of services provided by such senior management personnel, without charge to such senior management personnel or to Operator or to such Affiliate. All costs and expenses of the Hotel of permitting such personnel the use of all Hotel facilities shall, to the extent known by Advisor at the time of the preparation of the Annual Plan, be estimated by Advisor in the Annual Plan.

(c)    Operator may also, in its discretion but always in accordance with normal practice in other hotels and resorts under management of Operator or any of its Affiliates, permit personnel of Operator or any of its Affiliates and personnel of hotels and resorts under management of Operator or any of its Affiliates the use of all Hotel facilities, including (without limitation) those for the provision of

food and beverages, without charge (or with discounted charge) to such personnel or to Operator or to such Affiliate or to the hotels and resorts employing such personnel; provided that rooms in the Hotel shall only be booked on a space available basis. All costs and expenses of the Hotel of permitting such personnel the use of all Hotel facilities shall, to the extent known by Advisor at the time of the preparation of the Annual Plan, be estimated by Advisor in the Annual Plan.

## ARTICLE VIII
## FUNDING, BANKING, ETC.

8.01      <u>Request for Working Capital</u>

(a)      From time to time throughout the Term as and when requested by Operator, Owner shall provide working capital in amounts required for the uninterrupted and efficient operation of the Hotel in accordance with the Annual Plan then applicable and, without limiting the generality of the foregoing, sufficient to fund the cash requirements set out in sections 10.04(a) through 10.04(f), inclusive. If the Line of Credit has not been renewed and replenished in an amount equal to the Working Capital Reserve at least 15 days prior to the end of each Fiscal Quarter or if the Line of Credit is not sufficient to fund the working capital requirements of the Hotel for any reason whatsoever, including (without limitation) by reason of being fully drawn, expired, cancelled or otherwise not available, Operator shall be entitled to request Owner to fund any such deficiency in working capital in writing and, at the time provide Owner with a cash flow forecast of sources and uses of funds for the then current Fiscal Quarter. Owner shall then deposit in the Hotel Bank Accounts the amount of any such deficiency in working capital within ten days following Operator's written request for such funding. Any dispute as to the amount of working capital required for the operation of the Hotel shall be resolved by Operator taking into account the foreseeable financial needs of the Hotel.

(b)     To facilitate the funding of working capital contemplated in section 8.01(a), Owner shall, at least 30 days prior to the Scheduled Opening Date and at all times thereafter, maintain an irrevocable line of credit (the "Line of Credit") with a bank designated by Owner and approved by Operator in an amount equal to the Working Capital Reserve. The Line of Credit may be drawn upon freely and directly by Operator acting alone. The terms of the operation of the Line of Credit shall be in form and substance approved by Operator and shall expressly provide that no instruction by Owner terminating, diminishing or otherwise materially and adversely affecting Operator's right to draw funds shall be effective without the prior written approval of Operator. Operator shall be entitled at any time and from time to time to draw cash from the Line of Credit in any amount required to operate the Hotel in accordance with the Hotel Agreements or otherwise to perform its obligations under this Agreement. Owner shall renew and replenish the Line of Credit in an amount equal to the Working Capital Reserve at least 15 days prior to the end of each Fiscal Quarter.

## 8.02     Advances by Operator

Except as otherwise contemplated in sections 8.03 and 8.04, in no event shall Operator be required to advance any of its own funds for, or incur any liability in connection with, the operation of the Hotel. If, however, Operator requests Owner to advance funds in accordance with section 8.01(a) and Owner fails to do so within the 10 day period contemplated therein, Operator shall have the right to advance funds in connection with the operation and management of the Hotel. In addition, Operator shall have the right to advance funds for the payment of expenditures required to be made by Operator pursuant to section 6.02 or for the payment of sums due to a supplier, service contractor or other creditor in connection with the operation of the Hotel, if (i) Owner has failed to pay such creditor in a timely fashion, and (ii) such non-payment may trigger the imposition of any penalty, cost or liability affecting Operator or the Hotel or, in Operator's opinion, may prevent or hinder Hotel operations or may adversely affect or impair the credit status of Operator or the Hotel. Owner shall repay Operator on

demand any such advances, together with interest on such advances from the date of such advances at the Interest Rate.

8.03        **Investor's Loan**

(a)        Operator shall, at the request of Owner, advance or cause any of its Affiliates or any other Person to advance to Owner, on or before the Opening Date and on a non-revolving basis, an amount equal to $5,000,000 (the "Investor's Loan") on the following terms and conditions:

(i)        the entire amount of the Investor's Loan shall be used to either repay a portion of the outstanding principal amount of the financing secured by the First Mortgage or complete the construction of the Hotel;

(ii)        the Investor's Loan shall bear interest (the "Investor's Loan Interest") commencing from the date on which the Investor's Loan is advanced at the Investor's Loan Interest Rate. The Investor's Loan Interest shall be calculated monthly, in arrears, and shall be paid out of future cash available in the Hotel Bank Accounts in accordance with the priorities set forth in section 10.04 until the Investor's Loan, together with all accrued and unpaid Investor's Loan Interest, has been repaid in full;

(iii)        the Investor's Loan shall be secured by a mortgage registered against the Hotel ranking subordinate only to the First Mortgage;

(iv)        the Investor's Loan shall have the same term to maturity and principal repayment schedule as the First Mortgage (which shall be no longer than 10 years) and shall be repaid out of future cash available in the Hotel Bank Accounts in accordance with the priorities set forth in section 10.04;

(v)   notwithstanding the provisions of sections 8.03(a)(ii) and 8.03(a)(iv), the Investor's Loan, together with all accrued and unpaid Investor's Loan Interest, shall become immediately due and payable upon the earliest of the following events to occur:

(A)   any refinancing, refunding or replacement of all or any portion of the financing secured by the First Mortgage; provided that the principal amount of such refinancing, refunding or replacement is in excess of the principal amount of the financing then secured by the First Mortgage;

(B)   the sale, assignment, transfer or other disposition by Owner of control of its Interest to any Person or a change in control of Owner; or

(C)   the termination of this Agreement for any reason whatsoever; and

(b)   As consideration for making the Investor's Loan available to Owner, Owner shall pay to the Investor for each Fiscal Year (and proportionately for any fraction of a Fiscal Year) during which all or any portion of the Investor's Loan or the Investor's Loan Interest remains outstanding and unpaid, an amount (the "Investor's Return") equal to the product obtained by multiplying the Applicable Percentage for such Fiscal Year by the Adjusted Net Cash Flow for such Fiscal Year, which amount shall be payable to Operator upon receipt by Owner of the annual statement of profit and loss of the Hotel from Operator at the end of such Fiscal Year and otherwise in accordance with section 10.06(b).

8.04   **Operator's Cash Flow Guarantee**

(a)   Operator hereby agrees to pay, or cause of any of its Affiliates to pay, to Owner for each Fiscal Year (and proportionately for any fraction of a Fiscal Year)

during the Deficit Period an amount (the "Deficit Payment") equal to the amount by which the Hotel fails to achieve Net Operating Profit equal to the Target Amount on the following terms and conditions:

(i)   Operator's obligations to make Deficit Payments shall terminate in the event the Hotel achieves an amount of Net Operating Profit in excess of the Target Amount in any three consecutive Fiscal Years during the Deficit Period commencing with the fourth full Fiscal Year of the Deficit Period;

(ii)  the Deficit Payments shall not bear interest but shall be repaid out of future cash available in the Hotel Bank Accounts in accordance with the priorities set forth in section 10.04 in any Fiscal Year of the Term in which the Hotel achieves an amount of Net Operating Profit in excess of the Target Amount;

(iii) any Deficit Payment shall be made by Operator to Owner concurrently with the delivery to Owner of the annual statement of profit and loss of the Hotel by Operator at the end of each Fiscal Year of the Deficit Period in accordance with the provisions of section 10.06(b);

(iv)  notwithstanding the provisions of this section 8.04(a), Operator shall only be required to make the Prorated Deficit Payment in respect of any Fiscal Year during the Deficit Period if, during such Fiscal Year, either (1) one or more of the following events occurs, or (2) the effects of the occurrence of one or more of the following events in any previous Fiscal Year during the Deficit Period are continuing, which event or events in their totality, after giving effect to the proceeds received from any applicable business interruption insurance contemplated in section 16.01(a), adversely affect Net Operating Profit:

(A)   damage or destruction to all or any material part of the Hotel;

(B)   a Capital Refurbishing Program affecting 20% or more of the Hotel;

(C)   material interference with the normal operation of the Hotel by any Governmental Authority;

(D)   expropriation of all or any part of the Hotel;

(E)   strikes, walkouts or lock-outs affecting the normal operation of the Hotel, unless caused by the wilful misconduct, gross negligence or bad faith of Operator;

(F)   wars, fires, acts of God, disasters, riots or boycotts or shortages of material or labour; or

(G)   any other similar event of force majeure beyond the control of Operator;

provided that the provisions of this section 8.04(f) shall not apply in the event that the disruption to the normal operation of the Hotel in any Fiscal Year caused by any such event or events occurs or continues for an aggregate of less than 15 days in such Fiscal Year; and

(v)   notwithstanding the provisions of sections 8.04(a)(ii), the Deficit Payments shall become immediately due and payable to Operator upon the earliest of the following events to occur:

(A)   any refinancing, refunding or replacement of all or any portion of the financing secured by the First Mortgage; provided that the

principal amount of such refinancing, refunding or replacement is in excess of the principal amount of the financing then secured by the First Mortgage;

(B)    the sale, assignment, transfer or other disposition by Owner of control of its Interest to any Person or a change in control of Owner; or

(C)    the termination of this Agreement for any reason whatsoever.

(b)    Operator's obligations to make the Deficit Payments in accordance with the provisions of section 8.04(a) shall be supported by an irrevocable letter of credit in favour of Owner or the holder of the First Mortgage (the "Letter of Credit") having the following face amounts:

(i)    in each of the first eight Fiscal Years of the Deficit Period, an amount equal to $6,000,000;

(ii)    in the ninth Fiscal Year of the Deficit Period, an amount equal to $4,000,000; and

(iii)    in the last Fiscal Year of the Deficit Period, an amount equal to $2,000,000.

The Letter of Credit shall be issued contemporaneously with the execution of this Agreement by a Canadian financial institution designated by Operator, shall have a term ending 30 days after receipt by Owner of the annual statement of profit and loss of the Hotel for the last Fiscal Year of the Deficit Period in accordance with the provisions of section 10.06(b) and, at the time of issuance or re-issuance of the Letter of Credit, shall otherwise be in form and substance satisfactory to the holder of the First Mortgage, acting reasonably.  All draws under the Letter

of Credit shall be deemed to be Deficit Payments for all purposes of or in connection with this Agreement. All costs and expenses arising from the preparation, issuance and re-issuance of the Letter of Credit shall an Operating Expense, subject to a maximum of 0.5% per annum of the then current face amount thereof, and any excess costs and expenses arising from such preparation, issuance and re-issuance shall be borne by Operator.

8.05    **Bank Accounts**

(a)    Subject to Section 8.05(b), all funds derived from the operation of the Hotel shall be deposited into bank accounts established and maintained by Owner in connection with the operation of the Hotel (the "Owner Bank Accounts"), which at all times shall be at an insured bank designated by Owner and notified to Operator.

(b)    Notwithstanding section 8.05(a), if the Line of Credit has not been renewed and replenished in an amount equal to the Working Capital Reserve at least 15 days prior to the end of each Fiscal Quarter or if the Line of Credit is not sufficient to fund the working capital required for the uninterrupted and efficient operation of the Hotel during the then current Fiscal Quarter for any reason whatsoever, including (without limitation) by reason of being fully drawn, expired, cancelled or otherwise not available, and, if after 72 hours notice from Operator to Owner, the Line of Credit has not been so renewed and replenished, then, until such time as the Line of Credit has been so renewed and replenished, all funds derived from the operation of the Hotel shall no longer be deposited into the Owner Bank Accounts, but rather shall be deposited into the bank accounts established and maintained in connection with the operation of the Hotel (the "Hotel Bank Accounts"), which shall at all times be at an insured bank designated by Owner and approved by Operator and maintained under the name of the Hotel. Operator shall designate those Persons (each of whom shall be appropriately bonded) who may draw on such accounts. All disbursements in respect of the Hotel shall be

made from the Hotel Bank Accounts.  Operator shall make available to Owner from time to time when reasonably requested, all records of the Hotel Bank Accounts.

**8.06**      <u>Owner's Right to Funds</u>

The funds in the Hotel Bank Accounts shall be the property of Owner and, subject to the rights and obligations of Operator under this Agreement, shall be disbursed only in accordance with the provisions of this Agreement.  Operator shall have the right, in its discretion, to invest or cause to be invested any funds that are in the Hotel Bank Accounts in Permitted Investments.  Owner shall bear all losses occasioned by any loss of principal or interest resulting from the application of funds as contemplated by this Agreement or the failure or insolvency of the bank or other financial institution in which any Hotel Bank Account is maintained.

**8.07**      <u>Pledging of Bank Accounts</u>

Except as additional security for the line of credit contemplated by section 8.01(b) or in connection with a mortgage permitted by section 17.02, Owner shall not pledge or deal with the funds in the Hotel Bank Accounts in any manner that may impede the ability of Operator to pay obligations incurred in or in connection with the operation and management of the Hotel.

**8.08**      <u>Extending Credit</u>

In no event shall Operator be required to extend its own credit in connection with the acquisition of Furniture, Fixtures and Equipment or Operating Equipment and Supplies or otherwise for the operation of the Hotel.  If, however, any credit is extended for the account of Owner upon the reputation of Operator and the extension of the credit ultimately results in the liability of Operator to those creditors, then Owner shall indemnify and save Operator harmless from and against any and all claims, liabilities, costs and expenses that Operator incurs,

including (without limitation) legal fees in respect of amounts owing to those creditors, together with interest on such liabilities, costs and expenses from the date of incurring such liabilities, costs and expenses at the Interest Rate.


# ARTICLE IX
# TERM AND RENEWALS

## 9.01        Initial Term

The initial term of this Agreement shall be for a period commencing on the date hereof and terminating at midnight on the last day of the twentieth full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date.


## 9.02        Extension Terms

(a)     Operator shall have the right to extend the Term for a first extension term of 10 additional Fiscal Years.

(b)     If such first option of extension shall have been exercised, Owner and Operator may agree to extend the Term for such additional extension terms of 10 additional Fiscal Years each as may be agreed to by Owner and Operator.

(c)     In addition, the Term shall be extended automatically by a period equal to the period between any termination and subsequent reinstatement of this Agreement pursuant to section 13.02.


## 9.03        Exercise of Extension Options

The option to extend granted to Operator by section 9.02(a) shall be deemed to have been exercised unless Operator shall have given written notice to Owner of Operator's

- 31 -

intention not to exercise the option to extend, which notice shall be given by Operator not later than 12 months prior to the end of the initial term provided for in section 9.01.

9.04        Covenants to Apply

During the extension term provided for in section 9.02(a) and any subsequent extension term agreed to by Owner and Operator as contemplated by section 9.02(b), this Agreement shall continue in full force and effect in all respects, and all of the terms, covenants, conditions and provisions of this Agreement shall apply, except that there shall be no options to extend beyond those provided for in this Article IX.

ARTICLE X

REMUNERATION AND REIMBURSEMENT OF OPERATOR

10.01        Basic Fee

Owner shall pay to Operator a fee (the "Basic Fee") in United States Dollars for services rendered under this Agreement for each Fiscal Year of the Term (and proportionately for any fraction of a Fiscal Year) equal to 0.1% of Gross Receipts for such Fiscal Year.

10.02        Reimbursement of Costs

Owner shall reimburse Operator for all reasonable costs and expenses incurred by Operator in the performance of the services contemplated by this Agreement. Owner expressly acknowledges that such services may be for either (a) the exclusive benefit of the Hotel, or (b) the benefit of the Hotel and one or more other hotels or resorts that are owned or operated and managed by Operator or any of its Affiliates; provided that if such activities are not for the exclusive benefit of the Hotel, only an equitable portion of the costs and expenses associated therewith shall be allocated to the Hotel by Operator. Such costs and expenses may include, but are not limited to, consultants fees and expenses, out-of-pocket expenses incurred

in connection with the performance of the duties described in this Agreement, travel expenses and food and lodging of Operator's personnel (but shall not include the employment costs of such personnel, save and except for the total employment costs of the Senior Hotel Personnel and as provided for in this section 10.02). Such costs and expenses shall be estimated by Advisor in the Annual Plan and shall be reimbursed by Owner in United States Dollars. Operator shall cause Advisor to use its reasonable efforts to ensure that such costs and expenses are accurately estimated. Owner shall also reimburse Operator, on the basis of the number of days spent at the Hotel, for:

    (a)    the total employment costs of any personnel of Operator or any of its Affiliates who as a replacement spend time at the Hotel engaged in duties on a temporary basis fulfilling a function that is normally a full-time function of an employee of the Hotel;

    (b)    the total employment costs of any personnel of Operator or any of its Affiliates who spend time at the Hotel devoted to the problems or affairs of the Hotel; provided that, in each case, the time spent at the Hotel is not less than 15 full working days during any consecutive three month period; and

    (c)    the total employment costs of any personnel of Operator or any of its Affiliates who spend time at the Hotel supervising an approved refurbishing plan or capital improvement, including (without limitation) a Capital Refurbishing Program, unless such employment costs are payable to, or otherwise included in the cost of services provided by, Operator or any of its Affiliates as part of any such approved refurbishing plan or capital improvement.

To the extent that Advisor is able to estimate the number of days which will be spent by any personnel of Operator or any of its Affiliates at the Hotel in any Fiscal Year in connection with the performance of the services contemplated in paragraphs (a), (b) and (c) of this section 10.02, the total employment costs of such personnel contemplated in such paragraphs shall be estimated by Advisor in the Annual Plan for such Fiscal Year.

10.03     <u>Manner of Payment of Fees, Charges, Costs and Expenses</u>

Upon receipt by Owner of the statement of profit and loss of the Hotel from Operator at the end of each month and otherwise in accordance with section 10.06(a) Operator shall be:

(a)     paid the Basic Fee for the preceding month, calculated on the basis of Gross Receipts for the preceding month; and

(b)     reimbursed for all costs and expenses, if any, reimbursable to it pursuant to section 10.02 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement during the preceding month.

To the extent that there may be insufficient funds in the Hotel Bank Accounts for Operator to make the payments required to be made under this section 10.03 on behalf of Owner, Owner shall pay the amount of any deficit to Operator on demand, together with interest on such payments from the time such payments are required to be made under this section 10.03 at the Interest Rate.

10.04     <u>Payment of Available Cash</u>

The following payments shall be made by Operator on behalf of Owner from the Hotel Bank Accounts or from funds made available pursuant to section 8.01 in the following order of priority:

(a)     to the repayment to Operator of any monies advanced by it pursuant to sections 8.02 and 13.01 and all costs and expenses, if any, reimbursable to it pursuant to section 10.02 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement,

together with interest on such advances from the date of such advances at the Interest Rate;

(b) to the payment of all Operating Expenses, excluding, however, real property Taxes, insurance premiums and the Fees and Charges (other than the Basic Fee and the Advisory Fee);

(c) to the payment of the Incentive Fee to Advisor;

(d) to fund the Capital Reserve for replacement and renewals of Furniture, Fixtures and Equipment;

(e) to fund real property Taxes, insurance premiums and the Fees and Charges (other than the Basic Fee and the Advisory Fee);

(f) to fund adequate working capital reserves for the Hotel, as determined by Operator taking into account the reasonable foreseeable financial needs of the Hotel;

(g) to the payment to Owner of any Deficit Payment required to be made to Owner in accordance with the provisions of Section 8.04(a);

(h) to the repayment to Operator of any Deficit Payment;

(i) to the payment of the regularly scheduled and currently due and owing interest payments and principal repayments to the holder of the First Mortgage;

(j) to the payment of the regularly scheduled and currently due and owing Investor's Loan Interest and principal repayments under the Investor's Loan;

(k) to the payment to Owner of the Owner's Return;

(l)   to the repayment to the Investor of the Investor's Return; and

(m)   the balance to Owner.

The payments enumerated in this section 10.04 shall be made by Operator (by way of cash, direct debit to Hotel Bank Accounts, cheque, bank draft, wire transfer or any other means of payment selected by Operator) on behalf of Owner from time to time as required for the operation of the Hotel or as otherwise set forth in the Hotel Agreements; provided that the payment contemplated in section 10.04(m) shall be made by Operator as frequently as possible having regard to the working capital requirements for the operation of the Hotel.

10.05   **Use of Proceeds from Sales of Residential Apartments**

(a)   If the Investor's Loan has been made in accordance with section 8.03(a) and all or any part of the Investor's Loan or any accrued and unpaid Investor's Loan Interest is still outstanding or owing, then Owner hereby agrees that on the closing of any sale by Owner or any of its Affiliates of any Residential Apartment, the proceeds arising from such sale, after deducting:  (i) all reasonable costs and expenses incurred by Owner in connection with the closing of such sale, and (ii) the applicable portion thereof payable to Licensor in accordance with sections 7.01(ii) and 7.01(iii) of the Hotel Licence Agreement, shall be used to repay, on a pro rata basis, the outstanding principal and interest secured by the First Mortgage and the outstanding principal owing under the Investor's Loan, together with accrued and unpaid Investor's Loan Interest.

(b)   Owner hereby covenants not to, and to cause its Affiliates not to, enter into any agreement or understanding for the lease of any Residential Apartment to any Person, it being understood and agreed by Owner that the Residential Apartments shall only be made available for sale by Owner or its Affiliates or any other Person acting on its behalf.  Notwithstanding the foregoing, Owner or any of its Affiliates shall be entitled to enter into any agreement or understanding for the

lease of any Residential Apartment to any Person; provided that Owner or such Affiliate shall (i) obtain the prior written consent of Operator, and (ii) pay to Licensor a portion of the proceeds arising from such lease in an amount equivalent to the amount Licensor would have received in accordance with sections 7.01(ii) and 7.01(iii) of the Hotel License Agreement had such Residential Apartment been sold.

**10.06**    **Financial Statements of Hotel**

(a)    Operator shall deliver to Owner within 15 days after the end of each month a profit and loss statement prepared in United States Dollars and Venezuelan Bolivars showing the results of operation of the Hotel for the immediately preceding month and the Fiscal Year to date. Such statements shall be taken from the books of accounts maintained by Operator.

(b)    Within 60 days after the end of each Fiscal Year, Owner shall cause to be prepared and delivered to Owner and Operator, a profit and loss statement prepared in Venezuelan Bolivars certified by the Hotel's General Manager and the independent auditors of the Hotel showing the results of operation of the Hotel for such Fiscal Year and a computation of Gross Receipts, Gross Operating Profit, Net Operating Profit, Adjusted Net Cash Flow, and the Fees and Charges. Owner shall have no liability for delays in the preparation and delivery of such statements to Owner and Operator provided that Owner has taken all practical steps to facilitate the preparation of such statements on a timely basis. The cost of the audit shall be an Operating Expense. Owner shall engage, at the expense of the Hotel (i) KPMG, (ii) any other leading internationally recognized independent and reputable firm of certified public accountants, or (iii) any other independent and reputable firm of certified public accountants designated by Owner and approved by Operator, to be the auditors of the Hotel.

# ARTICLE XI
# BOOKS AND RECORDS

11.01      General

       Operator shall, for the account of Owner, keep full and adequate books of account and other records (collectively, the "Accounts") on an accrual basis reflecting the results of operation of the Hotel, all in accordance with Generally Accepted Accounting Principles applicable to the hotel industry and with the Uniform System of Accounts, with such exceptions as may be required by the provisions of this Agreement. The Accounts shall be presented in a format consistent with the format used in other hotels and resorts which Operator or any of its Affiliates own or operate and manage. Operator shall make available to the auditors of the Hotel from time to time when reasonably requested all accounts.

11.02      Location, Examination and Inspection

       Except for the portion of the Accounts that may be kept in a suitable location pursuant to the adoption of a central billing system or other centralized service, the Accounts and all other records relating to or reflecting the operation of the Hotel shall be kept at the Hotel. The Accounts shall be available to Owner and its representatives at all reasonable times for examination, inspection and transcription; provided that all requests for access to the Accounts and all inquiries resulting from such access shall be made to Operator and such access shall be subject to such restrictions as are necessary so as not to interfere with the operation of the Hotel. The Accounts pertaining to the Hotel shall at all times be the property of Owner, and those which are to be kept at the Hotel shall not be removed from the Hotel by Operator without Owner's prior consent, which consent may be unreasonably withheld or delayed.

## ARTICLE XII

## REPAIRS, REPLACEMENTS, MAINTENANCE AND IMPROVEMENTS

**12.01**       <u>Repairs, Replacements and Maintenance</u>

      Operator shall, at the sole cost and expense of Owner make such expenditures from time to time that are in accordance with the Annual Plan for repairs and maintenance, for replacements, renewals and additions to Furniture, Fixtures and Equipment and for minor capital improvements as are necessary to maintain the Hotel in good and safe operating condition and at the standard of a World Class Luxury Hotel (excluding structural repairs and changes to the Hotel and extraordinary repairs to or replacement of Furniture, Fixtures and Equipment as contemplated in section 12.02). If any such repairs, maintenance, replacements, renewals, additions or improvements shall be made necessary by any condition against the occurrence of which Owner has received or is entitled to the benefit of the guarantee or warranty of any supplier of labour or material for the construction of repairs, maintenance, replacements, renewals, additions or improvements to the Hotel or of the Furniture, Fixtures and Equipment installed therein, then Operator shall use its reasonable efforts to invoke such guarantees or warranties in Owner's or Operator's name and Owner will co-operate fully with Operator in the enforcement thereof.

**12.02**       <u>Structural Repairs</u>

      If structural repairs or changes to the Hotel or extraordinary repairs to or replacement of any Furniture, Fixtures and Equipment shall be required at any time during the Term to maintain the Hotel in safe operating condition or by reason of any Applicable Law or by order of any Governmental Authority or because Operator and Owner jointly agree upon the desirability thereof (excluding repairs and maintenance, replacements, renewals and additions to Furniture, Fixtures and Equipment and minor capital improvements as contemplated in section 12.01), then Owner shall make all such repairs, changes or replacements in or to the Hotel. All such repairs, changes or replacements shall be made at Owner's sole cost and expense with as little hindrance to the operation of the Hotel as reasonably possible. Operator shall use its

reasonable efforts to give Owner advance notice of any such repairs, changes or replacements and to obtain the approval of Owner prior to making any such repairs, changes or replacements in or to the Hotel. Whenever the giving of such advance notice or the obtaining of such approval is, however, impracticable, then Operator shall be entitled to make such repairs, changes or replacements without having to give such advance notice or having to obtain such approval; provided, however, that Operator shall give Owner notice as soon as practicable after such repairs, changes or replacements are made of the nature of such repairs, changes or replacements and the reasons therefor. Notwithstanding the foregoing, Owner shall have the right to either contest the need for any such repairs, changes or replacements or postpone compliance therewith, if such contestation or postponement is permitted by Applicable Law and will not in any way adversely affect the operation of the Hotel or the insurance contemplated by Article XVI or expose the Operator to civil or criminal liability, and Operator shall co-operate with Owner as Owner may request and execute any documents or pleadings required for such purpose; provided that (a) Operator is satisfied that the facts set forth in such documents or pleadings are accurate and that such execution and co-operation does not impose any liabilities, obligations or costs and expenses on Operator, and (b) Owner shall protect Operator from any loss, cost, damage or cost and expense which may result therefrom, such protection to be in form and substance satisfactory to Operator. The Capital Reserve Account shall not be utilized for repairs, changes or replacements contemplated in this section 12.02.

**12.03      Alterations, Additions and Improvements**

Operator shall, at the sole cost and expense of Owner, make such alterations, additions or improvements from time to time that are in accordance with the Annual Plan in or to the Hotel (excluding repairs and maintenance, replacements, renewals and additions to Furniture, Fixtures and Equipment and minor capital improvements as contemplated in section 12.01 and structural repairs and changes to the Hotel and extraordinary repairs to or replacement of Furniture, Fixtures and Equipment as contemplated in section 12.02). The cost of such alterations, additions or improvements shall be charged either directly to the current expenses or shall be capitalized on the books of account in accordance with Generally Accepted Accounting Principles applicable to the hotel industry and with the Uniform System of Accounts.

# ARTICLE XIII

## DAMAGE TO AND DESTRUCTION OF THE HOTEL

13.01     <u>Owner's Obligation to Repair</u>

(a)     Subject to sections 13.01(b) and 13.01(c), if the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire or any other casualty, Owner will with due diligence repair, rebuild or replace the same so that after such repairing, rebuilding or replacing the Hotel shall be substantially the same as prior to such damage or destruction. If Owner fails to begin such work within 90 days after the fire or other casualty or fails to complete the work diligently, Operator may, at its option, either (i) terminate this Agreement by written notice to Owner, (ii) pursue any other recourse available at law or in equity it may have, or (iii) undertake to complete such work for the account of Owner if the cost of repair, rebuilding or replacement is estimated by Operator and Owner to be less than 20% of the replacement cost of the Hotel. If Operator undertakes such work, Operator shall be entitled to be repaid upon demand by Owner for the cost of such work which shall be reasonable, together with interest on such cost from the date of incurring such cost at the Interest Rate, and the proceeds of any insurance, to the extent of the actual cost of such work, shall be made available to Operator.

(b)     If the cost of repair, rebuilding or replacement in the final three years of the current Term following a casualty is estimated by Operator and Owner to exceed 20% of the replacement cost of the Hotel, Owner shall have the right (exercisable by written notice given to Operator within 90 days following the date which is the later of the date of the occurrence of such casualty and the date of the determination of the estimate) not to repair, rebuild or replace the damage and to terminate this Agreement effective on the last day of the month following the month in which such notice of termination is given unless Operator has a further

right to extend the Term pursuant to section 9.02(a), in which case the notice of termination shall not be effective and Owner shall repair, rebuild or replace the Hotel as otherwise required by section 13.01(a).

(c)     If the cost of repairing, rebuilding or replacement not covered by insurance following a casualty should be estimated by Operator and Owner to exceed 20% of the replacement cost of the Hotel, then Owner shall have the option (exercisable by written notice given within 90 days following the date which is the later of the date of the occurrence of such casualty and the date of the determination of the estimate) not to repair, rebuild or replace and to terminate this Agreement effective on the last day of the month following the month in which such notice of termination is given.

(d)     If Owner, by reason of unavailability of supplies, strikes, walk-outs or other matters entirely beyond the control of Owner (which in no event shall include Owner's financial incapacity), shall be unable to undertake the repairs or restoration within the time provided for in section 13.01(a), the time during which Owner shall be able to undertake to accomplish the repairs or restoration shall be extended accordingly.

(e)     Operator shall, notwithstanding any delay or interruption resulting from any such damage or destruction, be entitled to receive from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Basic Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, or (ii) at any time after the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Basic Fee historically earned by Operator.

13.02      Operator's Reinstatement

If, following a termination of this Agreement by Operator in accordance with section 13.01, at any time during the five year period following such termination Owner or a Related Person intends to repair, rebuild or replace the Hotel or commences to do so, Owner shall promptly notify Operator in writing of such intention or commencement, and, at Operator's election (exercisable by written notice given to Owner within 60 days of receipt of the written notice by Owner of its intention to repair, rebuild or replace the Hotel or, if no such Owner's notice is given, Operator's actual knowledge of the commencement) this Agreement shall be reinstated (with only such amendments as are required due to changes in the type, scope or design of the project).

## ARTICLE XIV
## EXPROPRIATION

14.01      Complete Expropriation

If the whole of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings, or if such a portion of the Hotel shall be so taken as to make it imprudent or unreasonable, in Owner's and Operator's opinion, to operate the remaining portion as a hotel of the standard of operation then applicable to the Hotel, then in either event this Agreement shall be deemed to have terminated as of such time as possession of the Hotel or portion of the Hotel is surrendered or its operation is discontinued as a result of such taking or condemnation. Owner shall receive the whole of any award for any complete taking or condemnation; provided that Operator shall be entitled to receive from any award from such taking or condemnation (i) at any time prior to the end of the first Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Basic Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after

the Opening Date, an equitable apportionment of such award based on the Basic Fee historically earned by Operator.

### 14.02      Partial Expropriation

If only a part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings and the taking or condemnation does not make it financially or operationally unreasonable or imprudent, in Owner's and Operator's opinion, to operate the remaining portion as a hotel of the standard of operation then applicable to the Hotel, this Agreement shall not terminate; provided that any award therefor shall be used by Owner to repair any damage to the Hotel or any part of the Hotel, or to alter or modify the Hotel or any part of the Hotel, so as to render the Hotel a complete and satisfactory architectural unit as a World Class Luxury Hotel.  The remainder of any such award for any partial taking or condemnation shall be retained by Owner; provided that Operator shall be entitled to receive from any award for such taking or condemnation (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Basic Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Basic Fee historically earned by Operator.

### 14.03      Temporary Expropriation

If all or any part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings for a temporary use, this Agreement shall not terminate and Operator shall, for the duration of any delay or for the period of business interruption resulting from any such taking or condemnation, be entitled to receive from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment

of such insurance proceeds based on the Basic Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Basic Fee historically earned by Operator. When and if during the Term, the period of temporary use shall terminate, Owner shall make all such restoration, repairs and alterations as shall be necessary to restore the Hotel to a World Class Luxury Hotel.

## ARTICLE XV
## TAXES

**15.01**     **Payment of Taxes**

    **(a)**    Subject to section 15.02, all Taxes levied against the Hotel or any component part thereof shall be paid prior to the date the same become due and payable, subject to any right to pay by instalments to the extent permitted by Applicable Law. Should funds available from Hotel Bank Accounts not be sufficient to enable Operator to pay such obligations to the extent not paid by Owner in timely and complete fashion, Owner shall supply the deficiency in accordance with section 8.01.

    **(b)**    Operator shall cooperate with Owner as Owner may request from time to time with a view to ensuring that the Hotel is operated in a manner which minimizes the Tax levied against the Hotel; provided that Operator shall have no obligation to cooperate with Owner in that regard, if the effect would be to (i) compromise or otherwise impact in any manner whatsoever on the operation of the Hotel as a World Class Luxury Hotel, (ii) reduce or otherwise prejudice the amount of the sums, charges and fees otherwise payable to Operator under this Agreement or of the costs and expenses reimburseable to Operator pursuant to section 10.02, or (iii) render Operator liable for any damages, losses or any other costs

whatsoever or prejudice any rights, remedies or other benefits in favour of Operator under this Agreement.

**15.02**      Contest

Notwithstanding section 15.01, Owner may contest the validity of the amount of any Taxes, without prejudice to Operator's rights under this Agreement; provided that such contest is permitted by Applicable Law and will not in any way adversely affect the operation of the Hotel or expose Operator to civil or criminal liability. The costs and expenses of such contest shall be an Operating Expense. Operator shall co-operate with Owner as Owner may request and execute any documents or pleadings required for such purpose; provided that (a) Operator is satisfied that the facts set forth in such documents or pleadings are accurate and that such execution or co-operation does not impose any obligations or liabilities or costs and expenses on Operator, and (b) Owner shall protect Operator from any loss, cost, damage or cost and expense which may result therefrom, such protection to be in form and substance satisfactory to Operator. To the extent that any Taxes affect Operator or Operator's rights under this Agreement, Operator may, at the expense of Operator, contest the validity of the amount of any Taxes and Owner shall co-operate with Operator as Operator may request and execute any documents or pleadings required for such purposes.

## ARTICLE XVI
## INSURANCE

**16.01**      Coverage

(a)      Owner acknowledges and agrees that during the Term Operator will provide and maintain for the Hotel insurance coverage of the kinds and in the amounts carried by Operator or any of its Affiliates at other hotels and resorts insured under blanket policies arranged by Operator or any of its Affiliates. Without limiting the generality of the foregoing, such insurance coverage shall include:

(i)   the policies described in Schedule "B" attached to this Agreement; and

(ii)  other policies which the Operator or any of its Affiliates shall, from time to time, deem prudent for the operation of a World Class Luxury Hotel,

and the premiums payable in respect of all such insurance coverage shall be included in the calculation of Operating Expenses.

**(b)**   If Owner wishes any increased amount or additional form of insurance other than those arranged by Operator or any of its Affiliates as described in section 16.01(a), then Owner shall request Operator in writing to arrange such insurance and Operator shall make every reasonable effort to arrange such insurance.  If, in the view of Operator or any of its Affiliates or their general insurance brokers such insurance would not be obtainable, Operator shall so advise Owner promptly in writing.  Owner shall be free thereafter to attempt to arrange such increased amounts or additional forms of insurance, in accordance with the policy requirements set out in sections 16.02 through 16.06, until the next policy renewal.  If Owner increases such insurance above the limits or forms that are standard in the industry for properties of comparable location and character, the increased premium shall be excluded for the purposes of calculating Operating Expenses and, to the extent cash is not available in the Hotel Bank Accounts to make payments pursuant to section 10.04 as a result of those excess premiums, Owner shall deposit the amount of the deficiency into the Hotel Bank Accounts.

**(c)**   Owner understands that Operator cannot guarantee availability during the Term of all coverages, as described in section 16.01(a).  If at any time:

(i)  Operator shall, for any reason, be unable to arrange any or all of the insurance described in section 16.01(a), then Operator shall so notify Owner in writing and Owner shall be free thereafter to attempt to arrange such

insurance, in accordance with the policy requirements set out in sections 16.02 through 16.06, until the next policy renewal; and

(ii) in the view of Operator or any of its Affiliates or their general insurance brokers any coverage is not obtainable exactly as described in Schedule "B", then Operator shall substitute the obtainable coverage which in the opinion of Operator or any of its Affiliates or their general insurance brokers most closely meets the requirements of Schedule "B". Operator shall, however, notify Owner in writing of the nature of and reason for any such discrepancy;

Owner further understands that, notwithstanding the foregoing obligations, risks may exist from time to time which are not insurable or insured. Operator will make every reasonable effort to ensure that coverage is arranged to the standard of insurance described in Schedule "B" or that obtainable coverage which most closely meets the requirements of Schedule "B" in the opinion of Operator or any of its Affiliates or their general insurance brokers is substituted therefor as described in section 16.01(c)(ii).

(d)     Subject to Article XX, Operator or any of its Affiliates, in the performance of its obligations under this Article XVI, shall not be liable to Owner or to any other Person for any and all uninsured liability, loss, claim or damage. Owner shall indemnify, defend and hold Operator and any of its Affiliates harmless for any and all uninsured liability, loss, claim or damage.

16.02     Named Insureds

All policies required under, or otherwise contemplated by, this Article XVI shall:

(a)     name, as insureds, Operator, Advisor, Four Seasons and such other parties as Operator shall require to be named as insureds;

(b)     name as additional insureds Owner and such other Persons as Owner shall require to be named as additional insureds or loss payees;

(c)     contain a waiver of subrogation provision pursuant to which the insurer(s) waives all expressed and implied rights of subrogation against each of the parties insured and their respective Affiliates; and

(d)     provide that losses shall be payable to the parties insured as their respective interest may appear.  With respect to insurance on the Hotel structure, if the mortgagee is an institutional lender and so requires, insurance proceeds may be made payable to the mortgagee or to an insured bank in the country where the Hotel is located, in either instance as trustee for the custody and disposition of the proceeds.  Owner shall ensure that any mortgage shall contain a provision to the effect that proceeds from the insurance shall be promptly made available by the mortgagee for repair, rebuilding or restoration.

16.03     **Policies**

All policies required under, or otherwise contemplated by, this Article XVI shall include the following provisions:

(a)     such insurance shall be non-contributing with, and shall apply only as primary and not in excess to, any other insurance available to the parties insured; and

(b)     coverage shall not be cancelled, lapsed or materially reduced, except where the insurer(s) have provided the parties insured at least 30 days advance written notice thereof.

16.04     Insurance Companies

Owner and Operator shall use all reasonable efforts to ensure that all insurance shall be taken out by Owner or Operator in respect of the Hotel with insurance companies having (i) a Best Insurance Reports' policyholder rating of not less than "A" and a financial rating of at least IX, (ii) the equivalent thereof by other rating agencies, or (iii) a reputable and secure insurance company in the opinion of the general insurance brokers of Operator or any of its Affiliates.

16.05     Certificates of Insurance

Whenever insurance coverage is arranged by Operator or by Owner in accordance with this Agreement, whichever party has arranged for such coverage, will direct that up-to-date certificates of such coverage and subsequent renewals or replacements thereof will be delivered to:

(a)     the other party; and

(b)     any one else reasonably designated by the other party.

16.06     Blanket Policies

(a)     Where insurance is provided by Operator or any of its Affiliates, such insurance may be maintained under insurance policies which cover operations other than the Hotel. In such event, it is acknowledged and agreed by Owner that the purpose of such blanket policies is to provide mutual benefits to Owner, Operator and owners of other hotels and resorts managed by Operator or any of its Affiliates. Operator or any of its Affiliates are hereby authorized to make any amendments, consolidations or changes in either deductibles or the insurer designated to yield net cost reductions to a majority of the participants in any blanket policy.

(b)   Where coverage is provided under such a policy or policies, the insurer shall identify the proportion of the total premium which is applicable to the Hotel, and the opinion of the insurer with respect to the allocation shall be binding.

(c)   Operator shall be entitled to charge the Hotel's proportionate share of all premiums for business interruption insurance paid by Operator or any of its Affiliates as an Operating Expense of the Hotel.

**16.07    Insurance Appraisals**

Within a reasonable time following receipt of Owner's written request (but not more frequently than annually) Operator, where practicable, shall obtain such insurance appraisals of the replacement value of the Hotel, the Furniture, Fixtures and Equipment or any parts thereof as are specified in such written request.  The cost of such appraisals shall be an Operating Expense.

## ARTICLE XVII
## ASSIGNMENTS AND MORTGAGES

**17.01    Owner's Right to Assign**

Subject to the provisions of section 17.03, Owner shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person on the condition that such Person first enter into an agreement with Operator, in the form attached hereto as Schedule "D", agreeing:

(a)   that the Hotel Agreements continue in full force in effect after such sale, assignment, transfer or other disposition; and

- 51 -

(b)     to assume all of the contractual obligations of Owner contained in the Hotel Agreements.                     —

17.02     <u>Owner's Right to Mortgage</u>

Subject to the provisions of section 17.03, Owner shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to any Person on the condition that such mortgagee first enter into an agreement with Operator, in the form attached hereto as Schedule "E", agreeing:

(a)     to be bound by Owner's covenants and undertakings hereunder for any period during which it is in possession of the Hotel;

(b)     not to exercise any rights that it might otherwise have to in any way limit Operator's rights under this Agreement in respect of the Hotel Bank Accounts;

(c)     that in the event of a foreclosure of its mortgage or lien on the Hotel or this Agreement or of a conveyance in lieu of foreclosure (i) no default under such mortgage or other documents evidencing the lien in favour of such mortgagee, and no proceeding to foreclose the same, and no conveyance in lieu of foreclosure thereof, will disturb Operator's right to operate and manage the Hotel in accordance with the terms of this Agreement or affect any other right of Operator under this Agreement, and (ii) this Agreement shall continue in full force and effect and such mortgagee, its successors and assigns, or any party (the "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein upon foreclosure sale or by deed in lieu thereof, as the case may be, shall be a Qualified Person and shall automatically recognize this Agreement and Operator's rights hereunder for the balance of the Term upon the same terms, covenants and conditions as herein provided, with the same force and effect as though this Agreement were originally made directly between Operator and such mortgagee,

or its successors and assigns, or the Foreclosure Purchaser, as the case may be; and

(d)     not to sell, transfer or otherwise dispose of any interest it may have in the Hotel or this Agreement without first causing any transferee thereof to acknowledge and agree to be bound by and become a party to such agreements with Operator.

**17.03     Limitation on Owner's Right to Assign and Mortgage**

Notwithstanding the provisions of sections 17.01 and 17.02, Owner shall not without the express prior written consent of Operator, which consent may be withheld or delayed in the sole discretion of Operator without regard to the provisions of section 19.01(a), directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of, or mortgage, hypothecate or otherwise encumber, any interest, whether legal or beneficial, in all or any part of its Interest to any Person other than a Qualified Person. Any change in control of Owner, whether directly or indirectly and whether by way of transfer of shares, partnership interests or otherwise, to any Person other than a Qualified Person, shall be prohibited unless the express prior written consent of Operator, which consent may be unreasonably withheld or delayed, is obtained.

**17.04     Operator's Right to Assign**

Subject to section 17.06, Operator shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person, on the condition that:

(a)     the Person to whom the Interest of Operator is to be sold, assigned, transferred or otherwise disposed of shall first enter into an agreement with Owner, in form and substance satisfactory to Owner, agreeing to assume all of the contractual obligations of Operator contained in this Agreement; and

(b)     in the case of a sale, assignment, transfer or other disposition to an Affiliate of Operator, Operator shall first enter into an agreement with Owner, in form and substance satisfactory to Owner, agreeing to be jointly and severally liable with such Affiliate to perform all of the contractual obligations of Operator contained in this Agreement notwithstanding such sale, assignment, transfer or other disposition.

Upon a sale, assignment, transfer or other disposition to a Person other than an Affiliate, Operator shall be released from all of its obligations under this Agreement.

### 17.05     Operator's Right to Mortgage

Operator shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to a financial institution as security for its obligations to such financial institution.

### 17.06     Limitation on Operator's Right to Assign

Operator shall not without the express prior written consent of Owner, directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person other than (i) an Affiliate, (ii) a Person that results from any merger, amalgamation, consolidation or other reorganization of Operator, or (iii) a Person that acquires all or substantially all the assets of Operator and operates a hotel management business either on its own or in conjunction with its Affiliates.  This section 17.06 shall not, however, apply to a change in control of Four Seasons Hotels Inc. resulting from sales of its publicly traded shares to any Person.

# ARTICLE XVIII

# EVENTS OF DEFAULT AND TERMINATION

**18.01**      <u>General</u>

Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

(a)      the failure of Operator to disburse any amount to Owner provided for herein, or the failure of Owner to pay any amounts required to be paid by it hereunder, for a period of 30 days after the date on which notice of the failure has been given to the defaulting party by the other party;

(b)      the filing of a voluntary assignment in bankruptcy or insolvency or a petition for reorganization under any Applicable Law by Owner, any member or partner of Owner, or Operator;

(c)      the consent to an involuntary petition in bankruptcy or the failure by Owner, any member or partner of Owner, or Operator to vacate, within 60 days from the date of entry thereof, any order approving an involuntary petition;

(d)      the making of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner, any member or partner of Owner, or Operator a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of a party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of 120 consecutive days; or

(e)      the failure of either Owner or Operator to fulfil any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of 30 days after written

notice of the failure; provided that if upon receipt of any notice the defaulting party promptly and with all due diligence cures the default or, if the default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures the failure within the period so advised, then no event of default shall be deemed to have occurred unless and until the defaulting party has failed to take or to continue to take action or to complete the cure within the period.

18.02    **Rights of Non-Defaulting Party**

Upon the occurrence of any event of default pursuant to section 18.01 and the applicable grace periods having expired, either Owner or Operator, without prejudice to any other recourse at law or in equity which it may have, give to the other notice of its intention to terminate this Agreement after the expiration of a period of 30 days from the date of such notice and, upon the expiration of such period, the term of this Agreement shall expire unless such default has been cured.  Such notice shall be of no force and effect if within 30 days of receipt of such notice, the party receiving such notice shall promptly and with all due diligence cure the default or, if such default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures such default within the period so advised.

18.03    **Remedying Defaults**

Notwithstanding anything to the contrary contained in this Agreement, either Owner or Operator shall be entitled to remedy any default of the other under this Agreement with reasonable notice to the other or without notice in the event of any emergency or apprehended emergency, without prejudice to any rights under this Agreement and the party so remedying such default shall be repaid upon demand by the other for the cost of remedying such

default, together with interest on such cost from the date of incurring such cost at the Interest Rate.

18.04    **Bona Fide Dispute**

Notwithstanding the provisions of section 18.02, neither Owner nor Operator shall be entitled to take any of the actions contemplated in section 18.02, save and except for the commencement of any legal proceedings (in which case the provisions of sections 22.10 and 22.11 regarding jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained in this Agreement pending the resolution of a Dispute, if before the expiration of the 30 day notice period referred to in section 18.02, notice of a Dispute has been delivered in accordance with section 19.02(a) with respect to any of the foregoing events of default and the procedures set forth in sections 19.02(b) and (c) are being pursued in good faith (except that for this purpose under section 19.02(b), the requirement of a 30 day negotiation period under section 19.02(a) shall be inapplicable and the period within which to appoint an expert under section 19.02(b) shall commence on the date of delivery of notice of a Dispute).

18.05    **Owner's Right to Terminate**

(a)    Subject to the provisions of sections 18.05(b), 18.05(c) and 18.05(d) and in addition to any right arising out of section 18.02, Owner shall have the right to terminate this Agreement at any time following the Termination Test Effective Date if, in the two consecutive Fiscal Years immediately preceding the date of calculation of Net Operating Profit (any such two consecutive Fiscal Years a "Termination Test Period"), the Hotel fails to achieve the following amounts of Net Operating Profit:

(i)    in each of the eleventh to fifteenth Fiscal Years, inclusive (disregarding the initial Fiscal Year of less than 12 calendar months), an amount equal to $5,000,000;

- 57 -

(ii)    in each of the sixteenth to twentieth Fiscal Years, inclusive (disregarding the initial Fiscal Year of less than 12 calendar months), an amount equal to $6,000,000;

(iii)    in each of the twenty-first to twenty-fifth Fiscal Years, inclusive (disregarding the initial Fiscal Year of less than 12 calendar months), an amount equal to $7,000,000; and

(iv)    in each of the twenty-sixth to thirtieth Fiscal Years, inclusive (disregarding the initial Fiscal Year of less than 12 calendar months), an amount equal to $8,000,000.

**(b)**    If, during either Fiscal Year of any Termination Test Period, either (i) one or more of the following events occurs or (ii) the effects of the occurrence of one or more of the following events in any previous Fiscal Year are continuing, which event or events in their totality, after giving effect to the proceeds received from any applicable business interruption insurance contemplated in section 16.01(a), adversely affect Net Operating Profit, the applicable amounts of Net Operating Profit set out in section 18.05(a) shall be reduced by an amount determined by Owner and Operator equal to the difference between the amount of Net Operating Profit the Hotel would have achieved in such Fiscal Year had any of the following events not occurred or the effects of which not continued, as the case may be, and the amount of Net Operating Profit actually achieved by the Hotel in respect of such Fiscal Year:

(i)    damage or destruction to all or any material part of the Hotel;

(ii)    a Capital Refurbishing Program affecting 20% or more of the Hotel;

(iii)    material interference with the normal operation of the Hotel by any Governmental Authority;

58

(iv)   strikes, walkouts or lock-outs affecting the normal operation of the Hotel, unless caused by the wilful misconduct, gross negligence or bad faith of Operator;

(v)   wars, fires, acts of God, disasters, riots or boycotts or shortages of material or labour; or

(vi)   any other similar force majeure event beyond the control of Operator.

(c)   Notwithstanding the provisions of section 18.05(a), Owner's right to terminate this Agreement in respect of any Termination Test Period shall only be exercised (i) by written notice to Operator with 90 days of receipt by Owner of the annual statement of profit and loss of the Hotel from Operator in accordance with the provisions of section 10.06(b) for the immediately preceding Fiscal Year, which notice shall be effective 90 days after such notice is given, and (ii) with respect to the operations of the Hotel in the immediately preceding Termination Test Period.

(d)   Notwithstanding the provisions of section 18.05(a), Owner shall not have the right to terminate this Agreement in respect of any Termination Test Period if the failure of the Hotel to achieve the applicable amount of Net Operating Profit set out in section 18.05(a) in respect of either Fiscal Year of such Termination Test Period is the result of general market conditions prevailing in the Republic of Venezuela during such Fiscal Year.

(e)   Notwithstanding the provisions of section 18.05(a), Owner shall not have the right to terminate this Agreement in respect of any Termination Test Period, if Operator or any of its Affiliates pays to Owner an aggregate amount equal to the amount by which the Hotel failed to achieve the applicable level of Net Operating Profit as set forth in section 18.05(a) for either or both of the Fiscal Years of such Termination Test Period; provided, however, that in the event that Operator

or any of its Affiliates pays such amount to Owner in respect of only one of the Fiscal Years of such Termination Test Period, the other Fiscal Year of such Termination Test Period and the Fiscal Year immediately following such Termination Test Period shall be deemed to constitute the next Termination Test Period for purposes of section 18.05(a).

18.06     Operator's Right to Terminate

In addition to any right arising out of section 18.02 and notwithstanding sections 18.04, 19.02 and 19.03, Operator shall have the right to terminate this Agreement if the Opening Date does not occur on or before 180 days after September 30, 1998, other than by reason of any default by Operator in its obligations under this Agreement. Operator's right to terminate this Agreement in accordance with this section 18.06 shall be exercised by written notice by Operator given to Owner within 30 days after the relevant date mentioned above. If the Opening Date does not occur on or before the Scheduled Opening Date for any reason beyond the control of Owner, including (without limitation) the Hotel or any portion thereof being damaged or destroyed, and Operator does not terminate this Agreement in accordance with this section 18.06 Operator shall, for the period beginning on the Scheduled Opening Date and ending on the Opening Date, nevertheless be entitled to receive, from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a), an equitable apportionment of such insurance proceeds based on the Basic Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable.

18.07     Cross-Termination

If any or all of the Hotel Agreements (other than the Hotel Pre-Opening Services Agreement) are terminated after the Opening Date, or if the Hotel Pre-Opening Services Agreement is terminated other than as a result of the expiry of its term through the passage of time, then either Owner or Operator shall, in addition to any rights or remedies available to it at law or in equity, be entitled to terminate this Agreement by written notice to the other within 10 days after the date of such termination and Owner and Operator shall have no future

obligations arising out of this Agreement, save and except as expressly otherwise provided for in this Agreement.

### 18.08      Accounting on Termination

If this Agreement is terminated, Operator shall be entitled (in addition to any rights or remedies available to it at law or in equity) to all sums, charges and fees which it is entitled to receive under this Agreement, together with costs and expenses, if any, reimbursable to it pursuant to section 10.02 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement. The amount of all of such sums, charges, fees and costs and expenses shall be ascertained for the period ending on the date of such termination and shall be paid to Operator (i) to the extent ascertained on the date of such termination, on such date, and (ii) to the extent not ascertained on the date of such termination, on the date on which such sums, charges, fees and costs and expenses are ascertained after the date of such termination.

### 18.09      Owner to Receive All Books and Records Upon Termination

Upon termination of this Agreement, the Accounts, including (without limitation) originals or copies, as appropriate, of those Accounts not kept at the Hotel, shall be turned over to Owner forthwith so as to ensure the orderly continuance of the operation of the Hotel, but the Accounts shall thereafter be available to Operator at all reasonable times for inspection, audit, examination and transcription for a period of 10 years.

### 18.10      Claims on Termination

Notwithstanding anything contained in this Agreement, (i) the termination of this Agreement shall not prejudice any cause of action, claim or right of either Owner or Operator against the other accrued or to accrue on account of any default by the other of its obligations under this Agreement or arising as a result of the termination of this Agreement, and any term, covenant, condition or provision of this Agreement referable thereto shall not merge, but shall

survive, the termination of this Agreement, and (ii) the Dispute resolution procedure set forth in section 19.02 shall no longer apply to any of Owner or Operator after termination of this Agreement and any of Owner or Operator shall be entitled to commence legal proceedings seeking any recourse available to it at law or in equity, including (without limitation) mandatory, declaratory or injunctive relief to define or protect the rights and enforce the obligations contained in this Agreement; provided that such legal proceedings shall not involve issues which have previously been submitted to and settled by arbitration in accordance with this Agreement unless such legal proceedings involve the enforcement of an arbitration decision or award made in respect of such issues.

## ARTICLE XIX
## APPROVALS, DISPUTE RESOLUTION AND ARBITRATION

**19.01**      <u>**Approvals**</u>

Except as otherwise expressly provided in this Agreement:

(a)  all opinions contemplated by this Agreement must be reasonably formed and the approval of any document, proposed action or other matters in accordance with this Agreement shall not be unreasonably withheld or delayed; provided, however, that in determining the reasonableness of any such withholding or delay, full consideration shall be given to, and it shall be unreasonable to deny or refuse consent or approval to any matter if the effect of such denial or refusal would prevent or hinder, the operation of the Hotel as a World Class Luxury Hotel or the operation of the other components of the Project at a standard consistent with that applicable to the Hotel as a World Class Luxury Hotel; and

(b)  the following procedure shall be followed with respect to any matter requiring approval:

(i)    such documents or a written description of the proposed action or other matter requiring approval shall be submitted by the party having responsibility therefor (the "requesting party") to the party having the right of approval, which submission shall be accompanied by a request for approval in accordance with this Agreement;

(ii)    as soon as possible but not later than 30 days after receipt of any proposed budget or 15 days after the receipt of any other written request for approval (or such other time period as may be specified for approval with respect to any item in this Agreement) the party having the right of approval shall notify in writing the requesting party of its approval or of its specific objections to the document, proposed action or other matter;

(iii)    failure to respond in writing with specific objections within the maximum time period specified in section 19.01(b)(ii) shall constitute approval of all matters submitted;

(iv)    within 10 days of the receipt of any objections (or such other time period as may be specified in this Agreement), the requesting party shall:

    (i)    acquiesce to such objections; or

    (ii)    reach an agreement with the party objecting; or

    (iii)    call for a meeting of senior representatives of Owner and Operator to be convened to consider the matter in dispute (by giving notice to convene such meeting in writing indicating the specific issues in dispute to be resolved by such representatives); and

(v)    as soon as possible, but not later than 10 days after receiving a request to convene a meeting in accordance with section 19.01(b)(iv)(C),

representatives of Owner and Operator shall convene to consider the specific issues in dispute and resolve them to the mutual satisfaction of the parties and if unable to resolve the specific issues in dispute, the same shall be resolved in accordance with the arbitration procedure provided in section 19.03.

Once any document, proposed action or other matter is approved, no change or amendment thereof may be effected without the prior consent of both parties.

19.02      <u>Dispute Resolution</u>

Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to this Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner:

(a)      first, within 10 days after the receipt of notice of a Dispute by one party to the other, the parties shall in good faith attempt to negotiate for a period of 30 days in an effort to resolve the Dispute;

(b)      second, if the parties are unable to resolve the Dispute within such 30 day period, they shall retain a mutually acceptable expert to assist them in resolving the Dispute within 10 additional days, failing which they shall each retain an expert on the eleventh day and the two experts thus chosen shall together act as the expert for the purposes of this section 19.02(b). If either party shall fail to appoint an expert as required hereunder, the expert appointed by the other party shall be the sole expert. Within 90 days after the experts (or such single expert) have been retained, the experts (or such single expert) shall, on a non-binding basis, advise the parties in writing of their views. The fees and expenses of the experts (or such single expert) shall be borne equally;

(c)    third, if the parties are still unable to resolve the Dispute within such 90 day period, the parties shall resort to the arbitration procedures set forth in section 19.03; and

(d)    fourth, any party to the Dispute shall be entitled to join any Dispute proceeding arising out of this Agreement with any other Dispute proceeding arising out of either this Agreement or any of the other Hotel Agreements.

## 19.03    Arbitration

Except as otherwise provided in section 18.04 and this section 19.03, any Dispute shall be settled by arbitration as follows:

(a)    each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration. Within 10 days after receipt by the other party of such notice, each party shall appoint an arbitrator and within 10 days of their appointment the two arbitrators so chosen shall nominate a third arbitrator. If the two arbitrators fail within such 10 day period to nominate the third arbitrator, upon written request of either party, the third arbitrator shall be appointed by the International Court of Arbitration of the International Chamber of Commerce, and both parties shall be bound by the appointment so made. If either party hereto shall fail to appoint an arbitrator as required under this section 19.03(a), the arbitrator appointed by the other party shall be the sole arbitrator of the matter;

(b)    the decision of the arbitrators (or such single arbitrator) shall be made within 10 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator) when reduced to writing and signed by them shall be final, conclusive and

binding upon the parties hereto, and may be enforced in any court having jurisdiction;

(c)     the arbitration shall at the election of Operator be held in the City of Miami, Florida, United States of America or the City of Caracas, Republic of Venezuela and shall be conducted in the English language and, except for those procedures specifically set forth in this section 19.03, shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof; and

(d)     the arbitrators (or such single arbitrator) shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that each party shall be responsible for its own legal fees.

Notwithstanding anything contained in this section 19.03, any of Owner or Operator shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 22.10 and 22.11 governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained in this Agreement pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this section 19.03, (ii) commence legal proceedings (in which case the provisions of sections 20.10 and 20.11 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement, or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of either this Agreement or any of the other Hotel Agreements.

# ARTICLE XX
## OPERATOR'S LIABILITY

**20.01**     <u>Standard of Care</u>

(a)     Operator shall not, in the performance of its obligations under this Agreement, be liable to Owner or to any other Person for any act or omission (whether negligent, tortious or otherwise) of Operator or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives, except only to the extent such liabilities, obligations, claims, costs and expenses arise out of or are caused by the wilful misconduct, gross negligence or bad faith of Operator or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives.

(b)     Owner shall not, in the performance of its obligations under this Agreement, be liable to Operator for any advice given by Advisor pursuant to the Hotel Advisory Agreement and acted upon by Operator in accordance with this Agreement.

**20.02**     <u>Indemnities</u>

(a)     Owner hereby indemnifies and holds Operator and its Affiliates and any of their respective directors, officers, employees, consultants, agents and representatives (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of any action or omission or course of action on the part of an Indemnified Party in the performance of its obligations under this Agreement or otherwise in connection with any obligation incurred by or instrument executed by an Indemnified Party alone, an Indemnified Party together with Owner or by Owner alone, whether or not an Indemnified Party shall be the signatory or one of the signatories on behalf of Owner and whether incurred or executed on behalf

of Owner; provided that the indemnity shall not apply with respect to any liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses resulting from the wilful misconduct, gross negligence or bad faith of the Indemnified Party.

**(b)**      Operator hereby indemnifies and holds Owner and any of its directors, officers, employees, consultants, agents and representatives harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of or caused by the wilful misconduct, gross negligence or bad faith of Operator or any of its directors, officers, employees, consultants, agents or representatives, including (without limitation) under section 6.02.

## ARTICLE XXI
## ACKNOWLEDGMENTS

**21.01**      <u>Owner's Acknowledgments</u>

Owner acknowledges that:

**(a)**      in entering into this Agreement, Owner has not relied on any statement, study, representation or warranty of Operator, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, express or implied, relating to the Hotel, including (without limitation) any statement, study, representation or warranty relating to the structural integrity, safety or other design aspects of the Hotel, the competence of the Consultants, the compliance of the Hotel with Applicable Law, any projection or pro forma statements of earnings or profit or loss or statements as to future success of the Hotel which may have been prepared by or on behalf of Operator, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, and Owner

understands that no guarantee is made or implied by Operator or any of its Affiliates with respect thereto; provided that, for greater certainty, nothing in this section 21.01(a) shall affect in any manner whatsoever the obligation of Operator or its Affiliates to make Deficit Payments in accordance with the provisions of section 8.04; and

(b)     Operator is relying on the representations, warranties and covenants of Owner set out in the Hotel Agreements in connection with Operator entering into and fulfilling its obligations under this Agreement.

## 21.02     Operator's Acknowledgments

Operator acknowledges that Owner is relying on the representations, warranties and covenants of Operator set out in this Agreement, and of the Affiliates of Operator set out in the other Hotel Agreements, in connection with Owner entering into and fulfilling its obligations under this Agreement.

## ARTICLE XXII
## GENERAL PROVISIONS

## 22.01     Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

22.02        **Modification and Changes**

This Agreement cannot be changed or modified except by another agreement in writing signed by all the parties or by their respective duly authorized agents and consented to by all the parties to the other Hotel Agreements.

22.03        **Partial Invalidity**

In the event that any one or more of the phrases, sentences, clauses, Articles or sections contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having jurisdiction, or shall be or become invalid or unenforceable by virtue of any Applicable Law, the remainder of this Agreement shall be construed as if such phrases, sentences, clauses, Articles or sections had not been inserted except when such construction (a) would operate as an undue hardship on either party or (b) would constitute a substantial deviation from the general intent and purposes of the parties as reflected in this Agreement.  In the event of either (a) or (b) above, the parties shall use their best efforts to negotiate a mutually satisfactory amendment to this Agreement to circumvent such adverse construction.  If no such amendment has been agreed upon within 60 days the dispute shall be submitted to arbitration in accordance with the provisions of section 19.03.

22.04        **Counterparts**

This Agreement may be executed simultaneously in two or more counterparts, each of which counterparts shall be deemed an original.  In proving this Agreement it shall not be necessary to produce or account for more than one of the counterparts.

22.05        **Waivers**

No failure by a party to insist upon the strict performances of any provision of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such provision.  No

provision of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every provision of this Agreement shall continue in full force and effect with respect to any other breach then existing or subsequent breach thereof.

22.06     **Language**

The parties agree that this Agreement, and all agreements and documents entered into in connection herewith or delivered pursuant hereto, shall be prepared in the English language. A Spanish language version of this Agreement, and all agreements and documents entered into in connection herewith or delivered pursuant hereto, may be prepared for the convenience of the parties; provided, however, that, in the event of any Dispute as to the construction, interpretation or application of any provision of this Agreement, or any agreement or document entered into in connection herewith or delivered pursuant hereto, the English-language version shall prevail and shall be used in the settlement of such Dispute.

22.07     **Enurement**

This Agreement, which is expressly intended to be integral to and binding upon title to the Hotel, shall enure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns and, in light of its fundamental relationship to the Hotel, shall survive any mortgage, hypothecation or other encumbrance of, or any sale, assignment, transfer or other disposition of, the Interest of Owner to any Person.

22.08     **Recording**

Concurrently with the execution of this Agreement, the parties shall execute such documents as may be required by Operator to confirm the intention of the parties that this Agreement be an integral part of title to the Hotel. Such documents shall be in form and substance as satisfactory to Operator and, in that regard, shall be in the standard form used by Operator and its Affiliates. At the option of Operator, such documents may be recorded in such

places as counsel to Operator may recommend for the purpose of placing on record sufficient information to afford Operator the protection of any statutes governing title to the Hotel. At Owner's request and sole cost and expense, Operator shall execute, acknowledge and record such confirmations of the termination of those documents following the termination of this Agreement as may be reasonably necessary to reflect such termination.

## 22.09    Applicable Law

This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

## 22.10    Jurisdiction

The parties hereto irrevocably:

(a)     submit and consent to the non-exclusive jurisdiction of the courts of the Republic of Venezuela as regards any suit, action or other legal proceedings arising out of this Agreement;

(b)     waive, and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings, any claim that they are not personally subject to the jurisdiction of the courts of the Republic of Venezuela, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in such courts; and

(c)     agree not to seek, and hereby waive any review by any court which may be called upon to enforce the judgment of the courts referred to in section 22.10(a), of the merits of any such suit, action or proceeding in the event of failure of any party to defend or appear in any such suit, action or proceeding.

22.11        Designation of Agent for Service of Process

(a)      Operator irrevocably designates the the General Manager at the Hotel as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceeding brought in the Republic of Venezuela, and Operator agrees and consents that any such service of process as specified above shall be taken and be deemed to be valid personal service upon Operator and that any such service of process shall be of the same force and validity as if service were made upon it according to the laws governing the validity and requirements of such service in the Republic of Venezuela, and Operator waives all claims of error by reason of any such service. Notwithstanding the foregoing, Operator may, by notice to Owner, change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Owner shall promptly mail a copy of such process to Operator at its address set forth in section 22.12.

(b)      Owner irrevocably designates Dra. Ysbell Kearns at the address of Owner for Notices set out in section 20.12 as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceedings brought in the Republic of Venezuela, and Owner agrees and consents that any such service of process as specified above shall be taken and deemed to be valid personal service upon Owner and that any such service of process shall be of the same force and validity as if service were made upon them according to the laws governing the validity and requirement of such service in the Republic of Venezuela, and the Owner waives all claims of error by reason of any such service. Notwithstanding the foregoing, Owner may, by notice to Operator change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Operator shall promptly mail a copy of such process to Owner at its address set forth in section 22.12.

22.12    <u>Notices</u>

Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices") required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

If to Operator, to:         Four Seasons Caracas, C.A.
                            At the Hotel

                            Attn: General Manager


With a copy to:             Four Seasons Hotels Limited
                            1165 Leslie Street
                            Toronto, Ontario
                            Canada  M3C 2K8

                            Attn:  General Counsel

                            Facsimile No.:      (416) 441-4303

                            - and -

                            Goodman Phillips & Vineberg
                            250 Yonge Street
                            Suite 2400
                            Toronto, Ontario
                            Canada  M5M 2M6

                            Attn: Randolph Weisz


                            Facsimile No.: (416) 979-1234

If to Owner to:

Consorcio Barr, S.A.
Calle Veracruz, Edif. Torreon, Piso 2
Urb. Las Mercedes, Caracas, Venezuela

Attn: Ing. Lautaro Barrera B.

Facsimile No.: (+58-2) 924377


With a copy to:

Dra. Ysbell Duran Kearns
c/o Consorcio Barr, S.A.
Calle Veracruz, Edif. Torreon, Piso 2
Urb. Las Mercedes, Caracas, Venezuela

Facsimile No.: (+58-2) 924377


All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt. Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 22.12.

## 22.13    **Payments**

(a)    Any and all payments by Owner under this Agreement in respect of the costs and expenses reimbursable to Operator pursuant to section 10.02 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement shall be made free and clear of and without deduction or withholding for any and all present or future Taxes unless such Taxes are required by Applicable Law to be deducted or withheld. If Owner shall be required by Applicable Law to deduct or withhold any Taxes from or in respect of any such payment, the payment shall be increased as may be necessary so that after making all deductions or withholdings, including (without limitation)

deductions or withholdings applicable to any additional amounts paid under this section 22.13, Operator receives an amount equal to the payment it would have received if no deduction or withholding had been made. If a Tax credit is received by Operator for any Taxes deducted or withheld by Owner in accordance with this section 22.13 and in respect of which additional amounts have been paid by Owner under this section 22.13, then, to the extent that such Tax credit has been received and utilized by Operator, Operator shall pay to Owner an amount equal to such Tax credit; provided that such amount shall not exceed the additional amounts paid by Owner to Operator under this section 22.13.

(b)     In the event that any Taxes are required by Applicable Law to be deducted or withheld from or in respect of any payment by Owner under this Agreement, the parties shall in good faith negotiate a method of restructuring the manner in which such payment is to be made by Owner to Operator under this Agreement with a view to minimizing the Tax liability in connection with such payment; provided, however, that the method of restructuring the manner in which such payment is to be made does not prejudice the amount of the sums, charges and fees otherwise payable to Operator under this Agreement or of the costs and expenses reimbursable to Operator pursuant to section 10.02 and provided further that the method of restructuring the manner in which such payment is to made shall not result in any damages, losses or any other costs whatsoever to Operator or impact adversely on any rights, remedies or other benefits in favour of Operator under this Agreement.

22.14     **Time of Essence**

Time shall be of the essence of each and every term and obligation of this Agreement.

**22.15**        **Estoppel Certificates**

Each party shall, upon at least 10 days' written notice, execute and deliver to any other party, and to any other Person having or about to have a *bona fide* interest in the Hotel as such other party may designate in writing, a statement certifying that this Agreement is unmodified and in full force and effect, or if not, stating the details of any modification and stating that as modified it is in full force and effect, the date to which payments have been paid and whether or not, to the knowledge of the certifying party, there is any existing default on the part of any other party.

**22.16**        **Calculation Methodology**

As the receipts and expenses of the Hotel will be earned and incurred in various currencies, the parties agree that any financial statements, calculations or payments required to be prepared, calculated or made hereunder in a currency other than Venezuelan Bolivars shall, at the election of Operator, be prepared, calculated or made using the calculation methodology set out in Schedule "C".

**22.17**        **Other Opportunities**

(a)        In the event Operator or any of its Affiliates intends to develop any hotel or a resort project in the Republic of Venezuela during the Term, Operator shall grant to Owner, or shall cause to be granted to Owner, a right of first opportunity to participate in such hotel or resort development project.

(b)        Owner hereby grants to Operator the exclusive option to operate and manage any other luxury hotel or resort and related facilities which Owner or any of it Affiliates may develop in the Republic of Venezuela.

22.18      Access to Hotel Facilities

Owner and Operator acknowledge and agree that all owners and occupants of the Residential Apartments shall have access to and the use of the facilities of the Hotel. The scope of, and the fees and charges payable by, the owners and occupants of the Residential Apartments for such use and access shall be agreed to in advance by Owner and Operator and shall be incorporated into the agreement of purchase and sale for each Residential Apartment.

IN WITNESS WHEREOF the parties have duly executed this Agreement the day and year first above written.

**FOUR SEASONS CARACAS, C.A.**

By: _____

By: _____                    c/s


**CONSORCIO BARR, S.A.**

By: _____

By: _____                    c/s

22.18        Access to Hotel Facilities

Owner and Operator acknowledge and agree that all owners and occupants of the Residential Apartments shall have access to and the use of the facilities of the Hotel.  The scope of, and the fees and charges payable by, the owners and occupants of the Residential Apartments for such use and access shall be agreed to in advance by Owner and Operator and shall be incorporated into the agreement of purchase and sale for each Residential Apartment.

IN WITNESS WHEREOF the parties have duly executed this Agreement the day and year first above written.

FOUR SEASONS CARACAS, C.A.

By: _____

By: _____   c/s

CONSORCIO BARR, S.A.

By: _____

By: _____   c/s

## SCHEDULE "A"
## DEFINITIONS

(a)        "Accounts" has the meaning set out in section 11.01.

(b)        "Adjusted Net Cash Flow" means, in respect of any Fiscal Year, Net Operating Profit for such Fiscal Year less the aggregate of the following, without duplication, (i) First Mortgage Debt Service for such Fiscal Year, (ii) Investor's Loan Debt Service for such Fiscal Year, (iii) the Owner's Return for such Fiscal Year, and (iv) the Incentive Fee earned by Advisor in such Fiscal Year.

(c)        "Applicable Percentage" means the product obtained by multiplying 20% by the quotient obtained by dividing the then outstanding principal amount of the Investor's Loan by $5,000,000.

(d)        "Basic Fee" has the meaning set out in section 10.01.

(e)        "Deficit Payment" has the meaning set out in section 8.04.

(f)        "Deficit Period" means the period consisting of the first 10 Fiscal Years of the Term, with the first Fiscal Year of such period commencing three full calendar months after the Opening Date and ending on December 31 of the same year.

(g)        "Dispute" has the meaning set out in section 19.02.

(h)        "Environmental Law" means all Applicable Laws concerning discharges to the air, surface or subsurface soil, water or groundwater and concerning the refining, generating, handling, storing, treating, transferring, releasing, producing, processing, transporting or disposing of any Waste Materials.

(i)        "First Mortgage" means the first ranking permanent mortgage against the Hotel and, in the event such mortgage shall be registered against and relate to the entire Project, such

mortgage shall be deemed to secure the proportion of the total principal amount of such mortgage which is applicable to the Hotel.

(j)    "First Mortgage Debt Service" means, in respect of any Fiscal Year, the actual debt service payable in such Fiscal Year to the holder of the First Mortgage which (i) secures the actual principal amount of the First Mortgage, subject to a maximum principal amount of $25,000,000, (ii) bears interest at a rate equal to the actual interest rate on the First Mortgage, subject to a maximum interest rate of 13.5% per annum, and (iii) is amortized over a period not exceeding ten years on a straight line basis.

(k)    "Hotel Bank Accounts" has the meaning set out in section 8.03 and shall also include (without limitation) the Capital Reserve accounts.

(l)    "Interest" means the respective right, title and interest of Owner and Operator in and to the Hotel and the Hotel Agreements.

(m)    "Interest Rate" means the annual rate of interest equal to the lesser of (i) the highest rate then currently charged to Operator or any of its Affiliates for U.S. Dollar commercial loans by the Bank of Nova Scotia or, if the Bank of Nova Scotia is no longer their principal lending source, by their principal lending source plus 2% per annum, or (ii) the maximum legal rate permitted by Applicable Law.

(n)    "Investor" means Operator, any of its Affiliates or any other Person that makes the Investor's Loan available to Owner.

(o)    "Investor's Loan" has the meaning set out in section 8.03.

(p)    "Investor's Loan Debt Service" means, in respect of any Fiscal Year, the actual debt service payable in such Fiscal Year to the Investor in respect of the Investor's Loan.

(q)    "Investor's Loan Interest" has the meaning set out in section 8.03.

(r)     "Investor's Loan Interest Rate" means the annual rate of interest charged from time to time to Operator by its principal lending source for United States Dollar commercial loans made to Operator.

(s)     "Investor's Return" has the meaning set out in Section 8.03(b).

(t)     "Letter of Credit" has the meaning set out in section 8.04(a).

(u)     "Net Operating Profit" means, in respect of the Hotel in any Fiscal Year, Gross Operating Profit for such Fiscal Year less the aggregate of the following, without duplication, (i) real and personal property Taxes, (ii) insurance premiums, and (iii) expenditures from the Capital Reserve.

(v)     "Owners Return" means, in respect of any Fiscal Year, an amount equal to 12% of the Total Hotel Costs.

(w)     "Permitted Investments" means direct deposits in the bank at which the Hotel Bank Accounts are maintained or such other investments as Owner may approve from time to time.

(x)     "Prorated Deficit Payment" means, in respect of any Fiscal Year during the Deficit Period, an amount computed in accordance with the following formula:

A x [B + C],

where (i) A is the Target Amount; (ii) B is budgeted Net Operating Profit for the portion of such Fiscal Year not affected by the events in sections 8.04(a)(iv)(A) through 8.04(a)(iv)(G), inclusive, and (iii) C is the budgeted Net Operating Profit for such Fiscal Year.  A sample calculation of the Prorated Deficit Payment is attached hereto as Schedule "F".

(y)     "Qualified Person" means a Person that (i) is not, and is not an Affiliate of, a competitor of Operator or any of its Affiliates, (ii) has adequate financial capacity to perform the obligations of Owner under the Hotel Agreements, (iii) has an acceptable credit rating, (iv) is not of ill repute, and (v) is not in any other manner a Person with whom or with which a prudent business person would not wish to associate in a commercial venture.

(z)     "Senior Hotel Personnel" means the Hotel's General Manager, Controller, Purchasing Manager, Executive Assistant Manager, Director of Marketing, Director of Human Resources, Rooms Division Manager, Food and Beverage Director and Chief Engineer.

(aa)    "Target Amount" means an amount of Net Operating Profit for any Fiscal Year equal to $2,000,000; provided that in the event Net Operating Profit is calculated for any fraction of a Fiscal Year, such amount shall be altered (A) on a proportionate basis taking into account the number of days in such reduced Fiscal Year, and (B) on a seasonally adjusted basis taking into account the period during such reduced Fiscal Year in which the Hotel was open for guest occupancy.

(ab)    "Term" shall mean the initial term provided for in section 9.01 and any subsequent extension term provided for in section 9.02.

(ac)    "Termination Effective Date" means any time following the twelfth full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date.

(ad)    "Termination Test Period" has the meaning set out in section 18.05(a).

(ae)    "Total Hotel Costs" means an amount calculated as follows, without duplication, (i) the total costs incurred by Owner in connection with (A) the acquisition of the portion of the Land on which the Hotel is to be constructed, (B) the development and construction of the Hotel, and (C) the payment of the pre-opening and costs and expenses relating to the Hotel, minus (ii) the principal, interest, financing charges, fees, costs and expenses

relating to (A) the financing secured by the First Mortgage, and (B) the Investor's Loan. Total Hotel Costs shall be calculated as at the Opening Date in a manner to be agreed upon by Owner and Operator.

(af)     "Waste Materials" means any materials, substances and wastes which are or become regulated or classified as hazardous or toxic under any Applicable Law.

(ag)     "Working Capital Reserve" means an amount equal to the sum of (i) the working capital required for the uninterrupted and efficient operation of the Hotel during the next succeeding Fiscal Quarter in accordance with the Annual Plan then applicable, and (ii) the greater of (A) 5% of the amount referred to in section (ag) of this Schedule "A", and (B) such amount as may be required for the uninterrupted and efficient operation of the Hotel during the next succeeding Fiscal Quarter.

## SCHEDULE "B"
## INSURANCE COVERAGE

1.  Insurance which shall comply with all applicable Workers' Compensation & Occupational Disease Laws and which shall cover all employees of Owner engaged in operations which fall within the scope of this Agreement.

2.  Employers' Liability insurance with a limit of not less than $1,000,000 per occurrence.

3.  Comprehensive General Liability insurance, to a minimum limit of $1,000,000 inclusive limit per occurrence for Bodily Injury, and/or Personal Injury and/or Property Damage combined.  Such policies shall not be subject to a general aggregate, and shall include:

    (i)     Cross-Liability and/or Severability of Interests provisions;

    (ii)    Products and/or Completed Operations Liability (subject to aggregate if applicable);

    (iii)   Blanket Contractual Liability;

    (iv)    Owners and Contractors Protective Liability;

    (v)     Bodily Injury arising out of incidental professional liability and incidental medical malpractice insurance;

    (vi)    Liability arising out of the service of alcoholic beverages;

    (vii)   Liability arising out of those hazards known as the "X.C.U." hazards;

    (viii)  Advertising Injury Liability;

    (ix)    Worldwide jurisdiction;

        (x)    U.S. and Canadian domiciled companies;

4.    Non-owned Automobile Liability to a minimum limit of $1,000,000 any one loss, bodily injury and/or property damage liability combined.

5.    Legal liability for bodily injury and property damage arising out of the operations and/or storage of customers' automobiles to a minimum limit of $1,000,000 combined per occurrence, including legal liability for damage to customers' automobiles, for a minimum amount of $100,000 per occurrence.

6.    If any vehicles be owned and/or leased by or for the Hotel, Automobile Insurance for Third Party Liability to a minimum combined single limit of $1,000,000 Collision and Comprehensive coverages.

7.    Innkeepers Legal Liability insurance with policy limit(s) at least sufficient to insure the liability imposed by statute, for the safekeeping of property of guests, and including persons occupying accommodations under lease agreements.

8.    Umbrella Liability in excess of the liability coverages set forth in Sections 2, 3, 4, 5, 6 and 7, with limits not less than $249,000,000 per occurrence or in the aggregate. Such insurance shall also be extended to insure:

        (i)    Non-owned Aircraft and Non-owned Watercraft Liability.

9.    If aircraft and/or watercraft shall be owned and/or operated by or for the Hotel, then liability insurance shall be arranged for each to a minimum limit of $1,000,000 and Section 8 shall also apply in excess of such insurance.

    Such aircraft and/or watercraft shall also be insured for physical damage loss (if owned), or legal liability for physical damage (if rented or leased).

10.    Employee Dishonesty insurance to a minimum limit of $3,000,000 per occurrence.

11.     Broad Form Money and Securities insurance, including counterfeit paper currencies coverage, with minimum limits of $500,000.

12.     All Risks Property of Every Description (including accounts receivable and valuable papers insurance) (including to the extent reasonably available, flood and earthquake) insurance with any co-insurance clause deleted, providing:

      (i)     full replacement cost and consequential loss coverage on the building and structures, furniture, fixtures, equipment and supplies.  Such coverage shall be for the full replacement cost of the property insured;

      (ii)    combined business interruption (profits form) and extra expense coverage including continuing charges, expenses and payroll plus a 30-month period of indemnity including an amount sufficient to pay the Operator equal to what Operator might reasonably be expected to receive in the form of fees and charges if the Hotel had earned the amounts described in the Annual Plan.

13.     Comprehensive Boiler and Machinery insurance on a repair and replacement basis.  All objects shall be covered on a blanket basis to a minimum limit of $50,000,000. Coverage shall include use and occupancy (profits form) and extra expense.

14.     Hotel Safe Deposit Box Legal Liability insurance on property deposited by guests with limits sufficient to cover loss of property valued in excess of statutory limits but accepted for deposit.

15.     All risks Bailee's Customer insurance including burglary and theft with limits sufficient to cover the exposure to loss from operation of laundry, cleaning, tailoring and check room facilities with limits sufficient to cover the exposure to loss.

## SCHEDULE "C"
## CALCULATION METHODOLOGY

### Annual Plan and Financial Statements

Section 6.01(c) of the Hotel Advisory Agreement requires Advisor to prepare the Annual Plan in United States Dollars.

Sections 10.06(a) and (b), respectively, of the Hotel Management Agreement require Operator to deliver to Owner within 15 days after the end of each month a profit and loss statement prepared in United States Dollars and Venezuelan Bolivars and within 60 days after the end of each Fiscal Year an audited profit and loss statement prepared in Venezuelan Bolivars.

The Hotel books and records are to be kept in Venezuelan Bolivars, as all such revenues generated are recorded in Venezuelan Bolivars regardless of the currency which is collected from the Hotel guests and patrons. At the end of each month the books are closed for monthly reporting in Venezuelan Bolivars.

The actual profit and loss statement prepared each month in Venezuelan Bolivars will be converted into United States Dollars utilizing the average exchange rate for the past month calculated by taking the total of all daily exchange rates for such month divided by the number of days in such month. The exchange rate used will be the United States Dollar Exchange Rate.

The resultant profit and loss statement prepared each month in United States Dollars will become fixed and as such any future changes in exchange rates will not affect any prior periods. Year-to-date results in United States Dollars will be arrived at by accumulating the monthly results for prior months that were already converted to United States Dollars. Comparison to budget and prior year will be done in United States Dollars only.

## Accounting for Foreign Currencies

**Revenue**

As revenue will be collected in various currencies that will result in exchange variances, the following outlines the general accounting principles:

o      Revenue will be recorded daily in Venezuelan Bolivars.

o      Guests could settle their account at departure time in various currencies. These currencies will be collected and remitted to the bank. All exchange variances will be booked into Profit and Loss on Exchange Account.

o      All direct billing payments, including credit cards, will be remitted to the Owner Bank Accounts or the Hotel Bank Accounts, as the case may be. All exchange variances will be booked into Profit and Loss on Exchange Account.

o      All United States Dollars funds that are collected and remitted to the Owner Bank Accounts or the Hotel Bank Accounts, as the case may be, in United States Dollars will be converted on the books at the end of each month using the Exchange Rate on the last business day of such month.

**Operating Expenses**

All payments that are due and payable in Venezuelan Bolivars will be paid from the Venezuelan Bolivars funds that are made available to Operator. Accounting will record payments on the books in Venezuelan Bolivars to satisfy the liability recorded.

All payments that are due and payable in United States Dollars or Canadian Dollars will be paid from the United States Dollar or Canadian Dollar funds, as the case may be, that are made available to Operator. Accounting will use the United States Dollar Exchange Rate or the Canadian Dollar Exchange Rate, as the case may be, prevailing on the last Business Day of the

SCHEDULE "D"

# FORM OF ASSUMPTION AGREEMENT

THIS AGREEMENT made as of ●, ●.

TO:      [●]

WHEREAS ● ("Owner") a ● under the laws of ● and ● ("Operator"), a ● under the laws of ● entered into a hotel management agreement dated ●, 1996 (the "Hotel Management Agreement");

AND WHEREAS pursuant to the terms and conditions of that certain purchase agreement, dated ● (the "Purchase Agreement"), Owner has agreed to sell, assign and otherwise transfer all of its right, title and interest in and to the Hotel (as hereinafter defined) to the undersigned, ●, a ● under the laws of ●, with effect as and from the date hereof;

AND WHEREAS the undersigned has agreed to enter into this agreement in order to assume, perform and discharge all duties, obligations, covenants and agreements of Owner in accordance with the terms and conditions of the Hotel Management Agreement and to agree to be bound by the terms of the Hotel Management Agreement, from and after the date hereof, in all respects as if the undersigned were a signatory thereto;

NOW THEREFORE in consideration of the mutual covenants and agreements herein contained and the mutual covenants and agreements contained in the Hotel Management Agreement, the undersigned hereby agrees as follows:

1.        **Definitions**. All capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to them in the Hotel Management Agreement.

2.        **Assumption of Obligations**. The undersigned hereby undertakes and agrees to assume, perform and discharge all duties, obligations, covenants and agreements of Owner in accordance with the terms and conditions contained in the Hotel Management Agreement and to be bound by the terms of the Hotel Management Agreement in all respects as if the undersigned were a signatory thereto.

3.        <u>Successors and Assigns</u>.  The terms of this Agreement shall enure to the benefit of Operator and its successors and permitted assigns under the Hotel Management Agreement, with respect to the Hotel Management Agreement.

4.        <u>Governing Law</u>.  This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

        **IN WITNESS WHEREOF**, the undersigned has caused this Agreement to be executed as of the ● day of ●.

        **[●]**

        By:        _____
                Name:
                Title:

SCHEDULE "B"

## FORM OF SUBORDINATION AND NON-DISTURBANCE AGREEMENT

THIS AGREEMENT is made and entered into as of the ●, by and between ● ("Mortgagee"), a ●, and ●, a corporation incorporated under the laws of ● ("Operator").

## RECITALS

A.          Operator has entered into a hotel management agreement dated ● (as amended, modified or supplemented from time to time, the "Hotel Management Agreement") with ● ("Owner"), pursuant to which Operator has agreed to operate and manage a hotel and related facilities located in the City of Caracas, Venezuela, commonly known as the "Four Seasons Hotel, Caracas", and more particularly described on Exhibit A to this Agreement (the "Hotel").

B.          Mortgagee is the holder of that certain [Mortgage] (the "Mortgage"), dated as of ●, executed by Owner in favour of Mortgagee and encumbering the Hotel and the related property more particularly described therein to secure the obligations of Owner under that certain [Loan Agreement], dated as of ●, between Owner and Mortgagee.

C.          Mortgagee and Operator desire to set forth certain agreements made between them pertaining to their respective rights as mortgagee and operator, respectively, of the Hotel.

## AGREEMENT

NOW THEREFORE in consideration of the covenants and agreements set forth in this Agreement, the parties hereto agree as follows:

1.          General Subordination.  Subject to the provisions of section 2 of this Agreement, the Hotel Management Agreement and all rights and benefits of Operator thereunder are and shall at all times continue to be subordinate in all respects to:

      (a)          the rights and benefits of Mortgagee under the Mortgage;

      (b)          any and all advances made on the security of the Mortgage; and

      (c)          any and all increases, renewals, modifications, consolidations, replacements and extensions of the Mortgage. This section shall be self-operative and no further

preceding month to convert payments made in United States Dollars or Canadian Dollars into Venezuelan Bolivars on the books.

**Fees, Charges and Reimbursables**

Fee calculations based on a percentage of Gross Receipts or Gross Operating Profit and required to be made pursuant to sections 10.01 and 10.02 of the Hotel Advisory Agreement, section 10.01 of the Hotel Management Agreement, section 5.01 of the Hotel Services Agreement and section 7.01 of the Hotel License Agreement will be calculated from the actual United States Dollars profit and loss statement produced at the end of each month as outlined above in this Schedule under Annual Plan and Financial Statements.

Therefore, the calculation will not be done from the actual Venezuelan Bolivars profit and loss statement even if at some point the percentages on the Venezuelan Bolivars profit and loss statement could be lower or higher than the percentages established in the Agreement.

All reimbursement of costs, direct charges and any other expenses billed through Operator or any of its Affiliates, will be calculated and recorded as outlined above in this Schedule under Operating Expenses.

instruments or certificates shall be required to effect the subordination contemplated by this section. Operator shall, however, upon demand at any time or times, execute, acknowledge and deliver to Mortgagee any and all instruments and certificates that Mortgagee may reasonably request as necessary to confirm or evidence the subordination contemplated by this section. The subordination contemplated by this section does not constitute any waiver of, or modification or change to, the provisions of the Hotel Management Agreement.

2.        Non-Disturbance.  So long as the Hotel Management Agreement has not been terminated pursuant to the terms thereof:

(a)      in the event of the exercise by Mortgagee of any rights or remedies it may have by virtue of the Mortgage or otherwise, Mortgagee agrees (i) not to disturb the right of Operator to operate and manage the Hotel in accordance with the Hotel Management Agreement or affect any other right of Operator thereunder, and (ii) to observe and perform all the terms, conditions and obligations of Owner under the Hotel Management Agreement for any period during which it, or any Person (as defined in the Hotel Management Agreement) acting on its behalf, is in actual physical possession of the Hotel. Provided that (iii) Mortgagee shall not be bound by any modification or change to the provisions of the Hotel Management Agreement to which Mortgagee has not consented to in writing; and

(b)      in the event of a foreclosure of the Mortgage, or of a conveyance in lieu of foreclosure (i) no proceeding to foreclose the Mortgage, and no conveyance in lieu of foreclosure, will disturb the right of Operator to operate and manage the Hotel in accordance with the terms of the Hotel Management Agreement or affect any other right of Operator thereunder, and (ii) the Hotel Management Agreement shall continue in full force and effect and Mortgagee, its successors and assigns, or any third party (each a "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein on foreclosure of the Mortgage, or by deed in lieu of foreclosure, shall be a Qualified Person (as defined in the Hotel Management Agreement) and shall, together with an Affiliate (as defined in the Hotel Management Agreement) of such Foreclosure Purchaser, if such Foreclosure Purchaser is a single purpose entity or an entity without significant assets and such Foreclosure Purchaser has an Affiliate who has, or is more likely to have, the ability to perform the obligations of Owner under the Hotel Management

Agreement than such Foreclosure Purchaser, first enter into an agreement with Operator, in form and substance reasonably satisfactory to Operator, agreeing to recognize the rights and benefits of Operator, and observe and perform the obligations of Owner, under the Hotel Management Agreement for the balance of the term of the Hotel Management Agreement, including any extensions and renewals thereof, upon the same terms, covenants and conditions as therein provided and with the same force and effect as if the Hotel Management Agreement had been originally made directly between Operator, as "Operator" under the Hotel Management Agreement, and Foreclosure Purchaser, as "Owner" under the Hotel Management Agreement. Provided that (iii) subject to the provisions of section 4 of this Agreement, Foreclosure Purchaser shall not be liable to Operator for any act, omission, amount owing or default under the Hotel Management Agreement by Owner for any period occurring prior to Foreclosure Purchaser acquiring the Hotel or any interest or right therein on foreclosure of the mortgage, or by deed in lieu of foreclosure, and (iv) Foreclosure Purchaser shall not be bound by any modification or change to the provisions of the Hotel Management Agreement to which Mortgagee has not consented in writing.

3.        Attornment. Subject to the provisions of section 2 of this Agreement and so long as Operator is not then entitled to terminate the Hotel Management Agreement pursuant to the terms thereof, in the event that the interest of Owner in the Hotel is transferred to a Foreclosure Purchaser by reason of a foreclosure of the Mortgage, or by reason of a conveyance in lieu of foreclosure, Operator agrees to be bound by the terms, covenants and conditions contained in the Hotel Management Agreement for the balance of the term of the Hotel Management Agreement, including any extensions and renewals thereof, upon the same terms, covenants and conditions as therein provided and with the same force and effect as if the Hotel Management Agreement had been originally made directly between Operator, as "Operator" under the Hotel Management Agreement, and Foreclosure Purchaser, as "Owner" under the Hotel Management Agreement.

4.        Cure of Hotel Management Agreement Defaults. Operator shall provide Mortgagee with copies of any notice of default under the Hotel Management Agreement delivered to Owner, concurrently with delivery of such notice to Owner, and shall grant Mortgagee the following cure periods (each a "Hotel Management Agreement Cure Period") to cure such default on behalf of Owner:

(a)     in the case of an event of default contemplated by section 18.01(a) of the Hotel Management Agreement, 30 days after the applicable grace period has expired;

(b)     in the case of an event of default contemplated by sections 18.01(b), (c) or (d) of the Hotel Management Agreement, the time reasonably required by Mortgagee to foreclose or take possession so long as Mortgagee, unless prevented by Applicable Law, commences and continues to foreclose or take possession with all due diligence, and otherwise satisfactorily cures all defaults that can be cured; and

(c)     in the case of an event of default contemplated by section 18.01(e) of the Hotel Management Agreement, 60 days after the applicable grace period has expired or, if the default is not susceptible of being cured within the 60 day period and Mortgagee advises Operator in writing of the period which it is estimated will be required to cure the default and with all due diligence takes and continues action to cure and cures the default within the period so advised; provided, however, that if it is necessary for Mortgagee to foreclose the Mortgage or to take possession of the Hotel in order to cure such default, the Hotel Management Agreement Cure Period shall be extended to include the time reasonably required by Mortgagee to foreclose or take possession so long as Mortgagee commences and continues to foreclose or take possession with all due diligence and otherwise satisfactorily cures all defaults that do not so require possession of the Hotel by Mortgagee.

During a Hotel Management Agreement Cure Period, Mortgagee shall have the right, but not the obligation, to cure the applicable default on behalf of Owner under the Hotel Management Agreement if such default is capable of being cured.  Notwithstanding this section 4 or any other provision to the contrary, if, in the reasonable business judgment of Operator, the default by Owner materially and adversely affects the reputation of Operator in the hotel industry or places Operator materially at risk of civil or criminal liability, Operator shall have the right, at any time prior to completion of foreclosure or the taking of possession by Mortgagee, to elect by written notice to Mortgagee to terminate the Hotel Management Agreement in accordance with the terms of the Hotel Management Agreement.

5.          Cure of Mortgage Defaults.  Mortgagee shall provide Operator with copies of any notice of default under the Mortgage delivered to Owner, concurrently with delivery of such

notice to Owner, and shall grant Operator 10 days after the applicable grace period has expired (a "Mortgage Cure Period") to cure such default on behalf of Owner.  During a Mortgage Cure Period, Operator shall have the right, but not the obligation, to cure the applicable default on behalf of Owner under the Mortgage.

6.  <u>No Prohibited Transfers</u>.  Mortgagee acknowledges and agrees that any acquisition of the Hotel by Mortgagee, its successors and assigns, or by any third party, whether by foreclosure of the Mortgage or by deed in lieu of foreclosure or otherwise, shall be deemed to be a transfer within the meaning, and subject to the terms and conditions, of sections 17.01 and 17.03 of the Hotel Management Agreement.  Mortgagee also acknowledges and agrees that any sale, transfer, assignment or other disposition of the Mortgage by Mortgagee or its successors and assigns shall be deemed to be a mortgage within the meaning, and subject to the terms and conditions, of sections 17.02 and 17.03 of the Hotel Management Agreement.

7.  <u>Operator's Confirmation</u>.  If and to the extent the Hotel Management Agreement entitles Operator to notice of any mortgage granted by Owner, this Agreement shall constitute such notice to Operator with respect to the Mortgage.  Operator acknowledges and agrees that this Agreement satisfies and fulfils the provisions of section 17.02 of the Hotel Management Agreement with respect to the Mortgage.

8.  <u>Notices</u>.  Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices") required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by telex, facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

       If to Mortgagee, to:

            ●

       with a copy to:

            ●

If to Operator, to:

●

Attention:  ●

Facsimile No.:  ●

With a copy to:     Four Seasons Hotels Limited
1165 Leslie Street
Toronto, Ontario
Canada   M3C 2K8

Attn: General Counsel

Facsimile No.: (416) 441-4303

- and -

Goodman Phillips & Vineberg
Barristers & Solicitors
250 Yonge Street
Box 24, Suite 2400
Toronto, Ontario
M5B 2M6

Attention:  Randolph Weisz

Facsimile No.:  (416) 979-1234

All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by telex or facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt.  Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 8.

9.          <u>No Modification</u>.  No modification, amendment, waiver, or release of any provision of this Agreement or any right, obligation, claim, or cause of action arising hereunder

shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

10.          Successors.  This Agreement shall enure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns; provided, however, that the rights of Mortgagee and its successors and assigns to sell, transfer or otherwise dispose of this Agreement shall be subject to section 17.01 of the Hotel Management Agreement and the rights of Operator and its successors and assigns to sell, transfer or otherwise dispose of this Agreement shall be subject to section 17.04 of the Hotel Management Agreement.

11.          Applicable Law.  This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

12.          Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

13.          Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which counterpart shall be deemed an original.  In proving this Agreement it shall not be necessary to produce or account for more than one of the original counterparts executed by each of the parties hereto.

14.      Time of the Essence.  Time shall be of the essence of each and every term and obligation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

MORTGAGEE:  ●

By:      _____
         ●

OPERATOR:  [●]

By:      _____
         ●

SCHEDULE "F"

## SAMPLE CALCULATION OF PRORATED DEFICIT PAYMENT

For example, if:

(A)     one of the events described in Section 8.04(a)(iv)(A) through (G), inclusive, occurs or continues for a period of eight months in a Fiscal Year;

(B)     the budgeted Net Operating Profit for the period of such Fiscal Year not affected by such event was $2,000,000; and

(C)     the budgeted Net Operating Profit for such Fiscal year was $6,000,000;

then, the Prorated Target Amount for such Fiscal Year will be:

$$\$2,000,000 \times [\$2,000,000 \div \$6,000,000] = \$666,667.$$

# EXHIBIT "B"

# HOTEL ADVISORY AGREEMENT

**Between**

# FOUR SEASONS HOTELS AND RESORTS B.V.

**And**

# CONSORCIO BARR, S.A.

# FOUR SEASONS HOTEL, CARACAS

## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.01         Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.02         Recitals . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.03         Interpretation . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.04         Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE II - TERMINATION PRIOR TO THE OPENING DATE . . . . . . . . . . . . 7
    2.01         Termination Prior to Opening Date . . . . . . . . . . . . . . . . . 7

ARTICLE III - ACCESS TO HOTEL . . . . . . . . . . . . . . . . . . . . . . . . 8
    3.01         Access to Hotel . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE IV - OPENING DATE . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.01         Determination of Opening Date . . . . . . . . . . . . . . . . . . 8

ARTICLE V - ADVISOR'S AND OWNER'S RESPONSIBILITIES . . . . . . . . . . . . 9
    5.01         Advisor's Appointment . . . . . . . . . . . . . . . . . . . . . . 9
    5.02         Advisor's Responsibilities . . . . . . . . . . . . . . . . . . . 10
    5.03         Advisor's Responsibilities Relating to Residential Apartments . . . . 12
    5.04         Owner's Responsibility . . . . . . . . . . . . . . . . . . . . . 12
    5.05         Maintenance of Hotel and Capital Refurbishing Programs . . . . . . 13
    5.06         Dealings With Third Persons . . . . . . . . . . . . . . . . . . . 13

ARTICLE VI - ANNUAL PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    6.01         Annual Plan . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    6.02         Variations in the Annual Plan . . . . . . . . . . . . . . . . . . 15
    6.03         Owner's Obligation to Fund Capital for
                  Furniture, Fixtures and Equipment Replacements . . . . . . . . . . 16

ARTICLE VII - RELATIONSHIP OF ADVISOR AND OWNER . . . . . . . . . . . . . 17
    7.01         Advisor To Act as Agent for Owner . . . . . . . . . . . . . . . . 17
    7.02         Delegation of Authority By Advisor . . . . . . . . . . . . . . . . 18

ARTICLE VIII - ADVISOR NOT REQUIRED TO MAKE ADVANCES . . . . . . . . . . 18
    8.01         Advances By Advisor . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE IX - TERM AND RENEWALS . . . . . . . . . . . . . . . . . . . . . . 19
    9.01         Initial Term . . . . . . . . . . . . . . . . . . . . . . . . . 19
    9.02         Extension Terms . . . . . . . . . . . . . . . . . . . . . . . . 19
    9.03         Exercise of Extension Options . . . . . . . . . . . . . . . . . . 19
    9.04         Covenants to Apply . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE X - REMUNERATION AND REIMBURSEMENT OF ADVISOR . . . . . . . 20
    10.01        Advisory Fee . . . . . . . . . . . . . . . . . . . . . . . . . 20
    10.02        Incentive Fee . . . . . . . . . . . . . . . . . . . . . . . . . 20
    10.03        Reimbursement of Costs and Expenses . . . . . . . . . . . . . . 20

10.04      Manner of Payment of Fees, Charges, Costs and Expenses . . . . . 22

ARTICLE XI - NAME OF HOTEL AND RESIDENTIAL APARTMENTS . . . . . . . . 23
11.01      Name of Hotel . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
11.02      Name of the Residential Apartments . . . . . . . . . . . . . . . . . . 23

ARTICLE XII - ALTERATIONS, ADDITIONS AND IMPROVEMENTS TO THE
                 HOTEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
12.01      Alterations, Additions and Improvements . . . . . . . . . . . . . . . 24

ARTICLE XIII - DAMAGE TO AND DESTRUCTION OF THE HOTEL . . . . . . . . . 24
13.01      Owner's Obligation to Repair . . . . . . . . . . . . . . . . . . . . . 24
13.02      Advisor's Reinstatement . . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE XIV - EXPROPRIATION . . . . . . . . . . . . . . . . . . . . . . . . 26
14.01      Complete Expropriation . . . . . . . . . . . . . . . . . . . . . . . . 26
14.02      Partial Expropriation . . . . . . . . . . . . . . . . . . . . . . . . 27
14.03      Temporary Expropriation . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XV - ASSIGNMENTS AND MORTGAGES . . . . . . . . . . . . . . . . 28
15.01      Owner's Right to Assign . . . . . . . . . . . . . . . . . . . . . . . 28
15.02      Owner's Right to Mortgage . . . . . . . . . . . . . . . . . . . . . . 29
15.03      Limitation on Owner's Right to Assign and Mortgage . . . . . . . . . 30
15.04      Advisor's Right to Assign . . . . . . . . . . . . . . . . . . . . . . . 30
15.05      Advisor's Right to Mortgage . . . . . . . . . . . . . . . . . . . . . . 31
15.06      Limitation on Advisor's Right to Assign . . . . . . . . . . . . . . . . 31

ARTICLE XVI - EVENTS OF DEFAULT AND TERMINATION . . . . . . . . . . . . 31
16.01      General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
16.02      Rights of Non-Defaulting Party . . . . . . . . . . . . . . . . . . . . 33
16.03      Remedying Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . 33
16.04      Bona Fide Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
16.05      Advisor's Right to Terminate . . . . . . . . . . . . . . . . . . . . . . 34
16.06      Cross-Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
16.07      Accounting on Termination . . . . . . . . . . . . . . . . . . . . . . 35
16.08      Claims on Termination . . . . . . . . . . . . . . . . . . . . . . . . 35

ARTICLE XVII - APPROVALS, DISPUTE RESOLUTION AND ARBITRATION . . . 36
17.01      Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
17.02      Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . 38
17.03      Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE XVIII - ADVISOR'S LIABILITY . . . . . . . . . . . . . . . . . . . . . 40
18.01      Standard of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
18.02      Indemnities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ARTICLE XIX - ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . . . 42
    19.01      Owner's Acknowledgments . . . . . . . . . . . . . . . . . . . . 42
    19.02      Advisor's Acknowledgments . . . . . . . . . . . . . . . . . . 42

ARTICLE XX - GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . 43
    20.01      Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . 43
    20.02      Modification and Changes . . . . . . . . . . . . . . . . . . 43
    20.03      Partial Invalidity . . . . . . . . . . . . . . . . . . . . . . . . 43
    20.04      Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    20.05      Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    20.06      Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    20.07      Enurement . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    20.08      Recording . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    20.09      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . 45
    20.10      Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    20.11      Designation of Agent for Service of Process . . . . . . . . . . . . 46
    20.12      Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    20.13      Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    20.14      Time of Essence . . . . . . . . . . . . . . . . . . . . . . . . 50
    20.15      Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . 50
    20.16      Calculation Methodology . . . . . . . . . . . . . . . . . . . 50
    20.17      Other Elements and Components of Project . . . . . . . . . . . . 50

SCHEDULE "A"  -   **DEFINITIONS**
SCHEDULE "B"  -   **DESCRIPTION OF LAND**
SCHEDULE "C"  -   **FORM OF ASSUMPTION AGREEMENT**
SCHEDULE "D"  -   **FORM OF SUBORDINATION AND NON-DISTURBANCE
                               AGREEMENT**

THIS AGREEMENT is made this 9ᵀᴴ day of April, 1997.

B E T W E E N:

> **FOUR SEASONS HOTELS AND RESORTS B.V.**, a corporation incorporated under the laws of the Netherlands, having its principal offices at Herengracht 466, 2ᴺᴰ Floor, 1017 CA Amsterdam, The Netherlands,
>
> ("Advisor"),
>
> - and -
>
> **CONSORCIO BARR, S.A.**, a corporation domiciled in the City of Caracas, Republic of Venezuela, duly inscribed in the Second Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on December 18, 1990, under No. 27, Volume 113-A Second, having its principal offices at Calle Veracruz, Edif. Torreon, Piso 2, Urb. Las Mercedes, Caracas, Venezuela,
>
> ("Owner").

## RECITALS

A.    Owner is the legal and beneficial owner of certain real property situated in the City of Caracas, Venezuela, more precisely described in Schedule "B" attached hereto (the "Land").

B.    Owner is in the process of developing upon the Land a mixed-use commercial and residential project of approximately 73,000 square metres (the "Project") consisting of: (i) a World Class Luxury Hotel (as defined below) containing approximately 212 guest rooms, together with restaurants, bars, banquet, meeting and other public rooms, a fitness club and other facilities to be developed, constructed, furnished and equipped in accordance with the Hotel Design Brief (as defined below), (ii) a residential component

consisting of approximately 116 residential luxury apartment units and other related facilities, (iii) a commercial component consisting of up to 3,000 square metres of general office space, (iv) an exclusive retail component consisting of approximately six retail units for lease by retail tenants, and (v) two independent commercial components consisting of up to 1,300 square metres of general commercial space.

C.    Advisor, together with its Affiliates (as defined below), has expertise in the various phases of the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of World Class Luxury Hotels and other related facilities.

D.    Owner intends that the Hotel become one of the leading hotels in the City of Caracas and, at the same time, be operated and managed in an efficient manner and, in that regard, Advisor and its Affiliates have offered to provide to Owner certain services in connection with the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of the Hotel as a World Class Luxury Hotel and with a view to maximizing benefits for both Owner and Advisor and its Affiliates.  Owner, after a lengthy selection process, has decided to engage Advisor and its Affiliates to provide such services.

E.    Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Pre-Opening Services Agreement") with Four Seasons Hotels Limited ("Four Seasons") pursuant to which Four Seasons (for certain fees) has agreed to provide to Owner certain services with respect to the development and construction of the Hotel (as defined below) and certain other services with respect to the pre-opening of the Hotel.

F.    Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Services Agreement") with Four Seasons pursuant to which Four Seasons (for certain fees) has agreed to provide to Owner certain services with respect to the ongoing purchasing services, the refurbishing and the marketing of the Hotel.

G.  Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel License Agreement") with Four Seasons Hotels and Resorts B.V. ("Licensor") pursuant to which Licensor (for certain fees and other consideration) has agreed to provide the right and licence to use the Trademarks (as defined below) and to utilize the Proprietary Materials (as defined below) to Owner in connection with the marketing, operation and management of the Hotel and the marketing of the Residential Apartments (as defined below) for sale by Owner.

H.  Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Management Agreement") with Four Seasons Caracas, C.A. ("Operator") pursuant to which Operator (for certain fees) has agreed to provide to Owner certain services with respect to the day-to-day operation and management of the Hotel.

I.  Owner also wishes to obtain the benefit of Advisor's expertise in advising and providing services in connection with the supervision and direction of World Class Luxury Hotels and other related facilities and Advisor (for certain fees) has agreed to provide such advice and services to Owner in connection with the Hotel, upon and subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW THEREFORE in consideration of the covenants and agreements set forth in this Agreement, the parties agree that:

# ARTICLE I

## DEFINITIONS

**1.01**         <u>Definitions</u>

In this Agreement, the terms in Schedule "A" attached hereto shall have the respective meanings indicated therein.

**1.02**         <u>Recitals</u>

Advisor and Owner each represent and warrant to the other that the Recitals to this Agreement, insofar as they relate to it, are true and correct.

**1.03**         <u>Interpretation</u>

In this Agreement, save and except as otherwise expressly provided:

    **(a)**         all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun;

    **(b)**         the division of this Agreement into Articles and sections and the use of headings is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions;

    **(c)**         when calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date which is the reference day in calculating such period shall be excluded. If the last day of such period is not a business day, the period in question shall end on the next business day;

(d)     all monetary amounts are expressed in United States Dollars.  All payments of sums, charges, fees, costs, expenses and other amounts contemplated by this Agreement shall be paid in United States Dollars.  If, pursuant to the judgment or order of any court or otherwise, any amount due or payable hereunder in United States Dollars (the "Original Currency") is paid in any other currency (the "Second Currency"), such payment in the Second Currency shall discharge or satisfy the obligation of the party making such payment to pay such amount in the Original Currency only to the extent that the amount of such payment is, when converted on the date of such payment to the Original Currency based on the United States Dollar Exchange Rate, equivalent to the amount of such payment if such payment had been made in the Original Currency.  The party making such payment shall, as a separate and independent obligation, which shall not be merged in any such judgment or order or extinguished by any such payment in the Second Currency, pay or cause to be paid such obligation in respect of the Original Currency not so discharged and satisfied in accordance with the foregoing and indemnify the party receiving such payment and hold the party receiving such payment harmless from and against any losses, costs, damages or expenses which the party receiving such payment may sustain or incur as a result of any such amount being paid in the Second Currency;

(e)     all references to Article and section numbers refer to Articles and sections of this Agreement, and all references to Schedules refer to the Schedules attached hereto; and

(f)     the words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or section hereof.

1.04     Schedules

The following schedules are attached hereto and are incorporated and deemed to be an integral part of this Agreement:

| Schedule "A" | - | Definitions |
| Schedule "B" | - | Description of the Land |
| Schedule "C" | - | Form of Assumption Agreement |
| Schedule "D" | - | Form of Subordination and Non-Disturbance Agreement |

## ARTICLE II

## TERMINATION PRIOR TO THE OPENING DATE

**2.01** ___ **Termination Prior to Opening Date**

If any or all of the other Hotel Agreements are terminated in accordance with their terms prior to the Opening Date, then this Agreement shall terminate on the date of such termination and Owner and Advisor shall have no future obligations arising out of this Agreement, save and except as otherwise expressly provided for in this Agreement. Notwithstanding the foregoing, if this Agreement is terminated in accordance with its terms (other than as a result of the failure by Advisor to perform its obligations under this Agreement or by any Affiliates of Advisor to perform their respective obligations under any of the other Hotel Agreements) and within five years from the date of the termination Owner or a Related Person commences or intends to commence the development or construction or takes or intends to take any action in furtherance of the development or construction of a luxury hotel on the Land, then Owner shall promptly notify Advisor in writing of such intention or action (which notice shall set forth in reasonable detail the character of the contemplated hotel development or construction). In addition, upon receipt by Owner of a written offer from any Person for the provision of any of the services contemplated by this Agreement in respect of such proposed hotel (which offer Owner is willing to accept), Owner shall promptly submit a copy of such offer to Advisor. Advisor shall have a period of three months after receipt of a copy of such offer to notify Owner whether it is willing to provide the services contemplated in such offer on the terms and conditions set forth therein. If Advisor notifies Owner of its unwillingness to provide such services on the terms and conditions set forth in the offer or fails to notify Owner of its intention within such three month period, Owner shall be entitled to accept such offer on the terms and conditions set forth therein.

ARTICLE III

ACCESS TO HOTEL

3.01        <u>Access to Hotel</u>

Owner covenants that Advisor shall and may have complete access to the Hotel during the Term, free from interruption or disturbance.

ARTICLE IV

OPENING DATE

4.01        <u>Determination of Opening Date</u>

(a)     The opening date of the Hotel (the "Opening Date") will be the date of the actual opening of the Hotel for guest occupancy.  The Opening Date shall be determined by Advisor and approved by Owner.

(b)     A proposed opening date of the Hotel (the "Scheduled Opening Date") shall be determined by Advisor and approved by Owner.  Owner and Operator shall use all reasonable efforts to open the Hotel on the Scheduled Opening Date.  Owner has undertaken to complete the structure and the facade of the Residential Apartments, the Office Space, the Retail Space and the Commercial Space on or before the Scheduled Opening Date; provided that, if the failure to complete the balance of the Residential Apartments, the Office Space, the Retail Space and the Commercial Space on or before the Scheduled Opening Date could or may have material adverse effect on the opening of the Hotel on the Scheduled Opening Date or the operation of, or access to, the Hotel after the Opening Date, then Owner shall complete the balance of the Residential Apartments, the Office Space, the Retail Space and the Commercial Space on or before the Scheduled Opening Date to the extent necessary so as not to have material adverse effect on the opening of the Hotel on the Scheduled Opening Date or the operation of, or access to, the Hotel after the Opening Date.  If for any reason (other than

strikes, lock-outs, picketing or boycotts, hand-billing or similar types of activities, war, fire or acts of God), the opening of the Hotel or, to the extent required by the preceding sentence, the completion of the Residential Apartments, the Office Space, the Retail Space or the Commercial Space by the Scheduled Opening Date should be placed in jeopardy, Owner shall authorize all necessary overtime and shift work to be undertaken at Owner's sole cost and expense to meet the Scheduled Opening Date.

(c)     Owner's failure to approve the initial Proposed Annual Plan or revisions to the initial Annual Plan submitted by Advisor to Owner prior to the Scheduled Opening Date pursuant to section 6.01 shall delay the Opening Date until such time as the Dispute has been resolved in accordance with the Dispute resolution procedure pursuant to section 17.02.

(d)     The determination of the Opening Date shall not be construed as or operate as any confirmation by Advisor or any of its Affiliates of the structural integrity, safety or other design aspects of the Hotel or of the competence of Owner's architects, engineers, contractors and other consultants or as to the compliance by the Hotel with any Applicable Law.

## ARTICLE V

## ADVISOR'S AND OWNER'S RESPONSIBILITIES

5.01        **Advisor's Appointment**

Owner engages Advisor as the exclusive advisor to Owner during the Term with exclusive responsibility of advising Owner in connection with the supervision and direction of the Hotel as a World Class Luxury Hotel in accordance with the terms and conditions of this Agreement. Owner expressly agrees and undertakes, subject to the terms and conditions of the Hotel Agreements, to accept and promptly take all necessary action to implement all advice provided from time to time to Owner hereunder by Advisor.

5.02        Advisor's Responsibilities

Advisor shall, throughout the Term, in a professional, efficient and expeditious manner, do all things and take all necessary action to advise Owner in connection with the supervision and direction of the Hotel as a World Class Luxury Hotel, all for the account of and on behalf of Owner. Without limiting the generality of the foregoing and the other provisions of this Agreement, Advisor shall advise and discuss with Owner, subject to and in accordance with the terms and conditions of this Agreement and the Annual Plan, as to:

(a)    the details of any proposed capital refurbishing programs when required in the opinion of Advisor to maintain the Hotel as a World Class Luxury Hotel;

(b)    the programs to be used, and the operating policies and procedures to be followed, to maximize patronage of Hotel facilities, including (without limitation) the establishment of room rates for the Hotel on a basis consistent with a World Class Luxury Hotel;

(c)    the establishment of the Hotel policy regarding its association with any credit card system;

(d)    the details of plans and specifications for alterations, additions or improvements to the Hotel consistent with a World Class Luxury Hotel;

(e)    the elimination or improvement of operations problems;

(f)    the training and development of personnel of the Hotel and, in this regard, the courses made available through Advisor or any of its Affiliates and the dates and times on which such courses shall be made available to personnel of the Hotel through Advisor or any of its Affiliates;

(g)    the effectiveness of the Hotel's human resources department in meeting its objectives as set by Operator, including (without limitation) the Hotel's personnel

director, and the establishment, review and update of the Hotel's human resource polices and procedures;

(h)     the review of pay/benefit policies and external comparative surveys to ensure maintenance of a sound competitive position for the Hotel;

(i)     the review of turnover reports for employees of the Hotel and suggestions of remedial actions designed to reduce such turnover;

(j)     the review of periodic reports of food and beverage results at the Hotel, including (without limitation) the comparison of the same against detailed budget and labour standards;

(k)     the establishment, review and update of food and beverage control and service manuals, rooms division manual, housekeeping manual and labour standards manual;

(l)     the adequacy of the food and beverage controls in the Hotel, the adequacy of Hotel systems and procedures and the degree of compliance with Advisor's policies;

(m)     the monitoring of accounts receivable of the Hotel in accordance with Advisor's standards on a monthly basis and Advisor shall provide follow-up advice in respect thereof with an action plan where aging is unacceptable;

(n)     the selection, review and update of computer systems (hardware and software) for use in the Hotel;

(o)     the development, review and update of accounting software specifically for use in the Hotel;

(p)    the development of a guest history package for Hotel guests and the food and beverage point of sales system; and

(q)    the development of new products and changes in operations to improve quality and efficiency standards for the Hotel.

5.03    **Advisor's Responsibilities Relating to Residential Apartments**

Advisor shall, throughout the Term, in a professional, efficient and expeditious manner, do all things and take all necessary action to advise Owner in connection with the supervision and direction of the services to be provided by the Hotel to the owners and occupants of the Residential Apartments, all for the account of and behalf of Owner. Advisor is authorized and directed, as agent of Owner, to perform and cause to be performed services in connection with the supervision and direction of the services to be provided by the Hotel to the owners and occupants of the Residential Apartments, subject to and in accordance with the terms of this Agreement.

5.04    **Owner's Responsibility**

Owner shall cause the Hotel:

(a)    to be supervised and directed as a World Class Luxury Hotel and otherwise in accordance with this Agreement; and

(b)    to be furnished, equipped, operated, managed, serviced and marketed, and to continue to be developed and constructed, in accordance with the other Hotel Agreements,

and shall fulfil all of its obligations under this Agreement and under the other Hotel Agreements.

5.05        Maintenance of Hotel and Capital Refurbishing Programs

(a)      Owner covenants to maintain the Hotel as a World Class Luxury Hotel.

(b)      Owner agrees to approve any proposed capital refurbishing programs submitted to Owner by Advisor from time to time  for approval if they are necessary to fulfil the obligation of Owner to maintain the Hotel as a World Class Luxury Hotel.  Upon approval by Owner of any such capital refurbishing programs (the "Capital Refurbishing Programs"), Advisor shall allow the Capital Refurbishing Programs to be implemented by any Person engaged by Owner, including (without limitation) Advisor or any of its Affiliates.

5.06        Dealings With Third Persons

Owner hereby acknowledges and agrees that, in fulfilment of its obligations hereunder, Advisor may, subject to the terms and conditions of this Agreement, communicate directly with any Person engaged to provide services to the Hotel, including (without limitation) any Affiliates of Advisor, and Owner shall cause such Persons to act in furtherance of the advice given by Advisor throughout the Term.

ARTICLE VI
ANNUAL PLAN

6.01        Annual Plan

(a)      Not later than 60 days prior to the Scheduled Opening Date, and thereafter at least 45 days before the beginning of each Fiscal Year, Advisor shall submit to Owner for its approval an annual business plan for the Hotel (the "Proposed Annual Plan", which shall become the approved annual business plan for the Hotel (the "Annual Plan") once the same has been approved or deemed to have

been approved in accordance with this Agreement).   Advisor may submit revisions to the Annual Plan to Owner for Owner's review and approval.

(b)   Owner shall notify Advisor of its approval or its disapproval of the Proposed Annual Plan or revisions to the Annual Plan not later than 30 days after receipt thereof.  If no such notice is given by Owner within such 30 day period, then Owner shall be deemed to have approved of the Proposed Annual Plan or revisions to the Annual Plan.   Owner shall have the opportunity to meet personnel designated by Advisor as appropriate during the 30 day period.  If Owner disapproves of all or any portion of the Proposed Annual Plan or revisions to the  Annual Plan within such 30 day period, Owner shall furnish Advisor at the time of notice of such disapproval with detailed reasons for its objections to the Proposed Annual Plan or revisions to the Annual Plan and Owner and Advisor shall attempt to agree in respect of the items to which Owner objects within 30 days after notice of disapproval has been given, and if such agreement is not reached within such 30 day period, then either Owner or Advisor may refer the matter to the Dispute resolution procedure pursuant to the provisions of section 17.02; provided that pending the resolution of such Dispute in accordance with the Dispute resolution procedure (i) in the case of the initial Proposed Annual Plan or revisions to the initial Annual Plan submitted by Advisor to Owner, the Opening Date of the Hotel shall be delayed, and (ii) in the case of any subsequent Proposed Annual Plan or revisions to any subsequent Annual Plan submitted by Advisor to Owner, that Proposed Annual Plan and revisions to that Annual Plan (to the extent they are not the subject of the Dispute resolution procedure) and the Annual Plan and revisions to the Annual Plan for the preceding Fiscal Year (to the extent they address the matters subject to the Dispute resolution procedure and irrespective of whether it is the Annual Plan and revisions to the Annual Plan submitted by Advisor and approved by Owner for the preceding Fiscal Year in accordance with this section 6.01 or the Annual Plan and revisions to the Annual Plan deemed to have been the approved Annual Plan and revisions to the Annual Plan for the preceding Fiscal Year in accordance with this section 6.01) shall be deemed to be the approved Annual

Plan for the current Fiscal Year; provided that each applicable item of the Annual Plan and revisions to the Annual Plan for the preceding Fiscal Year shall be increased proportionately to reflect any increase in the Consumer Price Index during such preceding Fiscal Year.

(c)    Each Annual Plan shall be prepared in United States Dollars and shall include the following:

(i)    a marketing plan, which provides general sales and marketing philosophy and strategy covering both local and national sales, advertising and promotional activities, market analysis, advanced booking information, pricing strategy, customer relations policy, credit card policy and complimentary rooms policy;

(ii)   an annual forecast of operations, including projected occupancy rates and average daily room rates, estimated complimentary or discounted rooms, food, beverage and other sales, departmental expenses, advertising expenses and group service charges, general and administrative expenses, anticipated expenses for repairs, renovation and maintenance and capital improvements, expenses for utility services, Taxes and insurance;

(iii)  a projected balance sheet, cash flow budget and source and use of funds statement; and

(iv)   a capital plan for expenditures on Furniture, Fixtures and Equipment and any other proposed capital improvements.

**6.02**        <u>**Variations in the Annual Plan**</u>

(a)    Owner acknowledges that the Annual Plan is a planning tool used to attempt to achieve the objective of operating and maintaining a World Class Luxury Hotel in accordance with this Agreement.  As such, Owner agrees that Advisor shall

not be liable for any variance between actual results and the estimate of the projected results for the Fiscal Year set out in the Annual Plan , it being agreed that the Annual Plan cannot be relied upon as an assurance of actual results for such Fiscal Year.  Advisor shall notify Owner of the need to depart materially from the Annual Plan if, in the opinion of Advisor, adherence to the Annual Plan is impractical or such departure is necessary or desirable for the orderly, efficient or profitable operation of the Hotel.

(b)     Owner acknowledges that, notwithstanding Advisor's experience and expertise in relation to the supervision and direction of World Class Luxury Hotels, the projections contained in each Annual Plan are subject to and may be affected by changes in financial, economic and other conditions and circumstances beyond Advisor's control.  Owner further acknowledges that certain of the figures set forth in the Annual Plan for a Fiscal Year will be variable in correlation to the occupancy of the Hotel and, therefore, to the extent that the occupancy of the Hotel exceeds the occupancy projected in such approved Annual Plan, increases in such variable expenses shall be deemed a part of such approved Annual Plan. Operator agrees to indicate in each Annual Plan which figures are variable in correlation to the occupancy of the Hotel.

6.03        **Owner's Obligation to Fund Capital for Furniture, Fixtures and Equipment Replacements**

(a)     Owner hereby acknowledges and approves in advance the allocation in the Annual Plan for expenditures in connection with the replacement and renewal of Furniture, Fixtures and Equipment of an amount equal to:

(i)      1 % of Gross Receipts during the first Fiscal Year;

(ii)     2 % of Gross Receipts during the second Fiscal Year;

(iii)    3% of Gross Receipts during each of the third, fourth and fifth Fiscal Years; and

(iv)    for each Fiscal Year thereafter, 4% of Gross Receipts.

(b)    One twelfth of such amount for each Fiscal Year shall be deposited each month into a separate bank account designated for such expenditures (the "Capital Reserve") in accordance with the Annual Plan.  Advisor shall be entitled to advise Owner to cause Operator to expend any amounts in the Capital Reserve, including (without limitation) interest accrued thereon and any unused amounts in the Capital Reserve from any preceding Fiscal Year, for the purpose of the replacement and renewal of Furniture, Fixtures and Equipment.

(c)    Advisor shall not cause the aggregate of the unused amounts in the Capital Reserve from preceding Fiscal Years to exceed $1,500,000 at the end of any Fiscal Year without the express prior written consent of Owner.

## ARTICLE VII
## RELATIONSHIP OF ADVISOR AND OWNER

7.01    <u>Advisor To Act as Agent for Owner</u>

In the performance of its duties as the advisor of Owner, Advisor shall act solely as agent of Owner.  Nothing in this Agreement shall constitute or be construed to be or create a partnership, joint venture or joint employer relationship between Owner and Advisor and the relationship of Advisor to Owner shall be that of an agent acting on Owner's behalf.  Advisor shall not be required to expend any of its own funds or otherwise incur any debts or liabilities to any Person in the performance of its duties as the advisor to Owner.  All debts and liabilities to third Persons required or permitted to be incurred by Advisor under this Agreement in the course of fulfilling its obligations hereunder shall be the debts and liabilities of Owner only and Advisor shall not be liable for any such obligations by reason of its advising Owner in respect

of the supervision and direction of the Hotel.  Advisor may so inform third Persons with whom it deals on behalf of Owner and may take any other reasonable steps to carry out the intent of this section 7.01.

7.02        Delegation of Authority By Advisor

Advisor may engage one or more Persons to perform services in connection with the supervision and direction of the Hotel and each person engaged by Advisor to perform such services in connection with this Agreement, including (without limitation) any of its Affiliates, any agent or employee of Advisor or any of its Affiliates or any agent or employee of Owner hired by Advisor or any of its Affiliates, shall be acting solely as agent of Owner and not of Advisor for such purposes.  Notwithstanding that Advisor may engage one or more Persons to perform the services contemplated in this section 7.02, Advisor shall not be released from its responsibilities under this Agreement or any liabilities which may result therefrom nor shall such responsibilities or liabilities be diminished.

# ARTICLE VIII
## ADVISOR NOT REQUIRED TO MAKE ADVANCES

8.01        Advances By Advisor

In no event shall Advisor be required to advance any of its own funds for, or incur any liability in connection with, advising Owner in respect of the supervision and direction of the Hotel unless Owner shall have furnished Advisor with funds necessary for the reimbursement thereof or provided Advisor with an indemnity in form and substance satisfactory to it.

# ARTICLE IX
# TERM AND RENEWALS

9.01        Initial Term

The initial term of this Agreement shall be for a period commencing on the date hereof and terminating at midnight on the last day of the twentieth full Fiscal Year (disregarding the initial Fiscal Year of less than twelve (12) calendar months) after the Opening Date.

9.02        Extension Terms

**(a)**    Advisor shall have the right to extend the Term for a first extension term of 10 additional Fiscal Years.

**(b)**    If such first option of extension shall have been exercised, Owner and Advisor may agree to extend the Term for such additional extension terms of 10 additional Fiscal Years each as may be agreed to by Owner and Advisor.

**(c)**    In addition, the Term shall be extended automatically by a period equal to the period between any termination and subsequent reinstatement of this Agreement pursuant to section 13.02 of this Agreement.

9.03        Exercise of Extension Options

The option to extend granted to Advisor by section 9.02(a) shall be deemed to have been exercised unless Advisor shall have given written notice to Owner of Advisor's intention not to exercise the option to extend, which notice shall be given by Advisor not later than 12 months prior to the end of the initial term provided for in section 9.01.

9.04        Covenants to Apply

During the extension term provided for in section 9.02(a) or any subsequent extension term agreed to by Owner and Advisor as contemplated by section 9.02(b), this Agreement shall continue in full force and effect in all respects, and all of the terms, covenants, conditions and provisions of this Agreement shall apply, except that there shall be no options to extend beyond those provided for in this Article IX.


## ARTICLE X

## REMUNERATION AND REIMBURSEMENT OF ADVISOR

10.01        Advisory Fee

Owner shall pay to Advisor a fee (the "Advisory Fee") in United States Dollars for services rendered under this Agreement for each Fiscal Year of the Term (and proportionately for any fraction of a Fiscal Year) equal to 0.9% of Gross Receipts for such Fiscal Year.


10.02        Incentive Fee

Owner shall pay to Advisor an additional fee (the "Incentive Fee") in United States Dollars for services rendered under this Agreement for each Fiscal Year of the Term (and proportionately for any fraction of a Fiscal Year) equal to the sum of: (i) 10% of the Gross Operating Profit for such Fiscal Year, and (ii) 2.5% of the amount by which Gross Operating Profit for such Fiscal Year exceeds 35% of Gross Receipts for such Fiscal Year.


10.03        Reimbursement of Costs and Expenses

Owner shall reimburse Advisor for all reasonable costs and expenses incurred by Advisor in the performance of the services contemplated by this Agreement.  Owner expressly acknowledges that such services may be for either (a) the exclusive benefit of the Hotel, or

(b) the benefit of the Hotel and one or more other hotels or resorts that are owned or operated and managed by Advisor or any of its Affiliates; provided that if such activities are not for the exclusive benefit of the Hotel, only an equitable portion of the costs and expenses associated therewith shall be allocated to the Hotel by Advisor.  Such costs and expenses may include, but are not limited to, consultants fees and expenses, out-of-pocket expenses incurred in connection with performance of the duties described in sections 5.02 and 5.03, travel expenses and food and lodging of Advisor's personnel (but shall not include the employment costs of such personnel, save and except as provided for in this section 10.03).  Such costs and expenses shall be estimated by Advisor in the Annual Plan and shall be reimbursed by Owner in United States Dollars.  Advisor shall use its reasonable efforts to ensure that such costs and expenses are accurately estimated.  Owner shall also reimburse Advisor, on the basis of the number of days spent at the Hotel, for:

(a)     the total employment costs of any personnel of Advisor or any of its Affiliates who as a replacement spend time at the Hotel engaged in duties on a temporary basis fulfilling a function that is normally a full-time function of an employee of the Hotel;

(b)     the total employment costs of any personnel of Advisor or any of its Affiliates who spend time at the Hotel devoted to the problems or affairs of the Hotel; provided that, in each case, the time spent at the Hotel is not less than 15 full working days during any consecutive three month period; and

(c)     the total employment costs of any personnel of Advisor or any of its Affiliates who spend time at the Hotel supervising an approved refurbishing plan or capital improvement, including (without limitation) a Capital Refurbishing Program, unless such employment costs are payable to, or otherwise included in the cost of services provided by, Advisor or any of its Affiliates as part of any such approved refurbishing plan or capital improvement.

To the extent that Advisor is able to estimate the number of days which will be spent by any personnel of Advisor or any of its Affiliates at the Hotel in any Fiscal Year in connection with

the performance of the services contemplated in paragraphs (a), (b) and (c) of this section 10.03, the total employment costs of such personnel contemplated in such paragraphs shall be estimated by Advisor in the Annual Plan for such Fiscal Year.

10.04      <u>Manner of Payment of Fees, Charges, Costs and Expenses</u>

 (a) Upon receipt by Owner of the statement of profit and loss of the Hotel from Operator at the end of each month and otherwise in accordance with section 10.06(a) of the Hotel Management Agreement, Advisor shall be:

  (i) paid the Advisory Fee for the preceding month, calculated on the basis of Gross Receipts for the preceding month;

  (ii) paid the Incentive Fee for the preceding month, calculated on the basis of Gross Operating Profit for the preceding month; and

  (iii) reimbursed for all costs and expenses, if any, reimbursable to it pursuant to section 10.03 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement during the preceding month.

 (b) Upon receipt by Owner of the annual statement of profit and loss of the Hotel from Operator at the end of each Fiscal Year and otherwise in accordance with section 10.06(b) of the Hotel Management Agreement, the requisite adjustments to reflect the provisions of this Agreement shall be made between Owner and Advisor with respect to the Incentive Fee for such Fiscal Year concurrently with the delivery of such statement.

 (c) To the extent that there may be insufficient funds in the Hotel Bank Accounts for Operator to make the payments required to be made under this section 10.04 on behalf of Owner, Owner shall pay the amount of any deficit to Advisor on

demand, together with interest on such payments from the time such payments are required to be made under this section 10.04 at the Interest Rate.

## ARTICLE XI

## NAME OF HOTEL AND RESIDENTIAL APARTMENTS

**11.01**        <u>Name of Hotel</u>

During the Term, the Hotel shall at all times be known and designated as the "Four Seasons Hotel, Caracas" with such other name or names as may be selected by Advisor from time to time  with the approval of Owner.

**11.02**        <u>Name of the Residential Apartments</u>

(a)      Subject to Section 11.02(b), the Residential Apartments shall be known and designated by a name containing of the words "Four Seasons" and such other modifier or modifiers as may be selected by Advisor from time to time with the approval of Owner, such as the words "Apartments" or "Residences".

(b)      The entitlement of the Residential Apartments to be known and designated by a name containing the words "Four Seasons" shall be subject to the owners and occupants of the Residential Apartments or any association established by the owners and occupants of the Residential Apartments, as the case may be, entering into a trademark agreement with Licensor in form and substance satisfactory to Licensor and the owners and occupants of the Residential Apartments or the association established by the owners and occupants of the Residential Apartments, as the case may be.

ARTICLE XII

ALTERATIONS, ADDITIONS AND IMPROVEMENTS TO THE HOTEL

12.01      Alterations, Additions and Improvements

Advisor shall, when required in the opinion of Advisor to maintain the Hotel as a World Class Luxury Hotel, submit plans for alterations, additions or improvements to Owner for approval as part of the Annual Plan.

—

ARTICLE XIII

DAMAGE TO AND DESTRUCTION OF THE HOTEL

13.01      Owner's Obligation to Repair

(a)      Subject to sections 13.01(b) and (c), if the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire or any other casualty, Owner will with due diligence repair, rebuild or replace the same so that after such repairing, rebuilding or replacing the Hotel shall be substantially the same as prior to such damage or destruction. If Owner fails to begin such work within 90 days after the fire or other casualty or fails to complete the work diligently, Advisor may, at its option, either (i) terminate this Agreement by written notice to Owner, (ii) pursue any other recourse at law or in equity it may have, or (iii) if the cost of repair, rebuilding or replacement is estimated by Operator and Owner pursuant to the Hotel Management Agreement to be less than 20% of the replacement cost of the Hotel, advise Operator to cause such work to be completed for the account of Owner.

(b)      If the cost of repair, rebuilding or replacement in the final three years of the current Term following a casualty is estimated by Operator and Owner pursuant to the Hotel Management Agreement to exceed 20% of the replacement cost of the Hotel, Owner shall have the right (exercisable by written notice given to

Advisor within 90 days following the date which is the later of the date of the occurrence of such casualty and the date of the determination of the estimate) not to repair, rebuild or replace the damage and to terminate this Agreement effective on the last day of the month following the month in which such notice of termination is given unless Advisor has a further right to extend the Term pursuant to section 9.02(a), in which case the notice of termination shall not be effective and Owner shall repair, rebuild or replace the Hotel as otherwise required by section 13.01(a).

(c)   If the cost of repairing, rebuilding or replacement not covered by insurance following a casualty is estimated by Operator and Owner pursuant to the Hotel Management Agreement to exceed 20% of the total replacement cost of the Hotel, then Owner shall have the option (exercisable by written notice given within 90 days following the date which is the later of the date of the occurrence of such casualty and the date of the determination of the estimate) not to repair, rebuild or replace and to terminate this Agreement effective on the last day of the month following the month in which such notice is given.

(d)   If Owner, by reason of unavailability of supplies, strikes, walk-outs or other matters entirely beyond the control of Owner (which in no event shall include Owner's financial incapacity), shall be unable to undertake the repairs or restoration within the time provided in section 13.01(a), the time during which Owner shall be able to undertake to accomplish the repairs or restoration shall be extended accordingly.

(e)   Advisor shall, notwithstanding any delay or interruption resulting from any such damage or destruction, be entitled to receive from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) of the Hotel Management Agreement (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Advisory Fee, calculated on the basis of budgeted Gross

Receipts as set out in the Annual Plan then applicable, and the Incentive Fee, calculated on the basis of budgeted Gross Operating Profit as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Advisory Fee and the Incentive Fee historically earned by Advisor.

## 13.02      Advisor's Reinstatement

If, following a termination of this Agreement by Advisor in accordance with section 13.01, at any time during the five year period following such termination Owner or a Related Person intends to repair, rebuild or replace the Hotel or commences to do so, Owner shall promptly notify Advisor in writing of such intention or commencement, and, at Advisor's election (exercisable by written notice given to Owner within 60 days of receipt of the written notice by Owner of its intention to repair, rebuild or replace the Hotel, or, if no such Owner's notice is given, Advisor's actual knowledge of the commencement) this Agreement shall be reinstated (with only such amendments as are required due to changes in the type, scope or design of the project).

## ARTICLE XIV
## EXPROPRIATION

## 14.01      Complete Expropriation

If the whole of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings, or if such a portion of the Hotel shall be so taken as to make it imprudent or unreasonable, in Owner's and Advisor's opinion, to operate the remaining portion as a hotel of the standard of operation then applicable to the Hotel, then in either event, this Agreement shall be deemed to have terminated as of such time as possession of the Hotel or portion of the Hotel is surrendered or its operation is discontinued as a result of such taking or condemnation; provided that Advisor shall be entitled to receive from any award

for such taking or condemnation (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Advisory Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Incentive Fee, calculated on the basis of budgeted Gross Operating Profit as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Advisory Fee and the Incentive Fee historically earned by Advisor.

14.02      **Partial Expropriation**

If only a part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings and the taking or condemnation does not make it financially or operationally unreasonable or imprudent, in Owner's and Advisor's opinion, to operate the remaining portion as a hotel of the standard of operation then applicable to the Hotel, this Agreement shall not terminate; provided that any award therefor shall be used by Owner to repair any damage to the Hotel or any part of the Hotel, or to alter or modify the Hotel or any part thereof, so as to render the Hotel a complete and satisfactory architectural unit as a World Class Luxury Hotel. The remainder of any award for any partial taking or condemnation shall be retained by Owner; provided that Advisor shall be entitled to receive from any award for such taking or condemnation (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Advisory Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Incentive Fee, calculated on the basis of budgeted Gross Operating Profit as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Advisory Fee and the Incentive Fee historically earned by Advisor.

14.03        Temporary Expropriation

If all or any part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings for a temporary use, this Agreement shall not terminate and Advisor shall, for the duration of any delay or for the period of business interruption resulting from any such taking or condemnation, be entitled to receive from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) of the Hotel Management Agreement (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Advisory Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Incentive Fee, calculated on the basis of budgeted Gross Operating Profit as set out in the Annual Plan then applicable, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Advisory Fee and the Incentive Fee historically earned by Advisor.  When and if during the Term, the period of temporary use shall terminate, Owner shall make all such restoration, repairs and alterations as shall be necessary to restore the Hotel to a World Class Luxury Hotel.

## ARTICLE XV
## ASSIGNMENTS AND MORTGAGES

15.01        **Owner's Right to Assign**

Subject to the provisions of section 15.03, Owner shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person on the condition that such Person first enter into an agreement with Advisor, in the form attached hereto as Schedule "C", agreeing:

(a)    that the Hotel Agreements continue in full force and effect after such sale, assignment, transfer or other disposition; and

(b)    to assume all of the contractual obligations of Owner contained in the Hotel Agreements.

15.02    <u>Owner's Right to Mortgage</u>

Subject to the provisions of section 15.03, Owner shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to any Person on the condition that such mortgagee first enter into an agreement with Advisor, in the form attached hereto as Schedule "D", agreeing:

(a)    to be bound by Owner's covenants and undertakings hereunder for any period during which it is in possession of the Hotel;

(b)    that in the event of a foreclosure of its mortgage or lien on the Hotel or this Agreement or of a conveyance in lieu of foreclosure (i) no default under such mortgage or other documents evidencing the lien in favour of such mortgagee, and no proceeding to foreclose the same, and no conveyance in lieu of foreclosure thereof, will disturb Advisor's right to perform its duties pursuant to this Agreement or affect any other right of Advisor under this Agreement and (ii) this Agreement shall continue in full force and effect and such mortgagee, its successors and assigns, or any Person (the "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein upon foreclosure sale or by deed in lieu thereof, as the case may be, shall be a Qualified Person and shall automatically recognize this Agreement and Advisor's rights hereunder for the balance of the Term upon the same terms, covenants and conditions as herein provided, with the same force and effect as though this Agreement were originally made directly between Advisor and such mortgagee, or its successors and assigns, or the Foreclosure Purchaser, as the case may be; and

(c)    not to sell, transfer or otherwise dispose of any interest it may have in the Hotel or this Agreement without first causing any transferee thereof to acknowledge and agree to be bound by and become a party to such agreements with Advisor.

15.03     Limitation on Owner's Right to Assign and Mortgage

Notwithstanding the provisions of sections 15.01 and 15.02, Owner shall not without the express prior written consent of Advisor, which consent may be withheld or delayed in the sole discretion of Advisor without regard to the provisions of section 17.01(a), directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of, or mortgage, hypothecate or otherwise encumber, any interest, whether legal or beneficial, in all or any part of its Interest to any Person other than a Qualified Person. Any change in control of Owner, whether directly or indirectly and whether by way of transfer of shares, partnership interests or otherwise, to any Person other than a Qualified Person shall be prohibited unless the express prior written consent of Advisor, which consent may be unreasonably withheld or delayed, is obtained.

15.04     Advisor's Right to Assign

Subject to section 15.06, Advisor shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person, on the condition that:

    (a)     the Person to whom the Interest of Advisor is to be sold, assigned, transferred or otherwise disposed of shall first enter into an agreement with Owner, in form and substance satisfactory to Owner, agreeing to assume all of the contractual obligations of Advisor contained in this Agreement; and

    (b)     in the case of a sale, assignment, transfer or other disposition to an Affiliate of Advisor, Advisor shall first enter into an agreement with Owner, in form and substance satisfactory to Owner, agreeing to be jointly and severally liable with such Affiliate to perform all of the contractual obligations of Advisor contained in this Agreement notwithstanding such sale, assignment, transfer or other disposition.

Upon a sale, assignment, transfer or other disposition to a Person other than an Affiliate, Advisor shall be released from all of its obligations under this Agreement.

## 15.05     Advisor's Right to Mortgage

Advisor shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to a financial institution as security for its obligations to such financial institution.

## 15.06     Limitation on Advisor's Right to Assign

Advisor shall not without the express prior written consent of Owner, directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person other than (i) an Affiliate, (ii) a Person that results from any merger, amalgamation, consolidation or other reorganization of Advisor, or (iii) a Person that acquires all or substantially all the assets of Advisor and operates a hotel management business either on its own or in conjunction with its Affiliates. This section 15.06 shall not, however, apply to a change in control of Four Seasons Hotels Inc. resulting from sales of its publicly traded shares to any Person.

## ARTICLE XVI
## EVENTS OF DEFAULT AND TERMINATION

## 16.01     General

Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

    (a)    the failure of Advisor to disburse any amount to Owner provided for herein, or the failure of Owner to pay any amounts required to be paid by it hereunder, for

a period of 30 days after the date on which notice of the failure has been given to the defaulting party by the other party;

(b)     the filing of a voluntary assignment in bankruptcy or insolvency or a petition for reorganization under any Applicable Law by Owner, any member or partner of Owner, or Advisor;

(c)     the consent to an involuntary petition in bankruptcy or the failure by Owner, any member or partner of Owner, or Advisor to vacate, within 60 days from the date of entry thereof, any order approving an involuntary petition;

(d)     the making of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner, any member or partner of Owner, or Advisor a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of a party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of 120 consecutive days; or

(e)     the failure of either Owner or Advisor to fulfil any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of 30 days after written notice of the failure; provided that if upon receipt of any notice the defaulting party promptly and with all due diligence cures the default or, if the default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures the failure within that period so advised, then no event of default shall be deemed to have occurred unless and until the defaulting party has failed to take or to continue to take action or to complete the cure within the period.

16.02        Rights of Non-Defaulting Party

Upon the occurrence of any event of default pursuant to section 16.01 and the applicable grace periods having expired, either Owner or Advisor may, without prejudice to any other recourse at law or in equity which it may have, give to the other notice of its intention to terminate this Agreement after the expiration of a period of 30 days from the date of such notice and, upon the expiration of such period, the term of this Agreement shall expire unless such default has been cured. Such notice shall be of no force and effect if within 30 days of receipt of such notice, the party receiving such notice shall promptly and with all due diligence cure the default or, if such default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures such default within the period so advised.

16.03        **Remedying Defaults**

Notwithstanding anything to the contrary contained in this Agreement, either Owner or Advisor shall be entitled to remedy any default of the other under this Agreement with reasonable notice to the other or without notice in the event of any emergency or apprehended emergency, without prejudice to any rights under this Agreement and the party so remedying such default shall be repaid upon demand by the other for the cost of remedying such default, together with interest on such cost from the date of incurring such cost at the Interest Rate.

16.04        **Bona Fide Dispute**

Notwithstanding the provisions of section 16.02, neither Owner nor Advisor shall be entitled to take any of the actions contemplated in section 16.02, save and except for the commencement of any legal proceedings (in which case the provisions of sections 20.10 and 20.11 regarding jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained in this Agreement pending the resolution of a Dispute, if before the expiration of the 30 day notice period referred to in section 16.02, notice of a Dispute has been

delivered in accordance with section 17.02(a) with respect to any of the foregoing events of default and the procedures set forth in sections 17.02(b) and (c) are being pursued in good faith (except that for this purpose under section 17.02(b), the requirement of a 30 day negotiation period under section 17.02(a) shall be inapplicable and the period within which to appoint an expert under section 17.02(b) shall commence on the date of delivery of notice of a Dispute).

16.05       Advisor's Right to Terminate

In addition to any right arising out of section 16.02 and notwithstanding sections 16.04, 17.02 and 17.03, Advisor shall have the right to terminate this Agreement if the Opening Date does not occur on or before 180 days after September 30, 1998, other than by reason of any default by Advisor in its obligations under this Agreement. Advisor's right to terminate this Agreement in accordance with this section 16.05 shall be exercised by written notice by Advisor given to Owner within 30 days after the relevant date mentioned above. If the Opening Date does not occur on or before the Scheduled Opening Date for any reason beyond the control of Owner, including (without limitation) the Hotel or any portion thereof being damaged or destroyed, and Advisor does not terminate this Agreement in accordance with this section 16.05 Advisor shall, for the period beginning on the Scheduled Opening Date and ending on the Opening Date, nevertheless be entitled to receive, from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) of the Hotel Management Agreement, an equitable apportionment of such insurance proceeds based on the Advisory Fee, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Incentive Fee, calculated on the basis of budgeted Gross Operating Profit as set out in the Annual Plan then applicable.

16.06       Cross-Termination

If any or all of the other Hotel Agreements (other than the Hotel Pre-Opening Services Agreement) are terminated after the Opening Date, or if the Hotel Pre-Opening Services Agreement is terminated other than as a result of the expiry of its term through the passage of time, then either Advisor or Owner shall, in addition to any rights or remedies available to it at law or in equity, be entitled to terminate this Agreement by written notice to the other within

10 days after the date of such termination and Owner and Advisor shall have no future obligations arising out of this Agreement, save and except as expressly otherwise provided for in this Agreement.

## 16.07      Accounting on Termination

If this Agreement is terminated, Advisor shall be entitled (in addition to any rights or remedies available to it at law or in equity) to all sums, charges and fees which it is entitled to receive under this Agreement, together with costs and expenses, if any, reimbursable to it pursuant to section 10.03 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement.  The amount of all of such sums, charges, fees and out-of-pocket costs and expenses shall be ascertained for the period ending on the date of such termination and shall be paid to Advisor (i) to the extent ascertained on the date of such termination, on such date, and (ii) to the extent not ascertained on the date of such termination, on the date on which such sums, charges, fees and costs and expenses are ascertained after the date of such termination.

## 16.08      Claims on Termination

Notwithstanding anything contained in this Agreement, (i) the termination of this Agreement shall not prejudice any cause of action, claim or right of any of Owner or Advisor against the other accrued or to accrue on account of any default by the other of its obligations under this Agreement or arising as a result of the termination of this Agreement, and any term, covenant, condition or provision of this Agreement referable thereto shall not merge, but shall survive, the termination of this Agreement, and (ii) the Dispute resolution procedure set forth in section 17.02 shall no longer apply to any of Owner or Advisor after termination of this Agreement and any of Owner or Advisor shall be entitled to commence legal proceedings seeking any recourse available to it at law or in equity, including (without limitation) mandatory, declaratory or injunctive relief to define or protect the rights and enforce the obligations contained in this Agreement; provided that such legal proceedings shall not involve issues which have previously been submitted to and settled by arbitration in accordance with this Agreement

unless such legal proceedings involve the enforcement of an arbitration decision or award made
in respect of such issues.

## ARTICLE XVII
## APPROVALS, DISPUTE RESOLUTION AND ARBITRATION

17.01      <u>Approvals</u>

Except as otherwise provided in this Agreement:

(a)      all opinions contemplated by this Agreement must be reasonably formed and the
approval of any document, proposed action or other matters in accordance with
this Agreement shall not be unreasonably withheld or delayed; provided that in
determining the reasonableness of any such withholding or delay, full
consideration shall be given to, and it shall be unreasonable to deny or refuse
consent or approval to any matter if the effect of such denial or refusal would
prevent or hinder, the operation of the Hotel as a World Class Luxury Hotel or
the operation of the other components of the Project at a standard consistent with
that applicable to the Hotel as a World Class Luxury Hotel; and

(b)      the following procedure shall be followed with respect to any matter requiring
approval:

(i)      such documents or a written description of the proposed action or other
matter requiring approval shall be submitted by the party having
responsibility therefor (the "requesting party") to the party having the right
of approval, which submission shall be accompanied by a request for
approval in accordance with this Agreement;

(ii)      as soon as possible but not later than 30 days after receipt of any proposed
Annual Plan or 15 days after the receipt of any other written request for

approval (or such other time period as may be specified for approval with respect to any item in this Agreement) the party having the right of approval shall notify in writing the requesting party of its approval or of its specific objections to the document, proposed action or other matter;

(iii)   failure to respond in writing with specific objections within the maximum time period specified in section 17.01(b)(ii) shall constitute approval of all matters submitted;

(iv)   within 10 days of the receipt of any objections (or such other time period as may be specified in this Agreement), the requesting party shall:

   (A)   acquiesce to such objections; or

   (B)   reach an agreement with the party objecting; or

   (C)   call for a meeting of senior representatives of Owner and Advisor to be convened to consider the matter in dispute (by giving notice to convene such meeting in writing indicating the specific issues in dispute to be resolved by such representatives); and

(v)   as soon as possible, but not later than 10 days after receiving a request to convene a meeting in accordance with section 17.01(b)(iv)(C), representatives of Owner and Advisor shall convene to consider the specific issues in dispute and resolve them to the mutual satisfaction of the parties and if unable to resolve the specific issues in dispute, the same shall be resolved in accordance with the arbitration procedure provided in section 17.03.

Once any document, proposed action or other matter is approved, no change or amendment thereof may be effected without the prior consent of both parties.

17.02      Dispute Resolution

Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to this Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner:

(a)    first, within 10 days after the receipt of notice of a Dispute by one party to the other, the parties shall in good faith attempt to negotiate for a period of 30 days in an effort to resolve the Dispute;

(b)    second, if the parties are unable to resolve the Dispute within such 30 day period, they shall retain a mutually acceptable expert to assist them in resolving the Dispute within 10 additional days, failing which they shall each retain an expert on the eleventh day and the two experts thus chosen shall together act as the expert for the purposes of this section 17.02(b). If either party shall fail to appoint an expert as required hereunder, the expert appointed by the other party shall be the sole expert. Within 90 days after the experts (or such single expert) have been retained, the experts (or such single expert) shall, on a non-binding basis, advise the parties in writing of their views. The fees and expenses of the experts (or such single expert) shall be borne equally;

(c)    third, if the parties are still unable to resolve the Dispute within such 90 day period, the parties shall resort to arbitration procedures set forth in section 17.03; and

(d)    fourth, any party to the Dispute shall be entitled to join any Dispute proceeding arising out of this Agreement with any other Dispute proceeding arising out of either this Agreement or the other Hotel Agreements.

17.03      Arbitration

Except as otherwise provided in section 16.04 and this section 17.03, any Dispute shall be settled by arbitration as follows:

(a)      each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration.  Within 10 days after receipt by the other party of such notice, each party shall appoint an arbitrator and within 10 days of their appointment the two arbitrators so chosen shall nominate a third arbitrator.  If within such 10 day period the two arbitrators fail to nominate the third arbitrator, upon written request of either party, the third arbitrator shall be appointed by the International Court of Arbitration of the International Chamber of Commerce, and both parties shall be bound by the appointment so made.  If either party hereto shall fail to appoint an arbitrator as required under this section 17.03(a), the arbitrator appointed by the other party shall be the sole arbitrator of the matter;

(b)      the decision of the arbitrators (or such single arbitrator) shall be made within 30 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator) when reduced to writing and signed by them shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction;

(c)      the arbitration shall at the election of Advisor be held in the City of Miami, Florida, United States of America or the City of Caracas, Republic of Venezuela, as the case may be, and shall be conducted in the English language and, except for those procedures specifically set forth in this section 17.03, shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof; and

(d)      the arbitrators (or such single arbitrator) shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that each party shall be responsible for its own legal fees.

Notwithstanding anything contained in this section 17.03, any of Owner or Advisor shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 20.10 and 20.11 governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained herein pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this section 17.03, (ii) commence legal proceedings (in which case the provisions of sections 20.10 and 20.11 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement, or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of either this Agreement or any of the other Hotel Agreements.

## ARTICLE XVIII
## ADVISOR'S LIABILITY

### 18.01      Standard of Care

Advisor shall not, in the performance of its obligations under this Agreement, be liable to Owner or to any other Person for any act or omission (whether negligent, tortious or otherwise) of Advisor or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives, except only to the extent such liabilities, obligations, claims, costs and expenses arise out of or are caused by the wilful misconduct, gross negligence or bad faith of Advisor or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives.

18.02      Indemnities

     (a)     Owner hereby indemnifies and holds Advisor and its Affiliates and any of their respective directors, officers, employees, consultants, agents and representatives (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of any action or omission or course of action on the part of an Indemnified Party in the performance of its obligations under this Agreement or otherwise in connection with any obligation incurred by or instrument executed by an Indemnified Party alone, an Indemnified Party together with Owner or by Owner alone, whether or not an Indemnified Party shall be the signatory or one of the signatories on behalf of Owner and whether incurred or executed on behalf of Owner; provided that this indemnity shall not apply to any liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses resulting from the wilful misconduct, gross negligence or bad faith of the Indemnified Party.

     (b)     Advisor hereby indemnifies and holds Owner and any of its directors, officers, employees, consultants, agents and representatives harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of or caused by the wilful misconduct, gross negligence or bad faith of Advisor or any of its directors, officers, employees, consultants, agents or representatives.

## ARTICLE XIX

## ACKNOWLEDGMENTS

19.01        Owner's Acknowledgments

Owner acknowledges that :

(a)        in entering into this Agreement, Owner has not relied on any statement, study, representation or warranty of Advisor, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, express or implied, relating to the Hotel, including (without limitation) any statement, study, representation or warranty relating to the structural integrity, safety or other design aspects of the Hotel, the competence of the Consultants, the compliance of the Hotel with Applicable Law, any projection or pro forma statements of earnings or profit or loss or statements as to future success of the Hotel which may have been prepared by or on behalf of Advisor, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, and Owner understands that no guarantee is made or implied by Advisor or by any of its Affiliates with respect thereto; provided that, for greater certainty, nothing in this section 19.01(a) shall affect in any manner whatsoever the obligation of Operator or its Affiliates to make Deficit Payments in accordance with the provisions of section 8.04 of the Hotel Management Agreement; and

(b)        Advisor is relying on the representations, warranties and covenants of Owner set out in the Hotel Agreements in connection with Advisor entering into and fulfilling its obligations under this Agreement.

19.02        Advisor's Acknowledgments

Advisor acknowledges that Owner is relying on the representations, warranties and covenants of Advisor set out in this Agreement, and of the Affiliates of Advisor set out in

the other Hotel Agreements, in connection with Owner entering into and fulfilling its obligations under this Agreement.

## ARTICLE XX
## GENERAL PROVISIONS

### 20.01        Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

### 20.02        Modification and Changes

This Agreement cannot be changed or modified except by another agreement in writing signed by all the parties or by their respective duly authorized agents and consented to by all the parties to the other Hotel Agreements.

### 20.03        Partial Invalidity

In the event that any one or more of the phrases, sentences, clauses, Articles or sections contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having jurisdiction, or shall be or become invalid or unenforceable by virtue of any Applicable Law, the remainder of this Agreement shall be construed as if such phrases, sentences, clauses, Articles or sections had not been inserted except when such construction (a) would operate as an undue hardship on either party or (b) would constitute a substantial deviation from the general intent and purposes of the parties as reflected·in this Agreement.  In the event of either (a) or (b) above, the parties shall use their best efforts to negotiate a mutually satisfactory amendment to this Agreement to circumvent such adverse

construction. If no such amendment has been agreed upon within 60 days the dispute shall be submitted to arbitration in accordance with the provisions of section 17.03.

20.04    **Counterparts**

This Agreement may be executed simultaneously in two counterparts, each of which counterparts shall be deemed an original. In proving this Agreement it shall not be necessary to produce or account for more than one of the counterparts.

20.05    **Waivers**

No failure by a party to insist upon the strict performances of any provision of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such provision. No provision of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every provision of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

20.06    **Language**

The parties agree that this Agreement, and all agreements and documents contemplated herein or entered into in connection herewith or delivered pursuant hereto, shall be prepared in the English language. A Spanish language version of this Agreement, and all agreements and documents entered into in connection herewith or delivered pursuant hereto, may be prepared for the convenience of the parties; provided, however, that, in the event of any Dispute as to the construction, interpretation or application of any provision of this Agreement, or any agreement or document entered into in connection herewith or delivered pursuant hereto, the English-language version shall prevail and shall be used in the settlement of such Dispute.

20.07        Enurement

This Agreement, which is expressly intended to be integral to and binding upon title to the Hotel, shall enure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns and, in light of its fundamental relationship to the Hotel, shall survive any mortgage, hypothecation or other encumbrance of, or any sale, assignment, transfer or other disposition of, all or any part of the Interest of Owner to any Person.

20.08        Recording

Concurrently with the execution of this Agreement, the parties shall execute such documents as may be required by Advisor to confirm the intention of the parties that this Agreement be an integral part of title to the Hotel.  Such documents shall be in form and substance satisfactory to Advisor and, in that regard, shall be in the standard form used by Four Seasons and its Affiliates.  At the option of Advisor, such documents may be recorded in such places as counsel to Advisor may recommend for the purpose of placing on record sufficient information to afford Advisor the protection of any statutes governing title to the Hotel.  At Owner's request and sole cost and expense, Advisor shall execute, acknowledge and record such confirmations of the termination of those documents following the termination of this Agreement as may be reasonably necessary to reflect such termination.

20.09        Applicable Law

This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

20.10        Jurisdiction

The parties hereto irrevocably:

(a)     submit and consent to the non-exclusive jurisdiction of the courts of the Republic of Venezuela as regards any suit, action or other legal proceedings arising out of this Agreement;

(b)     waive, and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings, any claim that they are not personally subject to the jurisdiction of the courts of the Republic of Venezuela, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in such courts; and

(c)     agree not to seek, and hereby waive any review by any court which may be called upon to enforce the judgment of the courts referred to in section 20.10(a), of the merits of any such suit, action or proceeding in the event of failure of any party to defend or appear in any such suit, action or proceeding.

20.11     **Designation of Agent for Service of Process**

(a)     Advisor irrevocably designates the General Manager at the Hotel as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceeding brought in the Republic of Venezuela, and Advisor agrees and consents that any such service of process as specified above shall be taken and be deemed to be valid personal service upon Advisor and that any such service of process shall be of the same force and validity as if service were made upon it according to the laws governing the validity and requirements of such service in the Republic of Venezuela, and Advisor waives all claims of error by reason of any such service. Notwithstanding the foregoing, Advisor may, by notice to Owner, change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Owner shall promptly mail a copy of such process to Advisor at its address set forth in section 20.12.

(b)     Owner irrevocably designates Dra. Ysbell Kearns at the address of Owner for Notices set out in section 20.12 as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceedings brought in the Republic of Venezuela, and Owner agrees and consents that any such service of process as specified above shall be taken and deemed to be valid personal service upon Owner and that any such service of process shall be of the same force and validity as if service were made upon them according to the laws governing the validity and requirement of such service in the Republic of Venezuela, and the Owner waives all claims of error by reason of any such service.   Notwithstanding the foregoing, Owner may, by notice to Advisor change its designation of any agent for service of process.  Without in any way limiting the validity of such service of process, Advisor shall promptly mail a copy of such process to Owner at its address set forth in section 20.12.

**20.12     Notices**

Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices") required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

        If to Advisor, to:        Four Seasons Hotels and Resorts B.V.
                                  Herengracht 466
                                  2ND Floor
                                  1017 CA Amsterdam
                                  The Netherlands

                                  Attn: Managing Director

                                  Facsimile No.: (312) 0427-4082

With a copy to:                     Goodman Phillips & Vineberg
                                    250 Yonge Street
                                    Suite 2400
                                    Toronto, Ontario
                                    Canada  M5B 2M6

                                    Attn:  Randolph Weisz

                                    Facsimile No.: (416) 979-1234

If to Owner to:                     Consorcio Barr, S.A.
                                    Calle Veracruz, Edif. Torreon, Piso 2
                                    Urb. Las Mercedes, Caracas, Venezuela

                                    Attn: Ing. Lautaro Barrera B.

                                    Facsimile No.: (+58-2) 924377

With a copy to:                     Dra. Ysbell Duran Kearns
                                    c/o Consorcio Barr, S.A.
                                    Calle Veracruz, Edif. Torreon, Piso 2
                                    Urb. Las Mercedes, Caracas, Venezuela

                                    Facsimile No.: (+58-2) 924377

All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt.  Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 20.12.

20.13     **Payments**

(a)     Any and all payments by Owner under this Agreement in respect of the costs and expenses reimbursable to Advisor pursuant to section 10.03 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement shall be made free and clear of and without deduction or

- 49 -

withholding for any and all present or future Taxes unless such Taxes are required by Applicable Law to be deducted or withheld. If Owner shall be required by Applicable Law to deduct or withhold any Taxes from or in respect of any such payment, the payment shall be increased as may be necessary so that after making all deductions or withholdings, including (without limitation) deductions or withholdings applicable to any additional amounts paid under this section 20.13, Advisor receives an amount equal to the payment it would have received if no deduction or withholding had been made. If a Tax credit is received by Advisor for any Taxes deducted or withheld by Owner in accordance with this section 20.13 and in respect of which additional amounts have been paid by Owner under this section 20.13, then, to the extent that such Tax credit has been received and utilized by Advisor, Advisor shall pay to Owner an amount equal to such Tax credit; provided that such amount shall not exceed the additional amounts paid by Owner to Advisor under this section 20.13.

(b)     In the event that any Taxes are required by Applicable Law to be deducted or withheld from or in respect of any payment by Owner under this Agreement, the parties shall in good faith negotiate a method of restructuring the manner in which such payment is to be made by Owner to Advisor under this Agreement with a view to minimizing the Tax liability in connection with such payment; provided, however, that the method of restructuring the manner in which such payment is to be made does not prejudice the amount of the sums, charges and fees otherwise payable to Advisor under this Agreement or of the costs and expenses reimbursable to Advisor pursuant to section 10.03 and provided further that the method of restructuring the manner in which such payment is to made shall not result in any damages, losses or any other costs whatsoever to Advisor or impact adversely on any rights, remedies or other benefits in favour of Advisor under this Agreement.

20.14        Time of Essence

Time shall be of the essence of each and every term and obligation of this Agreement.

20.15        Estoppel Certificates

Each party shall, upon at least 10 days' written notice, execute and deliver to any other party, and to any other Person having or about to have a *bona fide* interest in the Hotel as such other party may designate in writing, a statement certifying that this Agreement is unmodified and in full force and effect, or if not, stating the details of any modification and stating that as modified it is in full force and effect, the date to which payments have been paid and whether or not, to the knowledge of the certifying party, there is any existing default on the part of any other party.

20.16        Calculation Methodology

As the receipts and expenses of the Hotel will be earned and incurred in various currencies, the parties agree that any financial statements, calculations or payments required to be prepared, calculated or made hereunder in a currency other than Venezuelan Bolivars shall, at the election of Advisor, be prepared, calculated or made using the calculation methodology set out in Schedule "C" attached to the Hotel Management Agreement.

20.17        Other Elements and Components of Project

Owner shall use its best efforts to cause the Residential Apartments, the Office Space, the Retail Space and the Commercial Space to be developed, constructed, furnished, equipped, operated, managed, serviced, marketed, supervised and directed at a level of standard and quality which is both consistent and compatible with that of the Hotel and which will not otherwise detract from the standard of the Hotel as a World Class Luxury Hotel. In addition, Owner shall be responsible for the supervision and management of, or causing the supervision and management of, relations with the owners and occupants of the Residential Apartments and

the tenants of the Office Space, the Retail Mall and the Commercial Space, including (without limitation) the supervision and management of any association established by the owners and occupants of the Residential Apartments or the tenants of the Office Space, the Retail Mall and the Commercial Space, the common marketing and advertising for the Office Space, the Retail Mall and the Commercial Space, and the allocation and collection of common area expenses charged to the owners and occupants of the Residential Apartments and the tenants of the Office Space, the Retail Mall and the Commercial Space.

**IN WITNESS WHEREOF** the parties have duly executed this Agreement the day and year first above written.

**FOUR SEASONS HOTELS AND RESORTS B.V.**

By: _____

By: _____

**CONSORCIO BARR, S.A.**

By: _____

By: _____

SCHEDULE "A"

## DEFINITIONS

(a)    "Advance Corporate Advertising Charge" has the meaning set out in the Hotel Services Agreement.

(b)    "Advance Corporate Sales and Marketing Charge" has the meaning set out in the Hotel Services Agreement.

(c)    "Advisory Fee" has the meaning set out in section 10.01.

(d)    "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with such first Person.

(e)    "Annual Plan" has the meaning set out in section 6.01(a).

(f)    "Applicable Law" means all laws, statutes, regulations, codes, by-laws, ordinances, treaties, orders, judgments, decrees, directives, rules, guidelines, orders, policies and other requirements of any Governmental Authority having jurisdiction, whether or not having the force of law.

(g)    "Basic Fee" has the meaning set out in the Hotel Management Agreement.

(h)    "business day" means the day of the year on which banks are not required or authorized to close in Toronto, Canada, New York, New York, United States of America and Caracas, Venezuela.

(i)    "Capital Refurbishing Programs" has the meaning set out in section 5.05(b).

(j)    "Capital Reserve" has the meaning set out in section 6.03(b).

(k)    "Centralized Purchasing Charge" has the meaning set out in the Hotel Services Agreement.

(l)     "Centralized Reservation Service Charge" has the meaning set out in the Hotel Services Agreement.

(m)     "Commercial Space" means the applicable portion of the Land and the approximately 1,300 square metres of general commercial space to be constructed by Owner on such portion of the Land.

(n)     "Consumer Price Index" means the consumer price index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York, New York - Northeastern N.J. Area, All Items (1982-84 = 100) or, if that consumer price index is no longer published, the index published by the former publisher of that consumer price index in substitution for that consumer price index or, in the absence of any such substituted index, any replacement index designated by Advisor, acting reasonably.  If a substitution or replacement of the Consumer Price Index is required, Advisor will make the necessary conversions.  If the base year for the Consumer Price Index (or any substituted or replacement index of the Consumer Price Index) is changed, Advisor will make the necessary conversions.

(o)     "control" means direct or indirect (i) ownership of a majority of voting shares or other interests in a Person and (ii) other effective control over the decision-making process of a Person.

(p)     "Corporate Advertising Charge" has the meaning set out in the Hotel Services Agreement.

(q)     "Corporate Sales and Marketing Charge" has the meaning set out in the Hotel Services Agreement.

(r)     "Dispute" has the meaning set out in section 17.02.

(s)   "Fees and Charges" means, collectively, the Advisory Fee, the Basic Fee, the Incentive Fee, the Royalty Fee, the Refurbishing Fee, the Advance Corporate Sales and Marketing Charge, the Advance Corporate Advertising Charge, the Corporate Sales and Marketing Charge, the Corporate Advertising Charge, the Centralized Reservation Service Charge and the Service Charge Deficiency.

(t)   "Fiscal Quarter" means each period of three consecutive months beginning on the first day of the first month of the Fiscal Year.

(u)   "Fiscal Year" means the calendar year for all purposes, except that the first Fiscal Year shall be the period commencing on the Opening Date and ending on December 31 of the same year.

(v)   "Four Seasons" has the meaning set out in Recital E.

(w)   "Furniture, Fixtures and Equipment" means all furniture, furnishings, fixtures and equipment required for the operation of a World Class Luxury Hotel, including (without limitation) lobby furniture, carpeting, draperies, paintings, bedspreads, television sets, office furniture and equipment such as safes, cash registers and accounting, computer, duplicating and communication equipment, telephone equipment, guest room furniture, specialized hotel equipment such as equipment required for the operation of kitchens, laundries, the front desk, dry cleaning facilities, pool and fitness club facilities, bars and cocktail lounges and decorative lighting, material handling equipment and cleaning and engineering equipment and all other fixtures, equipment, apparatus and personal property needed for such purposes.  Furniture, Fixtures and Equipment shall exclude, however, (i) Hotel systems and facilities (including, without limitation, safety, heating, lighting, plumbing, sanitation, air conditioning, ventilation, laundry and dry cleaning and kitchen systems and facilities, elevators and escalators), and (ii) Operating Equipment and Supplies.

(x)    "Generally Accepted Accounting Principles" means those accounting principles applicable to the hotel industry which are recognized as being generally accepted in the Republic of Venezuela from time to time as set forth in the handbook published by the Venezuelan Federation of Certified Public Accountants.

(y)    "Governmental Authority" means any government, whether federal, provincial, state, county, municipal, local or other, any ministry, department, agency, whether administrative or regulatory, or other body relating thereto and any board of fire underwriters or any other body which may exercise similar functions.

(z)    "Gross Operating Profit" means, in respect of any Fiscal Year, Gross Receipts for that Fiscal Year less the aggregate of the following, without duplication, (i) Operating Expenses for such Fiscal Year (other than Taxes and insurance premiums), and (ii) actual bad debts and an allowance for doubtful accounts in such Fiscal Year; provided, however, that any recovered bad debts and accounts receivable taken into account in the calculation of allowances for doubtful accounts (but only to the extent previously so provided) shall be included in Gross Receipts in the Fiscal Year in which they are recovered.

(aa)    "Gross Receipts" means all receipts, revenues, income (including, without limitation, service charges) and proceeds of sales of every kind earned directly or indirectly from the operation of the Hotel, the pool and fitness club or from the services provided to the owners and occupants of the Residential Apartments and rentals of all kinds received from tenants, sub-tenants, licensees and occupants of commercial and retail space located in the Hotel and off-site food and beverage sales, calculated on an accrual basis (whether in cash or on credit), including (without limitation) the proceeds of insurance received by Owner, Advisor, Four Seasons or Operator with respect to or in lieu of use and occupancy or business interruption insurance, security and other deposits not refunded, interest earned on funds from time to time in Hotel Bank Accounts,

any amount recovered in any legal action or proceedings or settlement thereof which arose out of the operation of the Hotel or from the services provided to the owners and occupants of the Residential Apartments, proceeds from the sale of surplus or obsolete Furniture, Fixtures and Equipment, fees paid by members of the fitness club (including, without limitation, fees relating to initiation, annual renewals and transfer of memberships), receipts representing accounts receivable treated as actual bad debts or taken into account in the calculation of allowances for doubtful accounts in the calculation of Gross Operating Profit in any prior accounting period pursuant to section 1.01(z) and telephone and parking charges to guests and patrons and to owners and occupants of the Residential Apartments. Gross Receipts shall exclude, however, (i) gratuities collected by Operator on behalf of Persons rendering services to guests and patrons of the Hotel and to owners and occupants of the Residential Apartments to the extent such gratuities are paid over to such Persons, (ii) Taxes collectible as a direct tax from guests or patrons of the Hotel, from owners and occupants of the Residential Apartments or from tenants, sub-tenants, licensees or occupants of commercial or retail space located in the Hotel or with respect to the business conducted in the Hotel to the extent such Taxes are paid over to taxing authorities, (iii) condemnation or expropriation awards, insurance proceeds (other than use and occupancy or business interruption insurance) and similar extraordinary capital receipts (other than the portion of such awards or receipts representing compensation for loss of Gross Receipts), (iv) recoveries in legal actions for tortious conduct (other than the portion of such awards or receipts representing compensation for loss of Gross Receipts) or awards for punitive damages, and (v) receipts from vending and coin operated machines to the extent such receipts are paid over to Persons owning such machines.

(ab)   "Hotel" means the applicable portion of the Land and the World Class Luxury Hotel to be constructed by Owner on such portion the Land as provided for in the Hotel Pre-Opening Services Agreement, which shall include approximately 212 guest rooms, together with restaurants, bars, banquet, meeting and other public rooms, a pool and fitness club and all other facilities as are necessary or

desirable for the operation of a World Class Luxury Hotel in accordance with the Hotel Management Agreement, and shall specifically include exclusive parking facilities required by Applicable Law or otherwise required for the operation of the Hotel (whether surface parking or within a structure located on the Land or otherwise provided by Owner), valet parking facilities, retail shops, including (without limitation) a gift and cigar shop, vitrines, storage and service areas, recreational facilities, public grounds and gardens, and all systems, facilities and equipment necessary for the operation of the Hotel (including, without limitation, safety, heating, lighting, plumbing, sanitation, air conditioning, ventilation, laundry and dry cleaning, kitchen systems and facilities, elevators, escalators and Furniture, Fixtures and Equipment).

(ac)   **"Hotel Agreements"** means, collectively, this Agreement, the Hotel Management Agreement, the Hotel Services Agreement, the Hotel License Agreement and the Hotel Pre-Opening Services Agreement.

(ad)   **"Hotel Bank Accounts"** has the meaning set out in the Hotel Management Agreement.

(ae)   **"Hotel Design Brief"** has the meaning set out in the Hotel Pre-Opening Services Agreement.

(af)   **"Hotel License Agreement"** has the meaning set out in Recital G.

(ag)   **"Hotel Management Agreement"** has the meaning set out in Recital H.

(ah)   **"Hotel Pre-Opening Services Agreement"** has the meaning set out in Recital E.

(ai)   **"Hotel Services Agreement"** has the meaning set out in Recital F.

(aj)   **"Incentive Fee"** has the meaning set out in section 10.02.

(ak) "Interest" means the respective right, title and interest of Owner and Advisor in and to the Hotel and the Hotel Agreements.

(al) "Interest Rate" means the annual rate of interest equal to the lesser of (i) the highest rate then currently charged to Advisor and its Affiliates for U.S. Dollar commercial loans by the Bank of Nova Scotia or, if the Bank of Nova Scotia is no longer their principal lending source, by their principal lending source plus two percent per annum, or (ii) the maximum legal rate permitted by Applicable Law.

(am) "Land" has the meaning set out in Recital A.

(an) "Letter of Credit" has the meaning set out in the Hotel Advisory Agreement.

(ao) "Licensor" has the meaning set out in Recital G.

(ap) "Office Space" means the applicable portion of the Land and the approximately 3,000 square metres of general office space to be constructed by Owner on such portion of the Land.

(aq) "Opening Date" means the date on which the Hotel is first opened to the public for guest room occupancy as set out in section 4.01(a).

(ar) "Operating Equipment and Supplies" means all chinaware, glassware, linens, silverware, tools, kitchen utensils, uniforms, engineering and housekeeping tools and utensils, food and beverage items, fuel, soap, light bulbs, mechanical stores, cleaning supplies and materials, matches, stationery, paper supplies, laundry supplies, food service preparation utensils, housekeeping supplies, accounting supplies and other immediately consumable items used in the operation of a World Class Luxury Hotel.

- 8 -

(as)   "Operating Expenses" means all operating expenses of the Hotel determined in accordance with Generally Accepted Accounting Principles applicable to the hotel industry and with the Uniform System of Accounts, including (without limitation) (i) the real property Taxes, provided that any assessments or re-assessments are directly allocable to the Hotel and are amortized over the longest amortization period permitted by Applicable Law, and personal property Taxes, (ii) insurance premiums, (iii) employee remuneration, bonuses, social charges, profit sharing, retirement and severance costs, health insurance, labor union dues and funding and other similar benefits, (iv) the aggregate of the Fees and Charges (other than the Incentive Fee, the Advance Corporate Sales and Marketing Charge and the Advance Corporate Advertising Charge), (v) the cost of any audit, and (vi) the costs and expenses arising from the preparation, issuance and re-issuance of the Letter of Credit, subject to a maximum amount of 0.5% per annum of the then current face amount thereof.  Operating Expenses shall also include all operating expenses incurred by the Hotel in providing services to the owners and occupants of the Residential Apartments. Operating Expenses shall exclude, however, (vii) depreciation, (viii) interest on funds borrowed by Owner (whether from partners of Owner or otherwise), (ix) expenditures for repairs caused by reason of construction, design or structural defects in the Hotel, (x) capital expenditures (including, without limitation, any expenditures from the Capital Reserve), (xi) losses that fall within the deductible amount on any insurance policies, (xii) amortization and other non-cash charges, (xiii) payments on any ground lease, (xiv) payments on capital leases or instalment sales contracts for Furniture, Fixtures and Equipment or Hotel building equipment and systems, (xv) payments of the collected gratuities, Taxes and receipts described in sections(aa)(i), (ii) and (v) of this Schedule "A", (xvi) discounts and allowances extended to guests and patrons of the Hotel, (xvii) expenses (such as Taxes and expenses for utilities) to the extent reimbursable by tenants, subtenants, licensees and occupants of commercial and retail space located in the Hotel, (xviii) any Service Charge Excess paid to Owner, and (xix) payments (such as cash advances or payments to an outside cleaner) to the extent reimbursable by guests and patrons of the

Hotel, and (xx) all operating expenses allocable to the Residential Apartments, the Office Space, the Retail Space and the Commercial Space.

(at)    "Operator" shall have the meaning set out in Recital H.

(au)    "Person" means any individual, partnership, corporation, Governmental Authority, trust, trustee, unincorporated organization and the heirs, executors, administrators or other legal representatives of any individual.

(av)    "Pre-Opening Plan and Budget" has the meaning set out in the Hotel Pre-Opening Services Agreement.

(aw)    "Project" has the meaning set out in Recital B.

(ax)    "Proposed Annual Plan" has the meaning set out in section 6.01(a).

(ay)    "Proprietary Materials" has the meaning set out in the Hotel License Agreement.

(az)    "Qualified Person" means a Person that (i) is not, and is not an Affiliate of, a competitor of Four Seasons or any of its Affiliates, (ii) has adequate financial capacity to perform the obligations of Owner under the Hotel Agreements, (iii) has an acceptable credit rating, (iv) is not of ill repute, and (v) is not in any other manner a Person with whom or with which a prudent business person would not wish to associate in a commercial venture.

(ba)    "Related Person" means, with respect to any Person, (i) an Affiliate of such first Person, (ii) any Person connected by blood relationship, marriage or adoption to such first Person, (iii) any director, officer or employee of such first Person, or (iv) any Affiliate of any Person described in this section (ba) of this Schedule "A".

(bb)   "Retail Space" means the applicable portion of the Land and the approximately eight retail units to be constructed by Owner on such portion of the Land for lease by commercial tenants.

(bc)   "Residential Apartments" means the applicable portion of the Land and the approximately 116 residential luxury apartment units to be constructed by Owner on such portion of the Land.

(bd)   "Royalty Fee" has the meaning set out in the Hotel License Agreement.

(be)   "Scheduled Opening Date" has the meaning set out in section 4.01(b).

(bf)   "Service Charge Deficiency" has the meaning set out in the Hotel Services Agreement.

(bg)   "Service Charge Excess" has the meaning set out in the Hotel Services Agreement.

(bh)   "Taxes" means all taxes imposed by any Governmental Authority, including (without limitation) income, profits, real property, personal property, goods and services, gross receipts or occupancy, sales, use, transfer, purchase, franchise, stamp, ad valorem, value added, capital stock or surplus, occupation, excise, payroll, unemployment, disability, employees' income withholding, social security or withholding taxes.

(bi)   "Term" shall mean the initial term provided for in section 9.01 and any subsequent extension term provided for in section 9.02.

(bj)   "Trademarks" has the meaning set out in the Hotel License Agreement.

(bk)   "Uniform System of Accounts" means the current edition of the Uniform System of Accounts for Hotels (being the Eighth Revised Edition on the date of

this Agreement) of the Hotel Association of New York City, Inc., as adopted by the American Hotel Association of the United States.

(bl)    "U.S. Dollars" or "U.S. $" means the lawful currency of the United States of America.

(bm)    **"United States Dollar Exchange Rate"** means, in respect of any business day, the rate of exchange for the conversion of Venezuelan Bolivars to United States Dollars as determined by using the official closing buying rate for United States Dollars as reported by the Central Bank of the Republic of Venezuela on such business day.

(bn)    **"Venezuelan Bolivars"** means the lawful currency of the Republic of Venezuela.

(bo)    **"World Class Luxury Hotel"** means a world class luxury hotel as understood in the hotel industry having the development, construction, operating, service and maintenance standards at least equal to those of other similar urban facilities which may at any time be managed by Four Seasons or any of its Affiliates in North America.

SCHEDULE "B"

## DESCRIPTION OF LAND

Northeast corner, intersection of Francisco de Miranda and Luis Roche Avenues, Altamira, Municipality of Chacao, State of Miranda. Cadastre #201-07-008, area of 6,07.90 m². Duly acquired by document inscribed in the Subaltern Registry Office of the Third Circuit of Sucre District of Miranda State, under No. 7, Volume 7 of the First Protocol on February 7, 1991.

ORM OF ASSUMPTION AGREE...ENT

THIS AGREEMENT made as of ●.

TO:         FOUR SEASONS HOTELS AND RESORTS B.V.

WHEREAS ● ("Owner") a ● under the laws of ● and Four Seasons Hotels and Resorts B.V. ("Advisor"), a corporation incorporated under the laws of the Netherlands entered into a hotel advisory agreement dated ●, 1996 (the "Advisory Agreement");

AND WHEREAS pursuant to the terms and conditions of that certain purchase agreement, dated ● (the "Purchase Agreement"), Owner has agreed to sell, assign and otherwise transfer all of its right, title and interest in and to the Hotel (as hereinafter defined) to the undersigned, ●, a ● under the laws of ●, with effect as and from the date hereof;

AND WHEREAS the undersigned has agreed to enter into this agreement in order to assume, perform and discharge all duties, obligations, covenants and agreements of Owner in accordance with the terms and conditions of the Advisory Agreement and to agree to be bound by the terms of the Advisory Agreement, from and after the date hereof, in all respects as if the undersigned were a signatory thereto;

NOW THEREFORE in consideration of the mutual covenants and agreements herein contained and the mutual covenants and agreements contained in the Advisory Agreement, the undersigned hereby agrees as follows:

1.          **Definitions**. All capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to them in the Advisory Agreement.

2.          **Assumption of Obligations**. The undersigned hereby undertakes and agrees to assume, perform and discharge all duties, obligations, covenants and agreements of Owner in accordance with the terms and conditions contained in the Advisory Agreement and to be bound by the terms of the Advisory Agreement in all respects as if the undersigned were a signatory thereto.

3.          Successors and Assigns.  The terms of this Agreement shall enure to the benefit of Advisor and its successors and permitted assigns under the Advisory Agreement, with respect to the Advisory Agreement.

4.          Governing Law.  This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

          IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the ● day of ●.

                                        [●]

                                        By:    _____

                                                 Name:
                                                 Title:

# FORM OF SUBORDINATION AND NON-DISTURBANCE AGREEMENT

THIS AGREEMENT is made and entered into as of the ●, by and between ● ("Mortgagee"), a ● under the laws of ●, and **FOUR SEASONS HOTELS AND RESORTS B.V.**, a corporation incorporated under the laws of the Netherlands ("Advisor").

## RECITALS

A.        Advisor has entered into a hotel advisory agreement dated ● (as amended, modified or supplemented from time to time, the "Hotel Advisory Agreement") with ● ("Owner"), pursuant to which Advisor has agreed to operate and manage a hotel and related facilities located in the City of Caracas, Venezuela, commonly known as the "Four Seasons Hotel, Caracas", and more particularly described on Exhibit A to this Agreement (the "Hotel").

B.        Mortgagee is the holder of that certain **[Mortgage]** (the "Mortgage"), dated as of ●, executed by Owner in favour of Mortgagee and encumbering the Hotel and the related property more particularly described therein to secure the obligations of Owner under that certain **[Loan Agreement]**, dated as of ●, between Owner and Mortgagee.

C.        Mortgagee and Advisor desire to set forth certain agreements made between them pertaining to their respective rights as mortgagee and operator, respectively, of the Hotel.

## AGREEMENT

NOW THEREFORE in consideration of the covenants and agreements set forth in this Agreement, the parties hereto agree as follows:

1.        <u>General Subordination</u>. Subject to the provisions of section 2 of this Agreement, the Hotel Advisory Agreement and all rights and benefits of Advisor thereunder are and shall at all times continue to be subordinate in all respects to:

(a)      the rights and benefits of Mortgagee under the Mortgage;

(b)      any and all advances made on the security of the Mortgage; and

(c)      any and all increases, renewals, modifications, consolidations, replacements and extensions of the Mortgage. This section shall be self-operative and no further instruments or certificates shall be required to effect the subordination contemplated by this section. Advisor shall, however, upon demand at any time or times, execute, acknowledge and deliver to Mortgagee any and all instruments and certificates that Mortgagee may reasonably request as necessary to confirm or evidence the subordination contemplated by this section. The subordination contemplated by this section does not constitute any waiver of, or modification or change to, the provisions of the Hotel Advisory Agreement.

2.        <u>Non-Disturbance</u>.  So long as the Hotel Advisory Agreement has not been terminated pursuant to the terms thereof:

(a)      in the event of the exercise by Mortgagee of any rights or remedies it may have by virtue of the Mortgage or otherwise, Mortgagee agrees (i) not to disturb the right of Advisor to operate and manage the Hotel in accordance with the Hotel Advisory Agreement or affect any other right of Advisor thereunder, and (ii) to observe and perform all the terms, conditions and obligations of Owner under the Hotel Advisory Agreement for any period during which it, or any Person (as defined in the Hotel Advisory Agreement) acting on its behalf, is in actual physical possession of the Hotel.  Provided that (iii) Mortgagee shall not be bound by any modification or change to the provisions of the Hotel Advisory Agreement to which Mortgagee has not consented to in writing; and

(b)      in the event of a foreclosure of the Mortgage, or of a conveyance in lieu of foreclosure (i) no proceeding to foreclose the Mortgage, and no conveyance in lieu of foreclosure, will disturb the right of Advisor to operate and manage the Hotel in accordance with the terms of the Hotel Advisory Agreement or affect

any other right of Advisor thereunder, and (ii) the Hotel Advisory Agreement shall continue in full force and effect and Mortgagee, its successors and assigns, or any third party (each a "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein on foreclosure of the Mortgage, or by deed in lieu of foreclosure, shall be a Qualified Person (as defined in the Hotel Advisory Agreement) and shall, together with an Affiliate (as defined in the Hotel Advisory Agreement) of such Foreclosure Purchaser, if such Foreclosure Purchaser is a single purpose entity or an entity without significant assets and such Foreclosure Purchaser has an Affiliate who has, or is more likely to have, the ability to perform the obligations of Owner under the Hotel Advisory Agreement than such Foreclosure Purchaser, first enter into an agreement with Advisor, in form and substance reasonably satisfactory to Advisor, agreeing to recognize the rights and benefits of Advisor, and observe and perform the obligations of Owner, under the Hotel Advisory Agreement for the balance of the term of the Hotel Advisory Agreement, including any extensions and renewals thereof, upon the same terms, covenants and conditions as therein provided and with the same force and effect as if the Hotel Advisory Agreement had been originally made directly between Advisor, as "Advisor" under the Hotel Advisory Agreement, and Foreclosure Purchaser, as "Owner" under the Hotel Advisory Agreement.  Provided that (iii) subject to the provisions of section 4 of this Agreement, Foreclosure Purchaser shall not be liable to Advisor for any act, omission, amount owing or default under the Hotel Advisory Agreement by Owner for any period occurring prior to Foreclosure Purchaser acquiring the Hotel or any interest or right therein on foreclosure of the mortgage, or by deed in lieu of foreclosure, and (iv) Foreclosure Purchaser shall not be bound by any modification or change to the provisions of the Hotel Advisory Agreement to which Mortgagee has not consented in writing.

3.        Attornment.  Subject to the provisions of section 2 of this Agreement and so long as Advisor is not then entitled to terminate the Hotel Advisory Agreement pursuant to the terms thereof, in the event that the interest of Owner in the Hotel is transferred to a Foreclosure Purchaser by reason of a foreclosure of the Mortgage, or by reason of a conveyance in lieu of

foreclosure, Advisor agrees to be bound by the terms, covenants and conditions contained in the Hotel Advisory Agreement for the balance of the term of the Hotel Advisory Agreement, including any extensions and renewals thereof, upon the same terms, covenants and conditions as therein provided and with the same force and effect as if the Hotel Advisory Agreement had been originally made directly between Advisor, as "Advisor" under the Hotel Advisory Agreement, and Foreclosure Purchaser, as "Owner" under the Hotel Advisory Agreement.

4.        Cure of Hotel Advisory Agreement Defaults.  Advisor shall provide Mortgagee with copies of any notice of default under the Hotel Advisory Agreement delivered to Owner, concurrently with delivery of such notice to Owner, and shall grant Mortgagee the following cure periods (each a "Hotel Advisory Agreement Cure Period") to cure such default on behalf of Owner:

(i)        in the case of an event of default contemplated by section 16.01(a) of the Hotel Advisory Agreement, 30 days after the applicable grace period has expired;

(ii)       in the case of an event of default contemplated by sections 16.01(b), (c) or (d) of the Hotel Advisory Agreement, the time reasonably required by Mortgagee to foreclose or take possession so long as Mortgagee, unless prevented by Applicable Law, commences and continues to foreclose or take possession with all due diligence, and otherwise satisfactorily cures all defaults that can be cured; and

(iii)      in the case of an event of default contemplated by section 16.01(e) of the Hotel Advisory Agreement, 60 days after the applicable grace period has expired or, if the default is not susceptible of being cured within the 60 day period and Mortgagee advises Advisor in writing of the period which it is estimated will be required to cure the default and with all due diligence takes and continues action to cure and cures the default within the period so advised; provided, however, that if it is necessary for Mortgagee to foreclose the Mortgage or to take possession of the Hotel in order to cure such default, the Hotel Advisory Agreement Cure Period shall be extended to include the time reasonably required

by Mortgagee to foreclose or take possession so long as Mortgagee commences and continues to foreclose or take possession with all due diligence and otherwise satisfactorily cures all defaults that do not so require possession of the Hotel by Mortgagee.

During a Hotel Advisory Agreement Cure Period, Mortgagee shall have the right, but not the obligation, to cure the applicable default on behalf of Owner under the Hotel Advisory Agreement if such default is capable of being cured. Notwithstanding this section 4 or any other provision to the contrary, if, in the reasonable business judgment of Advisor, the default by Owner materially and adversely affects the reputation of Advisor in the hotel industry or places Advisor materially at risk of civil or criminal liability, Advisor shall have the right, at any time prior to completion of foreclosure or the taking of possession by Mortgagee, to elect by written notice to Mortgagee to terminate the Hotel Advisory Agreement in accordance with the terms of the Hotel Advisory Agreement.

5.        Cure of Mortgage Defaults. Mortgagee shall provide Advisor with copies of any notice of default under the Mortgage delivered to Owner, concurrently with delivery of such notice to Owner, and shall grant Advisor 10 days after the applicable grace period has expired (a "Mortgage Cure Period") to cure such default on behalf of Owner. During a Mortgage Cure Period, Advisor shall have the right, but not the obligation, to cure the applicable default on behalf of Owner under the Mortgage.

6.        No Prohibited Transfers.   Mortgagee acknowledges and agrees that any acquisition of the Hotel by Mortgagee, its successors and assigns, or by any third party, whether by foreclosure of the Mortgage or by deed in lieu of foreclosure or otherwise, shall be deemed to be a transfer within the meaning, and subject to the terms and conditions, of sections 15.01 and 15.03 of the Hotel Advisory Agreement. Mortgagee also acknowledges and agrees that any sale, transfer, assignment or other disposition of the Mortgage by Mortgagee or its successors and assigns shall be deemed to be a mortgage within the meaning, and subject to the terms and conditions, of sections 15.02 and 15.03 of the Hotel Advisory Agreement.

7.        Advisor's Confirmation.  If and to the extent the Hotel Advisory Agreement entitles Advisor to notice of any mortgage granted by Owner, this Agreement shall constitute such notice to Advisor with respect to the Mortgage.  Advisor acknowledges and agrees that this Agreement satisfies and fulfils the provisions of section 15.02 of the Hotel Advisory Agreement with respect to the Mortgage.

8.        Notices.  Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices") required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by telex, facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

        If to Mortgagee, to:

            •

        with a copy to:

            •

        If to Advisor, to:

            Four Seasons Hotels and Resorts B.V.
            Herengracht 466
            2nd Floor
            1017 CA Amsterdam
            The Netherlands

            Attention:  Managing Director

            Facsimile No.:  (312) 04 274082

With a copy to:   Four Seasons Hotels Limited
                  1165 Leslie Street
                  Toronto, Ontario
                  Canada   M3C 2K8

                  Attn: General Counsel

                  Facsimile No.: (416) 441-4303

                  - and -

                  Goodman Phillips & Vineberg
                  Barristers & Solicitors
                  250 Yonge Street
                  Box 24, Suite 2400
                  Toronto, Ontario
                  M5B 2M6

                  Attention: Randolph Weisz

                  Facsimile No.: (416) 979-1234


All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by telex or facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt. Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 8.


9.          No Modification.  No modification, amendment, waiver, or release of any provision of this Agreement or any right, obligation, claim, or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.


10.         Successors.  This Agreement shall enure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns; provided, however, that the rights of Mortgagee and its successors and assigns to sell, transfer or otherwise dispose of this Agreement shall be subject to section 15.01 of the Hotel Advisory Agreement and the rights of

Advisor and its successors and assigns to sell, transfer or otherwise dispose of this Agreement shall be subject to section 15.04 of the Hotel Advisory Agreement.

11.      Applicable Law.  This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

12.      Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

13.      Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which counterpart shall be deemed an original.  In proving this Agreement it shall not be necessary to produce or account for more than one of the original counterparts executed by each of the parties hereto.

14.      Time of the Essence.  Time shall be of the essence of each and every term and obligation of this Agreement.

            IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

                        MORTGAGEE: ●

                                    By:   _____     _____
                                          ●

            ADVISOR:            FOUR  SEASONS  HOTELS  AND  RESORTS
                                B.V.
G24\WEISZR\3109944.8 (Execution Copy)
File Nos.: 95-3500 (FSHA) & 95-3505 (FOUR)     By:   _____
                                                    ●

# EXHIBIT "C"

# HOTEL SERVICES AGREEMENT

### Between

## FOUR SEASONS HOTELS LIMITED

### And

## CONSORCIO BARR, S.A.

## FOUR SEASONS HOTEL, CARACAS

TABLE OF CONTENTS

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.01          Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.02          Recitals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.03          Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.04          Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE II - TERMINATION PRIOR TO OPENING DATE . . . . . . . . . . . . . . 6
    2.01          Termination Prior to Opening Date . . . . . . . . . . . . . . . . 6

ARTICLE III - OWNER'S RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . 7
    3.01          Owner's Responsibility . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE IV - TERM AND RENEWALS . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.01          Initial Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.02          Extension Terms . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.03          Exercise of Extension Options . . . . . . . . . . . . . . . . . . 8
    4.04          Covenants to Apply . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE V - SALES, MARKETING, ADVERTISING AND PURCHASING SERVICES AND CHARGES . . . . . . . . . . . . . . . . . . . . . 9
    5.01          Corporate Sales and Marketing Charges and Corporate Advertising Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    5.02          Centralized Reservation Service Charge . . . . . . . . . . . . 11
    5.03          Adjustment of Charges . . . . . . . . . . . . . . . . . . . . . . 12
    5.04          Centralized Purchasing . . . . . . . . . . . . . . . . . . . . . . 12
    5.05          Refurbishing Fee . . . . . . . . . . . . . . . . . . . . . . . . . 15
    5.06          Reimbursement of Costs . . . . . . . . . . . . . . . . . . . . . 15
    5.07          Manner of Payment of Fees, Charges, Costs and Expenses . . . . . . 17

ARTICLE VI - DAMAGE TO AND DESTRUCTION OF THE HOTEL . . . . . . . . . 18
    6.01          Owner's Obligation to Repair . . . . . . . . . . . . . . . . . . 18
    6.02          Four Seasons' Reinstatement . . . . . . . . . . . . . . . . . . . 20

ARTICLE VII - EXPROPRIATION . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    7.01          Complete Expropriation . . . . . . . . . . . . . . . . . . . . . . 21
    7.02          Partial Expropriation . . . . . . . . . . . . . . . . . . . . . . . 22
    7.03          Temporary Expropriation . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE VIII - ASSIGNMENTS AND MORTGAGES . . . . . . . . . . . . . . . . . 23
    8.01          Owner's Right to Assign . . . . . . . . . . . . . . . . . . . . . 23
    8.02          Owner's Right to Mortgage . . . . . . . . . . . . . . . . . . . . 24
    8.03          Limitation on Owner's Right to Assign and Mortgage . . . . . . . . 25
    8.04          Operator's Right to Assign . . . . . . . . . . . . . . . . . . . . 25

| 8.05 | Four Seasons' Right to Mortgage | 26 |
| 8.06 | Limitation on Four Seasons' Right to Assign | 26 |

**ARTICLE IX - EVENTS OF DEFAULT AND TERMINATION** ............... 26

| 9.01 | General | 26 |
| 9.02 | Rights of Non-Defaulting Party | 28 |
| 9.03 | Remedying Defaults | 28 |
| 9.04 | Bona Fide Dispute | 29 |
| 9.05 | Four Seasons' Right to Terminate | 29 |
| 9.06 | Cross-Termination | 30 |
| 9.07 | Accounting on Termination | 30 |
| 9.08 | Claims on Termination | 31 |

**ARTICLE X - APPROVALS, DISPUTE RESOLUTION AND ARBITRATION** ..... 31

| 10.01 | Approvals | 31 |
| 10.02 | Dispute Resolution | 33 |
| 10.03 | Arbitration | 34 |

**ARTICLE XI - FOUR SEASONS' LIABILITY** ............................ 36

| 11.01 | Standard of Care | 36 |
| 11.02 | Indemnities | 36 |

**ARTICLE XII - ACKNOWLEDGMENTS** ................................. 37

| 12.01 | Owner's Acknowledgments | 37 |
| 12.02 | Four Seasons' Acknowledgments | 38 |

**ARTICLE XIII - GENERAL PROVISIONS** ............................. 38

| 13.01 | Entire Agreement | 38 |
| 13.02 | Modification and Changes | 39 |
| 13.03 | Partial Invalidity | 39 |
| 13.04 | Counterparts | 39 |
| 13.05 | Waivers | 40 |
| 13.06 | Language | 40 |
| 13.07 | Enurement | 40 |
| 13.09 | Applicable Law | 41 |
| 13.10 | Jurisdiction | 41 |
| 13.11 | Designation of Agent for Service of Process | 42 |
| 13.12 | Notices | 43 |
| 13.13 | Payments | 45 |
| 13.14 | Time of Essence | 46 |
| 13.15 | Estoppel Certificates | 46 |
| 13.16 | Calculation Methodology | 46 |

- iii -

SCHEDULE "A" -   DEFINITIONS

SCHEDULE "B" -   LIST OF OPERATING EQUIPMENT AND SUPPLIES
AND FURNITURE, FIXTURES AND EQUIPMENT

SCHEDULE "C" -   FORM OF ASSUMPTION AGREEMENT

SCHEDULE "D" -   FORM OF SUBORDINATION AND NON-DISTURBANCE
AGREEMENT

# HOTEL SERVICES AGREEMENT

THIS AGREEMENT is made this 9ᵀᴴ day of April, 1997.

B E T W E E N:

> FOUR SEASONS HOTELS LIMITED, a corporation incorporated under the laws of the Province of Ontario, Canada, having its principal offices at 1165 Leslie Street, Toronto, Ontario, Canada, M3C 2K8,
>
> ("Four Seasons"),
>
> - and -
>
> CONSORCIO BARR, S.A., a corporation domiciled in the City of Caracas, Republic of Venezuela, duly inscribed in the Second Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on December 18, 1990, under No. 27, Volume 113-A Second, having its principal offices at Calle Veracruz, Edif. Torreon, Piso 2, Urb. Las Mercedes, Caracas, Venezuela,
>
> ("Owner").

## RECITALS

A.      Owner is the legal and beneficial owner of the Land (as defined below) situated in the City of Caracas, Venezuela.

B.      Owner is in the process of developing upon the Land the Project (as defined below) consisting of (i) a World Class Luxury Hotel (as defined below) containing approximately 212 guest rooms, together with restaurants, bars, banquet, meeting and other public rooms, a fitness club and other facilities to be developed, constructed, furnished and equipped in accordance with the Hotel Design Brief (as defined below), (ii) a residential component consisting of approximately 116 residential luxury apartment units and other

related facilities, (iii) a commercial component consisting of up to 3,000 square metres of general office space, (iv) an exclusive retail component consisting of approximately six retail units for lease by retail tenants, and (v) two independent commercial components consisting of up to 1,300 square metres of general commercial space.

C.   Four Seasons, together with its Affiliates (as hereinafter defined), has expertise in the various phases of the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of World Class Luxury Hotels and other related facilities.

D.   Owner intends that the Hotel become one of the leading hotels in the City of Caracas and, at the same time, be operated and managed in an efficient manner and, in that regard, Four Seasons and its Affiliates have offered to provide to Owner certain services in connection with the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of the Hotel as a World Class Luxury Hotel and with a view to maximizing benefits for both Owner and Four Seasons and its Affiliates.  Owner, after a lengthy selection process, has decided to engage Four Seasons and its Affiliates to provide such services.

E.   Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Pre-Opening Services Agreement") with Four Seasons, pursuant to which Four Seasons (for certain fees) has agreed to provide to Owner certain services with respect to the development and construction of the Hotel (as defined below) and certain other services with respect to the pre-opening of the Hotel.

F.   Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Management Agreement") with Four Seasons Caracas, C.A. ("Operator"), pursuant to which Operator (for certain fees) has agreed to provide to Owner certain services with respect to the day-to-day operation and management of the Hotel.

G.     Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Advisory Agreement") with Four Seasons Hotels and Resorts B.V. ("Advisor"), pursuant to which Advisor (for certain fees) has agreed to provide advice and services to Owner with respect to the supervision and direction of the Hotel.

H.     Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel License Agreement") with Four Seasons Hotels and Resorts B.V. ("Licensor"), pursuant to which Licensor (for certain fees and other consideration) has agreed to provide the right and licence to use the Trademarks (as defined below) and to utilize the Proprietary Materials (as defined below) to Owner in connection with the marketing, operation and management of the Hotel and the marketing of the Residential Apartments (as defined below) for sale by Owner.

I.     Owner also wishes to obtain the benefit of Four Seasons' expertise in providing services in connection with the ongoing purchasing services, the refurbishing and the marketing of World Class Luxury Hotels, and Four Seasons (for certain fees) has agreed to provide such services to Owner with respect to the Hotel, upon and subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW THEREFORE** in consideration of the covenants and agreements set forth in this Agreement, the parties agree that:

- 4 -

# ARTICLE I
## DEFINITIONS

**1.01**          <u>Definitions</u>

All capitalized terms herein shall, unless otherwise indicated, have the meaning set forth in the Hotel Advisory Agreement.  In this Agreement, the terms in Schedule "A" attached hereto shall have the respective meanings indicated therein.

**1.02**          <u>Recitals</u>

Four Seasons and Owner each represent and warrant to the other that the Recitals to this Agreement, insofar as they relate to it, are true and correct.

**1.03**          <u>Interpretation</u>

In this Agreement, save and except as otherwise expressly provided:

(a)     all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun;

(b)     the division of this Agreement into Articles and sections and the use of headings is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions;

(c)     when calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date which is the reference day in calculating such period shall be excluded.  If the last day of such

period is not a business day, the period in question shall end on the next business day;

(d)    all monetary amounts are expressed in either United States Dollars or Canadian Dollars, as the case may be.  All payments of sums, charges, fees, costs, expenses and other amounts contemplated by this Agreement shall be paid in either United States Dollars or Canadian Dollars, as the case may be.  If, pursuant to the judgment or order of any court or otherwise, any amount due or payable hereunder in either United States Dollars or Canadian Dollars, as the case may be (the "Original Currency") is paid in any other currency (the "Second Currency"), such payment in the Second Currency shall discharge or satisfy the obligation of the party making such payment to pay such amount in the Original Currency only to the extent that the amount of such payment is, when converted on the date of such payment to the Original Currency based on the Canadian Dollar Exchange Rate (in the case of the Original Currency being Canadian Dollars) or the United States Dollar Exchange Rate (in the case of the Original Currency being United States Dollars), equivalent to the amount of such payment if such payment had been made in the Original Currency.  The party making such payment shall, as a separate and independent obligation, which shall not be merged in any such judgment or order or extinguished by any such payment in the Second Currency, pay or cause to be paid such obligation in respect of the Original Currency not so discharged and satisfied in accordance with the foregoing and indemnify the party receiving such payment and hold the party receiving such payment harmless from and against any losses, costs, damages or expenses which the party receiving such payment may sustain or incur as a result of any such amount being paid in the Second Currency;

(e)    all references to Article and section numbers refer to Articles and sections of this Agreement; and

(f)     the words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or section hereof.

**1.04**          **Schedule**

The following schedule is attached hereto and is incorporated and deemed to be an integral part of this Agreement:

|  |  |  |
|---|---|---|
| Schedule "A" | - | Definitions |
| Schedule "B" | - | List of Operating Equipment and Supplies and Furniture, Fixtures and Equipment |
| Schedule "C" | - | Form of Assumption Agreement |
| Schedule "D" | - | Form of Subordination and Non-Disturbance Agreement |

**ARTICLE II**

**TERMINATION PRIOR TO OPENING DATE**

**2.01**          **Termination Prior to Opening Date**

If any or all of the other Hotel Agreements are terminated in accordance with their terms prior to the Opening Date, then this Agreement shall terminate on the date of such termination and Owner and Four Seasons shall have no future obligations arising out of this Agreement, save and except as otherwise expressly provided for in this Agreement. Notwithstanding the foregoing, if this Agreement is terminated in accordance with its terms (other than as a result of the failure by Four Seasons to perform its obligations under this Agreement or by any Affiliates of Four Seasons to perform their respective obligations under any of the other Hotel Agreements) and within five years of the date of the termination Owner or a Related Person commences or intends to commence the development or construction or

takes or intends to take any action in furtherance of the development or construction of a luxury hotel on the Land, then Owner shall promptly notify Four Seasons in writing of such intention or action (which notice shall set forth in reasonable detail the character of the contemplated hotel development or construction). In addition, upon receipt by Owner of a written offer from any Person for the provision of any of the services contemplated by this Agreement in respect of such proposed hotel (which offer Owner is willing to accept), Owner shall promptly submit a copy of such offer to Four Seasons. Four Seasons shall have a period of three months after receipt of a copy of such offer to notify Owner whether it is willing to provide the services contemplated in such offer on the terms and conditions set forth therein. If Four Seasons notifies Owner of its unwillingness to provide such services on the terms and conditions set forth in the offer or fails to notify Owner of its intention within such three month period, Owner shall be entitled to accept such offer on the terms and conditions set forth therein.

# ARTICLE III
## OWNER'S RESPONSIBILITY

3.01      **Owner's Responsibility**

Owner shall cause the Hotel to be (i) serviced and marketed as a World Class Luxury Hotel and otherwise in accordance with this Agreement, and (ii) developed, constructed, furnished, equipped, operated, managed, supervised and directed in accordance with the other Hotel Agreements, and shall fulfil all of its obligations under this Agreement and under the other Hotel Agreements.

- 8 -

# ARTICLE IV
# TERM AND RENEWALS

**4.01**        <u>Initial Term</u>

The initial term of this Agreement shall be for a period commencing on the date hereof and terminating at midnight on the last day of the twentieth full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date.

**4.02**        <u>Extension Terms</u>

    **(a)**        Four Seasons shall have the right to extend the Term for a first extension term of 10 additional Fiscal Years.

    **(b)**        If such first option of extension shall have been exercised, Owner and Four Seasons may agree to extend the Term for such additional extension terms of 10 additional Fiscal Years each as may be agreed to by Owner and Four Seasons.

    **(c)**        In addition, the Term shall be extended automatically by a period equal to the period between any termination and subsequent reinstatement of this Agreement pursuant to section 6.02.

**4.03**        <u>Exercise of Extension Options</u>

The option to extend granted to Four Seasons by section 4.02(a) shall be deemed to have been exercised unless Four Seasons shall have given written notice to Owner of Four Seasons' intention not to exercise the option to extend, which notice shall be given by Four Seasons not later than 12 months prior to the end of the initial term provided for in section 4.01.

4.04        <u>Covenants to Apply</u>

During the extension term provided for in section 4.02(a) and any subsequent extension term agreed to by Owner and Four Seasons as contemplated by section 4.02(b), this Agreement shall continue in full force and effect in all respects, and all of the terms, covenants, conditions and provisions of this Agreement shall apply, except that there shall be no options to extend beyond those provided for in this Article IV.


## ARTICLE V

## SALES, MARKETING, ADVERTISING AND PURCHASING SERVICES AND CHARGES

5.01        **Corporate Sales and Marketing Charges**
            **<u>and Corporate Advertising Charges</u>**

(a)    Owner shall pay to Four Seasons the following charges and all related reimbursable expenses:

    (i)    for corporate sales and marketing services (including corporate sales offices, supervision of the Hotel's sales and marketing and advertising programs and public relations assistance):

        (A)    commencing 8 months prior to the Scheduled Opening Date, an advance corporate sales and marketing charge (the "Advance Corporate Sales and Marketing Charge") in United States Dollars equal to 0.87% of budgeted Gross Receipts as set out in the pro forma statements of the Hotel to be agreed upon between Owner and Four Seasons for the initial Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) for corporate

(b)    If the Opening Date is delayed beyond the Scheduled Opening Date for any reason, during the period between the Scheduled Opening Date and the Opening Date Owner shall continue to pay to Four Seasons the Advance Corporate Sales Marketing Charge and the Advance Corporate Advertising Charge which shall be calculated on a per diem basis based on the budgeted Gross Receipts as set out in the pro forma statements of the Hotel to be agreed upon between Owner and Four Seasons.

(c)    The percentages set out in section 5.01(a) for use in determining the Corporate Sales and Marketing Charge and the Corporate Advertising Charge will be equal to the percentages generally charged, from time to time, to any other hotel or resort owned, leased, licensed or managed by Four Seasons or any Affiliate thereof under the name "Four Seasons" for like services; provided, however, that such percentages shall not be increased by Four Seasons without the prior written consent of Owner.  Four Seasons will provide to Owner, at the same time as the Annual Plan is delivered to Owner, an annual corporate sales and marketing plan and an annual corporate advertising plan.

**5.02**    **Centralized Reservation Service Charge**

Commencing on the Opening Date, Owner shall pay to Four Seasons a charge (the "Centralized Reservation Service Charge") in United States Dollars relating to centralized reservation services to be provided to the Hotel by Four Seasons.  The Centralized Reservation Service Charge is intended to be an amount per month per hotel room in the Hotel equal to the amount per month per hotel room charged, from time to time, to other hotels and resorts owned, leased, licensed or managed by Four Seasons or any Affiliate thereof under the name "Four Seasons" for centralized reservation services, which amount is currently C$35.50 and shall be subject to change 30 days after written notice thereof has been given by Four Seasons to Owner.

5.03        <u>Adjustment of Charges</u>

Four Seasons acknowledges that the intent of the provisions of sections 5.01 and 5.02 is to permit the recovery of Four Seasons' costs of providing corporate sales and marketing services, corporate advertising services and centralized reservation services and it is intended that Four Seasons not realize a profit or loss on such services.  Accordingly, at the time of the delivery by Operator of the annual statement of profit and loss for the Hotel pursuant to section 10.07(b) of the Hotel Management Agreement, Four Seasons will furnish to Owner an audited statement of income and expense for its corporate sales and marketing, corporate advertising and centralized reservations divisions, indicating the total of such charges received and disbursements made for the previous Fiscal Year.  If the Corporate Sales and Marketing Charge, Corporate Advertising Charge or Centralized Reservation Service Charge paid by Owner exceeds Owner's pro rata share of expenses incurred by Four Seasons in respect of its corporate sales and marketing, corporate advertising and centralized reservations divisions for such Fiscal Year, Four Seasons shall promptly refund to Owner an amount equal to such excess (the "Service Charge Excess").  If the Corporate Sales and Marketing Charge, Corporate Advertising Charge and Centralized Reservation Service Charge for such Fiscal Year is less than Owner's pro rata share of expenses incurred by Four Seasons in respect of its corporate sales and marketing, corporate advertising or centralized reservations divisions for such Fiscal Year, Owner shall promptly pay to Four Seasons an amount equal to such deficiency (the "Service Charge Deficiency").

5.04        <u>Centralized Purchasing</u>

(a)        Subject to sections 5.04(b) and 5.04(c), commencing on the Opening Date, the Hotel may at the option of Owner participate in a centralized purchasing system whereby items of Furniture, Fixtures and Equipment and Operating Equipment and Supplies are purchased from suppliers designated by Four Seasons or from or through any Affiliates of Four Seasons and Owner shall pay to Four Seasons a charge (the "Centralized Purchasing Charge") in United States Dollars relating

to such centralized purchasing. The Centralized Purchasing Charge received by Four Seasons shall be the same as that generally charged, from time to time, to other hotels and resorts owned, leased, licensed or managed by Four Seasons or any Affiliate thereof under the name "Four Seasons" for centralized purchasing services, which is currently 7½ % of the total cost of any purchase (including the cost of storage, freight and installation, Taxes, fees and commissions to third Persons (other than the Centralized Purchasing Charge) and the costs of any contracts awarded and any items purchased, leased or hire-purchased on conditional sale; provided that the total cost of items purchased, leased or hire-purchased on an instalment payment basis shall be capitalized to reflect the actual total cost thereof) and shall be subject to change 30 days after written notice thereof has been given by Four Seasons to Owner; provided that Four Seasons shall not receive the Centralized Purchasing Charge in respect of Furniture, Fixtures and Equipment or Operating Equipment and Supplies purchased pursuant to any approved hotel refurbishing plan or capital improvement, including (without limitation) any refurbishing or capital improvement activity contemplated in an Annual Plan or any approved Capital Refurbishing Programs to the extent that Advisor has received a Refurbishing Fee based on such purchase.

(b)     Notwithstanding section 5.04(a), the Hotel shall participate in the centralized purchasing system with respect to any particular item of Furniture, Fixtures and Equipment or Operating Equipment and Supplies unless (A) the cost to the Hotel of purchasing such item otherwise than through the centralized purchasing system would be less than the cost to the Hotel of purchasing such item through the centralized purchasing system (including, but not limited to, the Centralized Purchasing Charge), (B) the specifications, including (without limitation) quality and availability, of such item purchased otherwise than through the centralized purchasing system would be at least as good as the specifications, including (without limitation) quality and availability, of such item purchased through the

- 14 -

centralized purchasing system, and (C) the purchase of such items otherwise purchased than through the centralized purchasing system will not otherwise adversely affect the operation and management of the Hotel as a World Class Luxury Hotel.

(c)     Notwithstanding section 5.04(a), the Hotel shall participate in the centralized purchasing system with respect to any particular item of Furniture, Fixtures and Equipment or Operating Equipment and Supplies which item is generally purchased on a system-wide basis at other hotels and resorts owned, leased, licensed or managed by Four Seasons or any Affiliate thereof under the name "Four Seasons", the current list of which is set out on Schedule "B" attached hereto and shall be subject to change 30 days after written notice thereof has been given by Four Seasons to Owner; provided that the Hotel need not participate in the centralized purchasing system with respect to any particular item of Furniture, Fixtures and Equipment or Operating Equipment and Supplies which is not marked with any Trademarks, any derivatives thereof or any other tradenames, distinct emblems, insignia, logos, slogans or distinguishing characteristics usually associated with any of the Trademarks if (A) the cost to the Hotel of purchasing such item otherwise than through the centralized purchasing system would be less than the cost to the Hotel purchasing such item through the centralized purchasing system (including, but not limited to, the Centralized Purchasing Charge), (B) a sample of such item has been presented by Owner to Four Seasons and approved by Four Seasons having regard to the specifications, including (without limitation) quality and availability, of such item, and (C) the purchase of such item otherwise than purchased through the centralized purchasing system will not otherwise adversely affect the operation and management of the Hotel as a World Class Luxury Hotel.

(d)     Notwithstanding the provisions of this section 5.04, the cost to the Hotel of any purchase accomplished through the centralized purchasing system (including,

- 5 -

without limitation, the Centralized Purchasing Charge), taking into account the quality and payment terms of the items purchased, shall be no greater than the cost at which such items could be obtained by Owner from Persons who are not Related Persons.  If such maximum is exceeded, the excess shall be rebated by Four Seasons promptly upon it becoming aware of such excess; provided that such rebate shall not exceed the Centralized Purchasing Charge received by Four Seasons in respect of the item in question.

(e)     All purchases accomplished through the centralized purchasing system shall be made by Four Seasons as agent for and at the sole risk of Owner.  Four Seasons makes no representation or warranty with respect to items so purchased and shall not be responsible for defects in any property acquired, but shall enforce third Person warranties regarding such items to the extent permitted by law and at Owner's sole cost and expense.

5.05     <u>Refurbishing Fee</u>

Owner may engage Four Seasons to provide services in connection with any approved hotel refurbishing plan or capital improvement, including (without limitation) any refurbishing or capital improvement activity contemplated in an Annual Plan or any Capital Refurbishing Programs, and, in consideration of Four Seasons providing such services, Owner shall pay to Four Seasons a fee (the "Refurbishing Fee") to be agreed to by Owner and Four Seasons based on the scope of Four Seasons' involvement in such approved hotel refurbishing plan or capital improvement and taking into account the employment costs of Four Seasons' personnel to be reimbursed by Owner pursuant to section 5.06.

5.06     <u>Reimbursement of Costs</u>

Owner shall reimburse Four Seasons for all reasonable costs and expenses incurred by Four Seasons in the performance of the services contemplated by this Agreement.

Owner expressly acknowledges that such services may be for either (a) the exclusive benefit of the Hotel, or (b) the benefit of the Hotel and one or more other hotels or resorts that are owned or operated and managed by Four Seasons or any of its Affiliates; provided that if such activities re not for the exclusive benefit of the Hotel, only an equitable portion of the costs and expenses associated therewith shall be allocated to the Hotel by Four Seasons. Such costs and expenses may include, but are not limited to, consultants fees and expenses, out-of-pocket expenses incurred in connection with performance of duties described in this Agreement, travel expenses and food and lodging of Four Seasons' personnel (but shall not include the employment costs of such personnel, save and except as provided for in this section 5.06). Such costs and expenses shall be estimated by Advisor in the Annual Plan. Four Seasons shall cause Advisor to use its reasonable efforts to ensure that such costs and expenses are accurately estimated. Owner shall also reimburse Four Seasons, on the basis of the number of days spent at the Hotel, for:

(a)     the total employment costs· of any personnel of Four Seasons or any of its Affiliates who as a replacement spend time at the Hotel engaged in duties on a temporary basis fulfilling a function that is normally a full-time function of an employee of the Hotel;

(b)     the total employment costs of any personnel of Four Seasons or any of its Affiliates who spend time at the Hotel devoted to the problems or affairs of the Hotel; provided that, in each case, the time spent at the Hotel is not less than 15 full working days during any consecutive three month period; and

(c)     the total employment costs of any personnel of Four Seasons or any of its Affiliates who spend time at the Hotel supervising an approved refurbishing plan or capital improvement, including (without limitation) a Capital Refurbishing Program, unless such employment costs are payable to, or otherwise included in the cost of services provided by, Four Seasons or any of its Affiliates as part of any such approved refurbishing plan or capital improvement.

- 17 -

To the extent that Four Seasons is able to estimate the number of days which will be spent by any personnel of Four Seasons or any of its Affiliates at the Hotel in any Fiscal Year in connection with the performance of the services contemplated in paragraphs (a), (b) and (c) of this section 5.06, the total employment costs of such personnel contemplated in such paragraphs shall be estimated by Advisor in the Annual Plan for such Fiscal Year.

5.07     Manner of Payment of Fees, Charges, Costs and Expenses

(a)     On the last day of each of the 12 months commencing immediately preceding the Scheduled Opening Date, Four Seasons shall be paid the Advance Corporate Sales and Marketing Charge and Advance Corporate Advertising Charge.

(b)     On the last day of each month commencing after the Scheduled Opening Date and before the Opening Date, Four Seasons shall be paid the charges contemplated by section 5.01(b).

(c)     Upon receipt by Owner of the statement of profit and loss of the Hotel at the end of each month and otherwise in accordance with section 10.06(a) of the Hotel Management Agreement, Four Seasons shall be:

(i)     paid the Corporate Sales and Marketing Charge and Corporate Advertising Charge for the preceding month, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable;

(ii)     paid the Centralized Reservation Service Charge for the preceding month;

(iii)     paid the Centralized Purchasing Charge, if any, for the preceding month;

(iv)     paid the Refurbishing Fee, if any, for the preceding month; and

(v)   reimbursed for all costs and expenses, if any, reimbursable to it pursuant to section 5.06 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement during the preceding month; and

(d)   Upon receipt by Owner of the annual statements referred to in section 5.03, the requisite adjustments shall be made between Owner and Four Seasons with respect to each of the Corporate Sales and Marketing Charge, Corporate Advertising Charge and Centralized Reservation Service Charge for such Fiscal Year and Four Seasons shall be paid any Service Charge Deficiency or Owner shall be paid any Service Charge Excess, as the case may be.

(e)   To the extent that there may be insufficient funds in the Hotel Bank Accounts for Operator to make the payments required to be made under this section 5.07 on behalf of Owner, Owner shall pay the amount of any deficit to Four Seasons on demand, together with interest on such payments from the time such payments are required to be made under this section 5.07 at the Interest Rate.

## ARTICLE VI
## DAMAGE TO AND DESTRUCTION OF THE HOTEL

6.01   **Owner's Obligation to Repair**

(a)   Subject to sections 6.01(b) and 6.01(c), if the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire or any other casualty, Owner will with due diligence repair, rebuild or replace the same so that after such repairing, rebuilding or replacing the Hotel shall be substantially the same as prior to such damage or destruction. If Owner fails to begin such work within 90 days after the fire or other casualty or fails to

complete the work diligently, Four Seasons may, at its option, either (i) terminate this Agreement by written notice to Owner, (ii) pursue any other recourse at law or in equity it may have, or (iii) if the cost of repair, rebuilding or replacement is estimated by Operator and Owner pursuant to the Hotel Management Agreement to be less than 20% of the replacement cost of the Hotel, advise Operator to cause such work to be completed for the account of Owner pursuant to, and in accordance with, the Hotel Management Agreement.

(b)     If the cost of repair, rebuilding or replacement following a casualty in the final three years of the current Term is estimated by Operator and Owner pursuant to the Hotel Management Agreement to exceed 20% of the replacement cost of the Hotel, Owner shall have the right (exercisable by written notice given to Four Seasons within 90 days following the date which is the later of the date of the occurrence of such casualty and the date of the determination of the estimate) not to repair, rebuild or replace the damage and to terminate this Agreement effective on the last day of the month following the month in which such notice of termination is given unless Four Seasons has a further right to extend the Term pursuant to section 4.02, in which case the notice of termination shall not be effective and Owner shall repair, rebuild or replace the Hotel as otherwise required by section 6.01(a).

(c)     If the cost of repairing, rebuilding or replacement not covered by insurance following a casualty is estimated by Operator and Owner pursuant to the Hotel Management Agreement to exceed 20% of the replacement cost of the Hotel, then Owner shall have the option (exercisable by written notice given within 90 days following the date which is the later of the date of the occurrence of such casualty and the date of the determination of the estimate) not to repair, rebuild or replace and to terminate this Agreement effective on the last day of the month following the month in which such notice is given.

(d)     If Owner, by reason of unavailability of supplies, strikes, walk-outs or other matters entirely beyond the control of Owner (which in no event shall include Owner's financial incapacity), shall be unable to undertake the repairs or restoration within the time provided in section 6.01(a), the time during which Owner shall be able to undertake to accomplish the repairs or restoration shall be extended accordingly.

(e)     Four Seasons shall, notwithstanding any delay or interruption resulting from any such damage or destruction, be entitled to receive from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) of the Hotel Management Agreement (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Corporate Sales and Marketing Charge and Corporate Advertising Charge, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Centralized Reservation Service Charge, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Corporate Sales and Marketing Charge, the Corporate Advertising Charge and the Centralized Reservation Service Charge historically earned by Four Seasons.

**6.02**     **Four Seasons' Reinstatement**

If, following a termination of this Agreement by Four Seasons in accordance with section 6.01, at any time during the five year period following such termination Owner or Related Person intends to repair, rebuild or replace the Hotel or commences to do so, Owner shall promptly notify Four Seasons in writing of such intention or commencement, and, at Four Seasons' election (exercisable by written notice given to Owner within 60 days of receipt of the written notice by Owner of its intention to repair, rebuild or replace the Hotel, or, if no such

Owner's notice is given, Four Seasons' actual knowledge of the commencement), this Agreement shall be reinstated (with only such amendments as are required due to changes in the type, scope or design of the project).

## ARTICLE VII
## EXPROPRIATION

7.01        Complete Expropriation

If the whole of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings, or if such a portion of the Hotel shall be so taken as to make it imprudent or unreasonable, in Owner's and Four Seasons' opinion, to operate the remaining portion as a hotel of the standard of operation then applicable to the Hotel, then in either event this Agreement shall be deemed to have terminated as of such time as possession of the Hotel or portion of the Hotel is surrendered or its operation is discontinued as a result of such taking or condemnation.  Owner shall receive the whole of any award for any complete taking or condemnation; provided that Four Seasons shall be entitled to receive from any award for such taking or condemnation (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Corporate Sales and Marketing Charge and the Corporate Advertising Charge, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Centralized Reservation Service Charge, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Corporate Sales and Marketing Charge, the Corporate Advertising Charge and the Centralized Reservation Service Charge historically earned by Four Seasons.

7.02        Partial Expropriation

If only a part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings and the taking or condemnation does not make it financially or operationally unreasonable or imprudent, in Owner's and Four Seasons' opinion, to operate the remaining portion as a hotel of the standard of operation then applicable to the Hotel, this Agreement shall not terminate; provided that any award therefor shall be used by Owner to repair any damage to the Hotel or any part of the Hotel, or to alter or modify the Hotel or any part of the Hotel, so as to render the Hotel a complete and satisfactory architectural unit as a World Class Luxury Hotel. The remainder of any award for any partial taking or condemnation shall be retained by Owner; provided that Four Seasons shall be entitled to receive from any award for such taking or condemnation (i) at any time prior to the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Corporate Sales and Marketing Charge and the Corporate Advertising Charge, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Centralized Reservation Service Charge, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such award based on the Corporate Sales and Marketing Charge, the Corporate Advertising Charge and the Centralized Reservation Service Charge historically earned by Four Seasons.

7.03        Temporary Expropriation

If all or any part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings for a temporary use, this Agreement shall not terminate and Four Seasons shall, for the duration of any delay or for the period of business interruption resulting from any such taking or condemnation, be entitled to receive from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) of the Hotel Management Agreement (i) at any time prior to the end of the first full

- 23 -

Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Corporate Sales and Marketing Charge and the Corporate Advertising Charge, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Centralized Reservation Service Charge, or (ii) at any time after the end of the first full Fiscal Year (disregarding the initial Fiscal Year of less than 12 calendar months) after the Opening Date, an equitable apportionment of such insurance proceeds based on the Corporate Sales and Marketing Charge, the Corporate Advertising Charge and the Centralized Reservation Service Charge historically earned by Four Seasons. When and if during the Term, the period of temporary use shall terminate, Owner shall make all such restoration, repairs and alterations as shall be necessary to restore the Hotel to a World Class Luxury Hotel.


## ARTICLE VIII
## ASSIGNMENTS AND MORTGAGES


8.01        Owner's Right to Assign

Subject to the provisions of section 8.03, Owner shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person on the condition that such Person first enter into an agreement with Four Seasons, in the form attached hereto as Schedule "C", agreeing:

(a)        that the Hotel Agreements continue in full force in effect after such sale, assignment, transfer or other disposition; and

(b)        to assume all of the contractual obligations of Owner contained in the Hotel Agreements.

8.02        <u>Owner's Right to Mortgage</u>

Subject to the provisions of section 8.03, Owner shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to any Person on the condition that such mortgagee first enter into an agreement with Four Seasons, in the form attached hereto as Schedule "D", agreeing:

(a)     to be bound by Owner's covenants and undertakings under the Hotel Agreements for any period during which it is in possession of the Hotel;

(b)     that in the event of a foreclosure of its mortgage or lien on the Hotel or this Agreement or of a conveyance in lieu of foreclosure (i) no default under such mortgage or other documents evidencing the lien in favour of such mortgagee, and no proceeding to foreclose the same, and no conveyance in lieu of foreclosure thereof, will disturb Four Seasons's right to perform its duties pursuant to this Agreement or affect any other right of Four Seasons under this Agreement and (ii) this Agreement shall continue in full force and effect and such mortgagee, its successors and assigns, or any Person (the "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein upon foreclosure sale or by deed in lieu thereof, as the case may be, shall be a Qualified Person and shall automatically recognize this Agreement and Four Seasons's rights hereunder for the balance of the Term upon the same terms, covenants and conditions as herein provided, with the same force and effect as though this Agreement were originally made directly between Four Seasons and such mortgagee, or its successors and assigns, or the Foreclosure Purchaser, as the case may be; and

(c)     not to sell, transfer or otherwise dispose of any interest it may have in the Hotel or this Agreement without first causing any transferee thereof to acknowledge and agree to be bound by and become a party to such agreements with Four Seasons.

8.03      Limitation on Owner's Right to Assign and Mortgage

          Notwithstanding the provisions of sections 8.01 and 8.02, Owner shall not without
the express prior written consent of Four Seasons, which consent may be withheld or delayed
in the sole discretion of Four Seasons without regard to the provisions of section 10.01(a),
directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell,
assign, transfer or otherwise dispose of, or mortgage, hypothecate or otherwise encumber, any
interest, whether legal or beneficial, in all or any part of its Interest to any Person other than
a Qualified Person.  Any change in control of Owner, whether directly or indirectly and whether
by way of transfer of shares, partnership interests or otherwise, to any Person other than a
Qualified Person shall be prohibited unless the express prior written consent of Four Seasons,
which consent may be unreasonably withheld or delayed, is obtained.

8.04      Operator's Right to Assign

          Subject to section 8.06, Four Seasons shall have the right at any time to sell,
assign, transfer or otherwise dispose of all or any part of its Interest to any Person on the
condition that:

     (a)      the Person to whom the Interest of Four Seasons is to be sold, assigned,
              transferred or otherwise disposed of shall first enter into an agreement with
              Owner, in form and substance satisfactory to Owner, agreeing to assume all of
              the contractual obligations of Four Seasons contained in this Agreement; and

     (b)      in the case of a sale, assignment, transfer or other disposition to an Affiliate of
              Four Seasons, Four Seasons shall first enter into an agreement with Owner, in
              form and substance satisfactory to Owner, agreeing to be jointly and severally
              liable with such Affiliate to perform all of the contractual obligations of Four
              Seasons contained in this Agreement notwithstanding such sale, assignment,
              transfer or other disposition.

Upon a sale, assignment, transfer or other disposition to a Person other than an Affiliate, Four Seasons shall be released from all of its obligations under this Agreement.

**8.05        Four Seasons' Right to Mortgage**

Four Seasons shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to a financial institution as security for its obligations to such financial institution.

**8.06        Limitation on Four Seasons' Right to Assign**

Four Seasons shall not without the express prior written consent of Owner, directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person other than (i) an Affiliate, (ii) a Person that results from any merger, amalgamation, consolidation or other reorganization of Four Seasons, or (iii) a Person that acquires all or substantially all the assets of Four Seasons and operates a hotel management business either on its own or in conjunction with its Affiliates. This section 8.06 shall not, however, apply to a change in control of Four Seasons Hotels Inc. resulting from sales of its publicly traded shares to any Person.

**ARTICLE IX**

**EVENTS OF DEFAULT AND TERMINATION**

**9.01        General**

Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

- 27 -

(a)     the failure of Four Seasons to disburse any amount to Owner provided for herein, or the failure of Owner to pay any amounts required to be paid by it hereunder, for a period of 30 days after the date on which notice of the failure has been given to the defaulting party by the other party;

(b)     the filing of a voluntary assignment in bankruptcy or insolvency or a petition for reorganization under any Applicable Law by Owner, any member or partner of Owner, or Four Seasons;

(c)     the consent to an involuntary petition in bankruptcy or the failure by Owner, any member or partner of Owner, or Four Seasons to vacate, within 60 days from the date of entry thereof, any order approving an involuntary petition;

(d)     the making of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner, any member or partner of Owner, or Four Seasons a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of a party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of 120 consecutive days; or

(e)     the failure of either Owner or Four Seasons to fulfil any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of 30 days after written notice of the failure; provided that if upon receipt of any notice the defaulting party promptly and with all due diligence cures the default or, if the default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures the failure within that period so advised, then no event of default shall be deemed to

have occurred unless and until the defaulting party has failed to take or to continue to take action or to complete the cure within the period.

9.02      Rights of Non-Defaulting Party

Upon the occurrence of any event of default pursuant to section 9.01 and the applicable grace periods having expired, either Owner or Four Seasons may, without prejudice to any other recourse at law or in equity which it may have, give to the other notice of its intention to terminate this Agreement after the expiration of a period of 30 days from the dat e of such notice and, upon the expiration of such period, the term of this Agreement shall expire unless such default has been cured.  Such notice shall be of no force and effect if within 30 days of receipt of such notice, the party receiving such notice shall promptly and with all due diligence cure the default or, if such default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures such default within the period so advised.

9.03      Remedying Defaults

Notwithstanding anything to the contrary contained in this Agreement, either Owner or Four Seasons shall be entitled to remedy any default of the other under this Agree ment with reasonable notice to the other or without notice in the event of any emergency or apprehended emergency, without prejudice to any rights under this Agreement and the party so remedying such default shall be repaid upon demand by the other for the cost of remedying such default, together with interest on such cost from the date of incurring such cost at the Interest Rate.

9.04        Bona Fide Dispute

Notwithstanding the provisions of section 9.02, neither Owner nor Four Seasons shall be entitled to take any of the actions contemplated in section 9.02, save and except for the commencement of any legal proceedings (in which case the provisions of sections 13.10 and 13.11 regarding jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained in this Agreement pending the resolution of a Dispute, if before the expiration of the 30 day notice period referred to in section 9.02, notice of a Dispute has been delivered in accordance with section 10.02(a) with respect to any of the foregoing events of default and the procedures set forth in sections 10.02(b) and (c) are being pursued in good faith (except that for this purpose under section 10.02(b), the requirement of a 30 day negotiation period under section 10.02(a) shall be inapplicable and the period within which to appoint an expert under section 10.02(b) shall commence on the date of delivery of notice of a Dispute).

9.05        Four Seasons' Right to Terminate

In addition to any right arising out of section 9.02 and notwithstanding sections 9.04, 10.02 and 10.03, Four Seasons shall have the right to terminate this Agreement if the Opening Date does not occur on or before 180 days after September 30, 1998, other than by reason of any default by Four Seasons in its obligations under this Agreement.  Four Seasons' right to terminate this Agreement in accordance with this section 9.05 shall be exercised by written notice by Four Seasons given to Owner within 30 days after the relevant date mentioned above.  If the Opening Date does not occur on or before the Scheduled Opening Date for any reason beyond the control of Owner, including (without limitation) the Hotel or any portion thereof being damaged or destroyed, and Four Seasons does not terminate this Agreement in accordance with this section 9.05, Four Seasons shall, for the period beginning on the Scheduled Opening Date and ending on the Opening Date, nevertheless be entitled to receive, from any insurance proceeds paid in respect of the business interruption insurance contemplated in section 16.01(a) of the Hotel Management Agreement, an equitable apportionment of such insurance

- 30 -

proceeds based on the Advance Corporate Sales and Marketing Charge and Advance Corporate Advertising Charge, the Corporate Sales and Marketing Charge and Corporate Advertising Charge, calculated on the basis of budgeted Gross Receipts as set out in the Annual Plan then applicable, and the Centralized Reservation Service Charge.

9.06        **Cross-Termination**

If any or all of the other Hotel Agreements other than the Hotel Pre-Opening Services Agreement are terminated after the Opening Date, or if the Hotel Pre-Opening Services Agreement is terminated other than as a result of the expiry of its term through the passage of time, then either Four Seasons or Owner shall, in addition to any rights or remedies available to it at law or in equity, be entitled to terminate this Agreement by written notice to the other within ten days after the date of such termination and Owner and Four Seasons shall have no future obligations arising out of this Agreement, save and except as expressly otherwise provided for in this Agreement.

9.07        **Accounting on Termination**

If this Agreement is terminated, Four Seasons shall be entitled (in addition to a ny rights or remedies available to it at law or in equity) to all sums, charges and fees which it is entitled to receive under this Agreement, together with costs and expenses, if any, reimbursable to it pursuant to section 5.06 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement. The amount of all of such sums, charges, fees and out-of-pocket costs and expenses shall be ascertained for the period ending on the date of such termination and shall be paid to Four Seasons (i) to the extent ascertained on the date of such termination, on such date, and (ii) to the extent not ascertained on the date of such termination, on the date on which such sums, charges, fees and costs and expenses are ascertained after the date of such termination.

9.08        Claims on Termination

   Notwithstanding anything contained in this Agreement, (i) the termination of this Agreement shall not prejudice any cause of action, claim or right of either Owner or Four Seasons against the other accrued or to accrue on account of any default by the other of its obligations under this Agreement or arising as a result of the termination of this Agreement, and any term, covenant, condition or provision of this Agreement referable thereto shall not merge, but shall survive, the termination of this Agreement, and (ii) the Dispute resolution procedure set forth in section 10.02 shall no longer apply to any of Owner or Four Seasons after termination of this Agreement and any of Owner or Four Seasons shall be entitled to commence legal proceedings seeking any recourse available to it at law or in equity, including (without limitation) mandatory, declaratory or injunctive relief to define or protect the rights and enforce the obligations contained in this Agreement; provided that such legal proceedings shall not involve issues which have previously been submitted to and settled by arbitration in accordance with this Agreement unless such legal proceedings involve the enforcement of an arbitration decision or award made in respect of such issues.


# ARTICLE X

## APPROVALS, DISPUTE RESOLUTION AND ARBITRATION

10.01        **Approvals**

   Except as otherwise provided in this Agreement:

   (a)  all opinions contemplated by this Agreement must be reasonably formed and the approval of any document, proposed action or other matters in accordance with this Agreement shall not be unreasonably withheld or delayed; provided that in determining the reasonableness of any such withholding or delay, full consideration shall be given to, and it shall be unreasonable to deny or refuse

consent or approval to any matter if the effect of such denial or refusal would prevent or hinder the operation of the Hotel as a World Class Luxury Hotel or the operation of the other components of the Project at a standard consistent with that applicable to the Hotel as a World Class Luxury Hotel; and

(b)    the following procedure shall be followed with respect to any matter requiring approval:

    (i)    such documents or a written description of the proposed action or other matter requiring approval shall be submitted by the party having responsibility therefor (the "requesting party") to the party having the right of approval, which submission shall be accompanied by a request for approval in accordance with this Agreement;

    (ii)    as soon as possible but not later than 30 days after receipt of any proposed budget or 15 days after the receipt of any other written request for approval (or such other time period as may be specified for approval with respect to any item in this Agreement) the party having the right of approval shall notify in writing the requesting party of its approval or of its specific objections to the document, proposed action or other matter;

    (iii)    failure to respond in writing with specific objections within the maximum time period specified in section 10.01(b)(ii) shall constitute approval of all matters submitted;

    (iv)    within 10 days of the receipt of any objections (or such other time period as may be specified in this Agreement), the requesting party shall:

        (A)    acquiesce to such objections; or

- 33 -

(B)     reach an agreement with the party objecting; or

(C)     call for a meeting of senior representatives of Owner and Four Seasons to be convened to consider the matter in dispute (by giving notice to convene such meeting in writing indicating the specific issues in dispute to be resolved by such representatives); and

(v)     as soon as possible, but not later than 10 days after receiving a request to convene a meeting in accordance with section 10.01(b)(iv)(C), representatives of Owner and Four Seasons shall convene to consider the specific issues in dispute and resolve them to the mutual satisfaction of the parties and if unable to resolve the specific issues in dispute, the same shall be resolved in accordance with the arbitration procedures provided in section 10.03.

Once any document, proposed action or other matter is approved, no change or amendment thereof may be effected without the prior consent of both parties.

**10.02       Dispute Resolution**

Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to this Agreement singularly, a "Dispute" and collectively, "Disputes") shall be resolved in the following manner:

(a)     first, within 10 days after the receipt of notice of a Dispute by one party to the other, the parties shall in good faith attempt to negotiate for a period of 30 days in an effort to resolve the Dispute;

- 34 -

(b)     second, if the parties are unable to resolve the Dispute within such 30 day period, they shall retain a mutually acceptable expert to assist them in resolving the Dispute within 10 additional days, failing which they shall each retain an expert on the eleventh day and the two experts thus chosen shall together act as the expert for the purposes of this section 10.02(b).  If either party shall fail to appoint an expert as required hereunder, the expert appointed by the other party shall be the sole expert.  Within 90 days after the experts (or such single expert) have been retained, the experts (or such single expert) shall, on a non-binding basis, advise the parties in writing of their views.  The fees and expenses of the experts (or such single expert) shall be borne equally;

(c)     third, if the parties are still unable to resolve the Dispute within such 90 day period, the parties shall resort to the arbitration procedures set forth in section 10.03; and

(d)     fourth, any party to the Dispute shall be entitled to join any Dispute proceeding arising out of this Agreement with any other Dispute proceeding arising out of either this Agreement or any of the other Hotel Agreements.

10.03     <u>Arbitration</u>

Except as otherwise provided in section 9.04 and this section 10.03, any Dispute shall be settled by arbitration as follows:

(a)     each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration.  Within 10 days after receipt by the other party of such notice, each party shall appoint an arbitrator and within 10 days of their appointment the two arbitrators so chosen shall nominate a third arbitrator.  If within such 10 day period the two arbitrators fail to nominate the third arbitrator, upon written request of either party, the third arbitrator shall be

appointed by the International Court of Arbitration of the International Chamber of Commerce, and both parties shall be bound by the appointment so made. If either party hereto shall fail to appoint an arbitrator as required in this section 10.03(a), the arbitrator appointed by the other party shall be the sole arbitrator of the matter;

(b)     the decision of the arbitrators (or such single arbitrator) shall be made within 30 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator) when reduced to writing and signed by them shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction;

(c)     the arbitration shall at the election of Four Seasons be held in the City of Miami, Florida, United States of America or the City of Caracas, Republic of Venezuela, as the case may be, and shall be conducted in the English language and, except for those procedures specifically set forth in this section, shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof; and

(d)     the arbitrators (or arbitrator) shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that each party shall be responsible for its own legal fees.

Notwithstanding anything contained in this section 10.03, any of Owner or Four Seasons shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 13.10 and 13.11 governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained herein pending the settlement of a Dispute in accordance with the

arbitration procedures set forth in this section 10.03, (ii) commence legal proceedings (in which case the provisions of sections 13.10 and 13.11 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement, or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of either this Agreement or any of the other Hotel Agreements.

## ARTICLE XI
## FOUR SEASONS' LIABILITY

**11.01**    **Standard of Care**

Four Seasons shall not, in the performance of its obligations under this Agreement, be liable to Owner or to any other Person for any act or omission (whether negligent, tortious or otherwise) of Four Seasons or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives, except only to the extent such liabilities, obligations, claims, costs and expenses arise out of or are caused by the wilful misconduct, gross negligence or bad faith of Four Seasons or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives.

**11.02**    **Indemnities**

(a)    Owner hereby indemnifies and holds Four Seasons and its Affiliates and any of their respective directors, officers, employees, consultants, agents and representatives (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of any action or omission or course of action on the part of an Indemnified Party in the performance of its obligations under this Agreement or otherwise in connection with any obligation incurred by or

instrument executed by an Indemnified Party alone, an Indemnified Party together with Owner or by Owner alone, whether or not an Indemnified Party shall be the signatory or one of the signatories on behalf of Owner and whether incurred or executed on behalf of Owner, provided that this indemnity shall not apply to any liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses resulting from the wilful misconduct, gross negligence or bad faith of the Indemnified Party.

(b)     Four Seasons hereby indemnifies and holds Owner and any of its directors, officers, employees, consultants, agents and representatives harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of or caused by the wilful misconduct, gross negligence or bad faith of Four Seasons or any of its directors, officers, employees, consultants, agents or representatives.

## ARTICLE XII
## ACKNOWLEDGMENTS

12.01   <u>Owner's Acknowledgments</u>

Owner acknowledges that:

(a)     in entering into this Agreement, Owner has not relied on any statement, study, representation or warranty of Four Seasons, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, express or implied, relating to the Hotel, including (without limitation) any statement, study, representation or warranty relating to the structural integrity, safety or other design aspects of the Hotel, the competence of the Consultants, the compliance

of the Hotel with Applicable Law, any projection or pro forma statements of earnings or profits or loss or statements as to future success of the Hotel which may have been prepared by or on behalf of Four Seasons, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, and Owner understands that no guarantee is made or implied by Four Seasons or by any of its Affiliates with respect thereto; provided that, for greater certainty, nothing in this section 12.01(a) shall affect in any manner whatsoever the obligation of Operator or its Affiliates to make Deficit Payments in accordance with the provisions of section 8.04 of the Hotel Management Agreement; and

(b)     Four Seasons is relying on the representations, warranties and covenants of Owner set out in the Hotel Agreements in connection with Four Seasons entering into this Agreement and fulfilling all of its obligations under this Agreement.

12.02     **Four Seasons' Acknowledgments**

Four Seasons acknowledges that Owner is relying on the representations, warranties and covenants of Four Seasons set out in this Agreement, and of the Affiliates of Four Seasons set out in the other Hotel Agreements, in connection with Owner entering into and fulfilling its obligations under this Agreement.

**ARTICLE XIII**
**GENERAL PROVISIONS**

13.01     **Entire Agreement**

This Agreement constitutes the entire agreement between the parties with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings

with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

**13.02       Modification and Changes**

This Agreement cannot be changed or modified except by another agreement in writing signed by all the parties or by their respective duly authorized agents and consented to by all the parties to the other Hotel Agreements.

**13.03       Partial Invalidity**

In the event that any one or more of the phrases, sentences, clauses, Articles or sections contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having jurisdiction, or shall be or become invalid or unenforceable by virtue of any Applicable Law, the remainder of this Agreement shall be construed as if such phrases, sentences, clauses, Articles or sections had not been inserted except when such construction (a) would operate as an undue hardship on either party or (b) would constitute a substantial deviation from the general intent and purposes of the parties as reflected in this Agreement.  In the event of either (a) or (b) above, the parties shall use their best efforts to negotiate a mutually satisfactory amendment to this Agreement to circumvent such adverse construction.  If no such amendment has been agreed upon within 60 days the dispute shall be submitted to arbitration in accordance with the provisions of section 10.03.

**13.04       Counterparts**

This Agreement may be executed simultaneously in two counterparts, each of which counterparts shall be deemed an original.  In proving this Agreement it shall not be necessary to produce or account for more than one of the counterparts.

13.05        <u>Waivers</u>

No failure by a party to insist upon the strict performances of any provision of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such provision. No provision of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every provision of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

13.06        <u>Language</u>

The parties agree that this Agreement, and all agreements and documents contemplated herein or entered into in connection herewith or delivered pursuant hereto, shall be prepared in the English language. A Spanish language version of this Agreement, and all agreements and documents entered into in connection herewith or delivered pursuant hereto, may be prepared for the convenience of the parties; provided, however, that, in the event of any Dispute as to the construction, interpretation or application of any provision of this Agreement, or any agreement or document entered into in connection herewith or delivered pursuant hereto, the English-language version shall prevail and shall be used in the settlement of such Dispute.

13.07        <u>Enurement</u>

This Agreement, which is expressly intended to be integral to and binding upon title to the Hotel, shall enure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns and, in light of its fundamental relationship to the Hotel, shall survive any mortgage, hypothecation or other encumbrance of, or any sale, assignment, transfer or other disposition of, all or any part of the Interest of Owner to any Person.

13.08        <u>Recording</u>

Concurrently with the execution of this Agreement, the parties shall execute such documents as may be required by counsel to Four Seasons to confirm the intention of the parties that this Agreement be an integral part of title to the Hotel.  Such documents shall be in form and substance satisfactory to Four Seasons and, in that regard, shall be in the standard used by Four Seasons and its Affiliates.  At the option of Four Seasons, such documents may be recorded in such places as counsel to Four Seasons may recommend for the purpose of placing on record sufficient information to afford Four Seasons the protection of any statutes governing title to the Hotel.  At Owner's request and sole cost and expense, Four Seasons shall execute, acknowledge and record such confirmations of the termination of those documents following the termination of this Agreement as may be reasonably necessary to reflect such termination.

13.09        <u>Applicable Law</u>

This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

13.10        <u>Jurisdiction</u>

The parties irrevocably:

(a)        submit and consent to the non-exclusive jurisdiction of the courts of the Republic of Venezuela as regards any suit, action or other legal proceedings arising out of this Agreement;

(b)        waive, and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings, any claim that they are not personally subject to the jurisdiction of the courts of the Republic of Venezuela, that the suit,

action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in such courts; and

(c) agree not to seek, and hereby waive any review by any court which may be called upon to enforce the judgment of the courts referred to in section 13.10(a), of the merits of any such suit, action or proceeding in the event of failure of any party to defend or appear in any such suit, action or proceeding.

13.11 <u>Designation of Agent for Service of Process</u>

(a) Four Seasons irrevocably designates the General Manager at the Hotel as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceeding brought in the Republic of Venezuela, and Four Seasons agrees and consents that any such service of process as specified above shall be taken and be deemed to be valid personal service upon Four Seasons and that any such service of process shall be of the same force and validity as if service were made upon it according to the laws governing the validity and requirements of such service in the Republic of Venezuela, and Four Seasons waives all claims of error by reason of any such service. Notwithstanding the foregoing, Four Seasons may, by notice to Owner, change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Owner shall promptly mail a copy of such process to Four Seasons at its address set forth in section 13.12.

(b) Owner irrevocably designates Dra. Ysbell Kearns, at the address of Owner for Notice as set out in section 13.12 as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceedings brought in the Republic of Venezuela, and Owner agrees and consents that any such service of process as specified above shall be taken and deemed to be valid

personal service upon Owner and that any such service of process shall be of the same force and validity as if service were made upon them according to the laws governing the validity and requirement of such service in the Republic of Venezuela, and Owner waives all claims of error by reason of any such service. Notwithstanding the foregoing, Owner may, by notice to Four Seasons change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Four Seasons shall promptly mail a copy of such process to Owner at its address set forth in section 13.12.

**13.12       Notices**

Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices") required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

If to Four Seasons, to:        Four Seasons Hotels Limited
                               1165 Leslie Street
                               Don Mills, Ontario
                               Canada  M3C 2K8

                               Attn: General Counsel

                               Facsimile No.: (416) 441-4303

| | |
|---|---|
| With a copy to: | Goodman Phillips & Vineberg<br>250 Yonge Street<br>Suite 2400<br>Toronto, Ontario<br>Canada M5B 2M6<br><br>Attn: Randolph Weisz<br><br>Facsimile No.: (416) 979-1234 |
| If to Owner to: | Consorcio Barr, S.A.<br>Calle Veracruz, Edif. Torreon, Piso 2<br>Urb. Las Mercedes, Caracas, Venezuela<br><br>Attn: Ing. Lautaro Barrera B.<br><br>Facsimile No.: (+58-2) 924377 |
| With a copy to: | Dra. Ysbell Duran Kearns<br>c/o Consorcio Barr, S.A.<br>Calle Veracruz, Edif. Torreon, Piso 2<br>Urb. Las Mercedes, Caracas, Venezuela<br><br>Facsimile No.: (+58-2) 924377 |

All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt. Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 13.12.

13.13      <u>Payments</u>

(a)      Any and all payments by Owner under this Agreement in respect of the costs and
expenses reimbursable to Four Seasons pursuant to section 5.06 or for which it
may be responsible arising out of anything done within the scope of its
responsibilities under this Agreement shall be made free and clear of and without
deduction or withholding for any and all present or future Taxes unless such
Taxes are required by Applicable Law to be deducted or withheld.  If Owner
shall be required by Applicable Law to deduct or withhold any Taxes from or in
respect of any such payment, the payment shall be increased as may be necessary
so that after making all deductions or withholdings, including (without limitation)
deductions or withholdings applicable to any additional amounts paid under this
section 13.13, Four Seasons receives an amount equal to the payment it would
have received if no deduction or withholding had been made.  If a Tax credit is
received by Four Seasons for any Taxes deducted or withheld by Owner in
accordance with this section 13.13 and in respect of which additional amounts
have been paid by Owner under this section 13.13, then, to the extent that such
Tax credit has been received and utilized by Four Seasons, Four Seasons shall
pay to Owner an amount equal to such Tax credit; provided that such amount
shall not exceed the additional amounts paid by Owner to Four Seasons under this
section 13.13.

(b)      In the event that any Taxes are required by Applicable Law to be deducted or
withheld from or in respect of any payment by Owner under this Agreement, the
parties shall in good faith negotiate a method of restructuring the manner in which
such payment is to be made by Owner to Four Seasons under this Agreement with
a view to minimizing the Tax liability in connection with such payment; provided,
however, that the method of restructuring the manner in which such payment is
to be made does not prejudice the amount of the sums, charges and fees otherwise
payable to Four Seasons under this Agreement or of the costs and expenses

reimburseable to Four Seasons pursuant to section 5.06 and provided further that the method of restructuring the manner in which such payment is to be made shall not result in any damages, losses or any other costs whatsoever to Four Seasons or impact adversely on any rights, remedies or other benefits in favour of Four Seasons under this Agreement.

## 13.14      Time of Essence

Time shall be of the essence of each and every term and obligation of this Agreement.

## 13.15      Estoppel Certificates

Each party shall, upon at least 10 days' written notice, execute and deliver to any other party, and to any other Person having or about to have a *bona fide* interest in the Hotel as such other party may designate in writing, a statement certifying that this Agreement is unmodified and in full force and effect, or if not, stating the details of any modification and stating that as modified it is in full force and effect, the date to which payments have been paid and whether or not, to the knowledge of the certifying party, there is any existing default on the part of any other party.

## 13.16      Calculation Methodology

As the receipts and expenses of the Hotel will be earned and incurred in various currencies, the parties agree that any financial statements, calculations or payments required to be prepared, calculated or made hereunder in a currency other than Venezuelan Bolivars shall,

at the election of Four Seasons, be prepared, calculated or made using the calculation methodology set out in Schedule "C" attached to the Hotel Management Agreement.

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed, all as of the date first above written.

FOUR SEASONS HOTELS LIMITED

By: _____

By: _____

CONSORCIO BARR, S.A.

By: _____

By: _____

SCHEDULE "A"

DEFINITIONS

(a)     "Advance Corporate Advertising Charge" has the meaning set out in section 5.01(a)(ii)(A).

(b)     "Advance Corporate Sales and Marketing Charge" has the meaning set out in section 5.01(a)(i)(A).

(c)     "Canadian Dollars" or "C$" means the lawful currency of Canada.

(d)     "Canadian Dollar Exchange Rate" means, in respect of any business day, the rate of exchange for the conversion of Venezuelan Bolivars to United States Dollars as determined by using the official closing buying rate for United States Dollars as reported by the Central Bank of the Republic of Venezuela on such business day and then the rate of exchange for the conversion of United States Dollars to Canadian Dollars as determined by using the noon rate for Canadian Dollars as reported by the Central Bank of Canada on such business day.

(e)     "Centralized Purchasing Charge" has the meaning set out in section 5.04.

(f)     "Centralized Reservation Service Charge" has the meaning set out in section 5.02.

(g)     "Corporate Advertising Charge" has the meaning set out in section 5.01(a)(ii)(B).

(h)     "Corporate Sales and Marketing Charge" has the meaning set out in section 5.01(a)(i)(B).

- 2 -

(i)     "Dispute" has the meaning set out in section 10.02.

(j)     "Fair Market Value" has the meaning set out in section 1.03(e).

(k)     "Interest" means the respective right, title and interest of Owner and Four Seasons in and to the Hotel and the Hotel Agreements.

(l)     "Qualified Person" means a Person that (i) is not, and is not an Affiliate of, a competitor of Four Seasons or any of its Affiliates, (ii) has adequate financial capacity to perform the obligations of Owner under the Hotel Agreements, (iii) has an acceptable credit rating, (iv) is not of ill repute, and (v) is not in any other manner a Person with whom or with which a prudent business person would not wish to associate in a commercial venture.

(m)     "Service Charge Deficieney" has the meaning set out in section 5.03.

(n)     "Refurbishing Fee" has the meaning set out in section 5.05.

(o)     "Service Charge Excess" has the meaning set out in section 5.03.

(p)     "Term" means the initial term provided for in section 4.01 and any subsequent extension term provided for in section 4.02.

SCHEDULE "B"

## LIST OF OPERATING EQUIPMENT AND SUPPLIES
## AND FURNITURE, FIXTURES AND EQUIPMENT

1.  <u>General Supplies</u> *(for new projects and operating hotels)*

| | |
|---|---|
| After-sun Cooling Gel | Sewing Kits |
| Amenity Baskets | Shampoo |
| Amenity Tray | Sheets |
| Ashtrays | Shoe Horns |
| Bathrobes (5 types) | Shoeshine Bags |
| Bath Mats | Shoe Mitts |
| Bath Rugs | Shower Caps |
| Bath Gel | Snack Tray |
| Bath Soap | Soap Dishes |
| Blankets | Soap (2 types) |
| Bottle Openers | Swim Suit Bags |
| Bedspread Storage Bags | Swim Wear |
| Business Cards | Towels |
| Cocktail Coasters | Umbrellas |
| Cocktail Napkins | Valet Bags |
| Clothes Brushes | Wastebaskets |
| Cotton Ball/Q-Tip Containers | |
| Decals | |
| Dental Care Kits | |
| Door Knob Cards | |
| Duvets | |
| Executive Stationery/Envelopes | |
| Facial Soap | |
| Facial Tissue Box Covers | |
| Gift Bags & Labels | |
| Guest Comment Cards | |
| Guest Ballpoint Pens/Pencils | |
| Guest Stationery/Envelopes | |
| Hair Conditioner | |
| Hair Dryers | |
| Hangers (3 types) | |
| Health Club Amenity Product Labels | |
| Ice Buckets/Trays/Tongs | |
| Laundry Bags | |
| Matches | |
| Memo Pads | |
| Mattress Pads | |
| Name Badges | |
| Pillows | |
| Pillow Cases | |
| Rollaway Bedspreads | |

2.   Kitchen & Bar Supplies *(for new projects only)*

3.   Food & Beverage Accessories *(for new projects only)*

   (a)   All forms for new projects.
   (b)   Restricted to the following categories for operating hotels:

   Chinaware
   Flatware
   Holloware
   Glassware
   Table Linens

4.   Printing & Stationery Supplies

   (a)   All forms required for new projects.

   (b)   Restricted primarily to proprietary items for operating hotels which are produced in large volumes for all hotels (e.g., memo pads, business cards, executive stationery, guest stationery, guest account folios, guest message forms, accounting statements, reservation forms).

SCHEDULE "C"

# FORM OF ASSUMPTION AGREEMENT

**THIS AGREEMENT** made as of ●, ●.

TO:          **FOUR SEASONS HOTELS LIMITED**

WHEREAS ● ("Owner") a ● under the laws of ● and Four Seasons Hotels Limited ("Four Seasons"), a corporation incorporated under the laws of the Province of Ontario, Canada entered into a hotel services agreement dated ●, 1996 (the "Hotel Services Agreement");

AND WHEREAS pursuant to the terms and conditions of that certain purchase agreement, dated ● (the "Purchase Agreement"), Owner has agreed to sell, assign and otherwise transfer all of its right, title and interest in and to the Hotel (as hereinafter defined) to the undersigned, ●, a ● under the laws of ●, with effect as and from the date hereof;

AND WHEREAS the undersigned has agreed to enter into this agreement in order to assume, perform and discharge all duties, obligations, covenants and agreements of Owner in accordance with the terms and conditions of the Hotel Services Agreement and to agree to be bound by the terms of the Hotel Services Agreement, from and after the date hereof, in all respects as if the undersigned were a signatory thereto;

NOW THEREFORE in consideration of the mutual covenants and agreements herein contained and the mutual covenants and agreements contained in the Hotel Services Agreement, the undersigned hereby agrees as follows:

1.          **Definitions**. All capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to them in the Hotel Services Agreement.

2.          **Assumption of Obligations**. The undersigned hereby undertakes and agrees to assume, perform and discharge all duties, obligations, covenants and agreements of Owner in accordance with the terms and conditions contained in the Hotel Services Agreement and to be

bound by the terms of the Hotel Services Agreement in all respects as if the undersigned were a signatory thereto.

3.        <u>Successors and Assigns</u>.  The terms of this Agreement shall enure to the benefit of Four Seasons and its successors and permitted assigns under the Hotel Services Agreement.

4.        <u>Governing Law</u>.  This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflicts of law rules applicable therein.

        IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the ● day of ●.

                                    [●]

                                    By: _____
                                            Name:
                                            Title:

SCHEDULE "D"

## FORM OF SUBORDINATION AND NON-DISTURBANCE AGREEMENT

THIS AGREEMENT is made and entered into as of the ●, by and between ● ("Mortgagee"), a ● under the laws of ●, and **FOUR SEASONS HOTELS LIMITED**, a corporation incorporated under the laws of the Province of Ontario, Canada ("Four Seasons").

## RECITALS

A.         Four Seasons has entered into a hotel services agreement dated ● (as amended, modified or supplemented from time to time, the "Hotel Services Agreement") with ● ("Owner"), pursuant to which Four Seasons has agreed to operate and manage a hotel and related facilities located in the City of Caracas, Venezuela, commonly known as the "Four Seasons Hotel, Caracas", and more particularly described on Exhibit A to this Agreement (the "Hotel").

B.         Mortgagee is the holder of that certain **[Mortgage]** (the "Mortgage"), dated as of ●, executed by Owner in favour of Mortgagee and encumbering the Hotel and the related property more particularly described therein to secure the obligations of Owner under that certain **[Loan Agreement]**, dated as of ●, between Owner and Mortgagee.

C.         Mortgagee and Four Seasons desire to set forth certain agreements made between them pertaining to their respective rights as mortgagee and operator, respectively, of the Hotel.

## AGREEMENT

NOW THEREFORE in consideration of the covenants and agreements set forth in this Agreement, the parties hereto agree as follows:

1.         General Subordination. Subject to the provisions of section 2 of this Agreement, the Hotel Services Agreement and all rights and benefits of Four Seasons thereunder are and shall at all times continue to be subordinate in all respects to:

(a)     the rights and benefits of Mortgagee under the Mortgage;

(b)     any and all advances made on the security of the Mortgage; and

(c)     any and all increases, renewals, modifications, consolidations, replacements and extensions of the Mortgage. This section shall be self-operative and no further instruments or certificates shall be required to effect the subordination contemplated by this section. Four Seasons shall, however, upon demand at any time or times, execute, acknowledge and deliver to Mortgagee any and all instruments and certificates that Mortgagee may reasonably request as necessary to confirm or evidence the subordination contemplated by this section. The subordination contemplated by this section does not constitute any waiver of, or modification or change to, the provisions of the Hotel Services Agreement.

2.       Non-Disturbance.   So long as the Hotel Services Agreement has not been terminated pursuant to the terms thereof:

(a)     in the event of the exercise by Mortgagee of any rights or remedies it may have by virtue of the Mortgage or otherwise, Mortgagee agrees (i) not to disturb the right of Four Seasons to operate and manage the Hotel in accordance with the Hotel Services Agreement or affect any other right of Four Seasons thereunder, and (ii) to observe and perform all the terms, conditions and obligations of Owner under the Hotel Services Agreement for any period during which it, or any Person (as defined in the Hotel Services Agreement) acting on its behalf, is in actual physical possession of the Hotel. Provided that (iii) Mortgagee shall not be bound by any modification or change to the provisions of the Hotel Services Agreement to which Mortgagee has not consented to in writing; and

(b)     in the event of a foreclosure of the Mortgage, or of a conveyance in lieu of foreclosure (i) no proceeding to foreclose the Mortgage, and no conveyance in lieu of foreclosure, will disturb the right of Four Seasons to operate and manage the Hotel in accordance with the terms of the Hotel Services Agreement or affect

any other right of Four Seasons thereunder, and (ii) the Hotel Services Agreement shall continue in full force and effect and Mortgagee, its successors and assigns, or any third party (each a "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein on foreclosure of the Mortgage, or by deed in lieu of foreclosure, shall be a Qualified Person (as defined in the Hotel Services Agreement) and shall, together with an Affiliate (as defined in the Hotel Services Agreement) of such Foreclosure Purchaser, if such Foreclosure Purchaser is a single purpose entity or an entity without significant assets and such Foreclosure Purchaser has an Affiliate who has, or is more likely to have, the ability to perform the obligations of Owner under the Hotel Services Agreement than such Foreclosure Purchaser, first enter into an agreement with Four Seasons, in form and substance reasonably satisfactory to Four Seasons, agreeing to recognize the rights and benefits of Four Seasons, and observe and perform the obligations of Owner, under the Hotel Services Agreement for the balance of the term of the Hotel Services Agreement, including any extensions and renewals thereof, upon the same terms, covenants and conditions as therein provided and with the same force and effect as if the Hotel Services Agreement had been originally made directly between Four Seasons, as "Four Seasons" under the Hotel Services Agreement, and Foreclosure Purchaser, as "Owner" under the Hotel Services Agreement. Provided that (iii) subject to the provisions of section 4 of this Agreement, Foreclosure Purchaser shall not be liable to Four Seasons for any act, omission, amount owing or default under the Hotel Services Agreement by Owner for any period occurring prior to Foreclosure Purchaser acquiring the Hotel or any interest or right therein on foreclosure of the mortgage, or by deed in lieu of foreclosure, and (iv) Foreclosure Purchaser shall not be bound by any modification or change to the provisions of the Hotel Services Agreement to which Mortgagee has not consented in writing.

3.      Attornment. Subject to the provisions of section 2 of this Agreement and so long as Four Seasons is not then entitled to terminate the Hotel Services Agreement pursuant to the terms thereof, in the event that the interest of Owner in the Hotel is transferred to a Foreclosure Purchaser by reason of a foreclosure of the Mortgage, or by reason of a conveyance in lieu of

foreclosure, Four Seasons agrees to be bound by the terms, covenants and conditions contained in the Hotel Services Agreement for the balance of the term of the Hotel Services Agreement, including any extensions and renewals thereof, upon the same terms, covenants and conditions as therein provided and with the same force and effect as if the Hotel Services Agreement had been originally made directly between Four Seasons, as "Four Seasons" under the Hotel Services Agreement, and Foreclosure Purchaser, as "Owner" under the Hotel Services Agreement.

4.        Cure of Hotel Services Agreement Defaults.   Four Seasons shall provide Mortgagee with copies of any notice of default under the Hotel Services Agreement delivered to Owner, concurrently with delivery of such notice to Owner, and shall grant Mortgagee the following cure periods (each a "Hotel Services Agreement Cure Period") to cure such default on behalf of Owner:

(a)     in the case of an event of default contemplated by section 9.01(a) of the Hotel Services Agreement, 30 days after the applicable grace period has expired;

(b)     in the case of an event of default contemplated by sections 9.01(b), (c) or (d) of the Hotel Services Agreement, the time reasonably required by Mortgagee to foreclose or take possession so long as Mortgagee, unless prevented by Applicable Law, commences and continues to foreclose or take possession with all due diligence, and otherwise satisfactorily cures all defaults that can be cured; and

(c)     in the case of an event of default contemplated by section 9.01(e) of the Hotel Services Agreement, 60 days after the applicable grace period has expired or, if the default is not susceptible of being cured within the 60 day period and Mortgagee advises Four Seasons in writing of the period which it is estimated will be required to cure the default and with all due diligence takes and continues action to cure and cures the default within the period so advised; provided, however, that if it is necessary for Mortgagee to foreclose the Mortgage or to take possession of the Hotel in order to cure such default, the Hotel Services Agreement Cure Period shall be extended to include the time reasonably required

by Mortgagee to foreclose or take possession so long as Mortgagee commences and continues to foreclose or take possession with all due diligence and otherwise satisfactorily cures all defaults that do not so require possession of the Hotel by Mortgagee.

During a Hotel Services Agreement Cure Period, Mortgagee shall have the right, but not the obligation, to cure the applicable default on behalf of Owner under the Hotel Services Agreement if such default is capable of being cured. Notwithstanding this section 4 or any other provision to the contrary, if, in the reasonable business judgment of Four Seasons, the default by Owner materially and adversely affects the reputation of Four Seasons in the hotel industry or places Four Seasons materially at risk of civil or criminal liability, Four Seasons shall have the right, at any time prior to completion of foreclosure or the taking of possession by Mortgagee, to elect by written notice to Mortgagee to terminate the Hotel Services Agreement in accordance with the terms of the Hotel Services Agreement.

5.        Cure of Mortgage Defaults. Mortgagee shall provide Four Seasons with copies of any notice of default under the Mortgage delivered to Owner, concurrently with delivery of such notice to Owner, and shall grant Four Seasons 10 days after the applicable grace period has expired (a "Mortgage Cure Period") to cure such default on behalf of Owner. During a Mortgage Cure Period, Four Seasons shall have the right, but not the obligation, to cure the applicable default on behalf of Owner under the Mortgage.

6.        No Prohibited Transfers. Mortgagee acknowledges and agrees that any acquisition of the Hotel by Mortgagee, its successors and assigns, or by any third party, whether by foreclosure of the Mortgage or by deed in lieu of foreclosure or otherwise, shall be deemed to be a transfer within the meaning, and subject to the terms and conditions, of sections 8.01 and 8.03 of the Hotel Services Agreement. Mortgagee also acknowledges and agrees that any sale, transfer, assignment or other disposition of the Mortgage by Mortgagee or its successors and assigns shall be deemed to be a mortgage within the meaning, and subject to the terms and conditions, of sections 8.02 and 8.03 of the Hotel Services Agreement.

7.　　　　Four Seasons's Confirmation. If and to the extent the Hotel Services Agreement entitles Four Seasons to notice of any mortgage granted by Owner, this Agreement shall constitute such notice to Four Seasons with respect to the Mortgage.　Four Seasons acknowledges and agrees that this Agreement satisfies and fulfils the provisions of section 8.02 of the Hotel Services Agreement with respect to the Mortgage.

8.　　　　Notices. Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices") required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by telex, facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

　　　　If to Mortgagee, to:

　　　　　　●

　　　　with a copy to:

　　　　　　●

　　　　If to Four Seasons, to:

　　　　　　Four Seasons Hotels Limited
　　　　　　1165 Leslie Street
　　　　　　Toronto, Ontario
　　　　　　Canada   M3C 2K8

　　　　　　Attn: General Counsel

　　　　　　Facsimile No.: (416) 441-4303

with a copy to:

Goodman Phillips & Vineberg
Barristers & Solicitors
250 Yonge Street
Box 24, Suite 2400
Toronto, Ontario
M5B 2M6

Attention: Randolph Weisz

Facsimile No.: (416) 979-1234

All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by telex or facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt. Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 8.

9.          No Modification.   No modification, amendment, waiver, or release of any provision of this Agreement or any right, obligation, claim, or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

10.          Successors.   This Agreement shall enure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns; provided, however, that the rights of Mortgagee and its successors and assigns to sell, transfer or otherwise dispose of this Agreement shall be subject to section 8.01 of the Hotel Services Agreement and the rights of Four Seasons and its successors and assigns to sell, transfer or otherwise dispose of this Agreement shall be subject to section 8.04 of the Hotel Services Agreement.

11.          Applicable Law.   This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

12.        Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

13.        Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which counterpart shall be deemed an original.  In proving this Agreement it shall not be necessary to produce or account for more than one of the original counterparts executed by each of the parties hereto.

14.        Time of the Essence.  Time shall be of the essence of each and every term and obligation of this Agreement.

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

        MORTGAGEE:            ●

                By:    _____
                       ●

        FOUR SEASONS:        FOUR SEASONS HOTELS LIMITED

                By:    _____
                       ●

# EXHIBIT "D"

# HOTEL PRE-OPENING SERVICES AGREEMENT

Between

## FOUR SEASONS HOTELS LIMITED

And

## CONSORCIO BARR, S.A.

## FOUR SEASONS HOTEL, CARACAS

TABLE OF CONTENTS

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
    1.01      Definitions . . . . . . . . . . . . . . . . . . . . . . . .   4
    1.02      Recitals . . . . . . . . . . . . . . . . . . . . . . . . . .   4
    1.03      Interpretation . . . . . . . . . . . . . . . . . . . . .   4
    1.04      Schedules . . . . . . . . . . . . . . . . . . . . . . . .   6

ARTICLE II - TERM AND TERMINATION PRIOR TO OPENING DATE . . . . . . . .   6
    2.01      Term . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
    2.02      Termination Prior to Opening Date . . . . . . . . . . . . . . . .   6

ARTICLE III - OWNER'S RESPONSIBILITY, RIGHTS OF APPROVAL AND
               STANDARD OF DESIGN BRIEFS . . . . . . . . . . . . . . . . .   7
    3.01      Owner's Responsibility . . . . . . . . . . . . . . . . . . . . . .   7
    3.02      Rights of Approval . . . . . . . . . . . . . . . . . . . . . . . .   8
    3.03      Standard of Hotel Design Brief . . . . . . . . . . . . . . . . . .   9

ARTICLE IV - PRE-OPENING PLAN AND BUDGET . . . . . . . . . . . . . . . . .   9
    4.01      Pre-Opening Plan and Budget . . . . . . . . . . . . . . . . . .   9

ARTICLE V - PROJECT ANALYSIS & SCHEMATIC DESIGN PHASE . . . . . . . . .  12
    5.01      Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
    5.02      Owner's Obligations . . . . . . . . . . . . . . . . . . . . . . .  12
    5.03      Four Seasons' Obligations . . . . . . . . . . . . . . . . . . . .  14
    5.04      Four Seasons' Personal Property Obligations . . . . . . . . . . .  15

ARTICLE VI - DESIGN DEVELOPMENT & WORKING DRAWINGS PHASE . . . . .  15
    6.01      Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
    6.02      Owner's Obligations . . . . . . . . . . . . . . . . . . . . . . .  16
    6.03      Four Seasons' Obligations . . . . . . . . . . . . . . . . . . . .  17
    6.04      Four Seasons' Personal Property Obligations . . . . . . . . . . .  18

ARTICLE VII - CONSTRUCTION PHASE . . . . . . . . . . . . . . . . . . . . . .  19
    7.01      Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    7.02      Owner's Obligations . . . . . . . . . . . . . . . . . . . . . . .  19
    7.03      Four Seasons' Obligations . . . . . . . . . . . . . . . . . . . .  20
    7.04      Four Seasons' Personal Property Obligations . . . . . . . . . . .  22

ARTICLE VIII - POST-OPENING DEFICIENCIES PHASE . . . . . . . . . . . . . . .  23
    8.01      Post-Opening Deficiency Phase . . . . . . . . . . . . . . . . . .  23
    8.02      Owner's Obligations . . . . . . . . . . . . . . . . . . . . . . .  23
    8.03      Four Seasons' Obligations . . . . . . . . . . . . . . . . . . . .  23

- iii -

ARTICLE XVII - APPROVALS, DISPUTE RESOLUTION AND ARBITRATION  . . . 38
    17.01       Approvals  . . . . . . . . . . . . . . . . . . . . . . . 38
    17.02       Dispute Resolution  . . . . . . . . . . . . . . . . . . 40
    17.03       Arbitration  . . . . . . . . . . . . . . . . . . . . . . 41

ARTICLE XVIII - FOUR SEASONS' LIABILITY . . . . . . . . . . . . . . . . . . . . . 42
    18.01       Standard of Care  . . . . . . . . . . . . . . . . . . . 42
    18.02       Indemnities  . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE XIX - ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . 44
    19.01       Owner's Acknowledgments . . . . . . . . . . . . . . . 44
    19.02       Four Seasons' Acknowledgments  . . . . . . . . . . . . 45

ARTICLE XX - GENERAL PROVISIONS  . . . . . . . . . . . . . . . . . . . . . 45
    20.01       Entire Agreement  . . . . . . . . . . . . . . . . . . . 45
    20.02       Modification and Changes  . . . . . . . . . . . . . . . 45
    20.03       Partial Invalidity  . . . . . . . . . . . . . . . . . . 45
    20.04       Counterparts . . . . . . . . . . . . . . . . . . . . . . 46
    20.05       Waivers  . . . . . . . . . . . . . . . . . . . . . . . . 46
    20.06       Language . . . . . . . . . . . . . . . . . . . . . . . . 46
    20.07       Enurement  . . . . . . . . . . . . . . . . . . . . . . . 47
    20.08       Recording  . . . . . . . . . . . . . . . . . . . . . . . 47
    20.09       Applicable Law . . . . . . . . . . . . . . . . . . . . . 48
    20.10       Jurisdiction  . . . . . . . . . . . . . . . . . . . . . 48
    20.11       Designation of Agent for Service of Process  . . . . . . . . . . . 48
    20.12       Notices  . . . . . . . . . . . . . . . . . . . . . . . . 49
    20.13       Payments . . . . . . . . . . . . . . . . . . . . . . . . 51
    20.14       Time of Essence  . . . . . . . . . . . . . . . . . . . . 52
    20.15       Estoppel Certificates . . . . . . . . . . . . . . . . . 52
    20.16       Pre-Opening Purchasing Services  . . . . . . . . . . . . 53

SCHEDULE "A" -  DEFINITIONS

SCHEDULE "B" -  HOTEL DESIGN BRIEF

SCHEDULE "C" -  SELECTED     CONSULTANTS     AND     SPECIALIZED
                   SUBCONTRACTORS

SCHEDULE "D" -  FORM OF ASSUMPTION AGREEMENT

SCHEDULE "E" -  SUBORDINATION AND NON-DISTURBANCE AGREEMENT

ARTICLE IX - DESIGNATED MANAGERS AND CO-ORDINATORS . . . . . . . . . . 24
    9.01     Owner's Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . 24
    9.02     Four Seasons' Responsibilities . . . . . . . . . . . . . . . . . . . . . . . 24
    9.03     General Co-ordination . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE X - EFICIENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   10.01   Deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE XI - REMUNERATION AND REIMBURSEMENT OF FOUR SEASONS . . 26
   11.01   Consulting Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   11.02   Reimbursement of Costs . . . . . . . . . . . . . . . . . . . . . . . . . 27
   11.03   Fund for Pre-Opening Costs and Expenses . . . . . . . . . . . . . . . 27
   11.04   Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XII - DAMAGE TO AND DESTRUCTION OF THE HOTEL . . . . . . . . 28
   12.01   Four Seasons' Entitlement to Fees and Charges During a Delay
               Resulting From Damage or Destruction . . . . . . . . . . . . . . . . . 28
   12.02   Four Seasons' Reinstatement . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XIII - EXPROPRIATION . . . . . . . . . . . . . . . . . . . . . . . . . 29
   13.01   Four Seasons' Entitlement to Fees and Charges During a Temporary
               Expropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE XIV - INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
   14.01   Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE XV - ASSIGNMENTS AND MORTGAGES . . . . . . . . . . . . . . . . 30
   15.01   Owner's Right to Assign . . . . . . . . . . . . . . . . . . . . . . . . . 30
   15.02   Owner's Right to Mortgage . . . . . . . . . . . . . . . . . . . . . . . 30
   15.03   Limitation on Owner's Right to Assign and Mortgage . . . . . . . . . 31
   15.04   Four Seasons' Right to Assign . . . . . . . . . . . . . . . . . . . . . . 32
   15.05   Four Seasons' Right to Mortgage . . . . . . . . . . . . . . . . . . . . 32
   15.06   Limitation on Four Seasons' Right to Assign . . . . . . . . . . . . . . 33

ARTICLE XVI - EVENTS OF DEFAULT AND TERMINATION . . . . . . . . . . . 33
   16.01   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   16.02   Rights of Non-Defaulting Party . . . . . . . . . . . . . . . . . . . . . 34
   16.03   Remedying Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   16.04   Bona Fide Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   16.05   Four Seasons' Right to Terminate . . . . . . . . . . . . . . . . . . . . 36
   16.06   Cross-Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   16.07   Accounting on Termination . . . . . . . . . . . . . . . . . . . . . . . 37
   16.08   Claims on Termination . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## HOTEL PRE-OPENING SERVICES AGREEMENT

**THIS AGREEMENT** is made as of the 2ND day of February, 1996.

**B E T W E E N:**

> **FOUR SEASONS HOTELS LIMITED,** a corporation incorporated under the laws of the Province of Ontario, Canada, having its principal offices at 1165 Leslie Street, Don Mills, Ontario, Canada, M3C 2K8,
>
> ("Four Seasons"),
>
> - and -
>
> **CONSORCIO BARR, S.A.,** a corporation domiciled in the City of Caracas, Republic of Venezuela, duly inscribed in the Second Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on December 18, 1990, under No. 27, Volume 113-A Second, having its principal offices at Calle Veracruz, Edif. Torreon, Piso 2, Urb. Las Mercedes, Caracas, Venezuela,
>
> ("Owner").

### RECITALS

A.   Owner is the legal and beneficial owner of the Land (as defined below) situated in the City of Caracas, Venezuela.

B.   Owner is in the process of developing upon the Land the Project (as defined below) consisting of: (i) a World Class Luxury Hotel (as defined below) containing approximately 212 guest rooms, together with restaurants, bars, banquet, meeting and other public rooms, a fitness club and other facilities to be developed, constructed, furnished and equipped in accordance with the designs and specifications approved by Four Seasons for the Hotel (as defined below) and the Hotel Design Brief (as defined

below), (ii) a residential component consisting of approximately 116 residential luxury apartment units and other related facilities, (iii) a commercial component consisting of up to 3,000 square metres of general office space, (iv) an exclusive retail component consisting of approximately six retail units for lease by retail tenants, and (v) two independent commercial components consisting of up to 1,300 square metres of general commercial space.

C.      Four Seasons, together with its Affiliates (as defined below), has expertise in the various phases of the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of World Class Luxury Hotels and other related facilities.

D.      Owner intends that the Hotel become one of the leading hotels in the City of Caracas and, at the same time, be operated and managed in an efficient manner and, in that regard, Four Seasons and its Affiliates have offered to provide to Owner certain services in connection with the development, construction, furnishing, equipping, servicing, marketing, operation, management, supervision and direction of the Hotel as a World Class Luxury Hotel and with a view to maximizing benefits for both Owner and Four Seasons and its Affiliates.   Owner, after a lengthy selection process, has decided to engage Four Seasons and its Affiliates to provide such services.

E.      Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Advisory Agreement") with Four Seasons Hotels and Resorts B.V. ("Advisor"), pursuant to which Advisor (for certain fees) has agreed to provide to Owner certain services with respect to the supervision and direction of the Hotel.

F.      Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Management Agreement") with Four Seasons Caracas, C.A. ("Operator"), pursuant to which Operator (for certain fees) has agreed to provide to Owner certain services with respect to the operation and management of the Hotel.

# HOTEL PRE-OPENING SERVICES AGREEMENT

**THIS AGREEMENT** is made as of the 2ND day of February, 1996.

**B E T W E E N:**

> **FOUR SEASONS HOTELS LIMITED**, a corporation incorporated under the laws of the Province of Ontario, Canada, having its principal offices at 1165 Leslie Street, Don Mills, Ontario, Canada, M3C 2K8,
>
> ("Four Seasons"),
>
> - and -
>
> **CONSORCIO BARR, S.A.**, a corporation domiciled in the City of Caracas, Republic of Venezuela, duly inscribed in the Second Commercial Registry of the Judicial Circuit of Federal District and State of Miranda on December 18, 1990, under No. 27, Volume 113-A Second, having its principal offices at Calle Veracruz, Edif. Torreon, Piso 2, Urb. Las Mercedes, Caracas, Venezuela,
>
> ("Owner").

## RECITALS

A.   Owner is the legal and beneficial owner of the Land (as defined below) situated in the City of Caracas, Venezuela.

B.   Owner is in the process of developing upon the Land the Project (as defined below) consisting of: (i) a World Class Luxury Hotel (as defined below) containing approximately 212 guest rooms, together with restaurants, bars, banquet, meeting and other public rooms, a fitness club and other facilities to be developed, constructed, furnished and equipped in accordance with the designs and specifications approved by Four Seasons for the Hotel (as defined below) and the Hotel Design Brief (as defined

- 4 -

## ARTICLE I
## DEFINITIONS

**1.01**        Definitions

All capitalized terms herein shall, unless otherwise indicated, have the meaning set forth in the Hotel Advisory Agreement.  In this Agreement, the terms in Schedule "A" attached hereto shall have the respective meanings indicated therein.

**1.02**        Recitals

Four Seasons and Owner each represent and warrant to the other that the Recitals to this Agreement, insofar as they relate to it, are true and correct.

**1.03**        Interpretation

In this Agreement, save and except as otherwise expressly provided:

    **(a)**        all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun;

    **(b)**        the division of this Agreement into Articles and sections and the use of headings is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions;

    **(c)**        when calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date which is the reference day in calculating such period shall be excluded.  If the last day of such

G.      Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel Services Agreement") with Four Seasons, pursuant to which Four Seasons (for certain fees) has agreed to provide to Owner certain services with respect to the ongoing purchasing services, the refurbishing and the marketing of the Hotel.

H.      Contemporaneously with the execution of this Agreement, Owner has entered into an agreement (the "Hotel License Agreement") with Four Seasons Hotels and Resorts B.V. ("Licensor"), pursuant to which Licensor (for certain fees and other consideration) has agreed to provide to Owner the right and licence to use the Trademarks (as defined below) and utilize the Proprietary Materials (as defined below) for the marketing, operation and management of the Hotel and the marketing of the Residential Apartments (as defined below) for sale by Owner.

I.      Owner also wishes to obtain the benefit of Four Seasons' expertise in providing services in connection with the development and construction of World Class Luxury Hotels and certain other services with respect to the pre-opening of the Hotel, and Four Seasons (for certain fees) has agreed to provide such services to Owner with respect to the Hotel, upon and subject to the terms and conditions set forth in this Agreement.


**AGREEMENT**


        **NOW THEREFORE** in consideration of the covenants and agreements set forth in this Agreement, the parties agree that:

period is not a business day, the period in question shall end on the next business day;

(d)   all monetary amounts are expressed in United Stated Dollars.  All payments of sums, charges, fees, costs, expenses and other amounts contemplated by this Agreement shall be paid in United States Dollars.  If, pursuant to the judgment or order of any court or otherwise, any amount due or payable hereunder in United States Dollars (the "Original Currency") is paid in any other currency (the "Second Currency"), such payment in the Second Currency shall discharge or satisfy the obligation of the party making such payment to pay such amount in the Original Currency only to the extent that the amount of such payment is, when converted on the date of such payment to the Original Currency based on the United States Dollar Exchange Rate, equivalent to the amount of such payment if such payment had been made in the Original Currency.  The party making such payment shall, as a separate and independent obligation, which shall not be merged in any such judgment or order or extinguished by any such payment in the Second Currency, pay or cause to be paid such obligation in respect of the Original Currency not so discharged and satisfied in accordance with the foregoing and indemnify the party receiving such payment and hold the party receiving such payment harmless from and against any losses, costs, damages or expenses which the party receiving such payment may sustain or incur as a result of any such amount being paid in the Second Currency;

(e)   all references to Article and section numbers refer to Articles and sections of this Agreement, and all references to Schedules refer to the Schedules attached hereto; and

(f)   the words "herein," "hereof," "hereunder," "hereinafter", "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or section hereof.

- 6 -

1.04        Schedules

The following schedules are attached hereto and are incorporated in and are deemed to be an integral part of this Agreement:

| Schedule "A" | - | Definitions |
|---|---|---|
| Schedule "B" | - | Hotel Design Brief |
| Schedule "C" | - | Selected Consultants and Specialized Subcontractors |
| Schedule "D" | - | Form of Assumption Agreement |
| Schedule "E" | - | Form of Subordination and Non-Disturbance Agreement |

## ARTICLE II

## TERM AND TERMINATION PRIOR TO OPENING DATE

2.01        Term

The term of this Agreement shall commence on the date hereof and shall expire four (4) months after the Opening Date.  *Is there an opening date*

2.02        Termination Prior to Opening Date

If the other Hotel Agreements are terminated in accordance with their terms prior to the Opening Date, then this Agreement shall terminate on the date of such termination and Owner and Four Seasons shall have no future obligations arising out of this Agreement, save and except as otherwise expressly provided for in this Agreement.  Notwithstanding the foregoing, if this Agreement is terminated in accordance with its terms (other than as a result of the failure by Four Seasons to perform its obligations under this Agreement or by any Affiliates of Four Seasons to perform their respective obligations under any of the other Hotel Agreements) and within five years from the date of the termination Owner or a Related Person commences or

intends to commence the development or construction or takes or intends to take any action in furtherance of the development or construction of a luxury hotel on the Land, then Owner shall promptly notify Four Seasons in writing of such action (which notice shall set forth in reasonable detail the character of the contemplated hotel development or construction). In addition, upon receipt by Owner of a written offer from any Person for the provision of any of the services contemplated by this Agreement in respect of such proposed hotel (which offer Owner is willing to accept), Owner shall promptly submit a copy of such offer to Four Seasons. Four Seasons shall have a period of three months after receipt of a copy of such offer to notify Owner whether it is willing to provide the services contemplated in such offer on the terms and conditions set forth therein. If Four Seasons notifies Owner of its unwillingness to provide such services on the terms and conditions set forth in the offer or fails to notify Owner of its intention within such three month period, Owner shall be entitled to accept such offer on the terms and conditions set forth therein.

**ARTICLE III**

**OWNER'S RESPONSIBILITY, RIGHTS OF
APPROVAL AND STANDARD OF DESIGN BRIEFS**

**3.01     Owner's Responsibility**

(a)     Owner shall cause the Hotel (i) to continue to be developed and constructed, and (ii) to be furnished and equipped, in each case as a world class luxury hotel comparable to the hotels and resorts operated and managed by Four Seasons or any Affiliate thereof under the name "Four Seasons" in North America in accordance with the designs and specifications approved by Four Seasons for the Hotel, the Hotel Design Brief and this Agreement, and shall fulfil all of its obligations under this Agreement.

(b)     Owner shall source, purchase and install all items of Personal Property acquired for the Hotel at the lowest possible cost which it can obtain for the Hotel taking into account all discounts, rebates and credits available and having regard to the specifications, including, without limitation, quality and availability, of such Personal Property and that the Hotel be

developed, constructed, furnished and equipped as a world class luxury hotel compatible to the hotels and resorts operated and managed by Four Seasons or any Affiliate thereof under the name "Four Seasons" in North America in accordance with the Hotel Design Brief and this Agreement.

3.02        **Rights of Approval**

The following matters, which are to be determined and revised from time to time, are subject to the approval of both Owner and Four Seasons, as provided herein:

(a)        the Schematic Design Drawings and the Design Development & Working Drawings and Specifications;

(b)        the operating pro forma and supporting rationale for the Hotel;

(c)        the Personal Property Budget;

(d)        the Project Budget and the Pre-Opening Plan and Budget; and

(e)        the insurance program for the Hotel prior to the Opening Date.

In addition, Owner shall select the Consultants and specialized subcontractors identified on Schedule "C" attached hereto, all in consultation with Four Seasons. Four Seasons hereby acknowledges that Owner has already selected and entered into binding arrangements with many of the Consultants. Notwithstanding the foregoing, if, in the opinion of Four Seasons, the services performed by any such Consultant shall prove to be inadequate or deficient or such Consultant shall demonstrate its inability to perform such services at a level to which Four Seasons is accustomed based in each case, on Four Seasons' experience with other Consultants performing like services, Owner shall have the obligation to rectify the matter in a manner acceptable to Four Seasons, including (without limitation) the replacement of such Consultant.

Four Seasons shall promptly give Owner notice of any such inadequate or deficient services, together with a reasonably detailed explanation as to what action should be taken by such Consultant to remedy such inadequate or deficient services.

### 3.03   Standard of Hotel Design Brief

Owner and Four Seasons acknowledge and agree that the Hotel Design Brief contemplates the furnishing and equipping of a world class luxury hotel comparable to the hotels and resorts operated and managed by Four Seasons or any Affiliate thereof under the name "Four Seasons" in North America.

### ARTICLE IV
### PRE-OPENING PLAN AND BUDGET

### 4.01   Pre-Opening Plan and Budget

(a)   Four Seasons shall prepare and submit to Owner at the time and in the manner set forth in this Agreement a pre-opening plan and budget (the "Proposed Pre-Opening Plan and Budget", which shall become the approved pre-opening plan and budget (the "Pre-Opening Plan and Budget") once the same has been approved or deemed to have been approved in accordance with this Agreement) which shall set forth in reasonable detail plans and expenses proposed to be incurred for:

FS duties:

(i)   the staffing of the Hotel prior to the Opening Date, including (without limitation) the training of the staff (together with an organizational chart of Hotel personnel required to staff the Hotel prior to the Opening Date), a schedule of anticipated dates for the commencement of full time service by such personnel, a schedule of the compensation to be paid to such

personnel (including, without limitation, the cost of any re-allocation assistance to be provided to such personnel) and any other information related to such personnel;

(ii)   the promotion of the Hotel prior to the Opening Date, including (without limitation) proposed corporate sales, marketing and advertising programs, printed material, travel and business entertainment programs;

(iii)   the organization of the Hotel's operations prior to the Opening Date and services, including (without limitation) those to be operated by tenants, subtenants, licensees or concessionaires; and

(iv)   the partial operation of the Hotel prior to the Opening Date for the purpose of staff training and operational and promotional development.

Four Seasons may submit the Proposed Pre-Opening Plan and Budget to Owner in portions from time to time as each portion is completed; provided that each portion thereof so submitted shall be cumulative in nature, and shall reflect any changes in portions thereof previously submitted until a complete and overall version of the Proposed Pre-Opening Plan and Budget has been submitted.

(b)   Upon approval by Owner of the Proposed Pre-Opening Plan and Budget or any portion thereof, Four Seasons shall carry out the activities contemplated in the Pre-Opening Plan and Budget or any portion thereof which has been approved. Owner shall be deemed to have approved the Proposed Pre-Opening Plan and Budget or any portion thereof if no objection is made by Owner within 10 days after receipt by Owner of Four Seasons' written request for Owner's approval of the Proposed Pre-Opening Plan and Budget or such portion thereof, which request shall not be submitted until at least 25 days after receipt by Owner of the Pre-Opening Plan and Budget or such portion thereof. Four Seasons may, from time

- 11 -

to time, submit revisions to the Pre-Opening Plan and Budget to Owner for Owner's review and approval (which approval shall be deemed to have been given if no objection is made by Owner within 15 days after receipt by Owner of the revision) and any revisions so approved for all purposes shall constitute part of the Pre-Opening Plan and Budget.

(c)     The Opening Date shall occur on the date determined in accordance with section 4.01 of the Hotel Advisory Agreement.  If Four Seasons determines that the Opening Date may be other than the Scheduled Opening Date contemplated in the Pre-Opening Plan and Budget, Four Seasons shall submit to Owner for its approval a revision of the Pre-Opening Plan and Budget which shall reflect any additional expense or saving, as the case may be, attributable to such rescheduled Scheduled Opening Date.

(d)     In accordance with the Pre-Opening Plan and Budget, Owner shall, subject to the approval by Four Seasons of the type and quality, negotiate leases, licenses and concession agreements for stores and shops constituting part of the Hotel which shall include, without limitation, a hair salon (other than the sundry shop which shall be operated and managed by Operator in accordance with the terms of the Hotel Management Agreement) and office space and lobby space at the Hotel all on a basis consistent with a World Class Luxury Hotel.

(e)     In accordance with the Pre-Opening Plan and Budget, Four Seasons, as agent and for the account of Owner, shall provide, as appropriate, personnel to, among other things:

    (i)     recruit, hire, train and direct an initial staff for the Hotel;

    (ii)    apply for, process and take all necessary steps to procure (in Four Seasons' name or Owner's name or both, as may be required by the

- 12 -

issuing authority) all licences and permits required for the operation of the Hotel and its related facilities, including (without limitation) liquor and restaurant licences; and

(iii)   do all other things necessary for the proper opening of the Hotel called for by the Pre-Opening Plan and Budget.

## ARTICLE V
## PROJECT ANALYSIS & SCHEMATIC DESIGN PHASE

**5.01      Term**

The Project Analysis & Schematic Design Phase (hereinafter referred to as either the "Project Analysis & Schematic Design Phase" or "Phase I") shall commence on the date of this Agreement and will end when Owner and Four Seasons have approved the Schematic Design Drawings.

**5.02      Owner's Obligations**

To the extent that Owner has not completed the following enumerated tasks prior to the commencement of Phase I, during such Phase, Owner shall, based upon the Hotel Design Brief:

(a)      prepare a preliminary version of the Project Budget, submit same to Four Seasons for review and revise and finalize same as and when required;

(b)      distribute the Hotel Design Brief to all Consultants involved in the design of the Hotel, and meet with Four Seasons and such Consultants to ensure that such

Consultants are provided with a thorough understanding of the requirements and scope of the Hotel;

(c)     establish a Hotel organization chart outlining, among other things, the identity of all Persons involved in the completion of the development and construction of the Hotel and their responsibilities;

(d)     establish a design schedule for the timely development of the design of the Hotel, and meet with Four Seasons and all Consultants involved in the design of the Hotel to ensure that same is met; .

(e)     during the development and construction of the Hotel, arrange and implement an accounting system for the Hotel and Hotel bank accounts, as well as invoice processing and payment procedures;

(f)     establish control procedures to effectively monitor and control all costs throughout the development and construction of the Hotel;

(g)     co-ordinate the development of the Schematic Design Drawings;

(h)     co-ordinate approvals from, and input of, Four Seasons as required throughout the course of Phase I;

(i)     obtain all necessary Building Permits; and

(j)     co-ordinate all local public relations activities.

- 14 -

5.03        Four Seasons' Obligations

To the extent that Four Seasons has not completed the following enumerated tasks prior to the commencement of Phase I, during such Phase, Four Seasons shall:

(a)     prepare, update, revise and review with Owner, as and when required, the following documents for the development of the Hotel:

    (i)     the Hotel Design Brief;

    (ii)    an operating pro forma and supporting rationale;

    (iii)   a design standards schedule;

    (iv)    an outline of the responsibilities of all specialist Consultants, such as those involved with the kitchens and laundry; and

    (v)     a preliminary version of the Proposed Pre-Opening Plan and Budget;

(b)     assist Owner with the preparation of a preliminary version of the Project Budget and revisions thereto as and when required;

(c)     assist Owner in the selection of Consultants, including (without limitation) assistance in defining the scope of services required;

(d)     meet with Owner and Consultants and review the Hotel Design Brief, the operating pro forma and supporting rationale, design standards schedule and the Project Budget, and review with Owner all of the responsibilities, sources of direction, budget control and reporting functions of specialist Consultants, such as those involved with the kitchens and laundry;

(e)     attend all meetings as required to assist in the development and finalization of the Schematic Design Drawings; and

(f)     review the proposed form of the Schematic Design Drawings with Owner for final approval, including (without limitation) all drawings, specifications, budgets and pro formas.

**5.04     Four Seasons' Personal Property Obligations**

In addition to the obligations required to be performed by Four Seasons during Phase I as outlined in section 5.03, to the extent that Four Seasons has not completed the following task prior to the commencement of Phase I, during such Phase, Four Seasons shall prepare a preliminary version of the Personal Property Budget based on the Hotel Design Brief, submit same to Owner for approval and revise and finalize same, at the request of Owner, as and when required.

**ARTICLE VI**

**DESIGN DEVELOPMENT & WORKING DRAWINGS PHASE** Phase II

**6.01     Term**

The Design Development & Working Drawings Phase (hereinafter referred to as either the "Design Development & Working Drawings Phase" or "Phase II") shall commence upon the completion of Phase I and shall end when Owner and Four Seasons have approved the Design Development & Working Drawings and Specifications.

6.02    <u>Owner's Obligations</u>

To the extent that Owner has not completed the following enumerated tasks prior to the commencement of Phase II, during such Phase, Owner shall, based upon the Hotel Design Brief:

(a)    interview and select the Consultants and specialist subcontractors identified on Schedule "C" attached hereto, all in consultation with Four Seasons;

(b)    interview and select such other Consultants and specialist subcontractors as are required for the Hotel;

(c)    co-ordinate the development of the Design Development & Working Drawings and Specifications;

(d)    revise the Project Budget;

(e)    co-ordinate approvals from, and input of, Four Seasons as required throughout the course of Phase II;

(f)    obtain all legal and tax advice necessary to ensure that the Hotel records, accounting systems and other systems are established and maintained in accordance with Applicable Law and in the most tax efficient manner;

(g)    direct the development of design and legal documentation for all retail and similar areas to be leased separately from the Hotel, and co-ordinate all pre-leasing activities in connection therewith; and

(h)    arrange all financing for the completion of the construction of the Hotel.

6.03        **Four Seasons' Obligations**

To the extent that Four Seasons has not completed the following enumerated tasks prior to the commencement of Phase II, during such Phase, Four Seasons shall, based upon the Hotel Design Brief:

(a)      in conjunction with Owner, issue all necessary direction to the Consultants for the development of the Design Development & Working Drawings and Specifications;

(b)      direct all specialist Consultants, such as those involved with the kitchens and laundry, in the preparation of their respective design documents;

(c)      direct the preparation of detailed layout drawings of all Hotel back of house areas, including (without limitation) office, maintenance and housekeeping areas;

(d)      direct the interior designers for the Hotel and the Project Architect in the preparation of detailed layouts for all public areas of the Hotel and review alternatives with Owner;

(e)      review and comment on all drawings and specifications submitted by the various specialist Consultants within the time constraints of the design program for the Hotel;

(f)      review all mechanical and electrical documents and specifications and provide assistance when required for Consultants to design the optimal energy management system for the energy efficiency of the Hotel;

(g)      comment to Owner and the general contractor for the Hotel on the suggested method of completion of the construction of the Hotel and the construction schedule therefor;

(h)     provide all necessary technical information for specialist systems for the Hotel, including (without limitation) computer systems to be incorporated in the Design Development & Working Drawings and Specifications;

(i)     assist Owner in the co-ordination of all Design Development & Working Drawings and Specifications to ensure same meet the hotel design standards and operating criteria of Four Seasons;

(j)     attend all meetings as required to assist in the development and finalization of the Design Development & Working Drawings and Specifications; and

(k)     review the proposed final form of Design Development & Working Drawings and Specifications with Owner for final approval, including (without limitation) all drawings, specifications, budgets and operating pro formas.

**6.04**     **Four Seasons' Personal Property Obligations**

In addition to the obligations required to be performed by Four Seasons during Phase II as outlined in section 6.03, to the extent that Four Seasons has not completed the following task prior to the commencement of Phase II, during such Phase, Four Seasons shall, at the request of Owner, revise the Personal Property Budget as required by any changes in the Hotel Design Brief.

- 19 -

## ARTICLE VII

### CONSTRUCTION PHASE   *Phase III.*

**7.01**      <u>Term</u>

The Construction Phase (hereinafter referred to as either the "Construction Phase" or "Phase III") shall commence upon the completion of Phase II and shall end on the Opening Date.

**7.02**      <u>Owner's Obligations</u>

To the extent that Owner has not completed the following enumerated tasks prior to the commencement of Phase III, during such Phase, Owner shall, based upon the Hotel Design Brief:

(a)   provide personnel and systems for the complete administration of the general contractor and the other Consultants during the completion of the construction period, including (without limitation) on-site representation;

(b)   monitor the general contractor to ensure compliance with the construction program and timetable, timely award of sub-contracts, quality of workmanship, on-site project organization and monthly payment obligations;

(c)   co-ordinate the distribution of shop drawings, samples and alternatives to Four Seasons and the Consultants for their approval;

(d)   arrange for the construction of model guestrooms and alter and adapt such model guestrooms as required and until approved by Owner and Four Seasons;

(e)    obtain a detailed construction schedule and co-ordinate the same with the timetable for the installation of Personal Property and the pre-opening hotel operations staff move-in program;

(f)    provide to Four Seasons detailed monthly reports, including (without limitation) detail concerning the costs and progress of, and problems experienced in, the construction of the Hotel;

(g)    arrange for the preparation of complete and detailed deficiency lists and ensure timely rectification of all deficiencies to the satisfaction and approval of Four Seasons;

(h)    obtain all Occupancy Permits;

(i)    obtain as-built drawings, maintenance manuals, air and water balance reports and spare stock and provide the same to Four Seasons;

(j)    obtain the insurance coverage in accordance with Article XIV; and

(k)    arrange all financing for the opening of the Hotel, including (without limitation) permanent financing and operational and working capital financing in accordance with the Hotel Agreements.

**7.03**    **Four Seasons' Obligations**

To the extent that Four Seasons has not completed the following enumerated tasks prior to the commencement of Phase III, during such Phase, Four Seasons shall, based upon the Hotel Design Brief:

(a)     meet with Owner and the Consultants to assist in the preparation and finalization of all construction documents for the Hotel;

(b)     review all construction documents to ensure same meet the hotel design standards and operating criteria of Four Seasons;

(c)     assist in the co-ordination of the construction of model guestrooms of the Hotel to resolve construction details, quality and alterations and carry out a final inspection of such models prior to installation of loose furnishings;

(d)     review all shop drawings for the provision of specialist items, including (without limitation) front desk millwork, and provide a list of all shop drawings to be reviewed;

(e)     review samples of construction materials as required by Owner;

(f)     review all shop drawings and fixture cuts for all food and beverage equipment, laundry equipment and garbage handling equipment;

(g)     recommend and assist Owner in implementing a detailed system of inspection of all work carried out on the Hotel site;

(h)     carry out a final inspection of kitchen and laundry equipment in conjunction with the appropriate specialist Consultants, such as those involved with the kitchens and laundry and, if necessary, prepare a deficiency list;

(i)     attend design and construction meetings as required to assist in the resolution of problems, to expedite construction and to co-ordinate same with the timetable for the installation of Personal Property;

- 22 -

    (j)      recommend to Owner all necessary budgets for working capital requirements and estimated operating deficits, if any; and

    (k)      prepare and submit to Owner, on a monthly basis, a complete report of costs and expenditures for the marketing, operating and staffing of the Hotel commencing with the first month following Owner's approval of the Pre-Opening Plan and Budget.

7.04        <u>Four Seasons' Personal Property Obligations</u>

        In addition to the obligations required to be performed by Four Seasons during Phase III as outlined in section 7.03, to the extent that Four Seasons has not completed the following enumerated tasks prior to the commencement of Phase III, during such Phase, Four Seasons shall:

    (a)      participate in the review of model guest rooms of the Hotel, including (without limitation) analysis of alternate furnishings where appropriate and determination of functional requirements;

    (b)      participate in the review of public areas of the Hotel, including (without limitation) analysis of alternate furnishings where appropriate and determination of functional requirements;

    (c)      provide Owner with a list of the quantities of all spare stock required for the Hotel; and

    (d)      assist Owner in the development of the hand-over procedures to operation.

- 23 -

## ARTICLE VIII

## POST-OPENING DEFICIENCIES PHASE

8.01        Post-Opening Deficiency Phase

The Post-Opening Deficiencies Phase (hereinafter referred to as either the "Post-Opening Deficiencies Phase" or "Phase IV") shall commence on the Opening Date and shall end on the date provided for in section 10.01.

8.02        **Owner's Obligations**

To the extent that Owner has not completed the following enumerated tasks prior to the commencement of Phase IV, during such Phase, Owner shall, based upon the Hotel Design Brief:

(a)        arrange for the rectification of all deficiencies in an expeditious manner to suit the exigencies of the operation of the Hotel in the manner described in section 10.01;

(b)        finalize all necessary legal documentation and all other financial and tax matters in respect of the Hotel; and

(c)        finalize all accounts and prepare a detailed final report and analysis in respect of the construction of the Hotel.

8.03        **Four Seasons' Obligations**

To the extent that Four Seasons has not completed the following enumerated tasks prior to the commencement of Phase IV, during such Phase, Four Seasons shall, based upon the Hotel Design Brief:

- 24 -

(a)  assist Owner in directing the Consultants in their preparation of final deficiency lists;

(b)  assist Owner in identifying and directing the rectification of all deficiencies; and

(c)  carry out a final inspection of the Hotel on completion of the rectification of all deficiencies.

**ARTICLE IX**

**DESIGNATED MANAGERS AND CO-ORDINATORS**

**9.01**      **Owner's Responsibilities**

Owner has assigned one or more individuals who has been identified to Four Seasons to act as Owner's project manager until completion of the Phase IV (collectively, the "Owner's Project Manager").

**9.02**      **Four Seasons' Responsibilities**

Four Seasons has assigned one or more individuals who has been identified to Owner to act as Four Seasons' project design and construction manager (collectively, the "Four Seasons' Project Manager").

**9.03**      **General Co-ordination**

Each of the individuals appointed as the Owner's Project Manager and the Four Seasons' Project Manager shall fully co-ordinate his or her respective authority and responsibilities with the other individuals so appointed. It is understood that each party is vitally interested in the qualifications and performance of the individuals appointed by the other party in the capacity of the Owner's Project Manager and the Four Seasons' Project Manager.

Accordingly, each party will consult with and obtain the approval of the other party prior to appointing any such individual and if, after any such appointment, the other party becomes dissatisfied with the performance of any such individual, the other party shall have the right to confer with the appointing party in an attempt to resolve any problems, including (without limitation) consideration of replacing such individual. It is understood, however, that any final decisions in this area will be made by the appointing party after due consideration of the views expressed by the other party in such consultations.

## ARTICLE X
## DEFICIENCIES

**10.01**      **Deficiencies**

30 days before the Scheduled Opening Date, Owner shall prepare and deliver to Four Seasons a listing of all deficiencies and construction work remaining uncorrected or incomplete (including, without limitation, "punchlist" items), which listing shall be subject to approval by Four Seasons. Four Seasons shall have the right to add additional items to such list (whether or not made before or after the Opening Date). If such matters could or may have a material adverse effect on the operation and management of the Hotel after the Opening Date, Four Seasons shall be entitled to delay the Opening Date until such time as such matters are completed. Owner shall co-operate with Four Seasons to ensure that all such matters are completed within four months following the Opening Date (if Owner is notified late of any specific item not included in such listing at the Opening Date, four months following such later date); provided that if such matters cannot be completed within such four month period, Owner shall commence such actions within such period and thereafter diligently prosecute such work to completion.

# ARTICLE XI
## REMUNERATION AND REIMBURSEMENT OF FOUR SEASONS

11.01        Consulting Fee

Owner shall pay to Four Seasons a consulting fee (the "Consulting Fee") in United States Dollars for its pre-opening services (including operational services) of $300,000. The Consulting Fee shall be paid as follows:

(a)    a portion of the Consulting Fee in the amount of $25,000, shall be payable upon the completion by Four Seasons to Owner of the Hotel Design Brief; and

(b)    the balance of the Consulting Fee, being $275,000, shall be payable in 13 consecutive equal monthly instalments of $20,000 each and one final monthly instalment of $15,000, commencing six months after the submission by Four Seasons to Owner of a preliminary version of the Hotel Design Brief; provided, however, that in the event the 14-month period contemplated in this section 11.01(b) shall not have expired at the end of the third month after the Opening Date, the balance of the Consulting Fee then outstanding shall be payable at the end of the third month after the Opening Date.

In the event that the Opening Date does not occur on the Scheduled Opening Date and Four Seasons is required to perform additional pre-opening management services during such extended pre-opening period, or in the event that the scope of the pre-opening management services or responsibilities of Four Seasons hereunder are expanded, the Consulting Fee payable to Four Seasons shall be fairly and equitably increased for all additional or expanded services performed by Four Seasons as a result thereof.

**11.02     Reimbursement of Costs**

Owner shall reimburse Four Seasons for all reasonable costs and expenses incurred by Four Seasons in the performance of the services contemplated by this Agreement. Owner expressly acknowledges that such services may be for either (a) the exclusive benefit of the Hotel, or (b) the benefit of the Hotel and one or more other hotels or resorts that are owned or operated and managed by Four Seasons or any of its Affiliates; provided that if such activities are not for the exclusive benefit of the Hotel, only an equitable portion of the costs and expenses associated therewith shall be allocated to the Hotel by Four Seasons. Such costs and expenses may include, but are not limited to, consultants fees and expenses, out-of-pocket expenses incurred in connection with the performance of the duties described in this Agreement, travel expenses and food and lodging of senior officers and other home office personnel of Four Seasons (but shall not include the employment costs of such officers or personnel). Such costs and expenses shall be estimated by Four Seasons in the Pre-Opening Plan and Budget or a separate reimbursables budget approved by Owner. Four Seasons shall use its reasonable efforts to ensure that such costs and expenses are accurately estimated.

Four Seasons shall submit to Owner monthly statements setting forth all costs and expenses reimbursable to Four Seasons pursuant to this section 11.02 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement during the preceding month and such reimbursable costs and expenses will be paid by Owner to Four Seasons in United States Dollars within 15 days after receipt of a statement by Owner.

**11.03     Fund for Pre-Opening Costs and Expenses**

Owner shall advance to Four Seasons amounts equal to the costs and expenses provided for in the Pre-Opening Plan and Budget, including (without limitation) the costs and expenses contemplated by section 11.02, at the times contemplated for the expenditure thereof in the Pre-Opening Plan and Budget.

**11.04**      Interest

Any amount not paid by Owner when due shall accrue interest on such amount from the date such amount became due at the Interest Rate.

# ARTICLE XII
## DAMAGE TO AND DESTRUCTION OF THE HOTEL

**12.01**      **Four Seasons' Entitlement to Fees and Charges**
**During a Delay Resulting From Damage or Destruction**

Four Seasons shall, notwithstanding any delay or interruption resulting from any damage or destruction to the Hotel, be entitled to receive, from any insurance proceeds paid in respect of the business interruption insurance maintained in accordance with Article XIV, the Consulting Fee at the time and in the manner specified in this Agreement.

**12.02**      **Four Seasons' Reinstatement**

If, following a termination of this Agreement by reason of any damage or destruction to the Hotel, at any time during the five year period following such termination Owner or Related Person intends to repair, rebuild or replace the Hotel or commences to do so, Owner shall promptly notify Four Seasons in writing of such intention or commencement, and, at Four Seasons' election (exercisable by written notice given to Owner within 60 days of receipt of the written notice by Owner of its intention to repair, rebuild or replace the Hotel, or, if no such Owner's notice is given, Four Seasons' actual knowledge of the commencement) this Agreement shall be reinstated (with only such amendments as are required due to changes in the type, scope or design of the hotel project, save and except as otherwise provided in this section 12.02). If the type, scope or design of the project is not changed, then the fees and charges payable to Four Seasons under this Agreement shall remain the same, but shall be increased or decreased to reflect any increase or decrease in the Consumer Price Index from the

date of termination to the date of re-instatement. However, if the type, scope or design of the project is changed, then the fees and charges payable to Four Seasons under this Agreement shall be fairly and equitably increased or decreased to reflect such changes.

## ARTICLE XIII

## EXPROPRIATION

13.01    **Four Seasons' Entitlement to Fees and Charges During a Temporary Expropriation**

If all or any part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceedings for a temporary use, Four Seasons shall be entitled to receive, from any insurance proceeds paid in respect of the business interruption insurance maintained in accordance with Article XIV, the Consulting Fee at the time and in the manner specified in this Agreement.

## ARTICLE XIV

## INSURANCE

14.01    **Coverage**

Owner shall provide and maintain for the Hotel, at all times during the construction period of the Hotel and up to and including the end of Phase IV, as an expense of the Hotel, policies of insurance to be proposed by Owner, and submitted to Four Seasons for approval.

- 30 -

# ARTICLE XV
## ASSIGNMENTS AND MORTGAGES

**15.01**     <u>Owner's Right to Assign</u>

Subject to the provisions of section 15.03, Owner shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person on the condition that such Person first enter into an agreement with Four Seasons, in the form attached hereto as Schedule "D", agreeing:

    **(a)**     that the Hotel Agreements continue in full force in effect after such sale, assignment, transfer or other disposition; and

    **(b)**     to assume all of the contractual obligations of Owner contained in the Hotel Agreements.

**15.02**     <u>Owner's Right to Mortgage</u>

Subject to the provisions of section 15.03, Owner shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to any Person on the condition that such mortgagee first enter into an agreement with Four Seasons, in the form attached hereto as Schedule "E", agreeing:

    **(a)**     to be bound by Owner's covenants and undertakings hereunder for any period during which it is in possession of the Hotel;

    **(b)**     that in the event of a foreclosure of its mortgage or lien on the Hotel or this Agreement or of a conveyance in lieu of foreclosure (i) no default under such mortgage or other documents evidencing the lien in favour of such mortgagee, and no proceeding to foreclose the same, and no conveyance in lieu of foreclosure

thereof, will affect any other right of Four Seasons under this Agreement, and (ii) this Agreement shall continue in full force and effect and such mortgagee, its successors and assigns, or any party (the "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein upon foreclosure sale or by deed in lieu of foreclosure, as the case may be, shall be a Qualified Person and shall automatically recognize this Agreement and Four Seasons' rights hereunder for the balance of the term of this Agreement upon the same terms, covenants and conditions as herein provided, with the same force and effect as though this Agreement were originally made directly between Four Seasons and such mortgagee, or its successors and assigns, or the Foreclosure Purchaser, as the case may be; and

(c)     not to sell, transfer or otherwise dispose of any interest it may have in the Hotel or this Agreement without first causing any transferee thereof to acknowledge and agree to be bound by and become a party to such agreements with Four Seasons.

15.03     <u>Limitation on Owner's Right to Assign and Mortgage</u>

Notwithstanding the provisions of sections 15.01 and 15.02, Owner shall not without the express prior written consent of Four Seasons, which consent may be withheld or delayed in the sole discretion of Four Seasons without regard to the provisions of section 17.01(a), directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of, or mortgage, hypothecate or otherwise encumber, any interest, whether legal or beneficial, in all or any part of its Interest to any Person other than a Qualified Person. Any change in control of Owner, whether directly or indirectly and whether by way of transfer of shares, partnership interests or otherwise, to any Person other than a Qualified Person shall be prohibited unless the express prior written consent of Four Seasons, which consent may be unreasonably withheld or delayed, is obtained.

- 32 -

**15.04**     <u>Four Seasons' Right to Assign</u>

Subject to the provisions of section 15.06, Four Seasons shall have the right at any time to sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person on the condition that:

(a)     the Person to whom the Interest of Four Seasons is to be sold, assigned, transferred or otherwise disposed of shall first enter into an agreement with Owner, in form and substance satisfactory to Owner, agreeing to assume all of the contractual obligations of Four Seasons contained in this Agreement; and

(b)     in the case of a sale, assignment, transfer or other disposition to an Affiliate of Four Seasons, Four Seasons shall first enter into an agreement with Owner, in form and substance satisfactory to Owner, agreeing to be jointly and severally liable with such Affiliate to perform all of the contractual obligations of Four Seasons contained in this Agreement notwithstanding such sale, assignment, transfer or other disposition.

Upon a sale, assignment, transfer or other disposition to a Person other than an Affiliate, Four Seasons shall be released from all of its obligations under this Agreement.

**15.05**     <u>Four Seasons' Right to Mortgage</u>

Four Seasons shall have the right at any time to mortgage, hypothecate or otherwise encumber all or any part of its Interest to a financial institution as security for its obligations to such financial institution.

**15.06**        Limitation on Four Seasons' Right to Assign

Four Seasons shall not without the express prior written consent of Owner, directly or indirectly, by way of transfer of shares, partnership interests or otherwise, sell, assign, transfer or otherwise dispose of all or any part of its Interest to any Person other than (i) an Affiliate, (ii) a Person that results from any merger, amalgamation, consolidation or other reorganization of Four Seasons or (iii) a Person that acquires all or substantially all the assets of Four Seasons and operates a hotel management business either on its own or in conjunction with its Affiliates. This section 15.06 shall not, however, apply to a change in control of Four Seasons Hotels Inc. resulting from sales of its publicly traded shares to any Person.

## ARTICLE XVI
## EVENTS OF DEFAULT AND TERMINATION

**16.01**        General

Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

(a)        the failure of Owner to pay any amounts required to be paid by it hereunder for a period of 45 days after the date on which notice of the failure has been given to the Owner by Four Seasons;

(b)        the filing of a voluntary assignment in bankruptcy or insolvency or a petition for reorganization under any Applicable Law by Owner, any member or partner of Owner, or Four Seasons;

- 34 -

(c)     the consent to an involuntary petition in bankruptcy or the failure by Owner, any member or partner of Owner, or Four Seasons to vacate, within 60 days from the date of entry thereof, any order approving an involuntary petition;

(d)     the making of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner, any member or partner of Owner, or Four Seasons a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of a party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of 120 consecutive days; or

(e)     the failure of either Owner or Four Seasons to fulfil any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of 30 days after written notice of the failure; provided that if upon receipt of any notice the defaulting party promptly and with all due diligence cures the default or, if the default is not susceptible of being cured within the 30 day period and the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures the failure within that period so advised, then no event of default shall be deemed to have occurred unless and until the defaulting party has failed to take or to continue to take action or to complete the cure within the period.

16.02     **Rights of Non-Defaulting Party**

Upon the occurrence of any event of default pursuant to section 16.01 and the applicable grace periods having expired, either Owner or Four Seasons may, without prejudice to any other recourse at law or in equity which it may have, give to the other notice of its intention to terminate this Agreement after the expiration of a period of 30 days from the date of such notice and, upon the expiration of such period, the term of this Agreement shall expire

unless such default has been cured.  Such notice shall be of no force and effect if within 30 days of receipt of such notice, the party receiving such notice shall promptly and with all due diligence cure the default or, if such default is not susceptible of being cured within the 30 day period, the defaulting party advises the other party in writing of the period which will be required to cure the default and with all due diligence takes and continues action to cure and cures such default within the period so advised.

### 16.03      Remedying Defaults

Notwithstanding anything to the contrary contained in this Agreement, either Owner or Four Seasons shall be entitled to remedy any default of the other under this Agreement with reasonable notice to the other or without notice in the event of any emergency or apprehended emergency, without prejudice to any rights under this Agreement and the party so remedying such default shall be repaid upon demand by the other for the cost of remedying such default, together with interest on such cost from the date of incurring such cost at the Interest Rate.

### 16.04      Bona Fide Dispute

Notwithstanding the provisions of section 16.02, neither Owner nor Four Seasons shall be entitled to take any of the actions contemplated in section 16.02, save and except for the commencement of any legal proceedings (in which case the provisions of sections 20.10 and 20.11 regarding jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained in this Agreement pending the resolution of a Dispute, if before the expiration of the 30 day notice period referred to in section 16.02, notice of a Dispute has been delivered in accordance with section 17.02(a) with respect to any of the foregoing events of default and the procedures set forth in section 17.02(b) and (c) are being pursued in good faith (except that for this purpose under section 17.02(b), the requirement of a 30 day negotiation

period under section 17.02(a) shall be inapplicable and the period within which to appoint an expert under section 17.02(b) shall commence on the date of delivery of notice of a Dispute).

**16.05**     **Four Seasons' Right to Terminate**

In addition to any right arising out of section 16.02 and notwithstanding sections 16.04, 17.02 and 17.03, Four Seasons shall have the right to terminate this Agreement if the Opening Date does not occur on or before 180 days after September 30, 1998, other than by reason of any default by Four Seasons in its obligations under this Agreement. Four Seasons' right to terminate this Agreement in accordance with this section 16.05 shall be exercised by written notice by Four Seasons given to Owner within 30 days after the relevant date mentioned above. If the Opening Date does not occur on or before the Scheduled Opening Date for any reason beyond the control of Owner, including (without limitation) the Hotel or any portion thereof being damaged or destroyed, and Four Seasons does not terminate this Agreement in accordance with this section 16.05, Four Seasons shall nevertheless be entitled to receive, from any insurance proceeds paid in respect of the business interruption contemplated in Article XIV the Consulting Fee, for the period beginning on the Scheduled Opening Date and ending on the Opening Date.

**16.06**     **Cross-Termination**

If any or all of the other Hotel Agreements are terminated after the Opening Date, then either Four Seasons or Owner shall, in addition to any rights or remedies available to it at law or in equity, be entitled to terminate this Agreement by written notice to the other within 10 days after the date of such termination and Owner and Four Seasons shall have no further obligations arising out of this Agreement, save and except as expressly otherwise provided for in this Agreement.

16.07        <u>Accounting on Termination</u>

If this Agreement is terminated, Four Seasons shall be entitled (in addition to any rights or remedies available to it at law or in equity) to all sums, charges and fees which it is entitled to receive under this Agreement, together with costs and expenses, if any, reimbursable to it pursuant to section 11.02 or for which it may be responsible arising out of anything done within the scope of its responsibilities under this Agreement to the date of termination.  The amount of all of such sums, charges, fees and out-of-pocket costs and expenses shall be ascertained for the period ending on the date of such termination and shall be paid to Four Seasons (i) to the extent ascertained on the date of such termination, on such date, and (ii) to the extent not ascertained on the date of such termination, on the date on which such sums, charges, fees and expenses are ascertained after the date of such termination.

16.08        <u>Claims on Termination</u>

Notwithstanding anything contained in this Agreement, (i) the termination of this Agreement shall not prejudice any cause of action, claim or right of any of Owner or Four Seasons against the other accrued or to accrue on account of any default by the other of its obligations under this Agreement or arising as a result of the termination of this Agreement, and any term, covenant, condition or provision of this Agreement referable thereto shall not merge, but shall survive, the termination of this Agreement, and (ii) the Dispute resolution procedure set forth in section 17.02 shall no longer apply to any of Owner or Four Seasons after termination of this Agreement and any of Owner or Four Seasons shall be entitled to commence legal proceedings seeking any recourse available to it at law or in equity, including (without limitation) mandatory, declaratory or injunctive relief to define or protect the rights and enforce the obligations contained in this Agreement; provided that such legal proceedings shall not involve issues which have previously been submitted to and settled by arbitration in accordance with this Agreement unless such legal proceedings involve the enforcement of an arbitration decision or award made in respect of such issues.

- 38 -

## ARTICLE XVII

## APPROVALS, DISPUTE RESOLUTION AND ARBITRATION

17.01    **Approvals**

Except as otherwise expressly provided in this Agreement:

(a)    all opinions contemplated by this Agreement must be reasonably formed and the approval of any document, proposed action or other matters in accordance with this Agreement shall not be unreasonably withheld or delayed; provided, however, that in determining the reasonableness of any such withholding or delay, full consideration shall be given to, and it shall be unreasonable to deny or refuse consent or approval to any matter if the effect of such denial or refusal would prevent or hinder, the operation of the Hotel as a World Class Luxury Hotel or the operation of the other components of the Project at a standard consistent with that applicable to the Hotel as a World Class Luxury Hotel; and

(b)    the following procedure shall be followed with respect to any matter requiring approval:

(i)    such documents or a written description of the proposed action or other matter requiring approval shall be submitted by the party having responsibility therefor (the "requesting party") to the party having the right of approval, which submission shall be accompanied by a request for approval in accordance with this Agreement;

(ii)    as soon as possible but not later than 30 days after receipt of any proposed budget or 15 days after the receipt of any other written request for approval (or such other time period as may be specified for approval with respect to any item in this Agreement) the party having the right of

approval shall notify in writing the requesting party of its approval or of its specific objections to the document, proposed action or other matter;

(iii)    failure to respond in writing with specific objections within the maximum time period specified in section 17.01(b)(ii) shall constitute approval of all matters submitted;

(iv)    within 10 days of the receipt of any objections (or such other time period as may be specified in this Agreement), the requesting party shall:

(A)    acquiesce to such objections; or

(B)    reach an agreement with the party objecting; or

(C)    call for a meeting of senior representatives of Owner and Four Seasons to be convened to consider the matter in dispute (by giving notice to convene such meeting in writing indicating the specific issues in dispute to be resolved by such representatives); and

(v)    as soon as possible, but not later than 10 days after receiving a request to convene a meeting in accordance with section 17.01(b)(iv)(C), representatives of Owner and Four Seasons shall convene to consider the specific issues in dispute and resolve them to the mutual satisfaction of the parties and if unable to resolve the specific issues in dispute, the same shall be resolved in accordance with the arbitration procedure provided in section 17.03.

Once any document, proposed action or other matter is approved, no change or amendment thereof may be effected without the prior consent of both parties.

- 40 -

17.02        Dispute Resolution

Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to this Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner:

(a)    first, within 10 days from the receipt of notice of a Dispute by one party to the other, the parties shall in good faith attempt to negotiate for a period of 30 days in an effort to resolve the Dispute;

(b)    second, if the parties are unable to resolve the Dispute within such 30 day period, they shall retain a mutually acceptable expert to assist them in resolving the Dispute within 10 additional days, failing which they shall each retain an expert on the eleventh day and the two experts thus chosen shall together act as the expert for the purposes of this section 17.02(b).  If either party shall fail to appoint an expert as required hereunder, the expert appointed by the other party shall be the sole expert.  Within 90 days after the experts (or such single expert) have been retained, the experts (or such single expert) shall, on a non-binding basis, advise the parties in writing of their views.  The fees and expenses of the experts (or such single expert) shall be borne equally;

(c)    third, if the parties are still unable to resolve the Dispute within such 90 day period, the parties shall resort to the arbitration procedures set forth in section 17.03; and

(d)    fourth, any party to the Dispute shall be entitled to join any Dispute proceeding arising out of this Agreement with any other Dispute proceeding arising out of either this Agreement or the other Hotel Agreements.

- 41 -

17.03      Arbitration

Except as otherwise provided in section 16.04 and this section 17.03, any Dispute shall be settled by arbitration as follows:

(a)      each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration. Within 10 days after receipt by the other party of such notice, each party shall appoint an arbitrator and within 10 days of their appointment the two arbitrators so chosen shall together nominate a third arbitrator. If within such 10 day period the two arbitrators fail to nominate the third arbitrator, upon written request of either party, the third arbitrator shall be appointed by the International Court of Arbitration of the International Chamber of Commerce, and both parties shall be bound by the appointment so made. If either party shall fail to appoint an arbitrator as required under this section 17.03(a), the arbitrator appointed by the other party shall be the sole arbitrator of the matter;

(b)      the decision of the arbitrators (or such single arbitrator) shall be made within 30 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator, as the case may be) when reduced to writing and signed by them shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction;

(c)      the arbitration shall at the election of Four Seasons be held in the City of Miami, Florida, United States of America or the City of Caracas, Republic of Venezuela, as the case may be, and shall be conducted in the English language and, except for those procedures specifically set forth in this section 17.03, shall be conducted

in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof; and

**(d)**    the arbitrators (or such single arbitrator) shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that each party shall be responsible for its own legal fees.

Notwithstanding anything contained in this section 17.03, any of Owner or Four Seasons shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 20.10 and 20.11 governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained herein pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this section 17.03, (ii) commence legal proceedings (in which case the provisions of sections 20.10 and 20.11 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement, or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of either this Agreement or the other Hotel Agreements.


## ARTICLE XVIII
## FOUR SEASONS' LIABILITY


**18.01**        <u>Standard of Care</u>

Four Seasons shall not, in the performance of its obligations under this Agreement, be liable to Owner or to any other Person for any act or omission (whether negligent, tortious or otherwise) of Four Seasons or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives, except only to the extent such liabilities, obligations, claims, costs and expenses arise out of or are caused by

the wilful misconduct, gross negligence or bad faith of Four Seasons or any of its Affiliates or any of their respective directors, officers, employees, consultants, agents or representatives.

**18.02**        **Indemnities**

(a)        Owner hereby indemnifies and holds Four Seasons and its Affiliates and any of their respective directors, officers, employees, consultants, agents and representatives (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of any action or omission or course of action on the part of an Indemnified Party in the performance of its obligations under this Agreement or otherwise in connection with any obligation incurred by or instrument executed by an Indemnified Party alone, an Indemnified Party together with Owner or by Owner alone, whether or not an Indemnified Party shall be the signatory or one of the signatories on behalf of Owner and whether incurred or executed on behalf of Owner; provided that this indemnity shall not apply to any liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses resulting from the willful misconduct, gross negligence or bad faith of the Indemnified Party.

(b)        Four Seasons hereby indemnifies and holds Owner and any of its directors, officers, employees, consultants, agents and representatives harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses of any kind or nature (including, without limitation, legal fees) arising out of or caused by the wilful misconduct, gross negligence or bad faith of Four Seasons or any of its directors, officers, employees, consultants, agents or representatives.

- 44 -

# ARTICLE XIX
# ACKNOWLEDGMENTS

19.01    <u>Owner's Acknowledgments</u>

Owner acknowledges that:

(a)    in entering into this Agreement, Owner has not relied on any statement, study, representation or warranty of Four Seasons, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, express or implied, relating to the Hotel, including (without limitation) any statement, study, representation or warranty relating to the structural integrity, safety or other design aspects of the Hotel, the competence of the Consultants, the compliance of the Hotel with Applicable Law, any projection or pro forma statements of earnings or profit or loss or statements as to future success of the Hotel which may have been prepared by or on behalf of Four Seasons, any of its Affiliates or any Person actually or apparently engaged by them or on their behalf, and Owner understands that no guarantee is made or implied by Four Seasons or any of its Affiliates with respect thereto; provided that, for greater certainty, nothing in this section 19.01(a) shall affect in any manner whatsoever the obligation of Operator or any of its Affiliates to make Deficit Payments in accordance with the provisions of section 8.04 of the Hotel Management Agreement; and

(b)    Four Seasons is relying on the representations, warranties and covenants of Owner set out in the Hotel Agreements in connection with Four Seasons entering into and fulfilling its obligations under this Agreement.

19.02      Four Seasons' Acknowledgments

Four Seasons acknowledges that Owner is relying on the representations, warranties and covenants of Four Seasons set out in this Agreement, and of the Affiliates of Four Seasons set out in the other Hotel Agreements, in connection with Owner entering into and fulfilling its obligations under this Agreement.

## ARTICLE XX
## GENERAL PROVISIONS

20.01      Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter contemplated herein.  Any other agreements regarding the subject matter contemplated herein, whether written or oral, are terminated.

20.02      Modification and Changes

This Agreement cannot be changed or modified except by another agreement in writing signed by all the parties or by their respective duly authorized agents and consented to by all the parties to the other Hotel Agreements.

20.03      Partial Invalidity

In the event that any one or more of the phrases, sentences, clauses, Articles or sections contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having jurisdiction, or shall be or become invalid or unenforceable by virtue of any Applicable Law, the remainder of this Agreement shall be construed as if such

phrases, sentences, clauses, Articles or sections had not been inserted except when such construction (a) would operate as an undue hardship on either party or (b) would constitute a substantial deviation from the general intent and purposes of the parties as reflected in this Agreement. In the event of either (a) or (b) above, the parties shall use their best efforts to negotiate a mutually satisfactory amendment to this Agreement to circumvent such adverse construction. If no such amendment has been agreed upon within 60 days the dispute shall be submitted to arbitration in accordance with the provisions of section 17.03.

20.04     **Counterparts**

This Agreement may be executed simultaneously in two counterparts, each of which counterparts shall be deemed an original. In proving this Agreement it shall not be necessary to produce or account for more than one of the counterparts.

20.05     **Waivers**

No failure by a party to insist upon the strict performances of any provision of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such provision. No provision of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every provision of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

20.06     **Language**

The parties agree that this Agreement, and all agreements and documents contemplated herein or entered into in connection herewith or delivered pursuant hereto, including (without limitation) drawings, schedules, specifications and budgets, shall be prepared in the English language. A Spanish language version of this Agreement, and all agreements and

documents entered into in connection herewith or delivered pursuant hereto, may be prepared for the convenience of the parties; provided, however, that, in the event of any Dispute as to the construction, interpretation or application of any provision of this Agreement, or any agreement or document entered into in connection herewith or delivered pursuant hereto, the English-language version shall prevail and shall be used in the settlement of such Dispute.

### 20.07    **Enurement**

This Agreement, which is expressly intended to be integral to and binding upon title to the Hotel, shall enure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns and, in light of its fundamental relationship to the Hotel, shall survive any mortgage, hypothecation, or other encumbrance of, or any sale, assignment, transfer or other disposition of, all or any part of the Interest of Owner to any Person.

### 20.08    **Recording**

Concurrently with the execution of this Agreement, the parties shall execute such documents as may be required by Four Seasons to confirm the intention of the parties that this Agreement be an integral part of title to the Hotel.  Such documents shall be in form and substance satisfactory to Four Seasons and, in that regard, shall be in the standard form used by Four Seasons and its Affiliates.  At the option of Four Seasons, such documents may be recorded in such places as counsel to Four Seasons may recommend for the purpose of placing on record sufficient information to afford Four Seasons the protection of any statutes governing title to the Hotel.  At Owner's request and sole cost and expense, Four Seasons shall execute, acknowledge and record such confirmations of the termination of those documents following the termination of this Agreement as may be reasonably necessary to reflect such termination.

20.09        Applicable Law

       This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the Republic of Venezuela without regard to the conflict of law rules applicable therein.

20.10        Jurisdiction

       The parties irrevocably:

    (a)    submit and consent to the non-exclusive jurisdiction of the courts of the Republic of Venezuela as regards any suit, action or other legal proceedings arising out of this Agreement;

    (b)    waive, and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings, any claim that they are not personally subject to the jurisdiction of the courts of the Republic of Venezuela, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in such courts; and

    (c)    agree not to seek, and hereby waive any review by any court which may be called upon to enforce the judgment of the courts referred to in section 20.10(a), of the merits of any such suit, action or proceeding in the event of failure of any party to defend or appear in any such suit, action or proceeding.

20.11        Designation of Agent for Service of Process

    (a)    Four Seasons irrevocably designates the General Manager at  the Hotel as its agent to accept and acknowledge on its behalf service of any and all process in

- 49 -

any such suit, action or proceeding brought in the Republic of Venezuela, and Four Seasons agrees and consents that any such service of process as specified above shall be taken and be deemed to be valid personal service upon Four Seasons and that any such service of process shall be of the same force and validity as if service were made upon it according to the laws governing the validity and requirements of such service in the Republic of Venezuela, and Four Seasons waives all claims of error by reason of any such service. Notwithstanding the foregoing, Four Seasons may, by notice to Owner, change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Owner shall promptly mail a copy of such process to Four Seasons at its address set forth in section 20.12.

**(b)**     Owner irrevocably designates Dra. Ysbell Kearns, at the address of Owner for Notices set out in section 20.12 as its agent to accept and acknowledge on its behalf service of any and all process in any such suit, action or proceedings brought in the Republic of Venezuela, and Owner agrees and consents that any such service of process as specified above shall be taken and deemed to be valid personal service upon Owner and that any such service of process shall be of the same force and validity as if service were made upon them according to the laws governing the validity and requirement of such service in the Republic of Venezuela, and the Owner waives all claims of error by reason of any such service. Notwithstanding the foregoing, Owner may, by notice to Four Seasons change its designation of any agent for service of process. Without in any way limiting the validity of such service of process, Four Seasons shall promptly mail a copy of such process to Owner at its address set forth in section 20.12.

## 20.12     Notices

Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications (collectively, "Notices")

required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

| | |
|---|---|
| If to Four Seasons, to: | Four Seasons Hotels Limited<br>1165 Leslie Street<br>Don Mills, Ontario<br>Canada    M3C 2K8 |
| | Attn: General Counsel |
| | Facsimile No.: (416) 441-4303 |
| With a copy to: | Goodman Phillips & Vineberg<br>250 Yonge Street<br>Suite 2400<br>Toronto, Ontario<br>Canada  M5B 2M6 |
| | Attn:  Randolph Weisz |
| | Facsimile No.: (416) 979-1234 |
| If to Owner, to: | Consorcio Barr, S.A.<br>Calle Veracruz, Edif. Torreon, Piso 2<br>Urb. Las Mercedes, Caracas, Venezuela |
| | Attn: Ing. Lautaro Barrera B. |
| | Facsimile No.: (+58-2) 924377 |

With a copy to:          Dra. Ysbell Duran Kearns
                         c/o Consorcio Barr, S.A.
                         Calle Veracruz, Edif. Torreon, Piso 2
                         Urb. Las Mercedes, Caracas, Venezuela

                         Facsimile No.: (+58-2) 924377

All Notices shall be effective for all purposes upon personal delivery thereof or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt. Any party may at any time change the addresses for Notices to such party by giving a Notice in the manner set forth in this section 20.12.

**20.13      Payments**

(a)      Any and all payments by Owner under this Agreement in respect of the costs and expenses reimbursable to Four Seasons pursuant to Section 11.02 or for which it may be responsible arising out of anything done with the scope of its responsibilities under this Agreement shall be made free and clear of and without deduction or withholding for any and all present or future Taxes unless such Taxes are required by Applicable Law to be deducted or withheld. If Owner shall be required by Applicable Law to deduct or withhold any Taxes from or in respect of any payment under this Agreement, the payment shall be increased as may be necessary so that after making all deductions or withholdings, including (without limitation) deductions or withholdings applicable to any additional amounts paid under this section 20.13, Four Seasons receives an amount equal to the payment it would have received if no deduction or withholding had been made. If a Tax credit is received by Four Seasons for any Taxes deducted or withheld by Owner in accordance with this section 20.13 and in respect of which additional amounts have been paid by Owner under this section 20.13, then, to

the extent that such Tax credit has been received and utilized by Four Seasons. Four Seasons shall pay to Owner an amount equal to such Tax credit; provided, however, that such amount shall not exceed the additional amounts paid by Owner to Four Seasons under this section 20.13.

**(b)**      In the event that any Taxes are required by Applicable Law to be deducted or withheld from or in respect of any payment by Owner under this Agreement, the parties shall in good faith negotiate a method of restructuring the manner in which such payment is to be made by Owner to Four Seasons under this Agreement with a view to minimizing the Tax liability in connection with such payment; provided, however, that the method of restructuring the manner in which such payment is to be made does not prejudice the amount of the sums, charges and fees otherwise payable to Four Seasons under this Agreement or of the costs and expenses reimbursable to Four Seasons pursuant to section 11.02 and provided further that the method of restructuring the manner in which such payment is to be made shall not result in any damages, losses or any other costs whatsoever to Four Seasons or impact adversely on any rights, remedies or other benefits in favour of Four Seasons under this Agreement

**20.14      Time of Essence**

Time shall be of the essence of each and every term and obligation of this Agreement.

**20.15      Estoppel Certificates**

Each party shall, upon at least 10 days' written notice, execute and deliver to any other party, and to any other Person having or about to have a *bona fide* interest in the Hotel as such other party may designate in writing, a statement certifying that this Agreement is unmodified and in full force and effect, or if not, stating the details of any modification and

stating that as modified it is in full force and effect, the date to which payments have been paid and whether or not, to the knowledge of the certifying party, there is any existing default on the part of any other party.

**20.16       Pre-Opening Purchasing Services**

In addition to the pre-opening services to be provided by Four Seasons in accordance with the provisions of this Agreement, Four Seasons shall, at the request of Owner, also provide services in connection with the pre-opening acquisition of Personal Property for the Hotel and the co-ordination of the installation of such Personal Property.  Upon the request of the Owner, Four Seasons shall prepare and submit to Owner a proposal outlining the costs and associated benefits of Four Seasons providing such services.  Such services shall be provided by Four Seasons for a fee to be agreed upon by Four Seasons and Owner, and Four Seasons shall be entitled to be reimbursed for all costs and expenses incurred in the performance of such services, including the employment costs of the on-site Personal Property installation co-ordination to be appointed by Four Seasons.

**IN WITNESS WHEREOF** the parties have executed this Agreement on this 9ᵀᴴ day of April, 1997.

FOUR SEASONS HOTELS LIMITED

By: _____

By: _____ c/s

- 54 -

**CONSORCIO BARR, S.A.**

By: _____

c/s

By: _____

## SCHEDULE "A"

## DEFINITIONS

(a)     "**Building Permits**" means all permits, licences or certificates of any Governmental Authority necessary or appropriate to complete the development and construction of the Hotel.

(b)     "**Construction Phase**" or "**Phase III**" means the period set out in section 7.01.

(c)     "**Consultants**" means all consultants required for the design, development, construction, furnishing and equipping of the Hotel, including (without limitation) the Project Architect and other architects (concept and production), accountants, archaeologists, attorneys, engineers (structural, civil, soil, mechanical, electrical, audio visual and traffic), the general contractor and other contractors, acoustic mechanical and electrical consultants, interior and other designers, decorators, planners, economists, environmental specialists, landscape consultants, kitchen and laundry consultants, traffic consultants and other consultants or specialists.

(d)     "**Consulting Fee**" has the meaning set out in section 11.01.

(e)     "**Design Development & Working Drawings and Specifications**" means the detailed plans, specifications and drawings prepared based on the Schematic Design Drawings for the construction of the Hotel.

(f)     "**Design Development & Working Drawings Phase**" or "**Phase II**" means the period set out in section 6.01.

(g)     "**Dispute**" has the meaning set out in section 17.02.

(h)     "**Four Seasons' Project Manager**" means Four Seasons' project design and construction manager, and shall have the meaning set out in section 9.02.

(i)     "Hotel Design Brief" means the Hotel Design Brief dated February 5, 1996 approved by Owner and Four Seasons and attached hereto as Schedule "B".

(j)     "Interest" means the respective right, title and interest of Owner and Four Seasons in and to the Hotel and the Hotel Agreements.

(k)     "Occupancy Permits" means all permits, licences or certificates from any Governmental Authority necessary or appropriate to open the Hotel for use and occupancy as a World Class Luxury Hotel.

(l)     "Owner's Project Manager" means Owner's project design and construction manager, and shall have the meaning set out in section 9.01.

(m)     "Personal Property" means all Furniture, Fixtures and Equipment and all Operating Equipment and Supplies.

(n)     "Personal Property Budget" means the budget for the purchase of Personal Property to be prepared by Four Seasons and approved by Owner in accordance with the terms of this Agreement.

(o)     "Post-Opening & Deficiencies Phase" or "Phase IV" means the period set out in section 8.01.

(p)     "Pre-Opening Plan and Budget" has the meaning set out in section 4.01(a).

(q)     "Project Architect" has the meaning set out in section 5.02(b).

(r)     "Project Analysis & Schematic Design Phase" or "Phase I" means the period set out in section 5.01.

(s)     "**Project Budget**" means the budget for the development and construction of the Hotel to be prepared by Owner and approved by Four Seasons in accordance with the terms of this Agreement, setting forth, in detail, the break-down of the total estimated costs of the development and construction of the Hotel and all appropriate categories of costs.

(t)     "**Proposed Pre-Opening Plan and Budget**" has the meaning set out in section 4.01(a).

(u)     "**Qualified Person**" means a Person that (i) is not, and is not an Affiliate of, a competitor of Four Seasons or any of its Affiliates, (ii) has adequate financial capacity to perform the obligations of Owner under this Agreement, (iii) has an acceptable credit rating, (iv) is not of ill repute, and (v) is not in any other manner a Person with whom or with which a prudent business person would not wish to associate in a commercial venture.

(v)     "**Schematic Design Drawings**" has the meaning set out in section 5.02(b).

# SCHEDULE "B"

## HOTEL DESIGN BRIEF



International Centre for Dispute Resolution

**FAX**

*International Centre for Dispute Resolution*
1633 Broadway, New York, NY 10019-6708
telephone 212 484 3299, facsimile 212 246 7274

| | | | |
|---|---|---|---|
| DATE | March 22, 2004 | | |
| To | Juan J. Rodriguez and Albert J. Xiques, Esqs. | FAX NUMBER | 1-305-377-1055 |
| | Robert Amsterdam, Esq. | | 1-416 367-0076 |
| | David Ernesto Quiroz, Esq. | | 011 58 212 761 5276 |
| | John H. Rooney Jr , Esq. | | 1-305 679-5710 |
| | Dr Jose Maria Abascal | | 011 52 55 56 62 53 76 |
| | Horacio A Grigera-Naon, Esq. | | 1-202 639-9355 |
| FROM | Andrea H. Bugbee | | |
| | International Case Manager | | |
| NUMBER OF PAGES | 74    Mssrs. Rodriguez, Xiques, Amsterdam and Quiroz | | |
| | 3    Mr. Rooney, Dr. Abascal and Mr. Grigera-Naon | | |
| RE | 50 T 180 00550 01 | | |
| | *Four Seasons Caracas, C A et al* | | |
| | *Vs* | | |
| | *Consorcio Barr, SA* | | |
| CC | | | |
| MESSAGE | Dear Counsel and Arbiters. | | |

Please see the attached  Thank you.

Regards,

Andrea



THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO
WHOM IT IS ADDRESSED  IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL,
PRIVILEGED OR OTHERWISE EXEMPT FROM DISCLOSURE  IF YOU ARE NOT THE
INTENDED RECIPIENT OR THE PERSON AUTHORIZED TO DELIVER THIS FAX TO THE
INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF
THIS FAX IS PROHIBITED  IF YOU HAVE RECEIVED THIS FAX IN ERROR  PLEASE
NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT) AND RETURN THE ORIGINAL
FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS

EXHIBIT
"9"

 **International Centre for Dispute Resolution**

Luis Martinez
Vice President

Steve Kim
Assistant Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone 212-484-4181 facsimile 212-246-7274
internet http://www.adr.org/ICDR

March 22, 2004

## VIA FACSIMILE

Juan J. Rodriguez, Esq.
Albert J. Xiques, Esq.
Rodriguez & Machado, P.A.
101 Madeira Avenue
Coral Gables, FL 33134

Robert Amsterdam, Esq.
Amsterdam & Peroff
35 Alvin Avenue
Toronto, Ontario
Canada M4T 2A7

David Ernesto Quiroz, Esq.
Badell, Grau & DeGrazia – Despacho de Abogados
Av. Francisco Solano Lopez cruce
Av. Las Acacias, Edif Seguros Mercantil
Piso 5  Sabana Grande, Caracas 1050
Venezuela

Re: 50 T 180 00550 01
     Four Seasons Caracas, C.A.
     and
     Four Seasons Hotels & Resorts, B.V.
     and
     Four Seasons Hotel, Ltd
     vs
     Consorcio Barr, S.A.

Dear Counsel:

By direction of the arbitrators we herewith transmit to you the duly executed Award in the above matter. The hard copies of said Award are forthcoming

The AAA administrative fees and arbitrator compensation information contained in the Award was calculated as of the date of the Awards preparation Information on any adjustments to same caused by subsequent payments will be provided by the Association.

Thank you for using the services of the AAA's International Centre for Dispute Resolution

Sincerely,

Andrea H. Bugbee
International Case Manager
(212) 484-3299
BugbeeA@adr.org

cc. Horacio A. Grigera Naon, Esq.
    John H. Rooney, Jr., Esq.
    Jose M. Abascal, Esq.

Encl.

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

In the Matter of the Arbitration between



50 T 180 00550 01
**Four Seasons Caracas, C.A.**
**Four Seasons Hotels and Resorts, B.V.**
**Four Seasons Hotel, Ltd.**
**Vs**
**Consorcio Barr, S.A.**

## AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreements entered into between the above-named Parties and dated April 9, 1997, and having been duly sworn, and having duly heard proofs and allegations of the Parties, do hereby, AWARD, as follows

### I. Introductory

1       The dispute subject to this arbitration has arisen between Four Seasons Caracas C.A., a corporation organized and existing under the laws of Venezuela ("Four Seasons Caracas" or « Operator ») Four Seasons Hotels and Resorts, B V., a corporation organized and existing under the laws of the Netherlands ("Four Seasons Netherlands") Four Seasons Hotel Limited, a corporation organized and existing under the laws of Canada (" Four Seasons Canada"), (collectively, all of them hereinafter referred to as « Claimants » or « Four Seasons Contractors »); and Consorcio Barr S.A., a corporation organized and existing under the laws of Venezuela ("Consorcio Barr", « Respondent » or « Owner »).

2.       On November 30, 2001, the Claimants commenced the present arbitral proceedings under the Commercial Arbitration Rules of the American Arbitration Association based on alleged breaches by the Respondent of a Hotel Management Agreement (the « Management Agreement ») dated April 9, 1997 between Four Seasons Caracas and the Respondent a Hotel Advisory Agreement (the « Advisory Agreement ») dated April 9, 1997 between Four Seasons Netherlands and the Respondent, a Hotel Services Agreement (the « Services Agreement ») dated April 9, 1997 between Four Seasons Canada and the Respondent, and a Hotel Pre-Opening Agreement (the « Pre-Opening Agreement ») dated February 2, 1996 between Four Seasons Canada and the Respondent (collectively, the "Contracts", and individually each of them, « Contract »)

3.     The proceedings, administered by the International Centre for Dispute Resolution of the American Arbitration Association (« ICDR »), were initiated pursuant to the following arbitration clause, that is found in all the Contracts, and that in the Management Agreement reads as follows : « 19.03. Arbitration. Except as otherwise provided in section 18.04 and this section 19.03, any Dispute shall be settled by arbitration as follows : (a) each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration. Within 10 days after receipt by the other party of such notice, each party shall appoint an arbitrator and within ten days of their appointment the two arbitrators so chosen shall nominate a third arbitrator. If the two arbitrators fail within 10 days to nominate the third arbitrator, upon written request of either party, the third arbitrator shall be appointed by the International Court of Arbitration of the International Chamber of Commerce, and both parties shall be bound by the appointment so made. If either party hereto shall fail to appoint an arbitrator as required under this section 19.03(a), the arbitrator appointed by the other party shall be the sole arbitrator of the matter ; (b) the decision of the arbitrators (or such single arbitrator) shall be made within 10 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator) when reduced to writing and signed by them shall be final, conclusive and binding on the parties hereto, and may be enforced in any court having jurisdiction ; (c) the arbitration shall at the election of the Operator be held in the City of Miami, Florida, United States of America or the City of Caracas, Republic of Venezuela and shall be conducted in the English language and, except for those procedures specifically set forth in this section 19.03, shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof; and (d) the arbitrators (or such single arbitrator) shall determine the proportion of the expenses which each party shall bear; provided, however, that each party shall be responsible for its own legal fees. Notwithstanding anything contained in this section 19.03, any of Owner or Operator shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 22.10 and 22.11 governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained in this Agreement pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this section 19.03, (ii) commence legal proceedings (in which case the provisions of sections 20.10 and 20.11 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement, or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of either this Agreement or any other Hotel Agreements »

4.     The Claimants originally appointed as arbitrator  Professor Michael W.Gordon, who was challenged by the Respondent and later resigned. To replace Professor Gordon  the Claimants appointed John H. Rooney Jr., Esq  as arbitrator. The Respondent appointed Dr. Emilio Pittier O as arbitrator. On July 29, 2002, the Arbitral Tribunal hearing this case was fully constituted through the appointment of its Chairman, Dr. Horacio A. Grigera Naon, by the co-arbitrators appointed by the Parties.

5     The Contracts relate to the design, opening, operation and management by the Claimants of a hotel (the « Hotel ») situated in a commercial real estate development located in Caracas,

Venezuela, adjacent to the Plaza Altamira, owned by the Respondent, which includes, besides the Hotel and its facilities, a tower of condominium units and retail and office space attached to the Hotel.

6.      The Respondent introduced challenges to the jurisdiction of the Arbitral Tribunal and pursued or introduced a number of legal actions in Venezuela in disregard of the arbitration clause set forth above.

7.      Such actions included an action seeking constitutional "Amparo" protection mostly regarding different measures taken by Four Seasons Caracas in connection with Hotel operations governed or concerned by the Contracts, filed on December 12, 2001 with Caracas' Twelfth Court of First Instance, Civil and Commercial Division, and an action for terminating the Hotel Management Agreement, obtaining damage compensation for breaches thereof and requesting interim relief, contrived through a modification introduced by the Respondent on February 20, 2002 to a legal complaint previously filed on December 13, 2001 by the Respondent with Caracas Tenth Court of First Instance, Civil and Commercial Division, that originally was circumscribed to seeking declaratory relief in connection with a second mortgage held by Four Seasons Caracas on the Hotel property to secure the repayment of moneys loaned by Four Seasons Caracas to the Respondent.

8.      Also on February 20, 2002, the Respondent requested and obtained, in the same legal suit initiated before the Caracas Tenth Court of First Instance, Civil and Commercial Division, and from the same Venezuelan judge who had admitted the modified complaint seeking the termination of the Hotel Management Agreement, an injunction *inter alia* ordering Four Seasons Caracas not to continue its cash management of the Hotel and granting access to the Respondent to financial and accounting information regarding the Hotel operations.

9       Equally after the initiation of these arbitral proceedings, and in view of the legal suit initiated on February 20, 2002 in Caracas by the Respondent, on April 29, 2002 the Claimants filed an amended complaint with the United States District Court, Southern District of Florida, among other things to compel the Respondent to arbitrate.

10.     On July 31, 2002, the Claimants applied for injunctive relief in these arbitral proceedings aimed at enjoining the Respondent from undertaking or continuing any actions to remove the Claimants from the Hotel facilities or preventing the Claimants from performing their contractual obligations and at restoring the Claimants to the management of the Hotel.

11.     On August 2, 1992, the Respondent in its turn made a written submission in this arbitration objecting to the Claimants' application and to the jurisdiction of this Arbitral Tribunal to hear and decide on the claims introduced by the Claimants in this arbitration, whereby the Respondent raised, in support of its objections, the exclusive jurisdiction of the Venezuelan courts to decide disputes arising out of the Contracts.

12      After hearing the Parties in a preliminary conference call on such matters as well as the differing views of the Claimants and the Respondent on the version of the Commercial Arbitration Rules of the American Arbitration Association applicable to these proceedings, the Arbitral Tribunal issued its Procedural Order No 1 dated August 15, 2002, providing, *inter alia*,

that (i) the present arbitral proceedings are governed by AAA's Commercial Arbitration Rules in effect as of September 1, 2000 (the "2000 Rules") as modified or supplemented through AAA's Supplementary Procedures for International Commercial Arbitration, as amended and in effect as of April 1, 1999 (the "Supplementary Procedures") (ii) in a first stage of the arbitral proceedings, the Arbitral Tribunal would decide on the jurisdictional issues mentioned above and the application for provisional relief introduced by the Claimants and the Parties were to exchange Memorials and Reply Memorials and supporting documentary evidence and written witness and expert witness statements regarding such matters, and (iii) a Hearing would take place on October 1-2, 2002, in Miami, Florida to receive evidence and hear the Parties on the said issues and the Claimant's provisional relief application

13.     After such Hearing, that took place with the participation of both Parties, on October 10, 2002, the Arbitral Tribunal rendered a Partial Award that rejected the objections raised by the Respondent to the jurisdiction of the Arbitral Tribunal, upheld its jurisdiction to decide the disputes between the Parties subject to the present arbitration, ordered the Respondent to desist from the lawsuit before the courts of Venezuela identified in paragraph 8 above and not to re-introduce before the courts of Venezuela the claims covered by such lawsuit, not to introduce new claims before the Venezuelan courts arising out or relating to the Contracts or to apply for any injunctive relief before the Venezuelan courts in support of or in connection with such lawsuits or claims, and to cease and desist from actions or conduct interfering with the exercise of certain rights of the Claimants under the Contracts.

14.     The Respondent did not abide by or enforce any of the orders issued by the Arbitral Tribunal through its Partial Award. However, the Respondent continued to participate in this arbitration by, *inter alia*, submitting memorials on the merits, making written presentations in regard to different procedural matters, including the production of evidence, and playing an active role in procedural conference call hearings involving the Parties and the Arbitral Tribunal, until the Evidentiary Hearing that took place in Miami, Florida, on September 22-25, 2003. Notwithstanding this circumstance, the Respondent did not cease to make written or oral submissions before the Arbitral Tribunal objecting to its jurisdiction or aimed at suspending this arbitration or at obtaining the resignation of the members of the Arbitral Tribunal, nor refrained from initiating new legal actions or promoting existing ones before the courts of Venezuela relating to the present arbitral proceedings or the claims or disputes being subject to this arbitration. Such actions originated different decisions of the Venezuelan courts leading to the annulment of that portion of the Partial Award that ordered the Respondent not to pursue or to desist from pursuing its claims regarding matters submitted to the present arbitral proceedings and introduced before the Venezuelan courts or covered by the arbitration clauses in the Contracts, asserting the jurisdiction of the Venezuelan courts on the disputes arising out of the Contracts, and the granting of provisional relief aimed at obtaining the suspension of these arbitral proceedings

15      After the issuance of the Partial Award, the Arbitral Tribunal and the Parties held a telephone conference for the procedural organization of the arbitral proceedings. On the basis of the agreements reached during the conference call, the Arbitral Tribunal issued on December 19, 2002 Procedural Order No. 2 providing for, among other things, the submission by the Respondent of its Statement of Defense, rules governing the exchange, taking and production of

evidence, the presentation of further Memorials, and a timetable for the arbitration, including the dates for the Evidentiary Hearing to take place in Miami, Florida, U.S.A.

16.     In view of different circumstances concerning the production of evidence and the availability of the Parties and of the members of the Arbitral Tribunal, on March 21, 2003 the Arbitral Tribunal issued Procedural Order No. 3, that introduced changes to the procedural timetable and moved the Evidentiary Hearing to the week commencing on September 22, 2003.

17.     From March 21, 2003 until the Evidentiary Hearing, the Arbitral Tribunal had to resolve numerous procedural differences between the Parties which led, *inter alia*, to further modifications of the procedural timetable set forth in Procedural Order No. 3, although the dates of the Evidentiary Hearing remained unchanged.

18.     The Arbitral Tribunal also considered and rejected on May 22, 2003 an application made by the Respondent on April 11, 2003 seeking the suspension of this arbitration and the resignation of all the members of the Arbitral Tribunal, based on the decision of March 21, 2003 of the Tenth Superior Court in Civil, Commercial and Traffic Matters of the Judicial Circuit of the Metropolitan Area of Caracas declaring null and void certain parts of the Partial Award, and a decision of March 25, 2003 of the Political Administrative Division of the Supreme Court of Justice of Venezuela declaring that the Venezuelan courts have jurisdiction over the disputes submitted to the present arbitration.

19.     The determinations of the Arbitral Tribunal in connection with the procedural differences mentioned above included a Ruling of June 12, 2003 on the incorporation of supplemental witness statements and the production of documents by the Respondent, and the order issued on June 26, 2003 for the production by the Respondent of documents covered by the Claimants' Request To Produce dated March 24, 2003, with which the Respondent did not comply.

20.     On June 4, 2003, the United States District Court for the Southern District of Florida Miami Division, confirmed the Partial Award rendered by this Arbitral Tribunal in all its parts including, without limitation the order of the Arbitral Tribunal enjoining the Respondent from engaging in litigation in Venezuela in connection with the matters subjected to the present arbitral proceedings.

21.     During the procedural teleconference held by the Parties and the Arbitral Tribunal on September 2, 2003 pursuant to Procedural Order No. 3 for the purpose of resolving certain pending evidentiary matters and organizing the Evidentiary Hearing scheduled to commence on September 22, 2003, counsel to the Respondent announced the Respondent's decision not to participate in the Evidentiary Hearing and to cease participation in the arbitration proceedings, and ratified the Respondent's objections to the jurisdiction of the Arbitral Tribunal. Although the Respondent was invited through its counsel by the Arbitral Tribunal to reconsider its position not to further participate in the arbitration, on September 5, 2003 the Respondent submitted a letter rejecting such Arbitral Tribunal's invitation, indicating that the Respondent would send a representative with no authority to answer questions from the Arbitral Tribunal or from opposing counsel to attend the Evidentiary Hearing, accompanied by English and Spanish language court reporters, and reiterating the Respondent's demands for the suspension of these arbitral proceedings and the resignation of all the members of the Arbitral Tribunal.

22.    On September 8, 2003, the Arbitral Tribunal issued a Ruling and Procedural Order No 4 whereby the Arbitral Tribunal (1) authorized the videotape inspection of the hotel premises requested by the Claimants and gave directions regarding the carrying out of such inspection, (2) established guidelines governing the Evidentiary Hearing scheduled to commence on September 22, 2003, (3) took note of the fact that the Respondent had not submitted any Oral Evidence Witness List identifying the witnesses the Respondent would have provide oral testimony or wish to be made available for cross-examination in the Evidentiary Hearing in compliance with Procedural Order No.3, and (4) rejected once more the Respondent's petitions challenging the jurisdiction of the Arbitral Tribunal and demanding the suspension of the arbitral proceedings and the resignation of the Arbitral Tribunal's members

23.    On Sunday September 21, 2003, the co-arbitrator Dr. Emilio Pittier O confirmed by phone to the other arbitrators that he would not be attending the Evidentiary Hearing in Miami, Florida commencing the following day because of an interim order issued on September 19, 2003 by the Sixth Superior Court in Civil, Commercial and Traffic Matters of the Judicial Circuit of the Metropolitan Area of Caracas suspending these arbitration proceedings.

24.    On September 22, 2003, at the commencement of the Evidentiary Hearing held in Miami, Florida, that was attended by Chairman Dr. Horacio A. Grigera Naón, co-arbitrator John H Rooney, Esq., counsel for the Claimants and a representative of the Respondent.   Mr. Joseph Matthews, Esq.   the latter without authority from the Respondent to answer questions or address the Arbitral Tribunal - and after hearing the Claimants on the issue raised by the absence of co-arbitrator Dr. Emilio Pittier O. and giving the opportunity to the Respondent's representative to address such issue, the Arbitral Tribunal informed the ICDR of this development.

25.    After hearing the members of the Arbitral Tribunal mentioned above and the representatives of the Parties attending the Evidentiary Hearing, that same day - September 22, 2003- the ICDR declared the office of the Respondent's party appointed Arbitrator vacant pursuant to R-21 of the 2000 Rules, authorized the remaining arbitrators to determine the continuation of the Evidentiary Hearing pursuant to R-21 (b) of the 2000 Rules, and invited the Respondent to appoint an arbitrator to fill the vacancy within ten days pursuant to R 14 of such Rules

26.    As determined by the Arbitral Tribunal, the Evidentiary Hearing continued through September 25, 2003, with the representative of the Respondent in attendance only during the morning and early afternoon of the first day i.e., September 22, 2003 The following fact or expert witnesses called by the Claimants appeared at the Evidentiary Hearing Ignacio Gómez Tobar, Vice-President and General Manager of the Four Seasons Hotel in Miami; Thomas Lind, former General Manager of the Four Seasons Hotel in Caracas; Craig Reid, Four Seasons General Manager and Regional Vice-President; Robert Dunigan, Director of Internal and Operational Audit, Four Seasons Canada Jorge Moore Gómez, former Director of Human Relations of the Four Seasons Hotel in Caracas; Dr. Enrique Lagrange, expert witness, Isabel Claver, expert witness, and Charles Ferraro, Senior Vice-President of Operations Four Seasons Canada (who had to leave because of the delays in the continuation of the Evidentiary Hearing resulting from the absence of the arbitrator appointed by the Respondent, but who later testified by means of teleconferencing during the Evidentiary Hearing) Neither the fact nor expert witnesses that submitted witness statements on the Respondent's behalf and that the Claimants

expressed the intention to cross-examine (Messrs. Janos Gyory K., Luis García Montalvo and Lautaro Barrera), nor the person within the control of the Respondent the Claimants wished to examine (Mr. Carlos L. Barrera, President of Consorcio Barr), appeared at the Evidentiary Hearing. The Evidentiary Hearing was recorded by court reporters, and court reporters fluent in the English and the Spanish languages were present throughout the Evidentiary Hearing. According to the agreement of the Parties, the Arbitral Tribunal accepted the Spanish language transcript of Dr. Enrique Lagrange's oral testimony as a part of the arbitral record.

27.     By communication of October 20, 2003, the ICDR informed that it had appointed José María Abascal, Esq. as new member of the Arbitral Tribunal in replacement of Dr. Emilio Pittier O.

28.     By communication dated October 30, 2003 the Arbitral Tribunal granted the Parties until December 1, 2003 for filing Post Hearing briefs.

29.     The Arbitral Tribunal only received a Post Hearing brief from the Claimants, that was timely filed.

30.     After inquiring of the Parties whether they had any further proofs to offer or witnesses to be heard, considering an exchange of written communications between the Parties not raising any evidentiary issues that took place on March 8, 2004, and being satisfied as to the completeness of the record before it, on March 17, 2004 the Arbitral Tribunal declared the hearing closed pursuant to R-37 of the 2000 Rules.


## II. The General Background of the Dispute


31.     According to the Contracts, the Claimants undertook to provide the Respondent certain services in connection with the development, design, furnishing, equipping, servicing, marketing, operation, supervision and direction of the Hotel as a World Class Luxury Hotel and with a view to maximizing the benefits derived from its exploitation for both the Claimants and the Respondent.

32.     Under the Contracts, the Respondent is obligated to construct, furnish and equip the Hotel according to the general and particular standards laid down by Four Seasons Canada, and to cause the Hotel to be operated and managed as a World Class Luxury Hotel (sections 3.01 and 3.03 of the Pre-Opening Agreement, sections 5.01, 5.04 and 5.05 of the Advisory Agreement, sections 4.01(h), 5.04 and 5.05 of the Management Agreement and section 3.01 of the Services Agreement). The Claimants contend — and it is, indeed, indisputed - that the general standard to be met is that of a « World Class Luxury Hotel » i.e. comparable to hotels and resorts operated and managed by Four Seasons Canada or any affiliate thereof under the name « Four Seasons » in North America. According to the Claimants, the particular standards to be met are those set out in the Pre-opening agreement and the Hotel Design Brief appended thereto, and the designs and specifications approved by Four Seasons Canada for the Hotel.

33.     The various services to be provided by the Claimants to the Respondent under the Contracts essentially consisted of two distinct phases. The first phase – or pre-opening phase – extended until the opening of the Hotel for business or its « Opening Date », i.e., as defined under article 4.01(a) of the Advisory Agreement and section (aq) of its Schedule « A » the date « on which the Hotel is first opened to the public for guest room occupancy… ». During the pre-opening phase, the Owner was to construct, furnish and equip the Hotel and make a number of arrangements to permit the Hotel to open for business with the support of the services provided by the Claimants, so as to enable the Hotel to commence and continue to operate as a « World Class Luxury Hotel ».

34.     The second phase – or post-opening phase – starts on the Opening Date and is to continue through the life of the Contracts; i.e., until the expiration of a period of twenty consecutive Fiscal Years after the Opening Date and any successive extensions agreed upon by the Parties. In this second phase, after a period of transition for the stabilization of the Hotel operations, the Hotel is expected to generate a steady flow of revenues that will be first applied, among other things, to the payment of fees to the Contractors, the reimbursement of advances of the Operator and other costs and expenses incurred by it for the benefit of the Hotel operation and other expenses to be covered by the Hotel revenues, and thereafter to the payment of revenue to the Owner net of such fees, reimbursements and operation expenses (article 10.04 of the Management Agreement). During this phase, the services provided by Four Seasons Caracas under the Management Agreement become paramount.

35.     The Claimants allege that the Respondent breached the Contracts in several respects and throughout both the pre-opening and post-opening phases. Such contractual breaches essentially include the following

(i)      failing to complete the construction, furnishing and equipping of the Hotel in accordance with the high standards of a world-class, luxury, Four Seasons hotel;

(ii)     failing to fund the working capital requirements of the Hotel and establish a line of credit that is sufficient to meet these working capital requirements;

(iii)    failing to pay approximately US$ 1,700,000.00 owing to the Claimants pursuant to the Contracts;

(iv)     seizing approximately US$ 800,000.00 from the Hotel bank accounts, funds which should have been used to fund the Hotel's working capital requirements

(v)      failing to hand over physical, operational and managerial control of the Hotel, including physical control of the infrastructural systems, facilities and equipment necessary for the operation and management of the Hotel;

(vi)     interfering with the Claimants' management and operation of the Hotel to such an extent that the Hotel does not meet the high standards of a world class, luxury, Four Seasons hotel; and

(vii)    failing to provide the Claimants with powers of attorney required to operate the Hotel

36     The deficiencies in the Hotel's construction, furnishing and equipping blamed by the Claimants on the Respondent include the failure to complete large portions of the physical facilities, including guest rooms, meeting and banquet rooms and the health club and spa, the failure to complete the furnishing of the Hotel, and the failure to provide adequate operating equipment and supplies required by the Hotel staff to provide services to the guests pursuant to the standards mentioned above

37.    The Claimants also allege that by failing to fund the working capital requirements of the Hotel and not setting up the contractually required Line of Credit to cover such working capital requirements, the Hotel has been and is exposed to severe cash flow problems that have jeopardized the « uninterrupted and efficient operation of the Hotel », and that include the inability of the Hotel to meet its obligations as they become due

38.    Furthermore, the Claimants contend that besides failing to reimburse the Claimants for expenses reimbursable to the Claimants according to the Contracts, to repay advances made by Four Seasons Canada/Four Seasons Caracas to make up for the failure of the Respondent to fund the working capital needs of the Hotel operation, and to pay fees due and payable to the Claimants under the Contracts, the Respondent breached its contractual obligation to delegate to Four Seasons Caracas the exclusive responsibility to manage the Hotel, and more generally, to give the Claimants full control of and discretion in the start up, procurement services, operation and management of the Hotel, as required under the Contracts. According to the Claimants, the Respondent interfered in different ways with the operation and management of the Hotel by Four Seasons Caracas, *inter alia* by refusing to relinquish physical control of the central Hotel components and its infrastructure, attempting to exercise arbitrary control and direction over the employees of the Claimants, and diverting funds obtained from the operation of the Hotel

39     Although the Claimants originally sought the approval by the Arbitral Tribunal of the annual plan for 2002 regarding the operations of the Hotel (approval that was refused by the Respondent), the Claimants withdrew such claim during the Evidentiary Hearing that took place on September 22-25, 2003 in Miami, Florida[1]

40.    The Claimants apply for relief for damages, totaling US$ 9,035,000, corresponding, among other things, to management fees owing to Four Seasons Caracas under the Management Agreement, incentive fees owing to Four Seasons Canada under the Advisory Agreement, working capital advances, pre-opening expenses, cash advances and interest on such advances reimbursable under the Management Agreement and the Pre-Opening Agreement, and the repayment of the principal amount and interest thereon of a loan made available to the Respondent under the Management Agreement and a loan agreement pursuant to it[2]

41     The Claimants also ask the Arbitral Tribunal to issue a permanent injunction enjoining the Respondent from any interference in the operation or management of the Hotel so long as the Management Agreement shall remain in force, and to order the Respondent to specifically

---

[1] Hearing transcript, at 705.

[2] Claimants' Memorial of May 19, 2003, at 45-46 ; document C 7.

perform its obligations under the Contracts including, but not limited to, the completion of the
Hotel and turning over all areas of the Hotel to « Four Seasons for its operation »[3].

42.    The Respondent rejects each and every of the Claimants' allegations summarized above
The  Respondent contends that the Claimants' claims do not originate in failures or deficiencies
in the construction of the Hotel or its equipment but in serious legal and contractual violations
that would have been incurred by the Claimants in the Hotel operation or in connection
therewith.

43     The Respondent says that the Hotel has been and remains closed because of the
Claimants' unilateral decision to shutdown the Hotel operations, which would constitute a
violation of the Contracts, that would not permit the Claimants to abandon the Hotel or halt the
Hotel's operations. The Respondent asserts that the Hotel was completed, furnished and
equipped by  the Respondent in accordance with the « world class luxury » standard required by
the Contracts, and that the fixtures, furniture, furnishings and decorative items used in the Hotel
not only comply with Four Seasons standards, but also in some cases exceed such standards.

44.    The Respondent denies the Claimants' allegation that the Respondent failed to honor its
obligations to provide working capital under the Management Agreement, and states that such
allegation derives from the Claimants' failure to understand  the financial aspects of the
Contracts and the contractual terms and conditions according to which the Respondent would be
obligated to provide such funding.

45.          More specifically, the Respondent points out that the Claimants (and in particular,
Four Seasons Caracas), in breach of the Management Agreement, refused access to accounting
information relating to the Hotel operation, did not keep the Hotel books in accordance with
generally accepted accounting practices and did not provide proper support for accounting book
entries, failed to provide the annual plan required by the Management Agreement (including a
marketing plan, an annual forecast of operations, a projected balance sheet, cash flow budget and
source and use of funds statement and a capital plan for expenditures on furniture, fixtures and
equipment) (the « Annual Plan ») for 2001, the first year of operations of the Hotel, did not issue
the Letter of Credit to guarantee a minimum net operating profit to the Owner, misrepresented
the state of construction of the Hotel, did not conduct itself in accordance with good corporate
governance principles, misappropriated Hotel funds, was generally grossly negligent in
discharging its duties as Operator, mismanaged the Hotel and finally shut down the Hotel
operations. The Respondent also contends (but has not filed a counterclaim) that the conduct of
the Claimants and the shutdown of the Hotel have caused losses to the Respondent that on
January 17, 2003 would amount to US$ 3,000,000 00[4] plus lost profits, that according to the
Respondent's estimate would amount to US$ 10,000,000 00, and damnum emergens[5]

---

[3] *Ibid.*, at 46-47

[4] Respondent's Statement of Defense of January 17, 2003, at 13

[5] Respondent's Memorial of May 20, 2003 , Respondent's Reply Memorial of August 15, 2003,
no  64, at 22

46.   Although the Respondent admits that Four Seasons Caracas did submit budgets for the Hotel operations (only one aspect or component of the contractually required Annual Plan), the Respondent indicates that such budgets showed gross inconsistencies adversely affecting their reliability, and that in breach of their contractual obligations, the Claimants never provided an Annual Plan for the first year of operation of the Hotel. In any case, the Respondent denies having approved any such Annual Plan. The Respondent also contends that the Claimants incurred in unnecessary and unacceptable expenditures that were « over budget ».

47.   In addition, the Respondent argues that the failure of Four Seasons Caracas to open a stand-by letter of credit for an amount of US$ 6,000,000.00 to support a Cash Flow Guarantee from Four Seasons Caracas and required by the Management Agreement was another contractual violation allowing the Respondent not to perform its own obligations under the Contracts or excused their non-performance.

48.   The Respondent denies owing any fees to the Claimants, or that the Claimants hold any credits against the Respondent, and states that many of the services for which such fees would have been charged were not performed or not authorized. The Respondent denies having seized Hotel funds and contends that, on the contrary, it was Four Seasons Caracas that unilaterally deposited Hotel revenue in its own accounts in violation of the Management Agreement.


### III. Findings and Considerations of the Arbitral Tribunal


### Preliminary Remark


49.   The Arbitral Tribunal considers and so finds that the Respondent has participated in this arbitration notwithstanding the Respondent's unilateral decision (1) not to have any active presence in the Hearing that took place in Miami, Florida, of which the Respondent was duly notified, and in which the Respondent was given full opportunity to participate, and (2) not to play any active role in this arbitration thereafter. The Arbitral Tribunal notes that before the Respondent took such decision the Respondent did actively participate in this arbitration through the submission of numerous briefs and memorials, its involvement in conference calls that included the Claimants, the Respondent and the Arbitral Tribunal, and the making of written submissions and the production of evidence in accordance with the procedural orders or directions issued from time to time by the Arbitral Tribunal in this arbitration.

50.   In any case, unlike a court of law, arbitral tribunals do not render default awards, and this Arbitral Tribunal shall make a determination of the claims asserted. Thus, the Arbitral Tribunal makes this Award on the basis of the pleadings filed by the Claimants and the Respondent and the evidence before it. Besides the sworn witnesses and expert witnesses present at the Hearing and listed before, such evidence includes eight binders of documents submitted by the Claimants, and numerous documents submitted by the Respondent. Although the witnesses were not cross examined because of the Respondent decision not to do so, they were extensively questioned by

the members of the Arbitral Tribunal present at the Hearing, who, through their questions, addressed issues raised by the Respondent in its pleadings

51.     However, and notwithstanding the foregoing, in accordance with generally accepted principles in international dispute resolution[6], when an arbitral tribunal is confronted with the decision of one of the parties to an international arbitration proceeding not to fully participate in the evidentiary hearing and subsequent proceedings, and such party is for all practical purposes absent during the evidentiary hearing, the arbitral tribunal cannot by its own enquiries entirely make up for the absence of such party, particularly in a case involving extensive questions of fact. The voluntary decision of Consorcio Barr not to participate in the Evidentiary Hearing in these arbitral proceedings may then limit the extent to which the Arbitral Tribunal is informed of the facts, among other things because, by opting not to participate in such Hearing, Consorcio Barr has unilaterally and intentionally forfeited the opportunity to counter the factual allegations of its opponents

52.     On one hand, these circumstances necessarily impose limits on the degree of vigilance the Arbitral Tribunal can reasonably exercise in determining the facts of the case and analyzing and evaluating the arguments submitted by Consorcio Barr regarding such facts. On the other hand, it would be contrary to the principle of the equality of the parties if the Claimants, that have fully appeared and participated in these proceedings, should be placed at a disadvantage by the Arbitral Tribunal allowing Consorcio Barr to profit from its decision not to fully participate. Therefore, the self-inflicted disadvantages for Consorcio Barr resulting from such decision, as a result of which Consorcio Barr has been for all practical purposes absent in the decisive evidentiary phase of these arbitral proceedings, directly leading to this final Award on the merits, are not then limited to the lost opportunity to submit argument and supporting evidence, and must necessarily be fully borne by Consorcio Barr.


(A) The Basic Obligations of the Parties under the Contracts


53.     The nature and scope of the relationship between the Claimants and the Respondent are evidenced by their respective rights and obligations as spelled out in the Contracts All the Contracts are governed by the laws of Venezuela (article 22.09, Management Agreement; article 20.09, Advisory Agreement; article 13.09. Services Agreement; article 20.09. Pre Opening Agreement).

54.     Although the Management Agreement is at the center of such relationship, all the Contracts converge in the common aim of starting up and developing a high class hotel business in Caracas, and for that reason their provisions present a certain level of interaction and interrelationship that is one of the defining traits of the transactions between the Claimants and the Respondent. Indeed, the Contracts are to be construed, and its provisions interpreted, as

[6] ICJ, Nicaragua vs. United States of America, Decision of June 27, 1986, 1986 27 June General List No 70, at nos. 30 31, pages 15-16

integrated parts of the same and one contractual whole or unit animated by the uniform objective of starting up and developing a World Class Luxury Hotel in Caracas, Venezuela.

55.    In its Recitals, the Management Agreement states that Four Seasons Caracas and its Affiliates (including Four Seasons Canada) have expertise in the « various phases of the development, construction, furnishing, equipping, operation, management, supervision and direction of World Class Luxury Hotels ». In view of such expertise, the Respondent entered into the Management Agreement to « obtain the benefit of the Operator's [Four Seasons Caracas] expertise in providing services with respect to the day-to-day operation and management of World Class Luxury Hotels and other facilities [...] in connection with the Hotel, into the Pre-Opening Agreement to obtain certain services from Four Seasons Canada regarding the development, construction and pre-opening of the Hotel; into the Services Agreement to obtain certain services from Four Seasons Caracas regarding purchasing, refurbishing and marketing services for the Hotel; and into the Advisory Agreement to obtain certain services and advice from Four Seasons Netherlands in connection with the supervision and direction of the Hotel[7].

56.    The expression « World Class Luxury Hotel » is defined in the Advisory Agreement as such term is understood « in the hotel industry »; i.e. it refers to a hotel meeting :

> « ....development,construction, operating, service and maintenance standards at least equal to those of other similar urban facilities which may at any time be managed by Four Seasons or any of its Affiliates in North America »[8]

57.    It is then indisputed that achieving the objective of opening the Hotel for business and operating it as a World Class Luxury Hotel at a profit constitutes the central and ultimate objective of the Contracts, which require from the Parties to apply themselves to the coordinated performance of their contractual obligations in a spirit of mutual cooperation in order to attain such objective. The absence of such spirit in any of the Parties would, of course, seriously undermine any possibility of success and - most likely - definitively derail the attainment of the ultimate purpose of the Contracts.

58    The Contracts describe the role and obligations assigned to each of the Parties for attaining the final end of starting up and operating the Hotel as a World Class Luxury Hotel

59.    For example, according to article 5.01 of the Management Agreement, Four Seasons Caracas is

> « ...the exclusive operator and manager of the Hotel during the Term with exclusive responsibility and full control and discretion in connection with the operation and management of the Hotel and its staff as a World Class Luxury Hotel in accordance with the terms and conditions of this Agreement. Owner expressly agrees and undertakes, subject to the terms and conditions of this Agreement, to allow Operator to operate and manage the Hotel and its staff as a World Class Luxury Hotel as Operator determines in its sole discretion »

---

[7] Management Agreement, Recitals C-F ; H-I.

[8] Schedule « A » of the Advisory Agreement, no (bo).

This provision then vests the Operator with wide discretionary powers and authority to operate the Hotel. For that reason, the Owner accepts, according to article 4.01 (i) of the Management Agreement, that :

« Operator may peaceably and quietly possess, manage and operate the Hotel during the Term, free from interruption or disturbance »

Therefore, by signing the Management Agreement, such powers, authority and possessory and other rights vested in the Operator are expressly acknowledged and accepted by the Respondent.

60.     Article 5.02 of the Management Agreement provides that Four Seasons Caracas shall « in a professional, efficient and expeditious manner, take all necessary action for the operation and management of the Hotel as a World Class Luxury Hotel, all for the account and on behalf of the Owner » This provision also defines the responsibilities of Four Seasons Caracas which, acting « as agent of Owner » is *inter alia* to (a) use all reasonable efforts to maximize patronage and profitability of Hotel facilities, including the establishment of room rates on a basis consistent with a World Class Luxury Hotel  collect all charges, rents and other amounts from guests and patrons of the Hotel; (b) hire, pay, supervise, relocate and discharge all personnel of the Hotel and « determine all matters with regard to such personnel », provided, however, that except for the Senior Hotel Personnel, all such personnel was to be employed by the Respondent and would become the Respondent's employees; (c) provide for the maintenance and repair of the Hotel in accordance with World Class Luxury Hotel Standards; (d) arrange for utility, telephone, detective agency protection, elevator, escalator, window washing, vermin extermination, trash removal and other services necessary for the operation of the Hotel and purchase on the credit of the Owner all Operating Equipment and Supplies and Furniture, Fixtures and Equipment and such other services and merchandise, as are necessary for proper operation of the Hotel as a World Class Luxury Hotel; (e) enter into contracts in connection with the operation and management of the Hotel; (f) establish the cash management and banking arrangements for the Hotel; (g) establish the Hotel policy regarding its association with any credit card system . Article 7.01 of the Management Agreement further states that Four Seasons Caracas « shall act solely as the agent of the Owner ».

61.     Finally, according to article 5.03 of the Management Agreement, the Operator undertook to provide certain services (e.g. room, maid, valet and laundry services) to the residential apartments adjacent to the Hotel.

62.     To facilitate the carrying out of its duties as an agent in accordance to the discretionary powers vested in Four Seasons Caracas under article 5.01 of the Management Agreement, article 7.02 thereof authorizes Four Seasons Caracas, *inter alia*, to engage one or more persons to perform services in connection with the operation and management of the Hotel, who will act as the Owner's agents, and to obtain from the Owner powers of attorney for such persons in order to enable them to perform such services

63.     The Respondent's responsibilities listed in article 5.04 of the Management Agreement  a similar article bearing the same number in the Advisory Agreement  article 3.01 of the Services Agreement, and article 3.01(a) of the Pre Opening Agreement  include causing the Hotel to be operated and managed as a World Class Luxury Hotel and to be furnished, equipped, supervised, directed, serviced and marketed and to be developed and constructed in accordance with the

Contracts. This latter provision of the Pre Opening Agreement very specifically requires from the Owner to cause the Hotel to be developed and constructed and be furnished and equipped:

« ...in each case as a world class luxury hotel comparable to the hotels and resorts operated and managed by Four Seasons or any Affiliate thereof under the name « Four Seasons » in North America in accordance with the designs and specifications approved by Four Seasons for the Hotel, the Hotel Design Brief and this Agreement »

According to article 5.05 of the Management Agreement and an identical article in the Advisory Agreement, the Owner

« covenants to maintain the Hotel as a World Class Luxury Hotel »

It is then clear from the letter and the spirit of the Contracts, that the determination of the standards to be met in the construction, equipping and furnishing of the Hotel to be complied with by the Respondent in the performance of its obligations under the Contracts to have the Hotel become a World Class Luxury Hotel were fixed by the Claimants, and that failure of the Respondent to abide by such standards would constitute a contractual breach by the Respondent. It is in accordance to such standards that, as provided in article 4.01 (h) of the Management Agreement, the Owner:

« ...shall, or shall cause, the Hotel to be developed, constructed, furnished and equipped and shall deliver the same to Operator in a turnkey state on the Opening Date for operation in accordance with the provisions of this Agreement »

64     It is equally clear that the Owner is also solely and fully responsible for obtaining all the funds necessary for the performance of its contractual obligations, including achieving by the Opening Date the ultimate result, undertaken by the Owner, of providing, on a turnkey basis, a Hotel that is a World Class Luxury Hotel. For this reason, according to article 4.01(h) of the Management Agreement, the Owner « shall arrange to obtain all financing necessary » in connection with the development, construction, furnishing and equipping of the Hotel

65.     Thus, according to the Contracts, the essential obligations and responsibilities of the Respondent include: (i) refraining from any conduct interfering or likely to interfere in the broad discretionary powers of the Operator to manage and operate the Hotel and the Hotel business; (ii) carrying out all its obligations to construct, furnish and equip the Hotel and complete other arrangements related to the Hotel's operation permitting it to open for business to the public as a World Class Luxury Hotel and to continue to operate as such, and (iii) providing the financing necessary to perform its contractual obligations.

66.     Another essential responsibility of the Respondent »... throughout the Term as and when requested by the Operator   » is to provide « working capital in amounts required for the uninterrupted and efficient operation of the Hotel » (article 8.01 (i) of the Management Agreement) The Term of the Management Agreement   defined in No. (ab) of its Schedule « A » »   commences on April 9, 1997 and expires on the last day of the twentieth full Fiscal Year (disregarding the initial Fiscal Year of less than twelve months) after the Opening Date of the Hotel (article 9.01), or any later date resulting from extensions of the initial Term agreed by the Owner and the Operator pursuant to article 9.02 of the Management Agreement

67.   The supply of working capital by the Respondent is clearly one of its fundamental obligations, before and after the Opening Date of the Hotel, not only because - as stated in article 7.01 of the Management Agreement - the relationship between the Owner and the Operator thereunder is not a partnership or joint venture imposing funding obligations on both Parties, but also because :

« Operator shall not be required to expend any of its own funds or otherwise incur any debts or liabilities to any Person in the performance of its duties as the operator and Manager of the Hotel. All debts and liabilities to third Persons required or permitted to be incurred by Operator under this Agreement in the course of its operation and management of the Hotel shall be the debts and liabilities of Owner only and Operator shall not be liable for any such obligations by reason of its operation and management of the Hotel for Owner. Operator may so inform third Persons with whom it deals on behalf of Owner and may      take other reasonable steps to carry out the intent of this section 7.01. »

68.   Furthermore, article 8 08 of the Management Agreement provides that in no event would the Operator be required to extend its own credit in connection with the acquisition of furniture, fixtures and equipment or operation equipment and supplies or « otherwise » for the operation of the Hotel.

69.   It is an indisputed fact that the arrangements to be provided by the Owner as a part of its contractual obligations include, during the pre opening phase, setting up different bank accounts needed for the normal operation of the Hotel. The flows into such accounts would essentially consist of cash, check or credit card payments from the Hotel guests and clients, and the outflows would be applied to pay for the costs and expenses of the Hotel operation. According to article 8.05(a) of the Management Agreement, all funds derived from the Hotel operation are to be deposited into bank accounts established and maintained by the Owner in connection with the operation of the Hotel, or « Owner Bank Accounts ».

70.   However, article 8.05 (b) of the Management Agreement also provides for the opening of Hotel Bank Accounts that shall be maintained under the name of the Hotel in a bank designated by the Owner and approved by the Operator. Although according to article 8.06 of the Management Agreement, the Hotel Bank Accounts are the property of the Owner and can only be disbursed in accordance with the provisions of the Management Agreement, unlike the Owner Bank Accounts – which are entirely controlled by the Owner - the disbursements of funds from the Hotel Bank Accounts are entirely controlled by the Operator , which « ... shall designate those Persons (...) who may draw on such accounts » (article 8.05 (b) of the Management Agreement). Although the Hotel Bank Accounts belong to the Owner, the Owner may not interfere in their movements by the Operator or pursuant to the Operator's instructions as a part of the general duty of the Owner of not interfering in the operation of the hotel by the Operator. Thus, according to article 8.07 of the Management Agreement:

« Owner shall not pledge or deal with the funds in the Hotel Bank Accounts in any manner that may impede the ability of Operator to pay obligations incurred in or in connection with the operation and management of the Hotel »

71.   The contractual rights of the Respondent in respect of, inter alia, the incurrence of expenditures and application of funds by Four Seasons Caracas as Operator of the Hotel include obtaining an Annual Plan covering each year of Hotel operation after the Opening Date (article 6 01 of the Advisory Agreement) and monthly profit and loss statements from the Operator

16

(article 10.06(a) of the Management Agreement), and accessing the books of accounts and records the Operator has the obligation to keep for the account of Owner in accordance with Generally Accepted Accounting Principles applicable to the hotel industry and having such books audited as provided in the Management Agreement (articles 10.06 (b), 11 of the Management Agreement).

72.    The paramount importance of the contractual obligation of the Owner to infuse working capital for the Hotel's operation is consonant with the unilateral and equally paramount contractual obligation of the Owner to fund the pre-opening fees, costs and expenses of the Hotel under article XI of the Pre-Opening Agreement with Four Seasons Canada and fully consistent with the role of the Owner as only (in the Pre-Opening phase) and exclusive (so long as the Hotel's operation does not generate sufficient revenue) provider of funds for the carrying out of the hotel business that is the subject-matter of the Contracts, and the Owner's capacity as principal in its agency relationship with Four Seasons Caracas pursuant to the Management Agreement or as contractor for the services supplied by the Claimants under the other Contracts.

73.    The unilateral and largely unconditional nature of the obligation of the Respondent to provide funding for the operation of the Hotel under article 8.01 (a) and correlative provisions of the Management Agreement is further confirmed by the Owner's obligation under article 8.01(b) thereof to provide for a Line of Credit extended by a banking institution designated by the Owner and approved by the Operator at least 30 days prior to the Scheduled Opening Date, for an amount equal to the Working Capital Reserve (as defined in the Management Agreement), that was to be renewed and replenished by the Owner as provided in such article. In case of any deficiencies in the satisfaction by the Owner of cash requirements under aforesaid article 8.01(b), the Operator is entitled to make unilateral calls on the Line of Credit to cover such deficiencies. If the Line of Credit is not renewed or replenished in an amount equal to the Working Capital Reserve *or*

> *"...if the Line of Credit is not sufficient to fund the working capital required for the uninterrupted and efficient operation of the Hotel for the then current Fiscal Quarter, for any reason whatsoever, including (without limitation) by reason of being fully drawn, expired, cancelled or otherwise not available..."*

then, the Operator is entitled to have all funds derived from the operation of the Hotel deposited in the Hotel Bank Accounts controlled by the Operator instead of in the Owner's Bank Accounts controlled by the Owner (article 8.05 (b) of the Management Agreement).

74.    Finally, the Management Agreement provides for certain rights in favor of the Owner, which appear to substantially constitute the contractually negotiated *quid pro quo* granted to the Owner in exchange for the vesting in the Operator Four Seasons Caracas practically the entire control over the Hotel operations and management, the Owner's concomitant obligation not to interfere with or disrupt the running of the Hotel operations by the Operator and the rendering of services relating to such operations by the Four Seasons Contractors under their respective Contract, the reliance of Consorcio Barr on the skills and expertise of the Claimants relating to the starting up, managing and operating hotels meeting World Class Luxury Hotel standards, and the punctual performance by the Owner of its largely unilateral and unconditional obligations to complete the Hotel in accordance with the Contracts and fund the Hotel's operations under the Management Agreement

75.    Thus, article 8.03 of the Management Agreement provides for the obligation of the
Operator to provide to the Owner, at the Owner's request , on or before the Opening Date  a loan
for an amount equal to US$ 5,000,000.00 (the « Investor's Loan »)  The Investor's Loan could
only be applied to repay existing financing secured through a first mortgage on the Hotel or to
complete the construction of the Hotel, and would be secured through a second mortgage on the
Hotel. According to article 8.04 of the Management Agreement, the Operator agrees to make
certain payments or « Deficit Payments » to the Respondent should the operations of the Hotel,
during any Fiscal Year in a period of ten Fiscal Years counted as from the Hotel's Opening Date
not reach certain guaranteed net operating profit levels. Deficit Payments would be repaid to the
Operator – without interest  out of funds available in the Hotel Bank Accounts when the Hotel
operations would yield the guaranteed net operating profit levels  The Operator's obligation to
make Deficit Payments was to be supported by an irrevocable letter of credit issued
contemporaneously with the execution of the Management Agreement by a Canadian financial
institution designated by the Operator.


B. The Relationship Among the Parties[9]


(i)    The Pre-Opening Phase


(a) The Respondent's Financial Difficulties


76.    The record establishes that the Respondent had financial difficulties adversely affecting
its ability, since the early stages of the Respondent's relationship with the Claimants – that
commenced by the execution on December 14, 1995 of a Letter of Intent by Four Seasons
Canada and Consorcio Barr - to discharge its basic contractual obligation to complete the
construction, furnishing and equipping of a Hotel conforming to the contractual requirements
This circumstance was one among other substantial circumstances for which Consorcio Barr was
responsible leading to continuous postponements of the Hotel Opening Date for reasons that may
not be attributed to the Claimants. The aggregate impact of such various circumstances led to
extending the pre-opening phase for a much longer period than originally expected or normal in
the hotel industry, that fluctuates from 12 to 15 months[10]


[9] In the footnotes of this Award, the following abbreviations shall have the following meaning  T
– Testimony, WS   Witness Statement

[10] Claver L. at 925-926

77.     Such financial difficulties were explicitly set forth by Consorcio Barr to the Claimants' management in a meeting in Aviara, California, on September 4, 1998[11], that on the Consorcio Barr side was attended by its President, Carlos L. Barrera, and his brother Lautaro Barrera[12]. During such meeting, Consorcio Barr also described the disruptions in the business environment caused by the course of political events in Venezuela and their adverse impact on the construction activities, including those directly relating to the Hotel, and the concomitant need to control costs during the pre-opening stage of the Hotel[13]. Nevertheless, there is no evidence that Consorcio Barr alleged then or thereafter that such disruptions constituted a legal excuse under Venezuelan law not to perform its obligations under the Contracts.

78.     Consorcio Barr's financial difficulties, present even before the execution of the Contracts, accounted for Consorcio Barr's interest in managing and controlling the Hotel's pre-opening procurement and expenditures and also for the markedly slow pace in the construction of the Hotel[14]. Despite Consorcio Barr apparently obtaining by May 1999 additional financing that permitted the resumption of construction and the funding of the Hotel pre-opening phase, that had slowed down significantly or ceased since the meeting in Aviara until January 1999[15], such financial difficulties did not cease.

79     In any case, by proceeding with the disbursement of a US$ 5,000,000.00 Investor's Loan pursuant to a notice of disbursement filed by Consorcio Barr on June 14, 2000[16] under a Loan Agreement dated May 19, 2000 between Four Seasons Caracas as lender and Consorcio Barr as Respondent (the « Loan Agreement »)[17], Four Seasons Caracas made a substantial contribution to the improvement of Consorcio Barr's financial situation and to neutralizing or minimizing the negative impact of Consorcio Barr's financial difficulties on the performance by Consorcio Barr of its basic obligations under the Contracts. Actually, the proceeds of the Investor's Loan - as provided in section 2.2 of the Loan Agreement – could only be applied to the prepayment of senior debt (as defined in such agreement and incurred in the construction of the Hotel) or funding the budget for completing the construction of the Hotel. Such Loan Agreement further evidences, with certain modifications, the Investor's Loan undertaking of Four Seasons Caracas under article 8.03 of the Management Agreement.

---

[11] Gómez Tobar WS, no 24, at 13.

[12] Internal Memo of the meeting by Four Seasons Mexico dated September 7, 1998, doc C-417 , Ferraro T., at 723-726.

[13] Letter of September 14, 1998 from Mr. Carlos Barrera, President of Consorcio Barr, to Mr Charles Ferraro, Area Vice-President of Four Seasons

[14] Gómez Tobar WS, no. 20, at 10.

[15] Gómez Tobar WS, no 24, at 13, no 26 at 14.

[16] Doc C-370

[17] Doc C-372

(b)   The Respondent's Interference in the Procurement and Incurrence of Expenditures for the Hotel and the Implementation of the Hotel Specifications and Design

80.    However, it is undisputed that even after such financial contribution from Four Seasons Caracas, Consorcio Barr never expressly approved the pre-opening plan and budget required under article IV of the Pre Opening Agreement, that was to be entirely funded by Consorcio Barr, and that would have permitted Four Seasons Canada and Four Seasons Caracas to (1) control the incurrence of expenditures and the procurement activities needed to open the Hotel as a World Class Luxury Hotel on the basis of expected cash contributions pre-approved by Consorcio Barr ; and (2) exercise their contractual rights and perform their contractual duties with the broad flexibility and discretion they were entitled to expect under the contractual provisions. Consorcio Barr never lent such approval although it is equally undisputed that the originally proposed pre-opening budget was substantially reduced by Four Seasons Canada to accomodate Consorcio Barr's concerns regarding costs and expenses[18], and that Consorcio Barr accepted the Hotel Design Brief[19] provided in article 3.01 of the Pre-Opening Agreement.

81.    It is equally indisputed that Consorcio Barr directly involved itself, since the inception of the pre-opening phase, in the procurement of goods and supplies for the Hotel, including Furniture, Fixtures and Equipment, or FF&E, when such function directly and exclusively corresponded to Four Seasons Canada on the basis of a Pre-Opening Plan and Budget approved by Consorcio Barr according to article 4 01(b) of the Pre-Opening Agreement, and to Four Seasons Caracas acting as Consorcio Barr's agent under the Management Agreement and pursuant to Four Seasons Caracas broad authority as Operator under this latter Agreement. Such situation remained unchanged despite the disbursement by Four Seasons Caracas of the Investor Loan to Consorcio Barr.

82.    By not approving the Pre-Opening Plan and Budget, Consorcio Barr secured for itself the ability to control the procurement of services, items and supplies needed for the opening of the Hotel that actually corresponded to Four Seasons Canada and Four Seasons Caracas under the Contracts  A factor seemingly facilitating Consorcio Barr's attainment of such objective is that it secured the appointment of Carlos Ricardo Barrera, the son of Mr  Carlos I  Barrera, President of Consorcio Barr  as Purchasing Manager[20].  Consorcio Barr's control of  and involvement in the Hotel procurement negatively affected the quality and quantity of the items, supplies and services provided or to be provided, led to delays in their delivery, including FF&E deliveries[21] and jeopardized the compliance with contractual provisions and specifications that had to be met for the Hotel to be completed as and become a World Class Luxury Hotel

---

[18] Consorcio Barr letter to Four Seasons dated June 20, 1997, doc  C-435.

[19] Dated February 5, 1996 , doc. C-469.

[20] Giacometti WS, no 28  at 11; Dunigan T., at 574 576 ; Dunigan Reply WS, at no 5

[21] Giacometti WS, at no. 7.

83      In parallel, Consorcio Barr implemented a general strategy of closely scrutinizing the activity of the  Four Seasons Contractors relating to the conduct of the pre-opening phase of the Hotel and the incurrence of expenditures in that phase, also with the  aim of reducing what Consorcio Barr considered to be excessive costs. Furthermore, Consorcio Barr showed a tendency to stick to its own views regarding the design of the Hotel – although it was obligated to abide, as the Contracts require, by the design and specifications provided by the Claimants - that had already surfaced during the months preceding the execution of the Contracts and continued to manifest itself thereafter[22]. Finally, there were  problems regarding the exchange of information and coordination relating to the implementation of Four Season standards and specifications despite the  contractual obligations of Consorcio Barr to follow, as indicated above, Four Season's specifications and directions in this respect. An example of a problem with the exchange of information and coordination related to the design of the Hotel rooms and their equipment and decoration because of Consorcio Barr's own ideas on these matters[23].

84.      In fact, Consorcio Barr was contractually bound to construct, furnish and equip the Hotel in a way permitting the implementation of the Hotel Design Brief and the additional specifications supplied by Four Seasons Canada to the Owner[24] as modified by the operating criteria specifically drafted by the Hotel General Manager appointed by Four Seasons Canada for the Hotel[25]. In carrying out  such obligations, Consorcio Barr had to take necessarily into account and adjust its contractual performance to the critical path activities (or road map describing each and every action to be achieved week by week to attain a planned Hotel Opening Date[26]) established by the Hotel General Manager and reviewed by Four Seasons Canada to make sure that such activities and their outcome satisfy World Class Luxury Hotel requirements and standards on the basis of such Brief and specifications [27] Any disruptions caused by the failure of Consorcio Barr to abide by such specifications or impeding or jeopardizing their implementation inevitably adversely affected the possibility of transforming the Hotel into a World Class Luxury Hotel by a firm and predictable Opening Date within a normal timeline according to the industry standards for such type of  Hotel.

85.      Consorcio Barr also interfered in the pre-opening phase with the hiring of staff for the Hotel operation, equally playing a vital role in the pre-opening of the Hotel[28]. As a result of such interference, delays were incurred in the selection, for example, of the General Manager of the Hotel, a process that although initiated in the spring of 1997 was only completed in June 1998

---

[22] Gómez Tobar WS, nos. 18-19, at 8-10.

[23] Giacometti WS, no.20d.

[24] Gómez Tobar T., at 215

[25] Goh WS, no.5 at 4

[26] Gómez Tobar T., at 148

[27] Ibidem

[28] Giacometti WS, nos  17-18, at 5-6. Ferraro T. at 731-732.

with the appointment of Mr. Olivier Masson, who had to be replaced in August 1999 by Mr. Yves Giacometti because of the deterioration of the relationship between Mr. Masson and Consorcio Barr, which considered that his personal expense reports were too elevated. Although the successive delays in the opening for business of the Hotel essentially responded to delays in its construction and the supply or installation of OS & E and FF&E, obviously the absence of a General Manager already in place during the months preceding some of the successively planned or targeted Opening Dates, or impeding the creation or preservation of an harmonious relationship between the Owner and the Hotel General Manager were factors conspiring against the Hotel readiness to open for business by such Dates in view of the central role played by the General Manager during the pre-opening phase regarding the determination of the critical path permitting to attain the target Opening Date and establishing the requirements to be met along such path [29]. Such interference also manifested itself through the questioning by Consorcio Barr of the salaries paid to Hotel personnel - particularly expatriate personnel - and by opposing the candidate chosen by Four Seasons Canada as Hotel controller [30]

86.   Rather, despite its lack of experience regarding the completion and launching for business of a Hotel like the one contemplated by the Contracts [31], Consorcio Barr's efforts were particularly oriented towards questioning specific cost or expenditure items and the items to be purchased in view of what was perceived by Consorcio Barr as an excessively costly pre-opening process. Four Seasons Canada was thus placed in the difficult situation of going forward with such process without the possibility of incurring expenditures within the margins of a pre approved Pre-Opening Plan and Budget and despite its being exposed to the continuous delays or objections of Consorcio Barr in approving purchases and expenditures needed for the opening for business of the Hotel or making payments of obligations incurred to such effect [32].

87.   Such circumstances, coupled with the total control of Consorcio Barr, during the pre-opening phase, of accounts from which disbursements destined to the Hotel could be made, allowed Consorcio Barr to exert a very tight control on expenditures and payments during the pre-opening phase, to the extent that the approval of every single purchase had to go through Consorcio Barr [33]. The practical upshot of this situation was the neutralization of Four Seasons Canada's and, when applicable, Four Seasons Caracas's, flexibility to incur and pay for such expenditures that, as the case may be, Four Seasons Canada and Four Seasons Caracas would have otherwise enjoyed had they counted with an approved pre-opening budget and not met with

---

[29] Gómez Tobar WS, nos. 21-24, at 11-13, Giacometti WS, no. 13, at 4.

[30] Gómez Tobar WS, no 27, at 14-15

[31] Gómez Tobar T. at 187-188, 210-212, 219-220

[32] E-mail of Mr. Gómez Tobar to Mr. Ferraro of March 3, 2000, doc. C-392

[33] Internal e-mail of Ivan Goh of December 4, 2000, doc. C-309. Robert Dunigan's T., at 469-473 ; Lind T., at 244-246

Consorcio Barr's continuous and minutious controls of expenditures and payments, admittedly undertaken in a conscious and systematic manner by Consorcio Barr[14]

(c) Pre-Opening Delays

88.    The combined effect of the Respondent's difficulties in funding the Hotel's pre-opening, leading to interruptions in the completion of the Hotel or the slowing down of the completion activities, and the deficiencies in the performance by the Respondent of its contracual obligations, including its interference in the Hotel's pre-opening activities, described in subsection (b) above, necessarily delayed the Hotel's Opening Date and prevented taking the pre-opening phase to completion within the reasonable expectations of the Claimants in accordance with the contractual provisions and the practices of the hotel industry. Such deficiencies essentially were the following.

89.    In the first place, reference must of course be made to the continuous failure of Consorcio Barr to complete the physical construction of the Hotel, which added its negative impact to the deficiencies and delays in the supply and installation of FF&E depicted above, also an exclusive responsibility of Consorcio Barr under the Contracts, and continuously contributed to delays in releasing to the Operator Hotel areas covered by the Management Agreement.

90.    Secondly, many of the necessary elements required for the opening of the Hotel as a World Class Luxury Hotel in accordance with the design and specifications contractually established and that should have been caused to be provided by Consorcio Barr pursuant to such design and specifications had not been, in fact, provided, without evidence of Claimants' conduct leading to such result.

91.    For example, as late as October 13, 2000 a Four Seasons Canada officer not only states that there is no single Hotel area ready to be turned over to Four Seasons Caracas to commence operations, including any of the guest room floors, but also that :

« Concerning the FF&E : I have seen in storage bed frames, some 100 headboards, some desk chairs armoires but no armchairs, sofas nor drapes, banquet tables (no chairs). I have not seen any public areas furniture in storage I have not seen any artwork of any kind or accessories being received »

« Concerning OS &E , some operating equipment have been received and the purchasing manager is preparing an updated list of what has been received I have personally seen bath towels, some silverware, glass ware and several other misc. Items but no bed linen (   ) »

« There are still a lot of purchase orders waiting for approval by the owners before Home Office Purchasing can act on their behalf or vendors waiting for payment before goods will be shipped As we speak, the F & B linen purchase orders are being processed by Home Office following last minute instructions from the owners We have no clue when or if these items will show up »

---

[14] E-mail of Lautaro Barrera to Jaime Cardie of June 26, 2000, doc C-368 Ferraro I at 752

« Uniforms – all back of the house uniforms are in production with a local company. It should be ready by the
end of this month. There is no progress on the Front of the House uniforms as far as the hotel is aware of. The
owners have purchased the fabrics, that the hotel have not seen. The hotel have not received it yet and therefore
no design or production have been initiated to date according to the hotel »[35]

The issue of the uniforms had been apparently pending already for several months. The
acquisition of other items, such as the bed linens and other items, also met with similar approval
delays by Consorcio Barr[36], which as indicated before, was *de facto* controlling the purchases
and procurement concerning the Hotel's pre-opening.

In fact, the lack of timely completion according to the requirements of a World Class Luxury
Hotel of the supply of items falling under the category of OS and E, or operating supplies and
equipment, and particularly of the supply or installation of those items that may be characterized
as FF & E, or furniture, fixtures and equipment[37] proved to be as or more detrimental to the
opening for business of the Hotel than the actual completion of the Hotel building[38] and are part
of the critical path for the opening – even a soft opening - of Four Seasons Hotels[39].

92.    Also, Consorcio Barr was not completing arrangements to be readied during the pre-
completion stage to allow Four Seasons Caracas to operate and manage the Hotel according to
the largely discretionary powers vested in Four Seasons Caracas under the Management
Agreement. It is indisputed that such arrangements included the setting up of bank accounts that
the Operator could use in its day to day Hotel operations:

« By far, the most urgent issue is the hotel's Banking arrangements. To this point, the owners still control all of
the hotel's bank accounts, severely limiting hotel management's ability to transact business. Hotel management
is unable to issue a check, process an advance deposit, or set up their credit card merchant agreements – it is
apparent that this is becoming a very big issue. »[40]

However, this issue remained largely unresolved even after January 19, 2001 (the date of the
Hotel's « soft » opening), as it will be seen later.

93.    An example of the serious shortcomings in the completion of the Hotel delaying its
opening is the detailed and extensive report available to Four Seasons Caracas and its top level
management by January 4, 2001 listing deficiencies that the Hotel presented even shortly before

---

[35] E-mail of October 13, 2000 from Ivan Goh to Charles Ferraro, doc. C-348

[36] E-mail of Jamie Cardie to Charles Ferraro of August 11, 2000, doc. C-361. E-mail of Marbella
Barrera to Jamie Cardie of June 14, 2000, doc. C-371.

[37] Lind T., at 239-240.

[38] Internal e-mail of Allan Scoler of February 22, 2000, doc. C-395.

[39] Doc. C-409.

[40] Internal e-mail of Mr. Dunigan to Mr. Ferraro of October 31, 2000, doc. C-332.

24

its « soft » Opening Date on January 19, 2001[41]. In fact, each time that Consorcio Barr proposed a new Opening Date, Four Seasons Canada and Four Season Caracas were forced to change or re-define certain previous minimum completion milestones belonging to the critical path that if not achieved would compromise opening the Hotel by such Date[42].

94.     Naturally, the Hotel revenue estimates and actuals depended on having the pending aspects and parts of the Hotel completed – including guest rooms and suites, restaurants, health club, spa, business center, banquet rooms, gift shops and released for operation to Four Seasons Caracas according to the Contracts and a predictable schedule, as common sense indicates and is proved by the record in this arbitration[43]. For this reason, such revenue estimates constituted an important factor in evaluating if the Hotel was ready for opening on sound economic bases, and each new scheduled Opening Date required a new estimate by Four Seasons Canada and Four Seasons Caracas personnel of the different aspects of the Hotel that still remained to be completed, with the invariable conclusion that the minimum level of completion required according to the practice of Four Seasons hotels for the opening of the Hotel had not been reached[44], and the ensuing postponement of the opening of the Hotel for business.

95.     Although Consorcio Barr kept making estimates of possible Opening Dates despite such circumstances[45], their materialization necessarily and inevitably depended on Consorcio Barr's ability to make progress in the carrying out of its obligations to complete the Hotel (construction, furnishing and equipping), as it was entirely the responsibility of Consorcio Barr together with securing any necessary third party financing to discharge it[46].

---

[41] Ivan Goh's report, e-mail of January 4, 2001 and attachment: doc. C293.

[42] For instance, internal memo of Jamie Cardy of Four Seasons Canada setting out completion milestones to meet Consorcio Barr's scheduled Hotel Opening on November 23, 2000, doc. C-351; and detailed critical path to achieve such Opening Date prepared by Four Seasons Caracas, doc. C-354.

[43] Internal e-mails (a) of December 12, 2000 from Mr. Charles Ferraro and attached budget (Doc. C 304, (b) of January 3, 2001 and attached budget from Mr. Philippe Vomer, then controller of the Hotel (Document C 296); of November 22, 2000 from Mr. Charles Ferraro (Doc. C 318)

[44] For example, internal e-mails of Ivan Goh of November 8, 2000, doc. C 328, of October 25, 2000, doc. C-336, of October 13, 2000, doc. C-348. Letter of August 8, 2000 of Allan Scoler, Design and Construction Manager, to Mr. I Carlos Barrera detailing areas of the Hotel requiring completion for an opening scheduled for October 2, 2000 (doc C 363).

[45] Giacometti WS, no. 38, at 14 ; no. 60, at 19

[46] Initially, the Opening Date foreseen by Consorcio Barr (before the execution of the Contracts but after the signing of the Letter of Intent) was October 1996 (Gomez Tobar WS, at no 11, 5). Thereafter, many other Opening Dates were planned and droppped. For instance, Consorcio Barr's letter of June 20, 1997, that envisaged October 1, 1998 as a possible Opening Date (doc. C-435); Gómez Tobar WS, no. 24, at 13; September 1999 and October 1999 were Opening Dates successively anticipated by Consorcio Barr; letter of Mr. Carlos Barrera to Mr. Isadore Sharp of

96.     Thus, although article 4.01 of the Advisory Agreement provides that the Opening Date shall be determined by the Advisor (Four Seasons Netherlands) and approved by the Owner, there is no doubt that since it essentially depends on the Hotel completion – the Owner's responsibility – it was really the pace and level of such completion, as achieved by the Owner, that determined the possibility of the opening of the Hotel for business on or by any specific date and any advance pre-opening and opening Hotel planning.

97.     On the other hand, the continuous changes in the Hotel Opening Dates led to considerable increases in the pre-opening costs and expenses largely associated with the need of hiring or employing sufficient personnel to finalize or accelerate the completion or full operation of those parts or aspects of the Hotel or the Hotel services still incomplete or inoperative so as to reach the minimum readiness required to make the opening possible, in addition to the personnel and higher-level staff that would become active on a daily basis as soon as the Hotel opened for business[47].

98.     These factors were not and could not be ignored by Consorcio Barr[48], if only because the record also proves that the continuous rescheduling of the Hotel Opening date was solely the

August 18, 2000 informing that the Opening Date was to be delayed until May 25th, 2000 (doc.C-357); e mail dated March 9, 2000 of Lautaro Barrera to Jamie Cardie, referring to a possible July/early August 2000 Opening Date ( Doc. C-386) and e mail from same to Roger Garland of March 10, 2000 setting forth a substantial list of incomplete aspects of the Hotel preventing such Opening Date (doc. C-387); e-mail from Yves Giacometti to Jamie Cardie of March 27, 2000, informing that Mr. Carlos Barrera was aiming at and pushing for September 7, 2000 , rather than October 2, 2000 (Doc. C-375), and e mail of the following day, March 28, 2000 from Jamie Cardie to Lautaro Barrera of Consorcio Barr requiring information from the latter as to the completion process in view of the attainment of the opening of the Hotel for business by September 7. 2000 (doc. C-376), e-mail to Mr. Lautaro Barrera of January 6, 2001, indicating that on December 2, 1999, Consorcio Barr had given May 10, 2000 as the Hotel Opening Date (Doc. C-289), e-mail of Mr. Carlos Barrera of October 18, 2000 stating November 23, 2000 as the targeted Opening Date (doc C-339); letter dated November 18, 2000 of Mr. Lautaro Barrera to Mr. Wolf Hengst, President, Chief Operations Officer , Four Seasons Canada, expressing Consorcio Barr's displeasure at Four Seasons Canada refusal to commit to a December 30, 2000 opening (Doc. C-323) Among other pre-opening dates that were considered one can mention October 2, 2000 (minutes of meeting involving Claimants' and Respondent's representatives of July 12, 2000, Doc. C-495, at 004543/004544); between October 16th and 23d, 2000 (internal e-mail from Yves Giacometti of October 15, 2000, doc. C 347), December 30, 2000 (internal e-mail of December 29, 2000 from Mr. Ivan Goh reporting a meeting among Mr. Goh, Mr. Yves Giacometti and Ms. Marbella Barrera, Doc. C-300, official announcement of the opening on December 30, 2000, Doc. C 330); second third week of December 2000 (letter from Mr. Carlos Barrera to Mr. Charles Ferraro of November 24, 2000 (doc C 315)

[47] For example, internal e-mail of Mr. Charles Ferraro of November 18, 2000, doc. C-325 Gomez Tobar T , at 177-178, 222 223, Dunigan s T at 589 591

[48] For example, letter from Mr. Lautaro Barrera of November 10, 2000 (doc. C326) in reply to Mr. Yves Giacometti's letter of October 17, 2000 (doc C-342) informing Mr. Barrera of the

consequence of Consorcio Barr's failure (i) to physically complete, furnish and equip the Hotel according to its contractual responsibilities; and (ii) to properly fund the pre-opening expenditures in accordance to Consorcio Barr's contractual obligation to cause the Hotel to become a World Class Luxury Hotel, and Consorcio Barr's interference in the pre-opening activities contractually entrusted to the Four Seasons Contractors.

99.     The Arbitral Tribunal finds that the cumulative and convergent outcome of the circumstances depicted above was that the relevant Four Seasons Contractors were effectively impeded from controlling and normally carrying out the pre-opening phase as they were legitimately justified and expected to do in view of (i) Consorcio Barr's responsibility, under article 3.01 of the Pre-Opening Agreement to cause the Hotel to become a World Class Luxury Hotel « in accordance with the designs and specifications approved by Four Seasons for the Hotel and with the Hotel Design Brief.. »; (ii) the provisions and general thrust and spirit of the Contracts vesting in the Four Seasons Contractors, because of their experience, know-how and expertise in establishing and attaining the standards of World Class Luxury Hotels of the Claimants, broad powers and authority to determine how to reach such standards and the working capital and other cash expenditures needed to such effect; and (iii) the disbursement by Four Seasons Caracas to Consorcio Barr of a US$ 5,000,000.00 Investor's Loan in compliance with undertakings originally assumed by Four Seasons Caracas under the Management Agreement to facilitate Consorcio Barr's performance of its obligations under the Contracts.

(d) The Hotel's « Soft Opening »

100.    In the hotel industry, a « soft opening » normally takes place when the owner and the operator agree that the hotel is substantially complete; although there might still be « a few missing items » for considering the hotel completed, and although such missing items would be considered as deficiencies, these are not considered sufficiently substantial as to adversely affect the « guest experience »[49] and thus postpone the opening of the hotel for business.

101.    The « soft opening » of the Hotel finally occurred on January 19, 2001. However, the opening of the Hotel on such date hardly qualified as a soft opening by the hotel industry standards because of the substantial nature of the deficiencies in the completion of the Hotel or negatively affecting its normal operation according to the reasonable expectations of guests for a hotel in the Hotel's category[50]. By January 25, 2001 (i.e., after the Hotel's « soft » opening on January 19, 2001), substantial deficiencies affecting *inter alia* the completion of the health club, pool bar and grill, guest rooms, engineering, sundry shop, hair salon, retail space and other vital

increased costs of hiring personnel to permit a possible opening of the Hotel by December 2000, as apparently then envisaged by Consorcio Barr.

[49] Ferraro T., at 721

[50] Claver T. at 974-977

parts or aspects of the Hotel remained unremedied [51], as made known to Consorcio Barr together with tentative completion dates — some agreed with Consorcio Barr and some pending of agreement — by e-mail[52].

102.    In fact, the Hotel « soft opening » on such date was decisively determined by the requests and pressure of Consorcio Barr[53], possibly spurred by its financial problems [54], despite the Four Seasons Contractors' upper staff judgement and the opinion of the officer directly involved in the supervision of the pre-opening of the Hotel[55]. The final acquiescence of the Four Seasons Contractors to the Hotel's soft opening can then only be explained in terms of a business judgement of its presidency[56], that apparently relied on the final honoring in good faith by Consorcio Barr of its duties to complete the Hotel and its compliance with its obligations under the Contracts, as is indeed required by Venezuelan law governing them, and on its perception of the importance of the Venezuelan hotel business market for the Four Seasons group. When the Hotel opened, only about 30 hotel rooms were ready for occupancy out of a total of 212 guest rooms and suites[57], and as set out in paragraph 101 above, the Hotel was far from complete in different areas or showed important deficiencies in the supply and installation of FF&E and thus was equally far from meeting World Class Luxury Hotel standards and requirements[58].

103.    The Arbitral Tribunal concludes, on the basis of the evidence before it and the foregoing considerations, that Consorcio Barr's performance of its contractual obligations during the Hotel pre-completion phase already showed serious deficiencies for which Consorcio Barr was entirely responsible, and denoted a pattern of conduct by Consorcio Barr that was continued thereafter, characterized by Consorcio Barr's tight and unwarranted control of the Claimants' activities to start up and operate the Hotel business as provided in the Contracts, the lack of a constructive spirit of cooperation with the Claimants in the carrying out of such activities, and the failure of

---

[51] Doc. C-276.

[52] Doc. C-274, e-mail to Lautaro Barrera of January 28, 2001 Giacometti WS, no 62, at 19-21.

[53] E.g., e-mail from Mr. Lautaro Barrera to Mr. Ferraro of January 11, 2001 " I am counting on your support to guarantee that there are no obstacles to prevent us from opening on the 16[th] " (Doc.C-285) Giacometti WS, no 40, at 14; no 48, at 16. Ferraro T at 736-737.

[54] Giacometti WS, no 14, at 5.

[55] Ferraro T., at 758-770 Goh WS, nos. 10-12 at 8-10. Giacometti WS, *Ibidem*

[56] Ferraro T., at 792.

[57] Giacometti WS, no 41 at 14 ; Goh WS, no 12, at 10

[58] The witness Janos Gyory K. offered by the Respondent, who expresses different views on these matters in his written witness statements, failed to appear at the Evidentiary Hearing and was therefore not available for cross examination by Claimants' counsel nor for questioning by the Arbitral Tribunal.

Consorcio Barr to perform its essential obligations to complete the Hotel, including funding its pre-opening and completion according to the contractual specifications and requirements

(ii) The Post-Opening Phase

104.    During the post-opening phase, the deficiencies in the performance by Consorcio Barr of its contractual obligations continued, and were indeed accompanied by a growing deterioration of the contractual relationship between the Four Seasons Contractors – particularly Four Seasons Canada and Four Seasons Caracas – and Consorcio Barr.

(a) The Hotel Bank Accounts. Procurement and Expenditures Management

105.    One of the salient aspects of Consorcio Barr's interference in the management and control of the Hotel operations by Four Seasons Caracas was that even in the post-opening phase, when the Hotel was expected to generate revenue, Four Seasons Caracas was not provided by Consorcio Barr with bank accounts under the control of the Operator permitting it to pay directly from such accounts for invoices or bills of vendors and suppliers of services (such as telephone or electricity), as it was required and authorized to do under the Management Agreement on behalf of the Owner. Thus, the Operator was forced to submit the bills invoices to Consorcio Barr, which decided in a discretionary way which vendors or service suppliers would be paid or not and when.

106.    It is noteworthy that Consorcio Barr refused to release its controls on the bank accounts and the payments to vendors and service suppliers - despite Four Seasons Caracas protestations - without any support for doing so in the contractual provisions and without otherwise invoking the practices of the hotel industry or any course of dealing currently observed in that respect by the Four Seasons companies in their hotel operations[59]

107     Only in March 2001, months after the soft opening of the Hotel on January 19, 2001, the Owner created a Bolivar Hotel Bank Account, from which the Operator could draw or dispose of funds by issuing checks. However, Consorcio Barr did not make arrangements pursuant to which all deposits of moneys originated in the activities of the Hotel - among them, Hotel guests and clients credit card payments - would be automatically transferred from the Owner Bank Accounts entirely controlled by it, to such or other Hotel Bank Accounts that although set up by the Owner would (i) be controlled by the Operator as provided in the Management Agreement, so that the Operator would be free to withdraw funds or make payments out of such Accounts,

---

[59] Dunigan WS. nos. 21-22 .

and (ii) be the end-recipients of all funds originated in the Hotel operations" By failing to make such arrangements, the Owner gained absolute discretion to establish the money amounts to be deposited in the Hotel Bank Account[61].

108.    The practical consequences of Consorcio Barr's omission to make such arrangements were depriving the Operator of the capacity to exercise any meaningful controls on the gross receipts of the Hotel and removing the Hotel revenue from the scope of the agency relationship between Owner and Operator and the Management Agreement governing such relationship.

109.    Thus, the Owner placed itself in a position permitting it to freely dispose of funds obtained from the Hotel operations, including utilizing or withdrawing funds without necessarily destining them to such operations or to satisfying working capital or other payment requirements under the Management Agreement, and particularly its article 10.04, that governs the application of funds obtained from the operation of the Hotel, including its operation expenses, and the order of priority to be observed when making payments out of such funds.

110.    Since article 10.04 of the Management Agreement establishes that the payments to which it refers are to be made « ... by the Operator on behalf of the Owner from the Hotel Bank Accounts... », it must necessarily be inferred that any monies obtained from the Hotel's operation and paid into the Owner's Bank Accounts should have been transferred to the Hotel Bank Accounts to comply with article 10.04 of the Management Agreement. Also, article 10.05 of the Management Agreement provides that the Basic Fee payable to the Operator for its services and the costs and expenses incurred by the Operator in the performance of such services are to be paid on a monthly basis from funds in the Hotel Bank Accounts. Arrangements by the Owner impeding or not permitting the cash flow derived from the Hotel operations to be deposited in the Hotel Bank Accounts should be then deemed conduct in breach of fundamental provisions of the Management Agreement, the existence and expected application of which must have necessarily played a central role in the decision of the Claimants to enter into the Contracts.

111.    Consequently, as a result of the Owner's failure to make banking arrangements in compliance with the Management Agreement, the previous situation, according to which the Operator would have to seek the Owner's approval to make each payment to vendors, suppliers and local employees, perpetuated itself. Thus, the Owner's total discretion to determine who should get paid or not, or when, remained unchanged.

112.    Additionally, Consorcio Barr insisted that each and every expense should be approved or disapproved by the Owner on the basis of « appropriate » support[62], which implied asserting a level of Owner control on and interference in the operation of the Hotel not supported by the Management Agreement, nor compatible with the discretion granted thereunder to the Operator for running the Hotel operations.

---

[60] Dunigan T. at 493-494, 499-502.

[61] Lind T. at 273-275.

[62] Internal e-mails of September 2001 between Messrs. Vonier and Lind considering Consorcio Barr's position in this respect as voiced by Mr. Lautaro Barrera, doc. C-165.

113.    Therefore, the Operator could only pay vendors or service suppliers bills in respect of which the Owner acceded to make available funds through transfers from the Owner's Bank Accounts to the Operator's only Bolivar Hotel Bank Account provided by the Owner to the Operator, or by the Owner drawing checks on the Owner's Bank Accounts[63]. These combined circumstances often led to the failure to pay or to delay payments of moneys due and payable to vendors or service suppliers for deliveries or services already made or rendered, with the concomitant adverse impact on the reputation of the Hotel and the efficient handling of the Hotel operations, or the return of checks[64] issued out of such Hotel Bank Account for insufficient funds, when the expected transfer from the Owner's Bank Accounts did not arrive or was delayed[65].

114.    In fact, through its discretionary controls on the payments to vendors and service suppliers of the Hotel, Consorcio Barr was able to unilaterally determine what was to be acquired and in what quantities for the Hotel operation, also thereby supplanting in practice the Operator's contractual power to determine, according to World Class Luxury Hotel standards, for example, what types of food, beverages and other amenities were to be made available for the guests' and clients consumption or use, and in which quantities[66], and compromising the Four Seasons group relationship with some of its vendors worldwide[67]. One specific example related to the supplier of chemical cleaning products, Ecolab, whose bills had been pending of payment for several months for an amount of US$ 70,000.00, and which, despite such circumstance, did not discontinue its supplies to the Hotel because of its 30 year relationship with the Four Seasons group and credited US$ 12,000.00 back to the Hotel to compensate for any excess costs incurred in the cleaning chemicals supply[68], a credit however not judged sufficient by Consorcio Barr in view of what it considered as excessive consumption of cleaning chemicals attributable to deficiencies in the cost controls exercised by the Operator.

115.    Furthermore, since the Owner also failed to grant the powers of attorney it was to provide to personnel of the Operator under article 7.02 of the Management Agreement, not only was the Operator prevented from opening the necessary Hotel Bank Accounts in the normal course of business and as required by the Hotel operations and the provisions of such Agreement, but also to control purchases from and payments to vendors and service providers related to such operations[69]. This situation – except for the brief period elapsed between December 1, 2001 and

---

[63] Lind T. at 273-275.

[64] E-mail of Philippe Vonier with attached list of « bounced » checks of August 30, 2001; doc. C 194.

[65] E-mail of Lydia Woik of August 30, 2001 and its attachment entitled "Four Seasons Hotel Caracas Accounting and Internal Control Review, August 20-23, 2001", doc. C 193.

[66] E-mail from Martin Rhomberg of September 5 2001, doc. C-179.

[67] Lind T. at 255.

[68] E-mail of Ivan Goh of September 7, 2001, doc C-173.

[69] Lind WS. at 246; Dunigan T. at 524-525.

April 18, 2002 during which Four Seasons Caracas gained substantial control of the Hotel's cash management – was present throughout the Hotel's post-opening operations period that virtually came to an end on June 13, 2002, when Four Seasons Caracas decided to cancel most of the Hotel's operations[70], and to an abrupt final close on July 25, 2002, with the eviction of the personnel of Four Seasons Caracas from all the Hotel areas, except the lobby[71].

(b) Owner's Cash Infusions. The Line of Credit

116.   To Consorcio Barr's contractual breaches determined by its unwarranted interference in the cash management, expenditure control and procurement related to the Hotel operations, one should add the failure of Consorcio Barr to put in place the irrevocable Line of Credit provided in article 8.01(b) of the Management Agreement, the purpose of which was precisely to automatically inject funds in the Hotel Bank Accounts to make up for working capital shortfalls, on which the Operator relied when it decided to accept contractually that the operation's gross receipts would go directly to the Owner's Bank Accounts rather than the Hotel Bank Accounts[72].

117.   The perversity of this situation became eloquently manifest when the moneys made available from the Owner's Bank Accounts to make payments required by the Hotel operation did not suffice to cover the working capital and other cash requirements of the Hotel operations under article 8.01(a) of the Management Agreement payable out of the Hotel Bank Accounts, without Consorcio Barr covering the ensuing shortfalls by honoring cash calls made on it despite its obligation to do so under the Management Agreement.

118.   Consorcio Barr contends that its obligations under the Management Agreement to provide funds for the operation of the Hotel or the irrevocable Line of Credit contemplated in article 8.01 of the Management Agreement only become effective upon approval of a first Annual Plan under the Advisory Agreement setting forth the planned working capital requirements and expenditures for the first Fiscal Year of Hotel operations[73]. The Arbitral Tribunal does not share Consorcio Barr's views in this respect.

119.   Pursuant to the core features of the contractual relationship between Four Seasons Caracas and the Respondent described in Chapter II.A of this Award, and of the Respondent with the other Claimants under their respective Contracts with the Respondent, the Respondent must

---

[70] Letter to Carlos Barrera of June 13, 2002, doc.C 32.

[71] Reid WS, nos. 21-46

[72] Dunigan T., at 485-486.

[73] Letter of Carlos Barrera to Thomas Lind of December 4, 2001, doc. R-1-121. Respondent's Reply Memorial of August 15, 2003, no.30, at 12 ; letter of Lautaro Barrera to Thomas Lind of December 21, 2001; letter of Lautaro Barrera to Thomas Lind of January 21, 2002..

supply at all times, and when cash-called by Four Seasons Caracas in accordance to the Management Agreement, all funds needed for the Hotel's pre-operational and operational needs throughout the Term, including those required after the Opening Date of the Hotel or the commencement of its operation by Four Seasons Caracas, even in the absence of an approved Annual Plan.

120     Although according to article 8.01 (a) of the Management Agreement the Owner is to provide working capital « in amounts required for the uninterrupted and efficient operation of the Hotel in accordance with the Annual Plan», Consorcio Barr's funding obligations are present throughout the Term of the Management Agreement, i.e., pre-date the issuance of the first Annual Plan, that is to be submitted, according to article 6.01(a) of the Advisory Agreement, towards the end of the Hotel pre-opening phase

121.    According to article 8.01 (a) of the Management Agreement, the Owner is obligated to satisfy cash requirements under article 10.04 (a) through 10.04 (f) inclusive of the Management Agreement, which depend on variables that cannot be controlled through the Annual Plan, or are triggered by the existence or occurrence of unpredictable circumstances (such as damage or destruction of the Hotel), or solely depend on the best judgement of the Operator, or simply come into existence and must be satisfied with or without an Annual Plan. Such requirements include, among other things, the reimbursement of working capital advances made by Four Seasons Caracas and reimbursable costs and expenses incurred by Four Seasons Caracas in the operation of the Hotel, the payment of all Operating Expenses (as defined under No. (as) of Schedule « A » to the Advisory Agreement) of the Hotel, taxes, premiums, fees and charges regarding the property where the Hotel is operated or required by its operation or services provided for its operation and « adequate working capital reserves » for the Hotel « as determined by Operator taking into account the reasonable foreseeable financial needs of the Hotel ».

122     This is further underlined by the last sentence of article 8.01(a) of the Management Agreement vesting the Operator with unilateral authority to settle any difference regarding the working capital requirements

« Any dispute as to the amount of the working capital required for the operation of the Hotel shall be resolved by Operator taking into account the foreseeable financial needs of the Hotel »

123.    It would be contradictory to vest the Operator with such authority, give the Operator the right to determine the working capital and other cash needs of the Hotel on the basis of its judgement regarding the Hotel's actual and reasonably foreseeable financial needs and obligations, dispense the Operator from expending its own funds or extending its own credit in connection with the operations of the Hotel, and at the same time subordinate the determination and satisfaction of the Hotel's working capital and cash requirements under article 8.01(a) of the Management Agreement and the setting up of the Line of Credit contemplated in its article 8.01 (b) should the Respondent fail to provide the corresponding cash infusions it is bound to provide, to a possible Owner's veto of the Annual Plan. It would be equally contradictory with the broad discretionary powers and authority granted to the Operator to manage and operate the Hotel under the provisions in the Management Agreement referred to above if such powers could be unilaterally neutralized merely by the Owner not approving the Annual Plan

33

124    In any case, as further set forth in paragraphs 167-174 of this Award, the Arbitral Tribunal also considers that the conduct observed by Consorcio Barr in its contractual relationship with the Claimants is inconsistent with its own contention that no such Annual Plan was submitted to Consorcio Barr, or that, if submitted, Consorcio Barr did not approve such Annual Plan, and that for that reason Consorcio Barr was entitled not to comply with its contractual obligations to infuse working capital and provide for other cash needs of the Hotel operations set forth in article 8.01(a) of the Management Agreement and provide the Line of Credit covering any working capital shortfalls required by article 8.01 (b) of such Agreement.

125.   Consorcio Barr correctly points out[74] that, according to article 6.01 (b) of the Advisory Agreement, if the first Annual Plan is not approved, the Opening Date of the Hotel « shall be delayed ».

126.   However, there is no evidence that Consorcio Barr requested the postponement of any of the many Hotel Opening Dates successively scheduled since the inception of its contractual relationship with the Claimants, nor of the « soft » Opening Date that finally materialized on January 19, 2001. Not only does the record establish that Consorcio Barr was pushing for that and other previous Scheduled Opening Dates, against the advice and opinion of the Operator, but also, that there is no trace that Consorcio Barr requested the postponement of any of those scheduled dates, or the date of the Hotel's « soft » Opening, because of the absence of a first Annual Plan, or of its approval by the Owner

127.   Nor is there evidence of a dispute between the Operator and the Owner regarding the approval of the first Annual Plan that was the subject of the mechanism contemplated in article 6.01 (b) of the Advisory Agreement authorizing the delay of the Opening Date. This provision requires from the Owner, within thirty days after receiving such Annual Plan, to notify its disapproval. Should such disapproval be lacking, the first Annual Plan is considered approved. If the Owner disapproves of the Annual Plan, a period of thirty days ensues for settling any differences, in absence of which either the Owner or the Advisor may take the matter to arbitration. The Opening Date is delayed while the dispute is pending. The record does not prove that such mechanism was resorted to by Consorcio Barr because of its disapproval of the first Annual Plan, and shows that the Hotel made its « soft » opening on January 19, 2001 with Consorcio Barr's approval, both circumstances strongly suggesting, since Consorcio Barr did not object to the Hotel's soft opening on such date, that such opening took place on the basis of an Annual Plan already approved by the Owner.

128.   In any event – hypothetically assuming that such was not the case - it is surprising that Consorcio Barr – which already in the Hotel pre-opening phase had manifested concerns regarding the costs and expenditures associated with the Claimants' services – would have been willing to push for Scheduled Opening Dates (and obviously accepted the soft Opening Date of January 19, 2001) without requiring as a pre-condition in all those instances, and as established in the Advisory Agreement, an Annual Plan satisfactory to it. This could only mean one of two things: either such pre-condition had been reasonably satisfied, and the Advisor had submitted an Annual Plan acceptable to Consorcio Barr (although the latter did not expressly manifest its

---

[74] Respondent's Reply Memorial, no 26, at 11-12

approval), or Consorcio Barr did not really care because it wanted to maintain its ability to control and scrutinize the Hotel's procurement and expenditures at a level of minutiae effectively preventing the Operator from exercising its contractual rights in this respect. In the first case, Consorcio Barr cannot claim that the Advisor failed to provide the Annual Plan to avoid, *inter alia*, its obligation to provide the Line of Credit, that became especially necessary since providing for the working capital needs of the Hotel operation is particularly significant during the Hotel stabilization period immediately following the Opening Date; in the second case, Consorcio Barr cannot make such claim either because it would have waived such requirement through its conduct.

129.    The Arbitral Tribunal considers that it would be contrary to a good faith interpretation of the provisions of the Management Agreement to conclude that its provisions allow Consorcio Barr to blow hot and cold at the same time, i.e., push the Advisor to a Hotel Soft Opening, that presupposes putting an end to the Hotel pre-opening phase and budget, the real commencement of the Hotel operations with its concomitant working capital requirements, the existence of an approved first Annual Plan, and counting on a proper supply of operating working capital as determined by the Operator, and at the same time continue to control the cash management and procurement activities pertaining to the Hotel operations, not properly satisfy its funding obligations and refuse to put in place the very banking device that would have permitted the Owner to rectify its own failure to meet the Hotel operation working capital needs, precisely by alleging that such Annual Plan did not count with the Owner's approval, or was not even submitted to it. The Arbitral Tribunal cannot sustain such interpretation and further concludes that Consorcio Barr breached its contractual obligations under article 8.01 of the Management Agreement by not complying with its funding obligations pursuant to such article and failing to supply the irrevocable Line of Credit required thereunder.


  (c) Consorcio Barr Conduct Interfering in the Operator's Peaceful Possession and Management of the Hotel


130.    The operation and management of the Hotel by the Operator was also interfered with or subject to limitations not contemplated in the Management Agreement, through other type of actions of Consorcio Barr.

131.    Such actions included the attempt of Consorcio Barr to obtain in February 2002, by force and through the actions of its security personnel, proprietary information loaded in the Operator's computer system located in the Hotel management information office, which led to the physical aggression of members of the Operator's personnel, some of whom had to be sent to the hospital, and police intervention, and ended only when the Operator's lawyers appeared on the scene[75].

---

[75] Lind T., at 331-336

132.   Another manifestation of Consorcio Barr's conduct interfering in the Hotel's operations was its unilateral determination to re-define the responsibilities of the engineering department of the Hotel and reduce its personnel to reduce costs, since in the view of Consorcio Barr, the Operator was taking care of activities (maintenance and operation of electrical and mechanical components) that should be Consorcio Barr's exclusive responsibility and handled by Consorcio Barr personnel[76].

133.   In view of the opposition of the Operator to accept such personnel reduction or its transfer to Consorcio Barr, Consorcio Barr induced the resignation of the entire engineering team hired by the Operator to such purposes, who were then re-hired by Consorcio Barr, which also gained physical control of the tools needed for providing certain engineering services to the Hotel[77] and denied the access of the Operator to the engineering area.

134   Although Consorcio Barr appears to have acted in this connection on a « *fait accompli* » basis, Consorcio Barr apparently relied on article 5.02 (c) of the Management Agreement, which exempts the Operator from responsibility for maintaining or repairing mechanical or electrical systems of the Hotel[78]. However, that very provision – which does not vest such or any responsibility in the Owner - clearly does vest responsibility in the Operator for the general maintenance of the Hotel, and article 5.02 (c) thereof stipulates that although the personnel of the Hotel (excepting the Senior Personnel) shall enter into an employment relationship with the Owner, who shall bear the burden of such personnel's salary as an Operating Expense to be charged to the Hotel gross receipts, such personnel is hired, paid, relocated, supervised and discharged by the Operator (with certain exceptions as to the hiring of the Hotel's Controller, Assistant Controller and Purchasing Manager). In the opinion of the Arbitral Tribunal, such provisions do not directly or indirectly authorize the Owner to exclude the Operator's access to the area where the engineering department of the Hotel is located or prevent the Operator from hiring and controlling the engineering personnel of the Hotel, and the Management Contract does not countenance Owner conduct interfering with such rights and authority of the Operator. One of the central obligations of the Owner under article 4.01(i) is precisely to ensure the Operator's right provided therein to « peaceably and quietly possess, manage and operate the Hotel ».

135   The Arbitral Tribunal finds that such actions, in substantial part involving the intimidating and uninvited presence of ostensibly armed security personnel of the Owner in the premises of the Hotel, that was responsible for episodes in which such personnel acted in a belligerent and menacing way towards personnel of the Operator, and the control by such Owner's personnel of areas that should have been under the control of the Operator under the Management Agreement, such as the Hotel's parking garage and the Hotel's security control

---

[76] E-mail of Carlos Barrera to Tomas Lind of September 2001, doc C 188.

[77] Thomas Lind e-mail of September 25, 2001, doc C 161, Lind T. at 322-330.

[78] E-mail of Lautaro Barrera of September 5, 2001, doc C 180.

central[79], constitute undue interference in the Operator's rights to manage and operate the Hotel under the Hotel Management Agreement, and a breach of its provisions.

(d) Failure of the Respondent to Complete the Hotel

136.   In addition to the interference of Consorcio Barr in the managing of the Hotel operations and its failure to provide banking arrangements and working capital infusions consistent with its contractual obligations and the needs of such operations, considered above, Consorcio Barr persisted in its non-compliance with its essential obligations under the Contracts to cause the completion of the Hotel's construction, furnishing and equipping according to World Class Luxury Hotel standards.

137.   By September 2001 – roughly seven months after the Hotel's « soft opening » on January 19, 2001 – the completion of the Hotel was still seriously deficient. Such and other deficiencies were synthesized as follows in the introductory paragraph of a report from a Four Seasons Canada officer charged with the periodic inspection of the Hotel's completion:

« The overall situation and status of the hotel since my last visit in April can be summed up as follows:

1.   Porte Cochere and arrival area : no change

2.   Lobby and public areas : no change, except for touch ups by the Hotel Engineering Department.

3.   Restaurants and bar on Mezzanine : no change, except for touch ups by the Hotel Engineering Department.

4.   Guest rooms : addition of 27 rooms to the sellable inventroy (from 129 to 156). However , most of the premium rooms and suites are still out of order as they are lacking FF&E which prevents us from selling the rooms and maximizing the yield.

5.   Banquet levels (7th and 8th floors) are now sellable but lack FF&E as well as appropriate banking supplies.

6.   Spa facilities are still under construction

7.   Health club : there is now equipment in the weight room

8.   Coral Restaurant (9th floor): still under construction

9.   Business Center is still lacking equipment

10.  Lobby retail outlets : 2 of the 6 are rented , some of the Vitrines are still empty

11.  Banking space at the lobby level is still under construction

12.  Major construction deficiencies such as air conditioning and ventilation/extraction problems as well as fire and safety issues have not been resolved satisfactorily

[79] Lind T., at 313-321.

37

13 Ceaseless interference from ownership is still as active as ever, together with their cash flow problems  this has created insurmountable challenges for hotel management to focus on guests

14 The constant shortage of day-to-day operating supplies, the lack of operating equipment and tools and an inferior/mediocre product frustrates and embarrasses employees who have to service and confront our guests every day »[30]

(e)    Reactions of the Four Seasons Contractors to Consorcio Barr's Breaches of Contract

138.    On October 4, 2001, the Chairman and Chief Executive Officer of Four Seasons Hotels and Resorts, Mr. Isadore Sharp, sent a letter to the Chairman of Consorcio Barr, Mr. Carlos L. Barrera, listing and summarily describing  the breaches of the Contracts  attributed by the Four Seasons Contractors to Consorcio Barr, namely failure to complete the Hotel, failure to allow Four Seasons Caracas to operate the Hotel free from interference, failure to provide adequate cash management and banking arrangements; failure to provide working capital required to fund the Hotel's operations; failure to pay  fees owing to the Claimants under the Contracts and to reimburse advances and other expenses made by the Operator and reimbursable to it under the Contracts. Such letter, besides stating that Consorcio Barr had defaulted in the payment of interest under section 4 2 of the Loan Agreement, required from Consorcio Barr, pursuant to section 3 3 of the Loan Agreement, to have «  all funds derived from the operation of the Hotel [...] deposited in the Hotel Bank Accounts and not the Owner Bank Accounts ». This provision of the Loan Agreement establishes that the failure by Consorcio Barr to maintain a Line of Credit as contemplated in the Management Agreement, providing funding sufficient to cover any outstandings plus interest thereon under the Loan Agreement, constitutes an event of default thereunder as a result of which all operation funds shall be deposited in the Hotel Bank Accounts. Mr. Sharp's letter specifically stated that :

« In terms of the Loan Agreement, please accept the notice of the matters described above as the formal notice of default under the Loan Agreement  We have no alternative but to proceed to exercise our rights and remedies under the Loan Agreement and the related security, if these defaults are not cured  within the time periods specified in the Loan Agreement »

139.    In this letter, Consorcio Barr was also required to remedy all these breaches, to stop the interference of Consorcio Barr in the operations of the Hotel, to provide powers of attorney and insurance coverage as required under the Management Agreement, and pointed out to Consorcio Barr that approximately US$ 880,000.00 of Hotel revenues that should have been deposited in the Hotel Bank Accounts had been removed and had not been applied or disbursed in compliance with article 10.04 of the Management Agreement  A calculation of sums owed by Consorcio Barr and the report mentioned in paragraph 136 above were attached to the letter

---

[30] Doc  C 190

140    In Consorcio Barr's reply of October 15, 2001, signed by its President Carlos L. Barrera[51], there were no specific answers as to the amounts claimed by Four Seasons or the issues raised regarding the deficiencies in the banking arrangements concerning the Hotel operation, the failure of Consorcio Barr to supply working capital for the operations or to provide the Letter of Credit securing such supply. Consorcio Barr's default under the Loan Agreement, or that the conditions to proceed according to section 3.3. thereof in connection with the deposit of the operation proceeds in the Hotel Bank Accounts had not been met.

141.    Although such reply contains a general denial of any interference by Consorcio Barr in the Hotel operations, Consorcio Barr does not deny in such letter that it failed to supply the powers of attorney required under the Management Agreement. Consorcio Barr indicates in this letter that the list of deficiencies in Mr. Goh's report attached to Four Season's letter of October 4, 2001 could apply to any Four Season Hotel and that such deficiencies do not interfere in the proper functioning of the Hotel. However, in its letter, Consorcio Barr does not set forth any specific and substantiated denial of the Hotel deficiencies described in such report, nor does it refute Four Seasons Caracas declaration of an event of default under the Loan Agreement providing for the Investor Loan nor allege that such default, and the other defaults regarding , *inter alia*, the putting in place of the Line of Credit under the Management Agreement, the supply of working capital or the reimbursement of costs and expenses of the Operator, had been cured or remedied

142.    There was no specific denial either of such deficiencies or pending sums owed by Consorcio Barr described in Mr. Sharp's letter of October 4, 2001, in Consorcio Barr's further letter of November 15, 2001 signed by its President, Carlos L. Barrera, to Four Seasons Caracas then General Manager, Mr. Thomas Lind.

(f) Contractual Breaches Attributed by Consorcio Barr to Four Seasons Contractors

143.    However, the November 15, 2001 letter – in which Consorcio Barr reacts to certain judicial notifications from Four Seasons Caracas addressed to Consorcio Barr - contains general allegations as to the non-compliance by Four Seasons Caracas with its obligations to manage the Hotel. Specifically, Consorcio Barr claimed that Four Seasons Caracas or Four Seasons Netherlands failed to (i) provide the letter of credit to secure Deficit Payments of the Operator under article 8.04 of the Management Agreement; (ii) submit an Annual Plan according to article VI of the Advisory Agreement not later than 60 days prior to the scheduled Opening Date; (iii) having spent more than three times the maximum amount needed in cleaning chemicals for the Hotel; and (iv) having incurred in unauthorized expenses and failing to submit the accounting and financial information regarding the operation of the Hotel

---

[51] Doc. C-153.; doc. R-3-15

144.    In further letters of November 21 and December 3, 2001 from Mr. Carlos L. Barrera to Mr. Duwaji, Senior Vice President Finance Operations of Four Seasons Canada[52], Consorcio Barr repeats some of the allegations regarding breaches by Four Seasons Caracas of the Management Agreement formulated in its letter to Mr. Lind. In this letter, Mr. Barrera also alleges that Four Seasons Caracas indulgently incurred in expenses leading to the loss of « hundreds of thousands of dollars » plus financial costs that would derive from Four Seasons Caracas delayed billing practices, which would justify the transaction by transaction approval and expense control carried out by the Owner. Consorcio Barr also denied that the only bank account opened by the Owner for the Hotel operations was not intended to be « for disbursements only » and insisted on its challenge of the reliability of the Hotel monthly financial reports. Such allegations are further considered below.

1. The Posting of the Letter of Credit

145.    Although the Management Agreement indeed provides for the issuance of a letter of credit by Four Seasons Caracas securing the Operator's obligations to make Deficit Payments together with the execution of such Agreement on April 9, 1997, and such letter of credit was not issued then or thereafter, there is no evidence that Consorcio Barr raised such circumstance before its letter of November 15, 2001 mentioned above. It follows that Consorcio Barr did not consider the issuance of such letter of credit – and the enforcement of the Deficit Payments secured through it – to be a pre-condition to the enforcement of its own obligations under the Contracts.

146.    Further confirmation is found in article 8.04 of the Management Agreement, which provides that Deficit Payment amounts equalling a certain level of target net operating profits not attained by the Hotel operations, payable by the Operator and guaranteed by the letter of credit, do not accrue or become payable before the Hotel Opening Date; i.e., when under normal circumstances, the Hotel is opened with a degree of completion reasonably satisfying the Parties' expectations regarding the generation of revenues through its operation and the distribution of fixed expenses, such as administrative expenses and marketing expenditures[53]

147.    As has been already found, when the Hotel opened for business on January 19, 2001, it was far from having reached such level of completion. For that reason, shortly before, on December 22, 2000, Mr. Isadore Sharp sent a letter to Mr. Carlos Barrera[54] indicating that for the purpose of the accrual and making of Deficit Payments, the Opening Date would only occur when all the Hotel's meeting rooms and guest rooms would be operational.

[52] Docs. C-133, C-134

[53] Ferraro T., at 743; Berman WS. at 8-9

[54] Doc. C-301.

148.    There is no evidence of any contemporaneous or reasonably proximate answer from Consorcio Barr addressing this specific point raised in Mr. Sharp's letter, nor has Consorcio Barr denied the relationship between the completion of the Hotel and the coming into effect of the Operator's Payment Deficit undertakings, nor the statement that the level of completion of the Hotel required for such coming into effect would be met when all the Hotel's « meeting rooms and guest rooms are fully operational », or that by the Opening Date (January 19, 2001), such requirement had not been met. Consequently, at least as from December 22, 2000, Consorcio Barr did not object that the Operator's Deficit Payment undertaking would not become enforceable before the date such requirements would have been fulfilled.

149.    Not only posting the letter of credit securing Deficit Payments would have been deprived of any practical meaning or business sense for those reasons, but also because it would have implied charging the operations with an unnecessary cost, since according to article 8.04(b) of the Management Agreement, all costs and expenses arising from, among other things, the issuance of the letter of credit, and representing up to 0.5% per annum of its face amount, is an Operating Expense payable, according to article 10.04 of the Management Agreement, out of the operations' gross receipts.

150.    When the soft opening of the Hotel took place on January 19, 2001, Consorcio Barr had already acknowledged its financial problems adversely impacting its ability to finance the completion of the Hotel, had received the US$ 5,000,000.00 Investor's Loan from Consorcio Barr without apparently overcoming such financial problems and their then actual or potential negative impact on the performance of its contractual obligations, and was already showing marked deficiencies in the compliance of such obligations, either because of its failure to substantially complete the Hotel according to World Class Luxury Hotel standards, its interference in the operation of the Hotel by the Operator, or its failure to abide by the terms and conditions of the Contracts for causing the Hotel to meet such standards. Consorcio Barr's awareness of these circumstances possibly also accounts for its failure to raise any questions relating to the Operator's compliance with its Deficit Payment undertaking or the issuance upfront of the letter of credit guaranteeing it.

151.    Consequently, the Arbitral Tribunal finds that Four Seasons Caracas did not breach article 8.04 of the Management Agreement by not posting the Letter of Credit contemplated therein.


2   Deficiencies in the Recording and Monitoring of Hotel Operation Costs and Expenditures


152.    The Respondent joined to these proceedings witness statements respectively dated May 2 and May 12, 2003 of Mr. José Luis García Montalvo, an accountant who provided auditing and accounting services to Consorcio Barr in connection with the Hotel operations. In such witness statements it is stated that financial reports supplied by Four Seasons Caracas and the accounting records of the Hotel operations or their supporting information were inaccurate or had been manipulated to misrepresent the real costs of food and beverages and the ensuing losses caused

to the Hotel operation, or dissimulate excessive costs that Four Seasons Caracas had failed to detect or tolerated. A concurring statement in this respect is found in the witness statement of Mr. Lautaro Barrera B., Vice-President and member of the board of directors of Consorcio Barr, equally presented by the Respondent, dated May 12, 2003. Numerous correspondence originated in Consorcio Barr or in Mr. Garcia Montalvo and addressed to personnel of the Claimants also refer, sometimes with a certain level of detail, to such irregularities, including the hiding or distortion of information, that would not be properly reflected through the books of account kept, or the financial reports supplied by, the Operator.

153.    However, neither Mr. Garcia Montalvo nor Mr. Lautaro Barrera has been called by the Respondent to testify at the Hearing that took place in Miami, Florida, on September 22-25, 2003, nor were they made available to testify at such Hearing by the Respondent, although the Claimants had requested their presence and the presence of other witnesses also under the control of the Respondent[85]. Thus, none of them has confirmed under oath his respective written witness statements before this Arbitral Tribunal, nor been available for questioning and cross-examination during the Hearing, all factors necessarily weighing against the evidentiary value of their written testimony

154.    Besides, such possible mistakes or deficiencies may be also reasonably attributed in part to the substantial diversion of the Operator's personnel attention towards resolving the immediate problems caused by the failure of the Respondent to discharge its contractual obligations, deficiencies in the banking arrangements, the interference of the Respondent in the Operator's activities and the uncertainty surrounding the performance of the Respondent s obligation to attain the full completion of the Hotel, that disrupted the Hotel's stabilization period characteristically required in the hotel industry after the opening of a new hotel for among other things, adjusting the operation costs and their assessment[86]

155.    The Arbitral Tribunal also notes that the Respondent has not requested in these arbitral proceedings, and in support of its allegations the performance of an independent expert examination of the books, accounts, records and supporting information kept by Four Seasons Caracas in respect of the Hotel operation, nor the production of documents or other evidence showing omissions in the accounting or reporting by Four Seasons Caracas of the Hotel operations, or other recording irregularities attributed by the Respondent to Four Seasons Caracas. The Respondent has not introduced either an action in accounting against Four Seasons Caracas in these proceedings, and there is no evidence that the Respondent has otherwise commenced any such action or obtained any arbitral determination on such matters under the arbitration clause in the Management Agreement.

156.    Consequently, although Consorcio Barr did question the Operator's control, evaluation, recording or information concerning certain Hotel operation costs (i.e., Hotel cafeteria food and beverage costs[87]; cleaning chemical costs [88], rental of linens for banquets[89]), and the Operator

---

[85] Hearing transcript, at 1006-1008

[86] Dunigan T., at 581-582; 588-593. Claver T at 924-925, 987-989; Dunigan Reply WS. at no 6

[87] Letter of Carlos Barrera to Mike Duwan of September 27, 2001, doc R 1 138

acknowledged having incurred mistakes in the monitoring, estimates or calculation of certain of such costs (and in such cases the Operator appears to have reasonably accommodated or attempted to accommodate the Owner's comments or remedied mistakes[90], as the Owner himself recognized in its communication of September 12, 2001 despite its continuous criticism in such letter of what Mr. Carlos L. Barrera characterized as grossly negligent and incompetent local management and non-compliance with Generally Accepted Accounting Practices ( or « GAAP ») Rules[91]), there is no convincing evidence before this Arbitral Tribunal that the Operator systematically or significantly failed to reasonably monitor, evaluate or manage the Hotel costs within its broad powers under the Management Agreement to run the Hotel as a First Class World Luxury Hotel or under the contractual provisions of this Agreement[92], or that any possible deficiencies in that respect were left unremedied or reached the level of a substantial breach authorizing Consorcio Barr to discontinue or pace the performance of its own obligations under the Management Agreement or the other Contracts

157.    Accordingly, the Arbitral Tribunal finds that Four Seasons Caracas did not incur or allow the excessive or unjustified incurrence of costs in connection with the operation of the Hotel.

158.    Under such circumstances, and pursuant to its powers, also acknowledged under section 20 of the Arbitral Tribunal's Procedural Order no. 3 of March 21, 2003, which has not been contested or challenged by the Respondent, the aforementioned written witness statements of Mr. Garcia Montalvo and Mr. Lautaro Barrera do not lead the Arbitral Tribunal to change or depart from its preceding findings; and the Arbitral Tribunal concludes that Four Seasons Caracas did not breach its obligations under the Management Agreement relating to the recording or accounting of the Hotel operations or the management, incurrence or monitoring of expenditures related thereto.

---

[88] Letter of Lautaro Barrera to ECOLAB Inc. of October 30, 2001, doc. R-2-33.

[89] Letter from Carlos L. Barrera to Thomas Lind of November 3, 2001, doc. R-1-134

[90] Ivan Goh's e-mail dated September 7, 2001, doc. C-173, Thomas Lind e-mail of August 31, 2001 to Carlos and Lautaro Barrera, par.4 of « Your Topics »; par 15 of « My Topics », doc. C-184.

[91] Letter of Mr. Carlos L. Barrera to Mr. Isadore Sharp of September 12, 2001, doc. C-168

[92] The letter of Mr. Carlos L. Barrera of September 20, 2001, doc. C-163, is an example of the type of scrutiny regarding the incurrence of costs and expenditures undertaken by Consorcio Barr that cannot be reconciled with Four Seasons Caracas broad authority in that respect in its capacity as Operator under the Management Agreement.

3. Financial Reporting. Access to Accounting Information.

159.    The different circumstances adversely affecting the performance by the Operator of its functions under the Management Agreement regarding the cash and procurement management of the Hotel operations already described also continued to jeopardize the capacity of the Operator's staff to provide financial reporting of the Hotel activities according to the regularity required by the Management Agreement, since the Operator lacked accurate and updated information about the inflow of Hotel operation moneys, the withdrawals actually made by the Owner from the Owner's Bank Accounts out of such moneys and the measure in which such withdrawals were applied to the cancellation of accounts payable originated in the operation of the Hotel.

160.    All such information depended on the supply by Consorcio Barr to Four Seasons Caracas of the bank statements corresponding to the Owner's Bank Accounts[93]. Although the Operator's staff could estimate the inflow of moneys into the Owner's Bank Accounts on the basis of the Hotel invoicing, it could only learn about the actual inflows, as well as the outflows, as reported in the Owner Bank Accounts, if and when the respective Owner Bank Accounts statements were released to the Operator by the Owner. This was the main reason explaining why the Operator was only able to produce on May 18, 2001, the first financial statements corresponding to the Hotel operation for the period elapsed between the Opening Date and April 2001[94], when under normal circumstances such statements should have been released on a monthly basis. Another concurring factor seems to have been that the Assistant Director of Finance, who had been appointed by the Owner on the basis of the Owner's entitlement to do so under the Management Agreement, was inexperienced in the Hotel business and the accounting procedures current in the industry.

161.    The practical upshot of the above was that the Operator encountered and had to attempt to overcome serious difficulties in setting up an efficient accounting and financial reporting system for the Hotel operations, for reasons not attributable to the Operator.

162.    On the other hand, the Arbitral Tribunal has found that the Respondent's allegations that the Claimants have denied access to accounting and other information regarding the operation of the Hotel is not sufficiently supported by the evidence. Although the witness statements of Mr. Garcia Montalvo and Mr. Lautaro Barrera mentioned before also refer to such denial, for the reasons already stated, the Arbitral Tribunal does not consider that such statements have sufficient evidentiary weight to prove that Four Seasons Caracas breached its financial reporting obligations under the Management Agreement, or its obligation to permit the Owner to access the books, accounts and related information concerning the Hotel operation. The record includes the monthly Profit and Loss Statements submitted by the Operator to the Owner under article 10.06(a) of the Management Agreement, and save for the delay in submitting such Statements

_____

[93] Ibidem. Also, Dunigan WS, nos. 25-29.

[94] Dunigan WS, no.36 , Dunigan T  at 605-606.

44

for the first three months of operations, which the Arbitral Tribunal has not found unreasonable under the circumstances affecting the preparation of such Statements the Arbitral Tribunal has not found that the Operator has incurred in other substantial delays, or delays jeopardizing the access of Consorcio Barr to such information

163    In response to Consorcio Barr's allegations regarding deficiencies in the financial reporting of the Hotel operations, which Consorcio Barr blamed on Four Seasons Caracas[95], Michael Duwaji, Senior Vice President Finance, Operations of Four Seasons wrote to Mr. Carlos L. Barrera inviting Consorcio Barr to inspect the accounts on the basis of which the financial reports of the operations were prepared  and have accounts and the books of the hotel reviewed by a leading, internationally recognized, independent and reputable firm of public accountants[96]. Although Consorcio Barr agreed on the need of such audit by an international auditing firm, Consorcio Barr conditioned its agreement on the Operator providing the Owner with the information the Owner considered to be entitled to[97], and also alleged that it had been prevented from carrying out such audit on account of not having received such information[98]. In view of such position, and apparently in order to put an end to what seemed to be an endless and fruitless discussion, Four Seasons Caracas invited once more Consorcio Barr to have the Hotel operation books and records audited by an independent international firm satisfying the Management Agreement requirements, to no avail despite Four Seasons Caracas reiterated offer to make the Hotel operation accounts available to the auditors or Consorcio Barr's representatives[99].

164.    Consequently, the Arbitral Tribunal finds that the Respondent has not discharged its burden of proving in these arbitral proceedings that it was prevented by the Operator from accessing the books and accounts of the Hotel operation or that Consorcio Barr could not access them under the terms and conditions set out in article 11.02 of the Management Agreement, or that such books were not kept in accordance to article 11.01 thereof, or that  Consorcio Barr was thereby prevented from carrying out an annual  audit of the operations, as it was indeed entitled and obligated to do under article  10.06 (b) of the Management Agreement at the end of each Fiscal Year.

165.    According to article 10 06(b) of the Management Agreement, within 60 days after the end of each Fiscal Year, the Owner shall  cause to be prepared and be delivered to the Owner and the Operator a profit and lost statement certified by the Hotel's General Manager and the

---

[95] Letter of Carlos Barrera to Michael Duwaji of November 21, 2001, doc. C-133.

[96] Letter of November 28, 2001, doc. C-137 Also letters of Thomas Lind of December 10 and 12, 2001 to Carlos Barrera indicating that the accounts are available for inspection under the terms contemplated in article 11.02 of the Management Agreement and offering his cooperation to facilitate arrangements permitting to review the accounts without interfering in the Hotel operation: docs. C-123 and C-117.

[97] Letter of Carlos Barrera to Michael Duwaji of December 3  2001, doc. C-132.

[98] E mail of Carlos Barrera to Tomas Lind of March 11, 2002 , doc  C-89

[99] Letter of December 12, 2001 to Mr  Carlos L Barrera, doc  C-117

independent auditors of the Hotel corresponding to such Fiscal Year operations. Although Four Seasons Caracas intimated the Owner in writing to proceed in accordance with this provision in respect of Fiscal Year 2001 and engage to such effect (as provided in such article) KPMG or any other leading internationally recognized independent and reputable firm of certified public accountants[100], there is no evidence of the Owner's compliance with such contractual obligation[101]. Such audit was finally performed at the cost and expense of the Operator[102].

166    Therefore, the Arbitral Tribunal concludes that Four Seasons Caracas is not in breach of its obligations to provide financial reporting and access to accounting information or supporting records under the Management Agreement.

### 4. The Submission/Approval of the First Annual Plan

167.    Consorcio Barr alleges that Four Seasons Netherlands failed to present to Consorcio Barr an Annual Plan for the first year of Hotel operations. According to article 6.01(a) of the Advisory Agreement, the Advisor is to submit to the Owner, for its approval, an Annual Plan comprising a marketing plan, an annual forecast of operations, a projected balance sheet, cash flow budget and source of funds statement, and a capital plan for expenditures on FF&E and any other proposed capital improvements, not later than 60 days prior to the Scheduled Opening Date, and thereafter 45 days before the beginning of each Fiscal Year. However, no evidence has been introduced showing that Consorcio Barr raised, on or after the Hotel Opening Date (January 19, 2001), and before its letter of November 15, 2001, the failure of Four Seasons Netherlands to submit its first Annual Plan Proposal[103].

168    The Claimants have provided evidence that the budget component of the Annual Plan for 2001 was submitted to the Owner as well as successive modifications thereof caused by the frequent re-scheduling of the Hotel's Opening Date resulting from the Owner's failure to complete the Hotel. According to the then Hotel's General Manager, a first budget was presented to Consorcio Barr on or about December 19, 2000[104]. Mr. Giacometti sent to Mr. Carlos Barrera, on February 13, 2001, a revised version of the December 19, 2000 budget[105]. There were several subsequent revisions or adjustments of the 2001 budget as a result of exchanges essentially held

---

[100] Letter of Mr. Thomas Lind to Mr. Carlos L. Barrera of January 17, 2002, doc. C.96

[101] Dunigan T., at 516.

[102] Dunigan T., at 517.

[103] Dunigan T., at 520.

[104] Giacometti WS. No. 50 at 17.

[105] Doc. C-268

with Mr. Lautaro Barrera of Consorcio Barr[106], from which it is evident that Consorcio Barr received the budget component of the Annual Plan corresponding to the first Fiscal Year of Hotel operations, that Consorcio Barr did not raise in any of those opportunities any omission to join to the budget the other components of the such Annual Plan, and that the only concern of Consorcio Barr revealed in such exchanges – consistent with Consorcio Barr's general attitude throughout the Hotel pre-opening phase - was the level of budgeted expenses. Accordingly, although the Parties seem to have finally conceded that it was not meaningful to prepare or argue about budgets before the Hotel's full completion[107], the record proves that Four Seasons Netherlands did not fail to present the budget component of the first Annual Plan as contractually required, that corresponded to the Owner's particular attention paid to the Hotel operations' costs and expenses. The Hotel budgets for 2001 appear to be appropriate according to the practices of the lodging industry and the normal estimates of luxury hotels operating in South America[108].

169.    In any case, according to article 6 01 (a) of the Management Agreement, the central role of the Annual Plan -- as admitted by the Respondent[109]   is to serve as a yardstick permitting to measure whether the Operator exceeds the aggregate of permitted expenditures set out in the Annual plan without the prior approval of the Owner. The Arbitral Tribunal is satisfied, for the reasons already given in this Award, that in practice the Owner already exercised controls on the operations expenditures that went beyond the controls that it would have been authorized to exercise under an Annual Plan issued according to the provisions of the Management Agreement, a circumstance necessarily rendering of relative actual importance the Annual Plan from the perspective of the Owner's avowedly paramount interest in controlling and monitoring the Hotel operations expenditures. In fact, by not approving Annual Plans, Consorcio Barr was in the position of continuing its policy aimed at gaining and exercising total control on the cash management of the Hotel operations and any expenditures and procurement activities related thereto to the detriment of the Operator's contractual rights.

170.    The Claimants did not provide the capital expenditure component of the 2001 Annual Plan – the one corresponding to the first year of operations after the Opening Date. However, such component constitutes a reserve to cover expenditures on repairs or improvements unlikely to be substantial in the first of year of operations since the Hotel is new[110] . Also, according to

---

[106] E-mail of Lautaro Barrera to Yves Giacometti of February 19, 2001, doc C-260 , e-mail of Yves Giacometti to Lautaro Barrera of February 22, 2001, doc. C-258; e-mail from Charles Ferraro to Lautaro Barrera of February 23, 2001; doc. C-256; e-mail from Lautaro Barrera to Yves Giacometti of March 9, 2001, doc C-247; minutes of meeting that included Mr. Lautaro Barrera among the participants, doc C-240; internal e-mail of Yves Giacometti of July 1, 2001; e-mail of Lautaro Barrera to Charles Ferraro of August 3, 2001; doc C-211 Ferraro T., at 749 752.

[107] Ferraro T., 752-755

[108] Berman WS, at 7

[109] Respondent's Reply Memorial of August 15 2003, no 26, at 11

[110] Ferraro T., at 748 749.

article 6.03 (a) (i) of the Advisory Agreement, the Owner approved in advance that 1% of the Gross Receipts during the first Fiscal Year would be applied to cover such reserve for such Year, so that in any event such part of the first Annual Plan had been already contractually pre-agreed[111]. Consequently, it may be concluded that the absence of the capital expenditure calculation is without practical significance. The same may be said of cash flow estimates in view of the volatile nature of the pace of completion of the Hotel and the difficulties of the Operator to obtain sufficient information on the cash management of the Hotel operations[112] that was controlled, for the reasons already described, by the Owner instead than by the Operator.

171.    The Claimants have joined to the record a Marketing Brief[113] and a Marketing Plan 2001[114]. The Respondent denies having received these documents, or that their substance satisfies the requirements of the marketing plan component of the Annual Plan, although without specifying why[115]

172.    Although the Arbitral Tribunal has not found conclusive evidence that the marketing plan component of the Annual Plan has been delivered to Consorcio Barr, the Arbitral Tribunal finds that Consorcio Barr's conduct reveals that Consorcio Barr only assigned importance to the Marketing Plan after November 15, 2001; i.e., as a part of its strategy to oppose the Claimants' allegations of contractual breaches incurred by Consorcio Barr. The fact that Consorcio Barr did not raise the failure by Four Seasons Netherlands to submit the Marketing Plan shortly before or by the Hotel's « soft » Opening Date by when, according to article 6.01 (a) the Advisory Agreement, such Marketing Plan should have been submitted to Consorcio Barr as one of the Annual Plan components – either indicates that such Marketing Plan was actually submitted to Consorcio Barr or that Consorcio Barr was ready to go ahead with the Hotel operations during the first Fiscal Year after the Opening Date without a Marketing Plan.Indeed, inferring the latter seems particularly pertinent, since the serious deficiencies in the Hotel completion by its « soft » Opening Date and thereafter and the ever-present uncertainty as to the Hotel's completion in accordance with the contractual requirements necessarily rendered, at all times, the preparation of any credible and reliable Marketing Plan of the Hotel as a World Class Luxury Hotel an exercise of doubtful practical meaning. For those reasons, the Arbitral Tribunal concludes that Consorcio Barr may not validly invoke the possible or actual failure of Four Seasons Netherlands to present a Marketing Plan for the first Fiscal Year of the Hotel Operations in order to excuse Consorcio Barr's own contractual breaches by claiming that Four Seasons Netherlands, because of such omission, failed to submit the first Annual Plan.

173.    In view of the already described accounting and bank account problems confronted by the Four Seasons Contractors and not attributable to them, and the contemporaneous need to

---

[111] Gómez Tobar T., at 158-161

[112] Dunigan T., at 523-524

[113] Doc C-499.

[114] Doc C-500

[115] Respondent Reply Memorial of August 15, 2003, no. 33 at 13

update the relevant components of the first Annual Plan because of the frequent changes in the scheduled Opening Date of the Hotel or the uncertainty surrounding the Hotel's completion in accordance with the Contracts, for which the Claimants are not held responsible either, the Arbitral Tribunal finds without support the Respondent's position that Four Seasons Netherlands failed to present to Consorcio Barr a first Annual Plan reasonably complete and complying with the contractual requirements as far the circumstances permitted. In addition, the fact that Consorcio Barr went ahead with the Hotel opening on January 19, 2001 – that could not have taken place, according to the Advisory Agreement, without a first Annual Plan approved by the Owner – strongly suggests, not only that such Annual Plan existed and was submitted to Consorcio Barr, but that was approved, or at least not rejected, by Consorcio Barr.

174.    Therefore, the Arbitral Tribunal concludes that neither Four Seasons Netherlands nor any other Claimant involved in the preparation or presentation of the first Annual Plan breached or caused to breach article VI of the Advisory Agreement, and that Consorcio Barr cannot rely on the submission of an incomplete Annual Plan for the first Fiscal Year of Hotel operations, or on the failure of Four Seasons Netherlands to submit an Annual Plan for such period, or on the non-approval by Consorcio Barr of the Annual Plan for the first year of Hotel operations, as an excuse for not performing or having failed to perform Consorcio Barr's own obligations under the Contracts.

175.    Consequently, the Arbitral Tribunal finds that the Claimants have not committed or incurred the contractual breaches alleged by the Respondent and blamed on the Claimants including, without limitation, the breach by Four Seasons Caracas of its management and operating duties under the Management Agreement. Also, the Arbitral Tribunal finds that the Respondent may not validly rely on such alleged breaches to explain or justify the Respondent's failure to perform its own obligations under the Contracts.


(g) The Taking Over of the Hotel Cash Management by Four Seasons Caracas


176.    In December 2001, in the absence of any satisfactory answer by Consorcio Barr to the fundamental breaches of the Contracts and the Loan Agreement attributed to Consorcio Barr in Mr. Sharp's letter of October 4, 2001 to Mr. Carlos Barrera, and in view of the fact that Consorcio Barr had not set up the irrevocable Line of Credit contemplated in the Management Agreement to make up for shortfalls in the funding of the Hotel operation working capital needs, Four Seasons Caracas decided to exercise its contractual rights to have the gross receipts of the Hotel operation directly deposited in the Hotel Bank Accounts. Accordingly, Four Seasons Caracas proceeded to (i) open Hotel Bank Accounts in the name and under the control of the Operator, Four Seasons Caracas C.A., in Banco de Venezuela, where the Owner's Bank Accounts were also held[116] ; (ii) take steps to have all the gross receipts of the Hotel operations directly deposited in the Hotel Bank Accounts (without going first through the Owner's Bank

---

[116] Lind T., at 281 Dunigan T. at 497, 502

Accounts), essentially by directly invoicing the Hotel services under the Hotel's name and no longer under Consorcio Barr's name[117], and gaining control, at the different points of sale located in the Hotel (e.g., the reception, restaurants, sundry shop), over credit card payments by substituting the Operator for Consorcio Barr in the credit card merchant agreements with the different banks controlling the credit card transactions[118], and (iii) effectively gain the general control of the cash management of the Hotel. Consorcio Barr contends that Four Seasons Caracas was not contractually entitled to do so, since according to the Management Agreement the Hotel Bank Accounts belong to the Owner, and that by proceeding in such manner, Four Seasons Caracas illegitimately misappropriated funds belonging to the Owner. Consorcio Barr interprets that the Hotel Bank Accounts, when allowed under the Management Agreement, should be opened in the Owner's, and not in the Operator's, name[119]. The Arbitral Tribunal does not agree with these contentions of Consorcio Barr.

177.    Although the Management Agreement indeed provides that the funds in the Hotel Bank Accounts shall be the property of the Owner (article 8.06), the meaning and scope of such ownership can only be understood by reading this article within the context of other relevant provisions of the Management Agreement.

178.    According to the Management Agreement, the Hotel Bank Accounts are not controlled by the Owner, but by the Operator, who designates who can draw on the Hotel Bank Accounts. Besides, the Hotel Bank Accounts are not opened in the name of the Owner but in the name of the Hotel; i.e., the business or operation of the Hotel Four Seasons Caracas, against the gross revenues of which not only the Owner has claims, but also the Operator and the other Claimants, in the form, for example, of fees, reimbursable costs and expenses.

179.    Pursuant to article 10.04 of the Management Agreement, not only the gross receipts of the Hotel Operation, normally paid into the Owner's Bank Accounts under article 8.05(a) of the Management Agreement, must be deposited by the Owner in the Hotel Bank Accounts, but as a result of the order of priority in the payment of funds set forth in such article 10.04, any ownership righs of the Owner in the cash deposited in the Hotel Bank Accounts is residual; i.e. can only materialize after the claims on the operation gross receipts to be preferentially paid out of such cash have been satisfied.

180     According to article 10.04 of the Management Agreement, such preferential claims belong or correspond to the Operator and other Claimants (e.g., repayment of monies advanced and cost and expenses paid for the operation and interest thereon; certain fees of the Claimants ); to the Hotel business or operation itself (e.g., funding of the Capital Reserve, real property taxes, funding of adequate working capital reserves of the Hotel, certain taxes, fees and insurance premiums); to the providers of funds for the Hotel Operation (e.g., Deficit Payments (funded by either the Owner or the Operator); repayment of certain loans, including the Investor Loan). Only

---

[117] Lind T., at 258. Dunigan T. at 510.

[118] Lind T., at 281. Dunigan T. at 508-509.

[119] Letter of July 18. 2002, from Lautaro Barrera to Craig Reed.

after all these claims have been satisfied, is the Owner entitled to the payment of its return, and eventually, to any balance left in the Hotel Bank Accounts.

181.    Therefore, in its capacity as agent acting on behalf of the Owner,[120] the Operator has the obligation to (i) hold the Hotel Bank Accounts and the cash deposited in them on behalf of the Owner in accordance to article 10.04 of the Management Agreement, as a result of which neither the Operator nor the Owner has exclusive rights on nor claims against such cash, and (ii) release to the Owner such portions of cash in the Hotel Bank Accounts that become due and payable to the Owner under article 10.04 of the Management Agreement after the satisfaction of the priority claims on such cash set forth in such article.

182.    Consequently, the rights of ownership of the Owner on the Hotel Bank Accounts, within the context of the Owner's contractual relationship with the Operator, and in respect of other holders of claims against the Hotel Bank Accounts under the Management Agreement, are limited to, and cannot go beyond, what is provided in the Management Agreement itself. For that reason, the Owner is not contractually entitled to claim absolute or exclusive ownership rights on the funds in the Hotel Bank Accounts or on the gross receipts derived from the operation of the Hotel vis-à-vis the Operator or the Hotel operation itself, as the Owner does in its correspondence with the Operator[121], and as it contends in this arbitration

183.    In view of the failure of the Owner to open the irrevocable Line of Credit required under article 8.01 (b) of the Management Agreement, the Operator was entitled, according to its article 8.05 (b) , and in order to comply with article 10.04 thereof, to take all necessary measures to ensure that

« ...all funds derived from the operation of the Hotel shall no longer be deposited into the Owner Bank Accounts, but shall be deposited into the bank accounts established and maintained in connection with the operation of the Hotel »

184.    To comply with article 8.05 (b) of the Management Agreement, the Operator was also contractually entitled to (i) open bank accounts that would serve as Hotel Bank Accounts under such article, to the extent that the Owner had failed to open Hotel Bank Accounts under the control of the Operator as required by the hotel industry practice for transactions like those covered by the Contracts and the provisions of the Management Agreement, including articles 8.05 (b) and 10.04; and (ii) adopt the necessary measures, and take appropriate steps, to ensure that all sources of funds derived from the Hotel operation, including credit card receipts, are deposited in the Hotel Bank Accounts. As already indicated, and as far as the opening of the Hotel Bank Accounts is concerned, only by March 2001, i.e., approximately two months after the Hotel Opening Date, the Operator had been only provided by the Owner with checkbooks corresponding to a Bolivar-denominated bank account [122]. However, according to the industry

[120] Dunigan T. at 491.

[121] E.g, letters of Mr. Carlos L. Barrera to Mr. Thomas Lind of December 31, 2001, January 3 and 7, 2002 ; docs C-109, C-106 , C-107.

[122] Dunigan T. at 482

practice and the requests of the Operator, the Owner should have provided the Operator with a
Hotel banking operation account in Bolivares, a Hotel banking operation account in USS dollars,
a Hotel banking account to handle payroll payments and a Hotel travel agent commission
account, all of them under the Operator's sole control[123].

185.    Furthermore, the actions taken by Four Seasons Caracas to gain control of the gross
receipts of the Hotel operations and cause them to be deposited in the Hotel Bank Accounts are
also countenanced by its rights as lender of an Investor's Loan to Consorcio Barr under the Loan
Agreement. In view of Consorcio Barr's failure to set up the Line of Credit, article 3.3 of the
Loan Agreement requires that all funds derived from the operation of the Hotel be deposited in
the Hotel Bank Accounts, and not the Owner's Bank Accounts, and authorizes Four Seasons
Caracas to withdraw from such Hotel Bank Accounts any sums due and payable to it under the
Loan Agreement, a right that Four Seasons Caracas was particularly justified in exercising
because of Consorcio Barr's defaults in servicing and repaying the Investor's Loan.

186.    During the period that such Hotel Bank Accounts remained with the Operator, the flows
of cash  corresponding to the Hotel operation gross receipts into them, and the payments and
withdrawals made out of such cash remained under the control of, and were managed by Four
Seasons Caracas (i.e, from  December 1, 2001 until April 18, 2002, when the Owner gained
control of the Hotel Bank Accounts and re-gained control of the cash management of the Hotel
operations pursuant to an order issued by a Venezuelan court[124]). Also during such period,  Four
Seasons Caracas continued to act on behalf and as agent of  the Owner[125], and was, accordingly,
also accountable for such management pursuant to the provisions of the Management
Agreement.

187.    Throughout such period, the Operator continued to supply the Owner with the monthly
profit and loss statements reporting the income obtained from Hotel operations deposited in the
Hotel Bank Accounts and the Hotel operations expenditures covered through withdrawals from
such Accounts, as well as copy of the reports generated by PricewaterhouseCoopers relating to
the disbursements made out of the Hotel Bank Accounts[126]. The Operator retained this
accounting firm, to examine moneys being spent and checks being drawn and  provide some
assurance that such disbursements were in the Hotel's operation normal course of business, and
that their proceeds were not applied to a different end, nor in contravention of the Management
Agreement[127].

---

[123] Claver T., at 932-933.

[124] Lind T., at 295-299, or deposited in them to the payment of fees or reimbursable  costs and
expenses due to them under the Contracts, despite their priority entitlement to them under the
said article 10.04

[125] Dunigan T., at 624.

[126] Lind T., at 283-284

[127] Dunigan T., at 514.

188.    Although not acting in an auditing capacity, PricewaterhouseCoopers on the basis of certain pre-established procedures meeting standards published by the Venezuelan Federation of Public Accountants, reviewed disbursements from the Hotel Bank Accounts, and compared the checks drawn on such accounts with the accounting records of the Hotel operation. The objective of these procedures was to determine if disbursements from the Hotel Bank Accounts corresponded to the respective charges to the accounting ledgers, and to the statements of account issued by the Operator, in order to determine the existence of any discrepancies[128]. Four Seasons Caracas did then observe during the period in which it controlled the Hotel Bank Accounts and the cash management of the Hotel, reporting procedures, including at least those it was obligated to enforce under the Management Agreement[129], permitting to inform Consorcio Barr about the accounts of the operation and the Operator's cash management activity, the composition of the cash inflow, and the expenses paid for with such cash[130].

189.    The Arbitral Tribunal finds that Consorcio Barr has not sustained its burden to prove that during such period, the funds obtained from the operation of the Hotel were either not deposited in the Hotel Bank Accounts or not paid out or applied according to article 10.04 of the Management Agreement. The Arbitral Tribunal has also found that Consorcio Barr has not supplied evidence that would permit to prove that during such period Four Seasons Caracas nor any other Claimant applied operation revenue or cash destined to the Hotel Bank Accounts to obtain the payment of their own fees or the reimbursement of their advances to cover working capital needs, or the payment of their costs and expenses related to the Operation (except for proceeds from certain Hotel operation receivables, that will be considered separately) despite any priority right they might have under the Contracts or article 10.04 of the Management Agreement, or that any Hotel operation gross receipts were deviated to such effect[131].

190.    Finally, Consorcio Barr has not introduced an action or claim in accounting before this Arbitral Tribunal or provided evidence that would permit this Arbitral Tribunal to conclude otherwise or to substantiate Consorcio Barr's allegations as to the unreliability or insufficiency of the financial reporting and other information regarding the Hotel operation provided by Four Seasons Caracas during this period, or that such reporting or supply of information did not meet the standards required under the Management Agreement, nor does Consorcio Barr base such allegations on an independent audit of the operation, the Hotel's books of account, and supporting documentation meeting the requirements of the Management Agreement. Consorcio Barr has not requested either to have an independent expert issue an opinion based on his review of such books or documents, nor required the production of other evidence, such as production of documents, in support of its allegations that such books or reports do not reflect all the operation transactions or the proceeds obtained from such transactions during the period that Four Seasons Caracas controlled the operation's cash management.

---

[128] As the one, for example, corresponding to March 2002; doc. C 70

[129] Lind T. at 282.

[130] Reid T. at 355.

[131] Lind T., at 293; Reid T., at 354; Dunigan T. at 531.

191.   One salient irregularity attributed by Consorcio Barr to Four Seasons Caracas regarding its management of the gross receipts of the operation during this period is the sale by Four Seasons Caracas to the Four Seasons operation of the Hotel Pierre in New York, N.Y., U.S.A., of American Express card receivables corresponding to Bellsouth, one of the important corporate guests of Four Seasons Hotels worldwide[132]. Four Seasons Caracas could not cash American Express receipts in Venezuela because CorpBanca, the local Venezuelan bank exclusively controlling American Express credit card merchant agreements in Venezuela, apparently after consulting with Consorcio Barr, or because influenced by it[133], refused to accept American Express card holder charges for Hotel services submitted by the Operator

192.   It is well-known in the hotel industry, as in a myriad of other industries or commercial activities, that accepting payments for services rendered made through credit cards represents an important part of the gross receipts, and that any interference in such payment mechanism adversely affects the business in question, its appeal to customers or users, and such business' general market outreach  In fact, the American Express credit card receipts represented 75 % of the total gross receipts of the Hotel[134]. In any case, in view of the Owner's obligations under the Management Agreement already described in Chapter II.A of this Award, the conduct of the Owner either impeding the flow of gross receipts to the Hotel Bank Accounts – including when such flow is channelled through the credit card mechanism to the Hotel Bank Accounts · , or the deposit of such receipts in those Accounts, constitutes a fundamental breach by the Owner of the Management Agreement, especially its article 10.04.

193.   Such breach is particularly aggravated because of the Owner's failure to provide the irrevocable Line of Credit covering working capital shortfalls that should have been otherwise funded by the Owner, and that would have permitted to make up for such shortfalls through the infusion of funds into the Hotel Bank Accounts. Absent such Line of Credit, both under the Management Agreement and the Loan Agreement (in the case of the latter, also in view of the defaults incurred by Consorcio Barr in repaying the Investor's Loan), the Owner had the obligation to cause any  Hotel operation gross receipts or proceeds, including proceeds from credit card receivables, to be directly deposited into the Hotel Bank Accounts. The failure of the Owner  to comply with such obligation, also jeopardizing the Operator's ability to operate and manage the Hotel, authorized Four Seasons Caracas, acting as Operator within the context of the broad powers vested in it under the Management Agreement, which are consistent with Four Seasons Caracas rights *qua* Lender under the Loan Agreement in view of Consorcio Barr's defaults and failure to provide the Line of Credit, to do anything necessary to cash such receivables and cause them to be applied as provided in the Management Agreement including, under special circumstances, by selling or discounting them.

194.   Consorcio Barr's failure to honor such obligations is certainly a special circumstance justifying, in the view of the Arbitral Tribunal, the decision of Four Seasons Caracas, particularly

---

[132] Letters of Carlos Barrera of June 5 and 6, 2002 , docs. R-1-29 and R-1-30.

[133] Lind T. at 286, 287, 290

[134] Lind T. at 286.

pursuant to its largely discretionary powers as Operator of the Hotel business under the Management Agreement, to sell and cash the American Express receivables corresponding to the Bellsouth account. Besides, Consorcio Barr has not demonstrated or attempted to demonstrate before this Arbitral Tribunal that such sale was not carried out at arm's length, or that it was subject to conditions with disadvantageous consequences for the Hotel operation (e.g., an excessive discount rate, the payment of exaggerated or artificial commissions), nor that the proceeds of such sale were not applied, in accordance with article 10.04 of the Management Agreement, to reimburse advances made for the Hotel operation ([135]) to be repaid on a priority basis under article 10.04(a) and (b) of the Management Agreement. Under such circumstances, the Arbitral Tribunal is not prepared to find that such sale constituted a breach of Four Seasons Caracas obligations under the Management Agreement.

(h) The Closing Down of the Hotel Operations

195.   After Four Seasons Caracas lost control of the cash management of the Hotel because of the Venezuelan court order referred to in paragraph 8 of this Award, the ability of Four Seasons Caracas to honor the payables of the Hotel met with increasing difficulties in view of Consorcio Barr's renewed control on the flow of funds towards the Operator or bank accounts controlled by the Operator. On the other hand, the Hotel receivables were again directly paid to or collected by the Owner without any control by the Operator on the application of the corresponding proceeds[136].

196.   As a result, vendors, suppliers and employees ceased to be paid. In addition, Consorcio Barr adopted a more hostile attitude towards Four Seasons Caracas, which found expression, for example, through the distribution in the Hotel public areas by Consorcio Barr personnel dressed in paramilitary uniforms of leaflets discrediting the operator Four Seasons Caracas and its senior management team[137]. In parallel, by mid-May 2002, it became apparent that the Owner had decided not to pay for any more Hotel operation bills or, except for a short period, wages[138], although it was collecting the proceeds obtained out of the Hotel operations. Also, Consorcio Barr persevered in its policy of not paying Four Seasons Caracas for housekeeping and valet services provided by the Hotel to the owners of the condominium apartments adjacent to the Hotel out of the condominium fees perceived by Consorcio Barr from such owners[139].

---

[135] Dunigan T. at 652-653. Doc. C-7

[136] Lind T., at 299, 301.

[137] Reid T., at 361 362.

[138] Reid T., at 367, 371 372

[139] Reid T. at 372. Reid WS nos. 21-46.

197    Four Seasons Caracas could continue paying for some time the Hotel's operations bills and the wages of the Hotel personnel. first out of moneys earned during Four Seasons Caracas cash management of the Hotel, and thereafter through the infusion of funds by Four Seasons Canada[140] Nevertheless, in face of the refusal of Consorcio Barr to commit itself to fund the Hotel operations, the approaching depletion of supplies needed for their continuation, and the increasing hostile conduct of Consorcio Barr personnel in the Hotel areas[141]. on June 13, 2002, Four Seasons Caracas notified the cancellation of catering and group events and new Hotel reservations, and the re-location of the existing in-house Hotel guests[142] By mid-June 2002, Four Seasons Caracas also discontinued its services to the condominiums adjacent to the Hotel[143].

198.    Thereafter, Consorcio Barr gradually shut off different sectors of the Hotel and cut services such as cable tv, electricity and telephone. Finally, on July 25, 2002 security guards of Consorcio Barr led by Mr. Lautaro Barrera, evicted the personnel of the Operator from all areas of the Hotel, except the Hotel lobby. This was the final result of a violent episode in which the Consorcio Barr security guards acted in an intimidating and aggressive manner displayed arms, held personnel of the Operator hostage, and clashed with the police that had come to deal with the hostage situation, as a result of which two of those guards were arrested[144] Another consequence of this episode was the closing down of the only two sectors of the Hotel still remaining in operation: the bar and one of its restaurants. As of the date of the Evidentiary Hearing held in Miami on September 22-25, 2003, the Operator's personnel was still and only controlling the Hotel lobby areas, but not the water and electricity supply or telephone service for such areas[145].

199.The evidence establishes that also after April 2002, when it regained the control of the Hotel's cash management, Consorcio Barr continued to breach the Management Agreement and the other Contracts and to fail to observe the good faith and diligent conduct required by articles 1160[146] and 1270[147] of the Venezuelan Civil Code in the performance of contractual obligations.

---

[140] *Ibidem.*

[141] Reid T., at 376-378.

[142] Letter of Thomas Lind to Carlos Barrera of June 13, 2002; doc. C 32

[143] Reid T. at 373.

[144] Reid T., at 385-395.

[145] Moore T., at 411-459, and videotaped evidence produced during the Hearing

[146] Article 1160, Venezuelan Civil Code  « Los contratos deben ejecutarse de buena fe y obligan no solamente a cumplir lo expresado en ellos, sino a todas las consecuencias que se derivan de los mismos contratos, según la equidad, el uso y la Ley »

[147] Article 1270, Venezuelan Civil Code  «La diligencia que debe ponerse en el cumplimiento de la obligación, sea que éste tenga por objeto la utilidad de una de las partes o de ambas partes, será siempre la de un buen padre de familia, salvo el caso de depósito. Por lo demás, esta regla

IV Conclusions Summary

200. The Arbitral Tribunal has determined that Consorcio Barr's contractual breaches consisted of, *inter alia*, the failure to cause the completion of the Hotel as a World Class Luxury Hotel and the failure to fund the Hotel's pre-opening and the Hotel operations or to obtain sufficient financing to such purposes, including the failure to satisfy working capital requirements, as a result of which it became impossible without further advances from the Operator, to continue making even the most basic payments; forcibly excluding the Operator from its peaceful possession of the Hotel, including the utilization of force to evict the Operator's personnel from practically all the Hotel premises, generally excluding, as the case may be, the Operator and the other Four Seasons Contractors from the cash, expenditure and procurement management of the Hotel operations or related thereto, and otherwise interfering in the Hotel pre opening activities of the Four Seasons Contractors and in the carrying out of Four Seasons Caracas duties as Hotel Operator; not depositing in Hotel Bank Accounts the proceeds obtained from the operation of the Hotel and, finally, rendering economically and physically impossible or impracticable the operation of the Hotel by Four Seasons Caracas. Consorcio Barr has equally failed to pay to Four Seasons Caracas and Four Seasons Netherlands fees, or to reimburse the Four Seasons Contractors, when applicable, costs and expenses paid, or advances made, for, or on account of, the Hotel operation. Consorcio Barr is always in default under the provisions of the Loan Agreement and has not repaid the Investor's Loan and interest accrued thereon.

201. The Arbitral Tribunal has found that the Four Seasons Contractors have not incurred in any contractual breach entitling Consorcio Barr not to perform or to discontinue the performance of its own obligations under the Contracts on the basis of their provisions or of Venezuelan law Furthermore, in view of such breaches by Consorcio Barr, that affect its fundamental obligations under bilateral Contracts and interfered with or impeded the performance of the Claimants' obligations thereunder, that largely depended on Consorcio Barr's performance of its own obligations, the Arbitral Tribunal also finds that the Claimants were justified, according to the *exceptio non adimpleti contractus* doctrine accepted by article 1168 of the Venezuelan Civil Code[148], in discontinuing the performance of, or not fully performing, their own obligations under the Contracts, including by closing the Hotel operation

202. Also, because of the contractual breaches incurred by Consorcio Barr and determined in this Award, the Arbitral Tribunal considers that the Claimants are entitled to relief for damages,

---

debe aplicarse con mayor o menor rigor, según las disposiciones contenidas, para ciertos casos, en el presente Código ».

[148] Article 1168 of the Venezuelan Civil Code: " En los contratos bilaterales, cada contratante puede negarse a ejecutar su obligación si el otro no ejecuta la suya, a menos que se hayan fijado fechas diferentes para la ejecución de las dos obligaciones".

other pecuniary relief, declaratory relief and other relief requested by the Claimants in this arbitration.

## V. Relief Granted

(a) Declaratory Relief

203.    The Claimants request this Arbitral Tribunal to declare that the Respondent has breached each and every one of the Contracts. On the basis of the findings and considerations set forth in Chapter III of this Award and the evidence on the record in these arbitral proceedings, including the evidence produced in the Hearing that took place in Miami, Florida, on September 22-25, 2003, the Arbitral Tribunal hereby declares that the Respondent has breached each and every one of the Contracts, including, without limitation, the covenant set forth in all of them generally imposing on Consorcio Barr the obligation to cause the Hotel to be developed, constructed, furnished, equipped, operated, managed, supervised and directed as a World Class Luxury Hotel.

(b) Relief for Damages and Other Pecuniary Relief

204    The Claimants have incorporated into the record a detailed breakdown of their damage claims under the relevant Contracts accompanied by equally detailed information on the contractual basis for the sums claimed and their calculation as of August 31, 2003[149]. The Claimants limit such claim for damages to their entitlement to the payment of fees and the reimbursement of costs, expenses and advances owing to them, plus interest thereon, authorized under the applicable provisions of the Contracts. In the Evidentiary Hearing that took place in Miami, Florida, oral testimony was heard from the Director of Internal and Operational Audit of Four Seasons Canada further explaining the source and calculation of such claims[150]. A detailed breakdown of the amounts claimed by the Claimants is further set out in their Post Hearing Brief[151].

205    Pursuant to article 8.01(a) of the Management Agreement, the Owner is obligated to provide working capital in amounts sufficient to satisfy, *inter alia*, the Hotel's cash requirements

---

[149] Doc C-7.

[150] Dunigan T, at 629 688.

[151] Claimants' Post Hearing Brief of December 1, 2003, at 35-36.

that include the reimbursement to the Operator of working capital advances and operation cost and expenses made or incurred by the Operator, as well as Operating Expenses, referred to in article 10.04 (2) of the Management Agreement

206.   According to article 10.02 of the Management Agreement, the Operator is entitled to the reimbursement of all reasonable costs and expenses incurred by the Operator in the performance of services contemplated by the Management Agreement, which include, without limitation, consultants fees and expenses, out-of-pocket expenses incurred in connection with the performance of the duties of the Operator under such Agreement, and travel expenses and food and lodging for the Operator's personnel. A similar provision is found in the other Contracts, including article 5.06 of the Service Agreement with Four Seasons Canada

207.   Article 10.01 and 10.03 of the Management Agreement provides that the Operator is entitled to be paid a Basic Fee sum equal to 0.1 % of the operations Gross Receipts (as defined in the Advisory Agreement) as compensation for its services as Operator.

208.   Pursuant to article 10.01 of the Advisory Agreement, the Owner shall pay to the Advisor (Four Seasons Netherlands) an Advisory Fee equal to 0.9 % of the Gross Receipts.

209.   According to article 10.02 of the Advisory Agreement, the Owner shall pay to Four Seasons Netherlands an Incentive Fee equal to 10 % of the Gross Operating Profit (as defined in the Advisory Agreement) of each Fiscal Year and 2.5% of the amount by which Gross Operating Profit for such Fiscal Year exceeds 35 % of Gross Receipts for such Fiscal Year.

210.   Under article 8.02 of the Management Agreement, the Operator is entitled to advance funds for the payment of , *inter alia* , working capital that the Owner would have failed to provide under article 8.01(a) of the Management Agreement and emergency expenditures the Operator is required to make under article 6.02 of the Management Agreement or :

« ...for the payment of sums due to a supplier, service contractor or other creditor of the Hotel, if (i) Owner has failed to pay such creditor in a timely fashion, and (ii) such non payment may trigger the imposition of any penalty, cost or liability affecting Operator or the Hotel or, in Operator's opinion, may prevent or hinder Hotel operations or may adversely affect or impair the credit status of Operator or the Hotel.

Under this provision, the Owner shall repay the Operator on demand such advances plus interest thereon.

211.   According to article 11.02 of the Pre-Opening Agreement, the Owner is to reimburse Four Seasons Canada for all reasonable costs and expenses incurred in the services provided by Four Seasons Canada under that Contract.

212.   Pursuant to articles 10.03 and 18.03 of the Management Agreement, 10.04 and 16.03 of the Advisory Agreement, 5.07 (c) of the Services Agreement, and 11.04 of the Pre-Opening Agreement, interest under the Interest Rate shall accrue on certain sums owed or in case of default in the payment of certain sums. The Interest Rate is defined in section (al) of Schedule A of the Advisory Agreement as :

« the annual rate of interest equal to the lesser of (i) the highest rate then currently charged to Advisor and its Affiliates for U.S. Dollar commercial loans by the Bank of Nova Scotia or, if the Bank of Nova Scotia is no longer

their principal lending source, by their pricipal lending source, plus two percent per annum or (ii) the maximum legal rate permitted by Applicable Law »

213   The Arbitral Tribunal is satisfied on the basis of the evidence before it that as of August 31, 2003 (i) Operating expeditures and Operating Expenses amounting to US$ 12,000.00 and US$ 864,400.00 are reimbursable or payable under articles 8.01(a) and 10.02 of the Management Agreement to the Operator Four Seasons Caracas , (ii) cash advances amounting to US$ 1,776,400.00 are reimbursable under article 8.02 of the Management Agreement to the Operator Four Seasons Caracas; and (iii) costs amounting to US$ 344,300.00 are reimbursable under article 11.02 of the Pre-Opening Agreement to Four Seasons Canada

214   The Claimants, in response to a request for clarification from the Arbitral Tribunal issued on February 8, 2004, have explained that although the amounts of US$ 864,400.00 and US$ 1,776,400.00 were advanced by Four Seasons Canada to Four Seasons Caracas, such moneys were actually applied by Four Seasons Caracas to cover costs and expenses relating to the Hotel operation or provide advances in connection therewith. For that reason, Four Season Caracas is entitled to obtain the reimbursement or repayment of such moneys from Consorcio Barr under the provisions of the Management Agreement mentioned immediately above[152]  Consorcio Barr has not brought forward argument or evidence disputing the application of such funds to the Hotel operation in accordance to such provisions. Furthermore, the Arbitral Tribunal is also satisfied on the basis of the evidence produced that the basic fee amounts claimed by Four Seasons Caracas and the advisory fee and incentive fee claimed by Four Seasons Netherlands correspond to services actually rendered by such Four Seasons Contractors under, as the case may be, the Management Agreement and the Advisory Agreement

215.   Accordingly, on the basis of the evidence provided and the considerations and contractual provisions referred to in preceding paragraphs 204-214, the Arbitral Tribunal finds that the Claimants identified below are entitled to the following relief for damages under the relevant Contracts as of August 31, 2003 :

(i) Four Seasons Caracas: US$ 12,000.00 (reimbursable expenditures according to article 10.02 of the Management Agreement); US$ 864,400.00 (Operating Expenses according to articles 8.01(a) and 10.02 of the Management Agreement) : US$ 1,776,400.00 (cash advances according to article 8.02 of the Management Agreement), US$ 10,890.00 (basic fee pursuant to article 10.03 of the Management Agreement);

(ii) Four Seasons Canada : US$ 344,300.00 (reimbursable costs and expenses according to article 11.02 of the Pre Opening Agreement);

(iii) Four Seasons Netherlands  US$ 98,010.00 (advisory fee pursuant to article 10.01 of the Advisory Agreement); US$ 60,500.00 (incentive fee pursuant to article 10.02 of the Advisory Agreement).

216   The Claimants also claim payment of (1) interest accruing on such principal amounts at the Interest Rate until August 31, 2003, plus (2) interest accruing at the Interest Rate on such

---

[152] Claimants' Post Hearing brief, at 35  Claimants' letter of February 17, 2004.

principal amounts and interest amounts accrued thereon until August 31, 2003, such interest to be computed between September 1, 2003 and the date of this Award, plus (3) post judgment interest on all such principal and accrued interest amounts[153]. However, the Claimants have not supplied the information on the basis of which interest at the Interest Rate has been established and calculated, nor substantiated the point in time on which the respective claimed principal amounts became due and payable. Furthermore, the Arbitral Tribunal does not consider it appropriate to allow for the calculation of interest on accrued interest amounts, which does not appear to have been consented to by the Parties[154] and that is not based on any Venezuelan law provisions invoked by the Claimants. Consequently, the Arbitral Tribunal determines that pre-award and post-award simple interest at the Interest Rate shall accrue as permitted under the relevant Contract on principal amounts due and payable to any of the Claimants under such Contract since such amounts became due and payable thereunder until all such unpaid principal amounts shall have been repaid in their entirety to the Claimant entitled to their payment according to this Award.

217.    The Respondent has not provided any specific or convincing argument (e.g., in the Hearing held in Miami, Florida on September 22-25, 2003, or through a Post-Hearing Brief), or convincing evidence in this arbitration, that has cast doubt or that could permit the rejection of the Claimants' calculation of the principal amounts due or the entitlement of each Claimant to the sums respectively assignable to each Claimant according to the breakdown referred to in paragraph 215 above; and the Arbitral Tribunal has no reason to believe that the interest rate applied to outstanding amounts as indicated in preceding paragraph 216 is excessive according to any Applicable Law, as this term is defined in the Advisory Agreement[155]. Thus, the Arbitral Tribunal is satisfied that damage amounts claimed under the Contracts and their assignment in this Award to the relevant Claimant, as granted by the Arbitral Tribunal, are supported by the relevant provisions in the Contracts and the arbitral record.

218.    Four Seasons Caracas also claims the payment of principal and interest amounts due and payable and outstanding under the Investor Loan provided to Consorcio Barr pursuant to the Loan Agreement.

219.    The Arbitral Tribunal is satisfied that it has jurisdiction to hear and decide on Four Seasons Caracas claims under the Loan Agreement against Consorcio Barr pursuant to the

---

[153] Claimants' Post-Hearing brief, at 41.

[154] Florida International Arbitration Act, Section 684.18 : « The arbitral tribunal may award interest as agreed to in writing by the parties or, in absence of such agreement, as the tribunal deems appropriate ».

[155] "All laws, statutes, regulations, codes, by laws, ordinances, treaties, order, judgments, decrees, directives, rules, guidelines, orders, policies, and other requirements of any Governmental Authority having jurisdiction, whether or not having the force of law". Governmental Authority is, *inter alia*, that of any government, whether federal, provincial, state, county municipal or other.

arbitration clauses found in the Contracts and, particularly, article 19.03 of the Management
Agreement, for the following reasons.

220     The record and the text of the Loan Agreement prove that the latter only evidences
modifications of the contractual undertaking of Four Seasons Caracas under article 8.03 of the
Management Agreement to provide financial support aimed at (1) providing funds for the
construction of the Hotel; or (2) reducing other financial constraints on the Owner that could
adversely affect the availability to the Owner of financial resources for the completion of the
Hotel. Clearly, the Loan Agreement is an ancillary agreement to the Management Agreement
and the other Contracts, since its only aim is to facilitate or make possible the compliance by the
Owner of its obligations covenanted in each of the Contracts to cause the construction,
furnishing and equipping of the Hotel as a World Class Luxury Hotel.

221     The ancillary nature of the Loan Agreement is confirmed by the interrelationship
between the provisions and definitions found in the Loan Agreement and in the Management
Agreement and the direct connection between certain basic aspects of the Management
Agreement and the Loan Agreement that have a bearing on the repayment of the Investor Loan.
Not only both parties to the Management Agreement are also parties to the Loan Agreement, but
also, the repayment of the Investor Loan is primarily based on gross receipts available from the
operation of the Hotel distributed from the Hotel Bank Accounts according to the order of
priority set out in article 10.04 of the Management Agreement, and the occurrence of a
Repayment Event (defined in the Loan Agreement as including, *inter alia,* the expiration of the
Contracts for any reason whatsoever, and the Opening Date not occurring on or before December
31, 2000) renders all moneys owing under the Loan Agreement immediately due and payable.
Besides, according to article 3.3 of the Loan Agreement, the absence or insufficiency of the Line
of Credit to be provided by the Owner according to the Management Agreement triggers an event
of default under the Loan Agreement allowing Four Seasons Caracas, *qua* lender thereunder, to
gain control over the funds in the Hotel Bank Accounts and obtain the repayment of any
outstandings plus interest thereon under the Loan Agreement out of the Hotel operation gross
receipts deposited in such Accounts. Also, like the Contracts the Loan Agreement (article 1.8) is
governed by Venezuelan law

222     On the basis of the above considerations, the Arbitral Tribunal is satisfied that the Loan
Agreement is a part of the one and single contractual structure including the Contracts and the
Loan Agreement, the main purpose of which was to transform the Hotel into, and operate it as, a
World Class Luxury Hotel. Under these circumstances, the fact that the Loan Agreement lacks a
dispute resolution provision and that the Respondent has not raised objections to the jurisdiction
of this Arbitral Tribunal to hear and decide disputes relating to the Loan Agreement on the basis
that it does not expressly contain an arbitration clause like the one found in the Contracts, can
only lead to the conclusion that any claims, differences or disputes arising under the Loan
Agreement are subject to resolution under the symmetrical arbitration clauses found in the
Contracts, including article 19.03 of the Management Agreement.

223     According to article 4.3 of the Loan Agreement, Four Seasons Caracas as Lender is
entitled to an Investor's Return (as defined therein). Under article IX of the Loan Agreement
Four Seasons Caracas is entitled in case of an Event of Default (as set forth therein) to the
repayment of all principal outstandings, Investor Return and interest thereon at the compounded

interest rate set forth in article 4 2 of the Loan Agreement, plus default interest at the Default Rate on overdue amounts as provided in article 10.02 of the Loan Agreement.

224. Since Consorcio Barr has not (1) denied that it has received the Investor Loan for the full principal amount set out in the Loan Agreement, (2) denied or produced or attempted to produce any evidence that such principal amount and any interest thereon are not due and payable, or (3) alleged or proved that such principal amount or interest has been repaid to Four Seasons Caracas in full or in part in accordance to the Loan Agreement, Consorcio Barr shall pay to Four Seasons Caracas the principal amount of US$ 5,000,000 00 loaned to Four Seasons Caracas under the Loan Agreement and any other overdue amounts payable therunder, plus, until such amounts shall have been paid or repaid in full to Four Season Caracas, pre-award and post-award interest thereon at, as the case may be, the contractual and default interest rates provided for in the Loan Agreement, and as each such rate may apply according to the latter's provisions. According to Schedule « A » of the Loan Agreement, the interest rate is « the annual rate of interest charged from time to time to Four Seasons Caracas by its principal lending source for United States Dollar commercial loans made to the Lender »; and the default rate means such interest rate plus 2% per annum.

225. The above does not extend to the Investor's Return (if any) since it has not been claimed by Four Seasons Caracas.

226 However, the Arbitral Tribunal does not accept the Claimants' claim amounting to US$ 200,000.00 « on account of attorneys fees and costs incurred by Four Seasons to defend actions in the national courts of Venezuela which were improperly brought by Consorcio Barr in contravention of the language of the Hotel Agreements, and of the Partial Award dated October 10, 2002 »[156], in absence of sufficient evidence brought to this arbitration substantiating such amounts[157].

## (c) Permanent Relief-Specific Performance

227. The Claimants request from the Arbitral Tribunal (i) an order permanently enjoining Consorcio Barr and its officers, directors or agents from interfering with the management of the Hotel; and (ii) an order requiring Consorcio Barr to specifically perform all of its obligations under the Contracts.

228 The Arbitral Tribunal considers the permanent relief requested by the Claimants as closely related to (although not identical with) the demand for specific performance of the

---

[156] Claimants' Post-Hearing Brief, at 41

[157] The witness Enrique Lagrange estimated such fees in the range of US$150,000 US$ 200,000 (Spanish language transcript of his testimony in the Miami Hearing on September 24, 2003, at 78), but there is no evidence produced in support of any of these or other amounts

obligations of the Respondent under the Contracts, equally requested by the Claimants. In any case it should be clear that were the Arbitral Tribunal to order the specific performance of the Contracts, the Respondent should abstain from conduct interfering in the management of the Hotel within the scope of its obligations under, for example, the Management Agreement. For this reason, the Arbitral Tribunal will first consider the Claimants' application for specific performance.

229.    In order to determine if specific performance of the Contracts is to be granted, the Arbitral Tribunal considers that it must take into account the applicable provisions of the laws of Venezuela, that constitute the proper law of the Contracts pursuant to the will of the Parties thereto.

230.    According to Venezuelan law (article 1264, Civil Code) obligations must be performed as undertaken. Thus, specific performance becomes the normal and natural way to discharge contractual obligations[158]. Venezuelan authors distinguish specific performance from compulsory performance or *ejecución forzosa*. While the former requires the discharge of the obligation in question by performing it as it was contracted for, the latter is present only when the obligor is compelled by the public authority to perform its obligations, as contracted for or otherwise[159].

231.    Only exceptionally is specific performance not considered as the natural remedy in case of contractual breach under Venezuelan law. In the view of the Arbitral Tribunal, the only exception under Venezuelan law relevant for this arbitration is when the obligor refuses to perform the obligation in question and, because of its characteristics, such obligation can only be discharged by the original obligor (because the obligee was relying on the special and irreplaceable personal abilities of the obligor for the performance of the obligation at stake, obligation *intuitu personae*); or when, although the obligation is not *intuitu personae*, its performance depends so much on the personal ability of the obligor, that its specific performance becomes almost impossible if the obligor refuses to perform. In addition, specific performance is not favored under Venezuelan law if the obligee would lack a legitimate interest in the specific performance of the obligation[160].

232.    The Arbitral Tribunal does not find that Consorcio Barr's obligations under the Contracts are *intuitu personae*, or of such personal nature that they would necessarily require their performance by Consorcio Barr. The Arbitral Tribunal also finds that the Claimants have a legitimate and serious interest in the specific performance of the Contracts by, or in respect of, Consorcio Barr, among other things, because the Claimants have committed their personal name, expertise and reputation to the starting up, launching in the market and operation of the Hotel – and no other hotel – as a World Class Luxury Hotel, and legitimately relied on the long term

---

[158] Article 1.264, Venezuelan Civil Code: "Las obligaciones deben cumplirse exactamente como han sido contraídas. El deudor es responsable de daños y perjuicios en caso de contravención".

[159] E. Maduro Luyando & E. Pittier Sucre, I Curso de Obligaciones, at 99 (2002)

[160] E. Maduro Luyando & E. Pittier Sucre, I Curso de Obligaciones, at 88-96 (2002)

operation of such Hotel — and no other hotel – to firm up such presence and reputation, not only in Venezuela, but also in the South American market — and no other country or market —, and to profit thereby[161].

233.   The Claimants have sufficiently evidenced the seriousness of such interest by persisting in the operation of the Hotel and insisting on its completion, rather than terminating the Contracts, despite the obstacles raised by the Respondent[162], until such point in time where such obstacles finally rendered such operation, not only impracticable, but virtually impossible. Under such circumstances, the Arbitral Tribunal is prepared to grant the specific performance of the Contracts requested by the Claimants together, for the reasons already put forward, with permanent relief enjoining the Respondent, so long as the Contracts shall remain in force, from interfering in the management of the Hotel.

234   The Claimants also apply for a declaration of non-liability on the part of the Claimants in respect of a counterclaim presumably submitted in this arbitration by Consorcio Barr against the Claimants. Although Consorcio Barr has referred in general terms to amounts that would be owed to Consorcio Barr by the Claimants, the Arbitral Tribunal has been unable to identify any counterclaim filed by Consorcio Barr in these arbitral proceedings, nor argument or evidence concretely presented by Consorcio Barr in the form of a counterclaim, nor has the Arbitral Tribunal any evidence before it indicating that a counterclaim has been introduced in this arbitration at the procedural juncture and in compliance with the requirements set out in R-4(b) of the 2000 Rules. Consequently, the Arbitral Tribunal is not prepared to make such declaration.

235.   In view of the breaches of the Contracts determined in this Award, for all of which Consorcio Barr is exclusively responsible, Consorcio Barr shall bear and pay all legal fees and costs related to these Arbitral Proceedings, including arbitrator fees and any ICDR fees, but excluding the legal fees of the Claimants in view of article 19.03(d) of the Management Agreement and symmetrical provisions found in the other Contracts, which establish that each party shall be responsible for its own legal fees.


VI  Decision


236   The Arbitral Tribunal declares, on the basis of findings of the Arbitral Tribunal and evidence produced in this Arbitration, including evidence produced in the Hearing that took place in Miami, Florida, U.S.A. on September 22-25, 2003, that was properly notified to Consorcio Barr S.A. and in which Consorcio Barr S.A. was given full opportunity to participate, that Consorcio Barr has breached each and every Contract.

---

[161] Mr. Amsterdam's Closing Argument, transcripts of the Hearing that took place in Miami, Florida on September 22-25, 2003, at 1060-1061

[162] Ferraro T., at 761-767; 781-783; 792-793.

237    The Arbitral Tribunal decides that the Claimants are entitled to the specific performance of the Contracts. Consorcio Barr S.A. is ordered to specifically perform all its obligations under the Contracts and, so long as the Management Agreement shall remain in force. Consorcio Barr S.A. (1) is permanently enjoined from directly or indirectly interfering in the management of the Hotel; and (2) shall cause its officers, directors or agents not to interfere in such management.

238.    Within thirty (30) days from the date of transmittal of this Award to the Parties, Consorcio Barr S.A. shall pay damages to the Claimants, as follows:

a) To Four Seasons Caracas C.A., the sum of US$ 12,000.00 pursuant to article 10.02 of the Management Agreement, the sum of US$ 864,000.00 pursuant to articles 8.01(a) and 10.02 of the Management Agreement; the sum of US$ 1,776,400.00 pursuant to article 8.02 of the Management Agreement; and the sum of US$ 10,890.00 pursuant to article 10.03 of the Management Agreement.

b) To Four Seasons Hotels Limited, the sum of US$ 344,300.00 pursuant to article 11.02 of the Pre-Opening Agreement.

c) To Four Seasons Hotels and Resorts B.V., the sum of US$ 98,010.00 pursuant to article 10.01 of the Advisory Agreement, and the sum of US$ 60,500.00 pursuant to article 10.02 of the Advisory Agreement

239    Within thirty (30) days of the transmittal of this Award to the Parties, Consorcio Barr S.A. shall repay to Four Seasons Caracas C.A. the full principal amount outstanding of the Investor's Loan equal to US$ 5,000,000.00.

240.    Consorcio Barr S.A. shall pay to the relevant Four Seasons Contractor identified above pre-award and post-award simple interest on the principal amounts due and payable under paragraph 238, from the date such amounts became due and payable until full payment of such amounts to the respective payee set forth in the aforesaid paragraph, at an interest rate equal to the Interest Rate set out in the Advisory Agreement.

241.    Consorcio Barr S.A. shall pay to Four Seasons Caracas C.A. pre-award and post-award interest on the principal amounts due and payable under the Loan Agreement set forth in paragraph 239 above and on any other overdue amounts payable under the Loan Agreement, which shall accrue, as established in the Loan Agreement, and as the case may be, at the interest rate and Default Rate set forth therein, until all such amounts shall have been paid or repaid in full to Four Seasons Caracas C.A.

242.    The compensation and expenses of the arbitrators totaling TWO HUNDRED FORTY TWO THOUSAND SIX HUNDRED THIRTY FOUR DOLLARS AND FORTY THREE CENTS (US$ 242,634.43) shall be borne by Consorcio Barr S.A. Therefore, Consorcio Barr S.A. shall pay to the CLAIMANTS the sum of TWO HUNDRED FORTY TWO THOUSAND SIX HUNDRED THIRTY FOUR DOLLARS AND FORTY THREE CENTS (US$ 242,634.43) for that portion of its share of arbitrator compensation and expenses previously advanced by the CLAIMANTS to ICDR (AAA).

243.    The administrative fees and expenses of the ICDR (AAA) totaling ELEVEN THOUSAND ONE DOLLARS ( US$ 11,001 00)  shall be borne by Consorcio Barr S.A. Therefore, Consorcio Barr S.A. shall pay to the CLAIMANTS the sum of ELEVEN THOUSAND ONE DOLLLARS (US$ 11,001 00) for that portion of its share of administrative fees previously advanced  by the CLAIMANTS to ICDR (AAA).

244.    Each Party shall be responsible for its own legal fees.

This AWARD is in full settlement of all claims submitted to this Arbitration.

We hereby certify that,for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Miami, Florida, USA.

March 17 2004
-----------------
Date

March 17, 2004
-----------------
Date

-----------------
Date

Dr. Horacio A. Grigera Naón

John H. Rooney, Esq.

José Maria Abascal, Esq.

State of Florida      }
County of Dade        } SS

I, Horacio A. Grigera Naón, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument, which is my Award.

March 17, 2004
-----------------
Date

Horacio A. Grigera Naón

OFFICIAL NOTARY SEAL
ELIZABETH MORFA
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD146332
MY COMMISSION EXP. SEPT 2,2006

67

State of ꞏꞏꞏꞏ         }
County of Dade       }SS :

I, John H. Rooney, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is my Award

_____          _____
         *March 17, 2004*                        John H. Rooney
         Date

OFFICIAL NOTARY SEAL
ELIZABETH MORFA
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD146332
MY COMMISSION EXP. SEPT 2,2006

State of              }
County of             }SS :

I, José M. Abascal, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is my Award.

_____          _____
         Date                                    José M. Abascal

68



administrative fees and expenses of the ICDR (AAA) totaling ELEVEN
AND ONE DOLLARS ( US$ 11,001.00) shall be borne by Consorcio Barr S.A.
Consorcio Barr S.A. shall pay to the CLAIMANTS the sum of ELEVEN
THOUSAND ONE DOLLLARS (US$ 11,001.00) for that portion of its share of adminstrative
fees previously advanced by the CLAIMANTS to ICDR (AAA)

244.    Each Party shall be responsible for its own legal fees

This AWARD is in full settlement of all claims submitted to this Arbitration.

We hereby certify that,for the purposes of Article 1 of the New York Convention of 1958 on the
Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Miami,
Florida, USA.

---------------------------------                    ------------------- ------------------ --- ------
        Date                                         Dr. Horacio A. Grigera Naón


-----------------------------------                  ------------------------------------- ----------
        Date                                         John H. Rooney, Esq.


MARCH 18, 2004
        Date                                         José María Abascal, Esq.


State of              )
County of             ) SS :


I, Horacio A. Grigera Naón, do hereby affirm upon my oath as Arbitrator, that I am the
individual described in and who executed this instrument, which is my Award

---------- ---------------------                     -------- -----------------------------------
        Date                                         Horacio A. Grigera Naón

67



```
                                }
                                }SS :
```

I, John H. Rooney, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award

```
--------------------------------          ------------------------------------
          Date                                  John H. Rooney
```

State of ⟍ }
County of ⟍ }SS : MEXICO CITY, MEXICO

I, José M. Abascal, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award

```
MARCH 18, 2004                            _____
----------------------------                  José M. Abascal
          Date
```





68

EMILIANO ZUBIRIA MAQUEO, Notario Veinticinco del Distrito Federal, C E R T I F I C O:- - - - - - - - - - - - - - - - Que el Licenciado JOSE MARIA ABASCAL ZAMORA, a quien conozco personalmente, reconoció como suya la firma que calza el presente documento, declaró que conoce en todos sus términos el contenido del documento y en lo que éste consiste, y manifestó bajo protesta de decir verdad y advertido de las penas en que incurren quienes declaran con falsedad ante notario, que es la firma que utiliza y acostumbra a usar en todos los actos jurídicos que celebra.- Lo anterior se hizo constar en el acta número cuarenta y nueve mil ciento cuarenta y cuatro, en razón de lo cual expido la presente certificación, en una foja útil, a diecinueve de marzo del dos mil cuatro.- Doy Fe.- - - - - - - - - - - - - - - - - - -



JS 44
(Rev. 12/96)

04 20673

# CIVIL COVER SHEET

CIV-MOORE

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Four Seasons Hotels, Ltd.; Four Seasons Hotels and Resorts,
B.V.; and Four Seasons Caracas, C.A.

## DEFENDANTS

Consorcio Barr, S.A.

MAGISTRATE JUDGE
O'SULLIVAN
Venezuelan Corp.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Canadian Corp.
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
        TRACT OF LAND INVOLVED.

*Dade 04-20673cv Kmm/Sullivan*

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Albert J. Xiques, Esq., Rodriguez & Machado, P.A.
101 Madeira Avenue, Coral Gables, FL 33134
(305) 377-1000

ATTORNEYS (IF KNOWN)

04 MAR 24

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
    Plaintiff

☒ 3 Federal Question
    (U.S. Government Not a Party)

☐ 2 U.S. Government
    Defendant

☐ 4 Diversity
    (Indicate Citizenship of Parties
    in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    another district
    (specify)

☐ 6 Multidistrict
    Litigation

☐ 7 Appeal to District
    Judge from
    Magistrate
    Judgment

NIGHT BOX
MAR 22 2004

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | PERSONAL INJURY | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | ☐ 362 Personal Injury - Med Malpractice | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury Product Liability | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability |  | B☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability |  | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | A LABOR | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | A LABOR | B SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: |  | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | A☐ 540 Mandamus & Other |  | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property |  | A☐ 550 Civil Rights |  |  |  |
|  |  | B☐ 555 Prison Condition |  |  |  |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

9 U.S.C. § 201, et seq.; Motion to Confirm and Enforce non-domestic arbitration award pursuant to New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $
$8,419,735.43 + simple interest

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) (See instructions)
IF ANY

JUDGE  K. MICHAEL MOORE

DOCKET NUMBER  02cv23249 & 01cv4572

DATE
Mar. 22, 2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT $150.00  APPLYING IFP _____  JUDGE 898729  MAG. JUDGE _____

03/23/04